UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:

TINTO HOLDING LTDA.,                                    Chapter 15
                                                        Case No.: 23-11719-MAM
      Debtor in a Foreign Proceeding.
_____/

DELOITTE TOUCHE TOHMATSU
CONSULTORES LTDA., solely as Judicial
Administrator and foreign representative of
TINTO HOLDING LTDA.,
      Plaintiff,
                                                        Adv. Case No. _____
v.

COLORADO INVESTMENT HOLDINGS
LLC, J&F INVESTIMENTOS S.A., JJMB
PARTICIPAÇÕES LTDA., and WWMB
PARTICIPAÇÕES LTDA.,
      Defendant.
_____/

## COMPLAINT

      Plaintiff Deloitte Touche Tohmatsu Consultores Ltda., solely as Judicial Administrator

and foreign representative of Tinto Holding Ltda. ("Tinto"), brings this Complaint against

Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB Participações

Ltda., and WWMB Participações Ltda.

## NATURE OF THE ACTION

      1.     Plaintiff seeks to recover an ownership interest in JBS S.A. ("JBS") that

Defendants unlawfully obtained from Tinto, a Brazilian agribusiness company.  When obtained

by Defendants, Tinto's interest in JBS was worth approximately R$8.76 billion (USD$4.84 billion).[1]

2.      Tinto should have obtained a large share of JBS by merging its greatest asset—a majority equity stake in Bertin S.A., a large Brazilian meat-processing company—with JBS.  But through a series of transactions between 2009 and 2014 connected to that merger, Defendants siphoned significant value out of Tinto, to the detriment of Tinto's estate and creditors.

3.      Defendants Colorado Investment Holdings LLC ("Colorado") (formerly known as Blessed Holdings LLC); J&F Investimentos S.A. ("J&F") (formerly known as J&F Participações S.A.); JJMB Participações Ltda. ("JJMB"); and WWMB Participações Ltda. ("WWMB") engineered the transactions that drained Tinto of its value for Defendants' benefit.  Colorado still has the shares that it took from Tinto.  J&F has since transferred its shares to JJMB and WWMB.

4.      Mainly because of these transactions, which stripped away Tinto's most critical asset, a Brazilian bankruptcy court placed Tinto into liquidation on November 29, 2018.  That court appointed Plaintiff as Tinto's judicial administrator.  On May 24, 2023, that court authorized Plaintiff to bring this suit.

5.      Plaintiff now brings claims for unjust enrichment, aiding and abetting breach of fiduciary duty, and claims under the Brazilian Bankruptcy Law and the Brazilian Civil Code, including claims under Article 129, VI, of the Brazilian Bankruptcy Law (transfer of establishment); Articles 166 and 167 of the Brazilian Civil Code (null and void transaction); Articles 186, 187, and 927 of the Brazilian Civil Code (illicit acts); and Article 884 of the Brazilian Civil Code (unjust enrichment) to recover from Defendants the shares they wrongfully

---

[1] Plaintiff provides approximate conversions of monetary figures from Brazilian reals into U.S. dollars (using the historic conversion rate on or about the relevant dates at issue) only for the Court's convenience.

obtained and the tax liability Tinto incurred as a result.  Plaintiff also brings a veil-piercing claim

under Article 50 of the Brazilian Civil Code and Article 82-A of the Brazilian Bankruptcy Law

to hold Defendants liable for the debts of Tinto's creditors.

## PARTIES

6.      Plaintiff Deloitte Touche Tohmatsu Consultores Ltda. has its principal place of

business at Av. Chucri Zaidan, 1240 - 4º / 12º Andar - Chácara Santo Antônio (Zona Sul), São

Paulo, 04711-130, Brazil.  It appears solely as judicial administrator and foreign representative

of Tinto.  Brothers Silmar Bertin and Natalino Bertin managed Tinto until the Brazilian

bankruptcy court appointed Deloitte as Tinto's judicial administrator on November 29, 2018.

7.      Defendant Colorado Investment Holdings LLC is a limited-liability company

organized and existing under the laws of the State of Delaware.

8.      Defendants J&F Investimentos S.A., JJMB Participações Ltda., and WWMB

Participações Ltda. are Brazilian entities.  Both JJMB and WWMB hold interests in J&F.

9.      J&F, JJMB, and WWMB all indirectly hold (or held during the events described

below) significant stakes in major U.S. companies, including Smithfield Beef Group Inc., Swift

& Company, and Pilgrim's Pride Corporation.  On information and belief, certain directors and

officers of these Defendants traveled to the U.S. numerous times to conduct business, including

with J.P. Morgan in New York, in their capacities as directors and officers of J&F, JJMB, and

WWMB.

## RELEVANT NONPARTIES

10.     JBS S.A. is a Brazilian agribusiness company.  At all times during the events

described below, J&F held a significant direct stake in JBS.

11.     The Batistas are a family of sophisticated Brazilian businessmen.  Members of the

Batista family are the ultimate beneficial owners of Colorado, J&F, JJMB, and WWMB.  Until

2014, the Batista family owned, in the aggregate, a majority stake in JBS.  Since then, they have continued to be the largest shareholders of the company.  Members of the Batista family have held director and officer positions in each Defendant and JBS.

12.    ZMF Fundo de Investimento em Participações ("ZMF FIP") is another Batista-owned fund that appears in several transactions detailed below.

13.    Bertin S.A. was a Brazilian agribusiness company indirectly owned, through Tinto, by brothers Silmar Bertin and Natalino Bertin and their families.  Tinto's equity stake in Bertin S.A. was its most significant asset.

14.    Silmar Bertin and Natalino Bertin are Brazilian nationals who, alongside their families, will be referred to as the "Bertins."  The Bertins founded, own, and manage a large Brazilian conglomerate operating in multiple sectors, including agriculture, energy, and infrastructure.

15.    Specific corporate entities beneficially owned by the Bertins that are relevant to this Complaint include:  (i) the Bertin family's main holding company, Heber Participações S.A. ("Heber"); and (ii) two other agribusiness companies, Comapi Agropecuaria S.A. ("Comapi") and Mafrip Matadouro Frigorífico Rio Pardo S.A. ("Mafrip").

## JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1334(b), as this is a civil proceeding related to a case under title 11, Case No. 23-11719-MAM (Chapter 15), and the outcome of this proceeding substantially affects Tinto's estate.[2]

---

[2] Plaintiff does not consent to entry of final orders or judgment by the bankruptcy court.

17.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1409(a) because Plaintiff is a foreign representative in a chapter 15 proceeding under title 11 in this District.

**STATEMENT OF FACTS**

18.     The facts described in this Complaint were extracted from Tinto's books and records, public documents, third party testimony in other proceedings, and other public records, and may not reflect the completeness of the facts described herein.

**I.     Background.**

19.     José Batista Sobrinho, patriarch of the Batista family, founded JBS in 1953.  It has grown ever since.  Today, JBS operates globally—including in the United States—and is among the world's largest meat-processing companies.  José Batista Sobrinho has several children, including Joesley Batista and Wesley Batista, who have helped run the company.  Since JBS's founding, the number of entities owned by and affiliated with the Batistas has grown to include—among many others—Defendants Colorado, J&F, JJMB, WWMB, and non-party ZMF FIP.

20.     During the late 2000s, the Batistas led JBS on a spree of international expansion. JBS bought a series of agribusiness and meat-processing companies across the globe, including the U.S.-based companies Smithfield Beef Group Inc., Swift & Company, and Pilgrim's Pride Corporation.

21.     Many of these acquisitions relied on funding from BNDES Participações S.A. ("BNDES"), Brazil's National Bank for Economic and Social Development.  BNDES funding helped the Batistas and JBS acquire Bertin S.A. in 2009—the transaction that lies at the heart of this Complaint.

22.     The Bertins incorporated Bertin S.A. in October 2007.  Shortly after, the Bertins

directed Tinto (then known as Bracol Ltda.) to transfer all its operating assets to the newly

formed Bertin S.A. At the time, Tinto held a large meatpacking business and about R$1 billion

(USD$550 million) in agricultural real estate. After the transfer, Bertin S.A. became a direct

subsidiary of Tinto—and Tinto's primary asset.

23.     Later that year, Bertin S.A. applied to BNDES for financial support. The

application to BNDES requested capital for several purposes, including the acceleration of Bertin

S.A.'s contemplated initial public offering. BNDES agreed to provide the requested capital.

24.     Market downturns in 2008 made it difficult for the Bertins to take the company

public. Instead, the Bertins considered partnering Bertin S.A. with a company that was already

public. The Bertins first approached Marfrig, a large, publicly traded Brazilian meatpacker,

about a potential merger. But the conversations did not pan out. By 2009, Joesley Batista

approached the Bertins and suggested that Bertin S.A. merge with JBS. The Bertins and Batistas

soon after reached an agreement.[3]

## II.    Public Merger Structure.

25.     On September 16, 2009, JBS and Bertin S.A. announced the signing of an

association agreement memorializing their intent to merge (the "Association Agreement"). A

JBS press release disclosed portions of the intended merger structure.

26.     Under the Association Agreement, the controlling shareholders of JBS—J&F and

ZMF FIP—would contribute all their shares of JBS to a newly formed holding company.

Similarly, Tinto would contribute all its shares of Bertin S.A.—representing 73.1% of Bertin

---

[3] This was not the first collaboration between the Bertins and the Batistas. Natalino
Bertin, for example, partnered with Joesley Batista in a business venture six years earlier. The
relationship would continue to develop. In 2011, J&F acquired another Bertin-affiliated
company, Higiene e Limpeza, in the cosmetics and cleaning-products industry. Natalino Bertin
would later sit on the board of directors of JBS from 2011 to 2013.

S.A.—to the same holding company.  The newly formed holding company would thus be the controlling shareholder of both JBS and Bertin S.A.  JBS would then absorb the operations of Bertin S.A.

27.    The merger depended on JBS successfully obtaining a USD$2.5 billion private subscription in its U.S. subsidiary from an undisclosed party (later revealed as BNDES).  JBS would use the funds to acquire Pilgrim's Pride.

28.    At the time of the Association Agreement, the ownership of Bertin S.A. looked like this:



**Figure 1:  The accurate and represented corporate structure of Bertin S.A. prior to signing of the Association Agreement.**

29.    At that same time, JBS was majority-owned by the Batistas—but just barely.  To raise capital for the purchase of several U.S. meatpackers, JBS had issued new equity to BNDES and other Brazilian state-owned entities, including the investment fund PROT Fundo de Investimento em Participações ("PROT FIP").  These issuances had significantly diluted the Batistas' ownership.  In fact, at the time of the Association Agreement, the Batistas maintained

majority control over JBS with a mere 50.11% stake through holding entities J&F (44%) and ZMF FIP (6.11%):



**Figure 2: The accurate and represented corporate structure of JBS S.A. prior to signing of the Association Agreement.**

30.     The Batistas created several entities in anticipation of the merger, as contemplated by the Association Agreement.  A week after signing the Association Agreement, the Batistas incorporated FB Participações ("FB Par"), the holding company that would later receive the majority interests of JBS and Bertin S.A.  In December 2009, at the direction of the Batistas and their corporate group, the Bertins also incorporated a new entity, Bertin Fundo de Investimento em Participações ("Bertin FIP"),[4] to hold Tinto's interest in Bertin S.A. and to later receive the Bertins' interest in FB Par.

31.     As a result, in preparation for the merger, JBS's and Bertin S.A.'s corporate structures looked like this:

---

[4] Bertin FIP has since been renamed Pinheiros Fundo de Investimento em Participações Multiestratégia.



**Figure 3: Both the accurate and represented corporate structures of Bertin S.A. and JBS S.A. in December 2009, in preparation for the JBS-Bertin S.A. merger.**

32.    Tinto, J&F, and ZMF FIP contributed their respective Bertin S.A. and JBS shares to FB Par in December 2009.  On December 31, 2009, at a special general meeting of JBS shareholders, the company's controlling shareholders approved the merger and dissolution of Bertin S.A. by JBS.

33.    Under the merger structure disclosed to the public, Tinto was to receive nearly 28.7% of JBS[5] in exchange for 73.1% of Bertin S.A:

---

[5] Under the proposed merger structure disclosed to the public, and in line with the value ascribed to the two companies, Tinto would hold 100% of Bertin FIP, which would in turn hold 48.52% of FB Par, which would in turn hold 59.13% of JBS.



**Figure 4:  The post-merger corporate structure of JBS S.A. that the Batistas and Bertins represented to the public.**

34.    But that is not what happened.

### III.    Concealed Merger Structure and Share Transfers.

35.    The public statements by JBS and Bertin S.A. obscured the true, hidden merger structure conceived by the Batistas and the Bertins, which neither family has (to this day) ever fully disclosed.  Indeed, the companies' public statements failed to disclose several steps and transactions taken by the Batistas, the Bertins, and their corporate groups—including Colorado, J&F, JJMB, and WWMB—in connection with the merger.  As a result of three covert, below-market share transfers, which Tinto entered into under the direction and control of the Bertins, the Batistas, and Defendants, Tinto transferred its expected 28.7% stake in JBS S.A. away in exchange for nearly nothing.

36.    Four months before the merger, on August 12, 2009, the Bertins entered into a private and undisclosed agreement with J&F (the "Initial Merger Agreement"), which functioned as a letter of intent for the future JBS-Bertin S.A. merger.  Tinto, despite holding the entirety of

the Bertins' interest in Bertin S.A., was not a signatory to the Initial Merger Agreement.

37.    Under the Initial Merger Agreement, the Bertins agreed to transfer their entire equity stake in Bertin S.A., directly owned by Tinto, to the Batistas.  In exchange, J&F agreed to pay R$750 million (USD$409.43 million) in cash to the Bertins' primary holding company, Heber.  Heber would receive the remaining balance of the purchase price—which, at that point, was still undecided—in JBS shares.  Tinto would receive nothing.

38.    The parties also agreed to cap the ownership stake in JBS that the Bertins could acquire through the transaction.  They executed an amendment to the Initial Merger Agreement on the same day that granted J&F the option to repurchase, for the nominal sum of R$1.00 (USD$0.55), any ownership of JBS in excess of 10% that the Bertins received from the transaction.

39.    To facilitate that transfer of assets, J&F directed the Bertins to place Bertin S.A. into a Fundo de Investimento em Participações ("FIP"), a Brazilian investment fund—Bertin FIP.  But this, too, benefited only the Batistas.

40.    Defendants Colorado, J&F, JJMB, and WWMB ultimately acquired Tinto's interest in Bertin FIP for trivial amounts.  But JBS was obligated to publicly declare the (much higher) market value of Bertin S.A. during the JBS-Bertin S.A. merger.  The FIP structure allowed the Defendants to disguise the discrepancy between those two values.  Under Brazilian law, a purchaser of shares in a FIP does not need to disclose the price of those shares.  By purchasing shares of Bertin FIP—which was formed only to hold shares of Bertin S.A., and functionally comprised only those shares—instead of directly purchasing Bertin S.A., Defendants could avoid reporting a value contradictory to the value of Bertin S.A. declared during the merger.

41.     The FIP also provided secrecy.  Bertin FIP was not subject to the same reporting requirements as Tinto.  Defendants would have had to report their acquisition of Tinto shares—but not their acquisition of Bertin FIP shares.

42.     Use of the FIP structure caused Tinto to accrue significant tax liability.  The transfers of Bertin FIP shares took place at prices so far below the market value of Bertin S.A. that Tinto incurred no capital gains taxes.  Once the discrepancy between these prices and the publicly-declared value of Bertin S.A. during the JBS-Bertin S.A. merger came to light, the Brazilian tax authority levied significant fines and interest charges on Tinto, far in excess of any capital gains taxes that Tinto would have initially owed.

43.     Once this necessary corporate structure was in place, Defendants began their covert scheme.

**A.     First Share Transfer.**

44.     On December 24, 2009, one week before the merger, the beneficial ownership of Bertin S.A.—through Bertin FIP—underwent a dramatic change.  Under the direction and control of the Bertins, the Batistas, and Defendants, Tinto entered into a share-transfer agreement (the "First Share-Transfer Agreement") with Colorado.

45.     Under the First Share-Transfer Agreement, Tinto transferred 65.8% of Bertin FIP to Colorado.  At that time, 65.8% of Bertin FIP amounted to 48.1% of Bertin S.A.  Bertin S.A. was valued at R$11.988 billion (USD$6.8 billion), meaning that a 65.8% stake in Bertin FIP was worth R$5.76 billion (USD$3.27 billion).  Yet Colorado agreed to pay just USD$10,000[6] to Tinto in exchange for it.  And Tinto never received even this trivial sum.  The First Share-

---

[6] The First Share-Transfer Agreement stated this purchase price in U.S. dollars. USD$10,000 was approximately equivalent to R$17,620 at the time.

Transfer Agreement included a confidentiality clause, under which the parties agreed to keep even the *existence* of the agreement a secret.

46.     According to Natalino Bertin's July 2019 formal testimony before the Brazilian Chamber of Deputies, Joesley Batista first introduced Colorado as a foreign investor to the Bertins during the merger negotiations.  J.P. Morgan in New York served as Colorado's global custodian during the events.[7]  But Joesley Batista's representation was a lie:  Colorado was in fact a Batista-controlled entity, established by J.P. Morgan as a Delaware entity barely a week before the parties signed the First Share-Transfer Agreement.  Joesley Batista directed his J.P. Morgan bankers in New York to structure Colorado as a hidden Delaware vehicle for the Batista family.  The Batistas purposefully concealed their control of Colorado, which J.P. Morgan and the Batistas designed solely to receive Tinto's interest in Bertin FIP for the Batistas' benefit.

47.     Furthermore, because Tinto sold its shares at a loss, it avoided paying capital gains on the transaction.

---

[7] J.P. Morgan has been a major financial advisor of JBS and the Batistas since JBS's IPO.

48.    After the First Share Transfer and before the JBS-Bertin S.A. merger, JBS's and

Bertin S.A.'s true corporate structures looked like this:



**Figure 5:  The accurate corporate structures of Bertin S.A. and JBS S.A.,
immediately after the First Share Transfer and before the merger.**

14

49.     After completion of the JBS-Bertin S.A. merger, Colorado's interest in Bertin FIP

converted from an indirect interest in Bertin S.A. to an indirect interest in JBS.  The post-merger

company's true corporate structure then looked like this:



**Figure 6:  The accurate corporate structure of JBS S.A. immediately post-merger.**

50.     Tinto should have held nearly 28.7% of JBS after the merger.  But because of the

First Share-Transfer Agreement, Tinto was instead left with 9.81% of the company—a

USD$3.27 billion reduction in value traded away for nothing.

### B.     *Second Share Transfer.*

51.     Nearly a year later, on November 11, 2010, and again under the control and

direction of the Bertins, the Batistas, and Defendants, Tinto executed another share-transfer

agreement (the "Second Share-Transfer Agreement") with Colorado.  Under the Second Share-

Transfer Agreement, Tinto transferred a 19.51% interest in Bertin FIP (which represented more

than half its remaining interest in the fund) to Colorado.  At the time, 19.51% of Bertin FIP

equaled an approximate 5.16% stake in JBS.  This interest was worth approximately

15

R$1.7 billion (USD$993.65 million).  In exchange, Colorado agreed to transfer to Tinto

R$17,000.00 (USD$9,883.72)—an amount that, again, Tinto never received.  Once again,

because Tinto sold its shares at a loss, it did not incur capital gains in this transaction.  At this

time, Tinto remained unaware that the Batistas were the true beneficial owners of Colorado.

Again, the Second Share-Transfer Agreement included a provision directing the parties to keep

the existence of the agreement confidential.

52.    After the Second Share Transfer, JBS's true corporate structure looked like this:



**Figure 7:  The accurate corporate structure of JBS S.A. immediately after the Second Share Transfer.**

53.    The First and Second Share-Transfer Agreements together stripped away the

majority of Tinto's assets, with nothing given in return.  Colorado profited greatly—between the

two transfers, it received an asset worth R$7.46 billion (USD$4.26 billion) in exchange for

R$34,620 (USD$19,883.72), which Colorado never paid.

54.    But for Tinto, only a sliver remained of its once-valuable meatpacking business.

The harm was considerable:  In 2008, Tinto reported consolidated gross revenues of more than

R$8.42 *billion* (USD$4.73 billion).  By 2011, after the merger and First and Second Share

Transfers, that figure had dropped to R$93.69 *million* (USD$51.59 million).  By April 2012, the Bertins had moved Tinto out of their core holding company, Heber, and transferred it to Riober Participações Ltda, a secondary Bertin-affiliated holding company owned by Natalino Bertin.

        ***C.***     ***Events between the Second and Third Share Transfers.***

55.    Tinto's remaining interest in Bertin FIP was transferred away in 2014.  But before that third transfer, two notable events took place.

56.    *First*, having seen a dramatic decrease in revenue, Tinto began to financially struggle and took out a loan from Banco do Brasil S.A. in order to meet its obligations as they became due.  This loan was collateralized on certain of Tinto's shares of Bertin FIP.

57.    *Second*, on December 31, 2013, Bertin FIP—by this point, majority-owned by Colorado—became a shareholder of J&F, as part of the Batistas' reorganization of the corporate structure of various Batista-affiliated entities.  Before, Bertin FIP and J&F shared ownership of FB Par.  But under the control and direction of Colorado, Bertin FIP used its shares of FB Par to raise the equity needed to join J&F.  Going into 2014, the actual corporate structure of JBS thus looked like this:



**Figure 8:  The accurate corporate structure of JBS S.A. immediately before the Third Share Transfer.**

### D.    *Third Share Transfer.*

58.    A few months later, on June 15, 2014, Tinto, Comapi (another agribusiness company in the Bertin corporate group), the Bertins, J&F, and the Batistas executed a third share-transfer agreement (the "Third Share-Transfer Agreement").  Under the Third Share-Transfer Agreement, the Bertins transferred to J&F the rest of Tinto's ownership interest in Bertin FIP (which amounted to around 1.5% of JBS), Tinto's equity stake in Mafrip (another agribusiness company in the Bertin corporate group), and some real estate.

59.    In exchange, J&F agreed to pay Tinto R$334 million (USD$149.51 million) in cash.[8]  Under the Third Share-Transfer Agreement, Tinto was directed to use R$130 million (USD$58.19 million) of those proceeds to repay the prior loan it had taken out from Banco do

---

[8] The Third Share-Transfer Agreement listed a total purchase price to J&F of R$346 million (USD$154.89 million), but stipulated that R$12 million (USD$5.37 million) of that price was already satisfied by previous payments made by J&F to Tinto.

Brasil.  Tinto's repayment of those debts would eliminate Banco do Brasil's security interest over Bertin FIP shares that, by the time of the Third Share-Transfer Agreement, were held by Colorado.

60.    As a result of the Third Share-Transfer Agreement, Tinto relinquished the rest of its interest in Bertin FIP (and indirectly in JBS).  Defendants became the full owners of Bertin FIP.

61.    Shortly after, J&F transferred its stake of Bertin FIP into two holding companies: JJMB and WWMB.  JBS's true corporate structure then looked like this[9]:



Figure 9:  The accurate corporate structure of JBS S.A. after the Third Share Transfer and the transfer of Bertin FIP interests to JJMB and WWMB.

62.    Through the three Share-Transfer Agreements, the Batistas successfully gained a significant asset—functionally, all of former Bertin S.A.—for a fraction of its actual value.

63.    The Bertins (either personally or through their primary holding company, Heber)

_____

[9] By 2014, as a result of continued mergers and acquisitions, the Batistas had lost their majority stake in JBS.

received cash and strengthened their ongoing business relationship with the Batistas.  In the midst of these transactions, Silmar Bertin and Natalino Bertin incorporated several offshore entities (including companies in the United Kingdom and the British Virgin Islands), for still-unknown reasons.

64.    But Tinto received scraps.  And now, to right this wrong, Plaintiff brings this case on behalf of the estate of Tinto and its many creditors, who were harmed by Defendants' scheme to strip Tinto of its most significant asset, which pushed Tinto into financial decline and insolvency.

### E.    *Plaintiff Uncovers the Fraud.*

65.    The JBS-Bertin S.A. merger involved a series of transactions that resulted in Tinto's complete loss of ownership of Bertin FIP, and indirectly JBS, in 2014.  But during and following the transactions, each Defendant denied and concealed the Batistas' ownership of Colorado.

66.    Colorado changed its on-paper ownership several times.  Each time, the Batistas used offshore and shell companies to ensure Colorado did not appear linked to the family.  At the time of Colorado's incorporation, the Batistas beneficially owned Colorado through Lunsville International Inc.—a Panamanian company that served as Colorado's sole member.

67.    By March 2010, ownership of Colorado had moved to Graal Trust ("Graal"), a Bahamian trust formed to hold and manage Colorado stock.  There were no settlors listed for the trust, but it had been formed at the direction of the Batistas.  The Private Trust Corporation Limited, a Bahamian entity, was the named trustee.

68.    In April 2010, Graal engaged Lighthouse Capital Insurance Company ("Lighthouse") and U.S. Commonwealth Life, A.I. ("U.S. Commonwealth")—based out of the Cayman Islands and Puerto Rico, respectively—to issue twelve life-insurance policies for the

20

secret benefit of Batista family members, and then transferred to Lighthouse and U.S. Commonwealth its shares of Colorado.

69.    At the end of April 2010, Lighthouse and U.S. Commonwealth each owned 50% of the shares of Colorado through Blessed Holdings Cayman Ltd. ("Blessed Cayman"), a special-purpose vehicle created to maintain and manage both the shares of Colorado and the life insurance policies issued to Graal for the benefit of the Batista family members.

70.    It wasn't until October 31, 2016 that the Batistas directly acquired Blessed Cayman, rather than beneficially owning it through a complex network of offshore companies and insurance policies.

71.    While Defendants varied Colorado's structure to disguise its true nature, Defendants also outwardly denied their connection to Colorado.

      a.    In 2014, JBS (under the control and direction of J&F) told the Brazilian securities commission (Comissão de Valores Mobiliários) that it did not know the identity of Colorado's owners.

      b.    Brazilian law required JBS to list in its public year-end filings the ultimate beneficial owners of shareholders who held more than 5% of JBS's total equity.  JBS (under the control and direction of J&F) listed the insurance companies Lighthouse and U.S. Commonwealth in its 2014, 2015, and 2016 year-end public filings, and omitted the Batistas as Colorado's owners.  The omission in JBS's 2016 filing is especially troubling given that the Batistas had officially purchased Blessed Cayman several months earlier.

      c.    On May 23, 2017, Wesley Batista testified to the Brazilian federal police

that only his brother Joesley knew the identity of Colorado's owner.

      d.      Even as recently as 2020, Wesley Batista stated that, at the time of the

merger, Colorado did not belong to JBS "or people related to the JBS

group" and claimed he did not know "who it used to belong to."

72.     The Brazilian securities commission learned of the Batistas' acquisition of

Blessed Cayman only from JBS's 2016 tax filings.  Upon learning of the acquisition, the

commission questioned JBS about Colorado's ownership, and on May 25, 2017, JBS finally

amended its public shareholder-disclosure filing to show that the Batistas owned Colorado.

73.     Tinto did not learn Colorado's true ownership until after it became insolvent and

was placed under the judicial administrator's control.  The judicial administrator was alerted to

Colorado's true identity through a motion that a Tinto creditor filed in the bankruptcy action on

February 13, 2019.  Many other details about the merger and transactions remain unknown to

Plaintiff.

74.     The Brazilian tax authorities subsequently uncovered the illicit use of the Bertin

FIP structure, including the misreporting of Bertin S.A.'s value, and issued a tax debt certificate

against Tinto.  The tax authority has now levied R$5,162,248,946.57 (USD$1,045,243,570.62) in

tax liability and fines against Tinto.  Under Brazilian law, a significant part of this liability

receives payment priority, and thus must be satisfied before certain other creditors of Tinto can

be paid.  This liability would not have existed but for J&F directing the Bertins to place Tinto's

shares of Bertin S.A. into Bertin FIP.

## FIRST CAUSE OF ACTION:
## UNJUST ENRICHMENT

75.     Plaintiff brings this cause of action against Defendants Colorado Investment

Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., and WWMB Participações

Ltda.

76.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

77.    Each of these Defendants was enriched as a result of the Share-Transfer Agreements described above.

78.    Each of these Defendants received the proceeds of the Share-Transfer Agreements, which amounted in aggregate to all of Tinto's equity stake in Bertin FIP.  These shares were worth more than R$8.76 billion (USD$4.84 billion).  The proceeds received by these Defendants eclipsed, by a staggering sum, the amounts that should have been paid by these Defendants to Tinto under those same Share-Transfer Agreements.

79.    By draining Tinto of a majority of its assets for minimal or no payments, each of these Defendants was enriched at the expense of Tinto and Tinto's creditors, on whose behalf and for whose benefit Plaintiff now acts.

80.    Each of these Defendants knew the true value of Tinto's Bertin FIP shares.  These Defendants entered and caused Tinto to enter into the Share-Transfer Agreements, which on their face transferred Tinto's Bertin FIP shares to these Defendants for far below their true market value.  Each of these Defendants stripped Tinto of its Bertin FIP shares without providing just compensation in return.

81.    Tinto and its creditors suffered harm as a result.  If not for the transfer of the shares to these Defendants, Tinto may have been able to avoid bankruptcy and pay its creditors.  Even if Tinto had still entered bankruptcy, the Bertin FIP shares would have been sold and their value would have been divided among Tinto's creditors according to Brazilian bankruptcy law.

82.    Defendants engineered the JBS-Bertin S.A. merger and related transactions so that, by the end, Tinto would have transferred directly to Colorado and J&F (and indirectly to

JJMB and WWMB) its ownership in Bertin FIP.  These Defendants knew or should have known, when they received the Bertin FIP shares, that they were receiving wrongfully obtained property at the expense of Tinto and its creditors.

83.     It is against equity and good conscience to permit these Defendants to retain the Bertin FIP shares.

**SECOND CAUSE OF ACTION:**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

84.     Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC and J&F Investimentos S.A.

85.     Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

86.     As officers of Tinto, Silmar Bertin and Natalino Bertin owed fiduciary duties to Tinto, including the duty of care to preserve corporate assets and prevent insolvency, and the duty of loyalty.  In their capacity as fiduciaries, Silmar Bertin and Natalino Bertin had the obligation to supervise and monitor corporate affairs, and to exercise independent judgment to benefit Tinto and its creditors.

87.     Silmar Bertin and Natalino Bertin violated their duty of care and duty of loyalty when they directed Tinto to enter into the Share-Transfer Agreements.  Silmar Bertin and Natalino Bertin, as sophisticated businessmen and the founders of Bertin S.A., were aware of the true value of the Bertin FIP shares, and knew that they were substantially underpriced in the Share-Transfer Agreements.  In these transactions, Silmar Bertin and Natalino Bertin acted to benefit Defendants, not Tinto.

88.     Silmar Bertin and Natalino Bertin also violated their duty of care and duty of loyalty when they directed Tinto to transfer its shares of Bertin S.A. into Bertin FIP.  Silmar Bertin and Natalino Bertin, as sophisticated businessmen and the founders of Bertin S.A., were

aware that the creation of Bertin FIP could only serve to benefit Defendants and their illicit

scheme.  They instead acted to benefit Defendants by use of the FIP structure—a decision that

resulted in significant tax liability.

89.    Colorado and J&F aided and abetted Silmar Bertin and Natalino Bertin in these

breaches of their fiduciary duties when Defendants participated in the Share-Transfer

Agreements.  These defendants were aware of the Bertin FIP shares' true value when they

entered into the Share-Transfer Agreements and knew that they were substantially underpriced.

They also instructed Tinto to place its assets into Bertin FIP, knowing that, if discovered, the

scheme would subject Tinto to massive tax liability.

90.    Tinto suffered harm as a result.  If not for the transfer of the shares to Defendants,

Tinto may have been able to avoid bankruptcy and pay its creditors.  The Share-Transfer

Agreements rendered Tinto insolvent.  And placing the assets of Bertin S.A. into Bertin FIP

saddled Tinto with a R$5,162,248,946.57 (USD$1,045,243,570.62) tax liability it otherwise

would not have incurred.  That liability continues to harm other of Tinto's creditors, who cannot

be paid until a significant portion of that tax liability is satisfied.

### THIRD CAUSE OF ACTION:
### ACTION TO DECLARE ABSOLUTE NULLITY OF A TRANSACTION

91.    Plaintiff brings this cause of action against Defendant Colorado Investment

Holdings LLC.

92.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

93.    Under Article 166 of the Brazilian Civil Code, a transaction is null and void if,

among other things, its object is illicit, impossible, or indeterminable; the parties had illicit and

decisive motives; the transaction was not performed in the form prescribed by law; or the

transaction's purpose defrauds a mandatory law.

94.     As outlined above, the First and Second Share-Transfer Agreements are null and void under one or more of these standards.  Without limitation, the Bertins and Colorado used the merger as an opportunity to increase Colorado's position at the expense of Tinto's creditors. These illegal motives led the Bertins and Colorado to take several illegal actions.  Colorado (while concealing its connection to the Batistas) paid Tinto nearly nothing in exchange for the multibillion-dollar asset it received.  The end result was that Defendant Colorado was enriched at the expense of Tinto's creditors.

95.     Because the First and Second Share-Transfer Agreements are null and void under Article 166 of the Brazilian Civil Code, this Court should revert the parties to their status prior to these Share-Transfer Agreements.

**FOURTH CAUSE OF ACTION:**
**ACTION TO DECLARE VOID TRANSACTION**

96.     Plaintiff brings this cause of action against Defendant Colorado Investment Holdings LLC.

97.     Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

98.     Under Article 167 of the Brazilian Civil Code, a transaction is null and void if, among other things, the transaction appears to confer or transmit rights to persons other than those to whom those rights are really conferred; the contract contains a statement, condition, or clause that is not true; or the contract is not dated as of the actual date of execution.

99.     As outlined above, the First and Second Share-Transfer Agreements between the Bertins and Colorado are null and void under one or more of these standards.  These agreements appeared to effectuate a legitimate asset sale by Tinto to Colorado, and contained statements indicative of that intent—but in reality, these agreements unlawfully resulted in Colorado's enrichment at the expense of Tinto and its creditors.

26

100.    Because the First and Second Share-Transfer Agreements are null and void under Article 167 of the Brazilian Civil Code, this Court should revert the parties to their status prior to these Share-Transfer Agreements.

**FIFTH CAUSE OF ACTION:**
**TRANSFER OF ESTABLISHMENT**

101.    Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., and WWMB Participações Ltda.

102.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

103.    Under Article 129, VI, of the Brazilian Bankruptcy Code, the sale or transfer of a business's establishment is ineffective if (1) it is made without the express consent or payment of all then-existing creditors, and (2) if the debtor is left, after the sale or transfer, with insufficient assets to pay its liabilities.  Brazilian law defines an establishment as "any complex of organized goods, for the exercise of the company, by an entrepreneur, or by a company."  Brazilian Civil Code, Article 1142.  "The establishment may be a unitary object of legal and translational or constitutive rights and business, which are compatible with its nature."  Brazilian Civil Code, Article 1143.

104.    Tinto's shares of Bertin FIP constituted an establishment, as they were the core business asset held by Tinto.  The Bertin FIP shares, in turn, controlled Tinto's ownership of groups of assets arranged under single corporate brands in the meat-processing industry—first Bertin S.A., and later JBS.  Tinto's creditors did not know—and did not provide any form of consent—when Defendants acquired Tinto's shares of Bertin FIP.  As a result of the transfers, Tinto was left without sufficient assets to satisfy the claims of its creditors.

105.    To remedy this violation of Article 129, VI, of the Brazilian Bankruptcy Code,

Plaintiff respectfully requests that this Court order the Defendants to immediately revert the

parties to their status prior to the Share-Transfer Agreements.

**SIXTH CAUSE OF ACTION:**
**PIERCING OF THE CORPORATE VEIL**

106.    Plaintiff brings this cause of action against Defendants Colorado Investment

Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., and WWMB Participações

Ltda.

107.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

108.    Under Article 82-A, Sole Paragraph of the Brazilian Bankruptcy Law, Plaintiff

may bring a claim to hold a corporation's owners, controllers, and administrators—as well as

third parties—personally liable in accordance with Article 50 of the Brazilian Civil Code.  A

claim under Article 50 has two elements:  abuse of the legal personality of the bankrupt

company, and an actual benefit directly or indirectly accrued from that abuse to the

administrators or shareholders of the company or companies whose veil is sought to be pierced.

The legal personality of a company can be abused through a commingling of assets, including a

transfer of assets without effective compensation.  It can also be abused in cases of diversion of

purpose, such as when the legal entity is used to harm creditors or for the commission of an

unlawful act.

109.    As outlined above, Defendants abused the legal personality of Tinto by

unlawfully causing the transfer of Tinto's assets—its shares of Bertin FIP—without effective

compensation, at the expense of Tinto's creditors.  Defendants directed Tinto to transfer its stake

in Bertin FIP—worth R$8.76 billion (USD$4.84 billion)—for very little in return.  This transfer

without effective compensation fell within the purview of Article 50.  Colorado—disguised as a

28

third-party entity—and J&F received the shares and paid nothing in return.  JJMB and WWMB,

for their part, are alter egos of J&F—one of the other recipients of the Bertin FIP shares.  J&F

quickly shuffled the shares of Bertin FIP it acquired in the Third Share Transfer into JJMB and

WWMB.  Colorado, J&F, JJMB, and WWMB all benefitted from their abuse of Tinto's legal

personality by obtaining the valuable shares.

110.    Accordingly, Defendants are liable to Plaintiff for the relief sought by this

lawsuit.

**SEVENTH CAUSE OF ACTION:**
**COMPENSATION FOR THE DAMAGES CAUSED BY THE ILLICIT ACTS**

111.    Plaintiff brings this cause of action against Defendants Colorado Investment

Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., and WWMB Participações

Ltda.

112.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

113.    Article 186 of the Brazilian Civil Code imposes liability where a defendant

undertook an illicit act, either negligently or with the intention to cause damage (i.e., willful

misconduct), that violates the plaintiff's rights, causing damage.  Article 187 of the Brazilian

Civil Code extends liability to the holder of a right who, in exercising it, clearly exceeds the

limits imposed by its economic or social purpose, good faith, or good customs.  Article 927 of

the Brazilian Civil Code states that a party whose illicit acts damage others is obliged to pay

damages.

114.    As detailed above, in September 2020, the Brazilian tax authority assessed

R$1,079,096,994.18 (USD$218,493,762.49) in taxes against Tinto for transferring its shares of

Bertin S.A. into Bertin FIP, which Tinto did at the direction of Defendants.  By directing Tinto in

this manner, Defendants manifestly exceeded the limits imposed by the economic and social

purposes of the rights they held with respect to Tinto, absent good faith or good custom. Defendants acted with intent to avoid paying taxes, which ultimately damaged Tinto for their own benefit.

115.    The tax authority also fined Tinto R$2,479,020,315.70 (USD$501,947,905.50) for failing to disclose the true nature of the sale and failing to timely pay taxes.  To this day, Tinto continues to accrue interest on the tax liability and fines, which already totals over R$1,604,131,636.69 (USD$324,801,902.63).

116.    As a result of the foregoing, Plaintiff has been damaged by the actions of Colorado, J&F, JJMB, and WWMB in an amount equal to the liability imposed on it—to date, R$5,162,248,946.57 (USD$1,045,243,570.62).  Accordingly, Defendants are liable to Plaintiff for that damage.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.      Entry of an order requiring the imposition of a constructive trust in favor of

Plaintiff over all shares derived by Defendants under the unlawful transactions

alleged above, to prevent unjust enrichment to Defendants, and an order that such

shares be paid over and transferred to Plaintiff in full;

B.      Entry of an order awarding damages for the tax liability Tinto incurred because of

Defendants' actions;

C.      Entry of an order holding Defendants liable for the debts sought by Tinto's

creditors;

D.      Awarding Plaintiff all damages according to proof;

E.      Any other relief that the Court may deem just and proper.


Dated: May 24, 2023                              Respectfully submitted,

                                                 SEQUOR LAW, P.A.
                                                 1111 Brickell Avenue, Suite 1250
                                                 Miami, Florida 33131
                                                 Telephone: (305) 372-8282
                                                 Facsimile: (305) 372-8202
                                                 Email: ggrossman@sequorlaw.com
                                                 nmiller@sequorlaw.com
                                                 jmosquera@sequorlaw.com


                                    By:     _/s/ Nyana Abreu Miller_____
                                            Gregory S. Grossman
                                            Florida Bar No.: 896667
                                            Nyana Abreu Miller
                                            Florida Bar No. 92903
                                            Jennifer Mosquera
                                            Florida Bar No.: 1018656

Derek T. Ho (*pro hac vice* pending)
Andrew E. Goldsmith (*pro hac vice*
  pending)
Grace W. Knofczynski (*pro hac vice*
  pending)
Eden M. Bernstein (*pro hac vice*
  pending)
Chase H. Robinett (*pro hac vice*
  pending)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dho@kellogghansen.com
agoldsmith@kellogghansen.com
gknofczynski@kellogghansen.com
ebernstein@kellogghansen.com
crobinett@kellogghansen.com

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via electronic

filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such

filing to all CM/ECF participants in this case**,** as indicated on the service list on May 24, 2023.

*/s/ Nyana Abreu Miller*
Nyana Abreu Miller

<u>**SERVICE LIST**</u>

**23-11719-MAM Notice will be electronically mailed to:**

Gregory S Grossman, Esq on behalf of
Debtor TINTO HOLDING LTDA.
ggrossman@sequorlaw.com, ngonzalez@sequorlaw.com
nmiller@sequorlaw.com; mrivera@sequorlaw.com
jmosquera@sequorlaw.com; afalcon@sequorlaw.com

Office of the US Trustee

USTPRegion21.MM.ECF@usdoj.gov