**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In re:

TINTO HOLDING LTDA.,                                    Chapter 15
                                                        Case No.:  23-11719-MAM
      Debtor in a Foreign Proceeding.
_____/

AJ RUIZ CONSULTORIA
EMPRESARIAL S.A., solely as Judicial
Administrator and foreign representative of
TINTO HOLDING LTDA.,
      Plaintiff,                                   Adv. Case No. 23-01118-MAM

v.                                                      **JURY TRIAL DEMANDED**

COLORADO INVESTMENT HOLDINGS
LLC, J&F INVESTIMENTOS S.A., JJMB
PARTICIPAÇÕES LTDA., WWMB
PARTICIPAÇÕES LTDA., JOESLEY
MENDONÇA BATISTA, WESLEY
MENDONÇA BATISTA, and JBS S.A.,
      Defendants.
_____/

## AMENDED COMPLAINT

      Plaintiff AJ Ruiz Consultoria Empresarial S.A., solely as Judicial Administrator and

foreign representative of Tinto Holding Ltda. ("Tinto"), brings this Amended Complaint against

Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB Participações

Ltda., WWMB Participações Ltda., Joesley Mendonça Batista, Wesley Mendonça Batista, and

JBS S.A.

## NATURE OF THE ACTION

      1.     Plaintiff seeks to recover an ownership interest in JBS S.A. ("JBS") that

Defendants unlawfully obtained from Tinto, a Brazilian agribusiness company.  When obtained

by Defendants, Tinto's interest in JBS was worth approximately R$8.76 billion (USD$4.84 billion).[1]

2.     Tinto should have obtained a large share of JBS by merging its greatest asset—a majority equity stake in Bertin S.A., a large Brazilian meat-processing company—with JBS.  But through a series of transactions between 2009 and 2014 connected to that merger, Defendants siphoned significant value out of Tinto, to the detriment of Tinto's estate and creditors.

3.     Defendants Joesley Mendonça Batista and Wesley Mendonça Batista (together, the "Batistas") are the ultimate beneficial owners of Defendant Colorado Investment Holdings LLC (formerly known as Blessed Holdings LLC) ("Colorado").  They also own (wholly or in significant part) Defendants J&F Investimentos S.A. (formerly known as J&F Participações S.A.) ("J&F"), JJMB Participações Ltda. ("JJMB"), WWMB Participações Ltda. ("WWMB"), and JBS.  The Batistas—by and through Colorado and J&F—engineered the transactions that drained Tinto of its value for their personal benefit.  That value is now in the possession of Colorado, JJMB, and WWMB.

4.     Mainly because of these transactions, which stripped away Tinto's most critical asset, a Brazilian bankruptcy court placed Tinto into liquidation on November 29, 2018.  That court appointed Plaintiff as Tinto's judicial administrator.  On May 24, 2023, that court authorized Plaintiff to bring this suit; on September 5, 2023, that court authorized Plaintiff to file this Amended Complaint.

5.     Plaintiff now brings claims for unjust enrichment, claims for aiding and abetting breach of fiduciary duty, and claims under the Brazilian Bankruptcy Law and the Brazilian Civil

---

[1] Plaintiff provides approximate conversions of monetary figures from Brazilian reals into U.S. dollars (using the historic conversion rate on or about the relevant dates at issue) only for the Court's convenience.

Code, including claims under Articles 166 and 167 of the Brazilian Civil Code (null and void transaction); Article 129 VI of the Brazilian Bankruptcy Law (transfer of establishment); and Articles 186, 187, and 927 of the Brazilian Civil Code (illicit acts) to recover from Defendants the shares they wrongfully obtained and the tax liability Tinto incurred as a result. Plaintiff also brings a veil-piercing claim under Article 50 of the Brazilian Civil Code and Article 82-A of the Brazilian Bankruptcy Law to hold Defendants liable for the debts of Tinto's creditors.

**PARTIES**

6.      Plaintiff AJ Ruiz Consultoria Empresarial S.A. has its principal place of business at Rua Lincoln Albuquerque, No. 259, 13th Floor, Suite 131, São Paulo, Brazil 05004-010. It appears solely as judicial administrator and foreign representative of Tinto. Brothers Silmar Bertin and Natalino Bertin managed Tinto until the Brazilian bankruptcy court appointed a judicial administrator on November 29, 2018.

7.      Defendant Colorado Investment Holdings LLC is a domestic limited-liability company organized and existing under the laws of the State of Delaware.

8.      Defendants Joesley Mendonça Batista and Wesley Mendonça Batista, Brazilian nationals, are the ultimate beneficial owners of Colorado. Until 2011, the Batistas, along with certain of their family members, were also the majority shareholders of JBS. Since then, they have continued to be the largest shareholders of the company. Joesley Batista was the Chief Executive Officer and Chairman of JBS from 2007 to 2011. Wesley Batista was the Chief Executive Officer of JBS from 2011 to 2017. Joesley Batista maintains a residence in New York. Until recently, and during all relevant times, Wesley Batista maintained a residence in Colorado, which he periodically lived in and frequently visited for business and personal reasons.

9.     Defendant JBS S.A. is a Brazilian agribusiness company.  It is publicly traded, with its American Depositary Shares listed on the New York Stock Exchange under the ticker symbol "JBSAY."  It is currently seeking to directly list its shares on the New York Stock Exchange, and has filed a registration request with the United States Securities and Exchange Commission to accomplish this goal.

10.     Defendant J&F Investimentos S.A. is a Brazilian entity that, during the events described below, was majority-owned and controlled by the Batistas and their affiliates.  Today, it is wholly owned and controlled by Defendants Joesley and Wesley Batista.  At all times during the events described below, J&F held a significant indirect stake in JBS.

11.     Defendants JJMB Participações Ltda. and WWMB Participações Ltda. are Brazilian entities.  Together, the Batistas wholly own JJMB and WWMB, with Joesley Batista owning 99.999% of JJMB and Wesley Batista owning 99.999% of WWMB.

12.     The Batistas, JBS, J&F, JJMB, and WWMB all directly or indirectly hold (or held during the events described below) significant stakes in major U.S. companies, including Smithfield Beef Group Inc., Swift & Company, and Pilgrim's Pride Corporation.  On information and belief, both Joesley Batista and Wesley Batista traveled to the United States numerous times to conduct business, including with J.P. Morgan in New York, in their capacities as (i) directors and officers of J&F, JJMB, and WWMB; and (ii) the ultimate beneficial owners of Colorado.

**RELEVANT NONPARTIES**

13.     Bertin S.A. was a Brazilian agribusiness company indirectly owned, through Tinto, by brothers Silmar Bertin and Natalino Bertin and their families.  Tinto's equity stake in Bertin S.A. was its most significant asset.

14.     Silmar Bertin and Natalino Bertin are Brazilian nationals who, alongside their

4

families, will be referred to as the "Bertins." The Bertins founded, own, and manage a large Brazilian conglomerate operating in multiple sectors, including agriculture, energy, and infrastructure.

15.    Specific corporate entities beneficially owned by the Bertins that are relevant to this Amended Complaint include: (i) the Bertin family's main holding company, Heber Participações S.A. ("Heber"); and (ii) two other Bertin-affiliated agribusiness companies, Comapi Agropecuaria S.A. ("Comapi") and Mafrip Matadouro Frigorífico Rio Pardo S.A. ("Mafrip").

16.    ZMF Fundo de Investimento em Participações ("ZMF FIP") is another Batista-owned fund that appears in several transactions detailed below.

## JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1334(b), as this is a civil proceeding related to a case under title 11, Case No. 23-11719-MAM (Chapter 15), and the outcome of this proceeding substantially affects Tinto's estate.[2]

18.    Venue is proper in the Southern District of Florida under 28 U.S.C. § 1409(a) because Plaintiff is a foreign representative in a chapter 15 proceeding under title 11 in this District.

## STATEMENT OF FACTS

### I.    Background.

19.    José Batista Sobrinho, patriarch of the Batista family, founded JBS in 1953. It has grown ever since. Today, JBS operates globally—including in the United States—and is among the world's largest meat-processing companies. José Batista Sobrinho has several

---

[2] Plaintiff consents to the Bankruptcy Court's entry of final orders, except that Plaintiff reserves the right to move to withdraw the reference to request a jury trial.

children, including Defendants Joesley Batista and Wesley Batista, who have helped run the company. Since JBS's founding, the number of entities owned by and affiliated with the Batistas has grown to include—among many others—Colorado, J&F, JJMB, WWMB, and nonparty ZMF FIP.

20.     During the late 2000s, the Batistas led JBS on a spree of international expansion. JBS bought a series of agribusiness and meat-processing companies across the globe, including the U.S.-based companies Smithfield Beef Group Inc., Swift & Company, and Pilgrim's Pride Corporation.

21.     Many of these acquisitions relied on funding from BNDES Participações S.A. ("BNDES"), Brazil's National Bank for Economic and Social Development. BNDES funding helped the Batistas and JBS acquire Bertin S.A. in 2009—the transaction that lies at the heart of this Amended Complaint.

22.     The Bertins incorporated Bertin S.A. in October 2007. Shortly after, the Bertins directed Tinto (then known as Bracol Ltda.) to transfer all its operating assets to the newly formed Bertin S.A. At the time, Tinto held a large meatpacking business and about R$1 billion (USD$550 million) in agricultural real estate. After the transfer, Bertin S.A. became a direct subsidiary of Tinto—and Tinto's primary asset.

23.     Later that year, Bertin S.A. applied to BNDES for financial support. The application to BNDES requested capital for several purposes, including the acceleration of Bertin S.A.'s contemplated initial public offering. BNDES agreed to provide the requested capital.

24.     Market downturns in 2008 made it difficult for the Bertins to take the company public. Instead, the Bertins considered partnering Bertin S.A. with a company that was already public. The Bertins first approached Marfrig Global Foods S.A., a large, publicly traded

Brazilian meatpacker, about a potential merger.  But the conversations did not pan out.  By 2009, Defendant Joesley Batista had approached the Bertins and suggested that Bertin S.A. merge with JBS.  Joesley Batista and Wesley Batista soon after reached an agreement with the Bertins.[3]

## II.    Public Merger Structure.

25.    On September 16, 2009, JBS and Bertin S.A. announced the signing of an association agreement memorializing their intent to merge (the "Association Agreement").  A JBS press release disclosed portions of the intended merger structure.

26.    Under the Association Agreement, the controlling shareholders of JBS—J&F and ZMF FIP—would contribute all their shares of JBS to a newly formed holding company. Similarly, Tinto would contribute all its shares of Bertin S.A.—representing 73.1% of Bertin S.A.—to the same holding company.  The newly formed holding company would thus be the controlling shareholder of both JBS and Bertin S.A.  JBS would then absorb the operations of Bertin S.A.

27.    The merger depended on JBS successfully obtaining a USD$2.5 billion private subscription in its U.S. subsidiary from an undisclosed party (later revealed as BNDES).  JBS would use the funds to acquire Pilgrim's Pride Corporation in the United States.

28.    At the time of the Association Agreement, the ownership of Bertin S.A. looked like this:

---

[3] This was not the first collaboration between the Bertins and the Batistas.  Natalino Bertin, for example, partnered with Defendant Joesley Batista in a business venture six years earlier.  The relationship would continue to develop.  In 2011, J&F acquired another Bertin-affiliated company, Higiene e Limpeza, in the cosmetics and cleaning-products industry. Natalino Bertin would also later sit on the board of directors of JBS from 2011 to 2013.



**Figure 1:  The accurate and represented corporate structure of Bertin S.A. prior to signing of the Association Agreement.**

29.    At that same time, JBS was majority-owned by the Batistas—but just barely.  To raise capital for the purchase of several U.S. meatpackers, JBS had issued new equity to BNDES and other Brazilian state-owned entities, including the investment fund PROT Fundo de Investimento em Participações ("PROT FIP").  These issuances had significantly diluted the Batistas' ownership.  In fact, at the time of the Association Agreement, the Batistas maintained majority control over JBS with a mere 50.11% stake through holding entities J&F (44%) and ZMF FIP (6.11%):



**Figure 2:  The accurate and represented corporate structure of JBS S.A. prior to signing of the Association Agreement.**

30.    The Batistas created several entities in anticipation of the merger, as contemplated by the Association Agreement.  A week after signing the Association Agreement, the Batistas incorporated FB Participações ("FB Par"), the holding company that would later receive the

majority interests of JBS and Bertin S.A.  In December 2009, at the direction of the Batistas and their corporate group, the Bertins also incorporated a new entity, Bertin Fundo de Investimento em Participações ("Bertin FIP"),[4] to hold Tinto's interest in Bertin S.A. and to later receive the Bertins' interest in FB Par.

31.    As a result, in preparation for the merger, JBS's and Bertin S.A.'s corporate structures looked like this:



**Figure 3:  Both the accurate and represented corporate structures of Bertin S.A. and JBS S.A. in December 2009, in preparation for the JBS-Bertin S.A. merger.**

32.    Tinto, J&F, and ZMF FIP contributed their respective Bertin S.A. and JBS shares to FB Par in December 2009.  On December 31, 2009, at a special general meeting of JBS shareholders, the company's controlling shareholders approved the merger and dissolution of Bertin S.A. by JBS.

---

[4] Bertin FIP has since been renamed Pinheiros Fundo de Investimento em Participações Multiestratégia.

33.    Under the merger structure disclosed to the public, Tinto was to receive nearly

28.7% of JBS[5] in exchange for 73.1% of Bertin S.A:



Figure 4:  The post-merger corporate structure of JBS S.A. that the Batistas and the Bertins represented to the public.

34.    But that is not what happened.

## III.    Concealed Merger Structure and Share Transfers.

35.    The public statements by JBS and Bertin S.A. obscured the true, hidden merger

structure conceived by the Batistas and the Bertins, which neither family has (to this day) ever

fully disclosed.  Indeed, the companies' public statements failed to disclose several steps and

transactions taken by the Batistas, the Bertins, and their corporate groups in connection with the

merger.  As a result of three covert, below-market share transfers, which Tinto entered into under

the direction and control of the Bertins and Defendants, Tinto transferred its expected 28.7%

stake in JBS away in exchange for nearly nothing.

_____

[5] Under the proposed merger structure disclosed to the public, and in line with the value
ascribed to the two companies, Tinto would hold 100% of Bertin FIP, which would in turn hold
48.52% of FB Par, which would in turn hold 59.13% of JBS.

36.    Four months before the merger, on August 12, 2009, the Bertins entered into a private and undisclosed agreement with the Batistas and J&F (the "Initial Merger Agreement"), which functioned as a letter of intent for the future JBS-Bertin S.A. merger.  Tinto, despite holding the entirety of the Bertins' interest in Bertin S.A., was not a signatory to the Initial Merger Agreement.

37.    Under the Initial Merger Agreement, Tinto would transfer its entire equity stake in Bertin S.A. to the Batistas.  In exchange, the Batistas and J&F agreed to pay R$750 million (USD$409.43 million) in cash to the Bertins' primary holding company, Heber.  Heber would receive the remaining balance of the purchase price—which, at that point, was still undecided—in JBS shares.  Tinto would receive nothing.

38.    The parties also agreed to cap the ownership stake in JBS that the Bertins could acquire through the transaction.  They executed an amendment to the Initial Merger Agreement on the same day that granted J&F the option to repurchase, for the nominal sum of R$1.00 (USD$0.55), any ownership of JBS in excess of 10% that the Bertins received from the transaction.

39.    To facilitate that transfer of assets, the Batistas and J&F directed the Bertins to place Bertin S.A. into a Fundo de Investimento em Participações ("FIP"), a Brazilian investment fund—Bertin FIP.  But this, too, benefited only the Batistas.

40.    Joesley Batista, Wesley Batista, Colorado, J&F, JJMB, and WWMB ultimately acquired Tinto's interest in Bertin FIP for trivial amounts.  But JBS was obligated to publicly declare the value of new equity issued during the JBS-Bertin S.A. merger—and by extension, the value of Bertin S.A. during the merger.  The FIP structure allowed the Batistas to disguise the discrepancy between that value and the amount that Joesley Batista, Wesley Batista, Colorado,

and J&F paid for the shares of Bertin FIP in private transactions.  Under Brazilian law, a purchaser of shares in a FIP does not need to disclose the price of those shares.  By purchasing shares of Bertin FIP—which was formed only to hold shares of Bertin S.A., and functionally comprised only those shares—instead of directly purchasing Bertin S.A., the Batistas could avoid reporting a value contradictory to the value of Bertin S.A. implicitly declared during the merger.

41.    The FIP also provided secrecy.  Bertin FIP was not subject to the same reporting requirements as Tinto.  The Batistas would have had to report their acquisition of Tinto shares—but not their acquisition of Bertin FIP shares.

42.    Use of the FIP structure caused Tinto to accrue significant tax liability.  The transfers of Bertin FIP shares took place at prices so far below the market value of Bertin S.A. that Tinto incurred no capital gains taxes.  Once the discrepancy between these prices and the publicly declared value of Bertin S.A. during the JBS-Bertin S.A. merger came to light, the Brazilian tax authority levied significant fines and interest charges on Tinto, far in excess of any capital gains taxes that Tinto would have initially owed.

43.    Once this necessary corporate structure was in place, Defendants began their covert scheme.

A.    *First Share Transfer.*

44.    On December 24, 2009, one week before the merger, the beneficial ownership of Bertin S.A.—through Bertin FIP—underwent a dramatic change.  Under the direction and control of the Bertins and the Batistas, Tinto entered into a share-transfer agreement (the "First Share-Transfer Agreement") with the Delaware-based Colorado, then known as Blessed Holdings LLC.

45.    Under the First Share-Transfer Agreement, Tinto transferred 65.8% of Bertin FIP

to Colorado.  At that time, 65.8% of Bertin FIP amounted to 48.1% of Bertin S.A.  Bertin S.A. was valued at R$11.988 billion (USD$6.8 billion), meaning that a 65.8% stake in Bertin FIP was worth R$5.76 billion (USD$3.27 billion).  Yet Colorado agreed to pay just USD$10,000[6] to Tinto in exchange for it.  And Tinto never received even this trivial sum.  The First Share-Transfer Agreement included a confidentiality clause, under which the parties agreed to keep even the *existence* of the agreement a secret.

46.    According to Natalino Bertin's July 2019 formal testimony before the Brazilian Chamber of Deputies, Joesley Batista first introduced Colorado as a U.S.-based investor to the Bertins during the merger negotiations.  J.P. Morgan in New York served as Colorado's global custodian during the events.[7]  But Joesley Batista's representation was a lie:  Colorado was in fact a Batista-controlled entity, established by J.P. Morgan as a Delaware entity barely a week before the parties signed the First Share-Transfer Agreement.  Joesley Batista directed his J.P. Morgan bankers in New York to structure Colorado as a hidden Delaware vehicle for the Batista family.  The Batistas purposefully concealed their control of Colorado, which J.P. Morgan and the Batistas designed solely to receive Tinto's interest in Bertin FIP for the Batistas' benefit.

47.    Furthermore, because Tinto sold its shares at a loss, it avoided paying capital gains on the transaction.

---

[6] The First Share-Transfer Agreement stated this purchase price in U.S. dollars. USD$10,000 was approximately equivalent to R$17,620 at the time.

[7] J.P. Morgan has been a major financial advisor of JBS and the Batistas since JBS's IPO.

48. After the First Share Transfer and before the JBS-Bertin S.A. merger, JBS's and

Bertin S.A.'s true corporate structures looked like this:



**Figure 5:  The accurate corporate structures of Bertin S.A. and JBS S.A.,
immediately after the First Share Transfer and before the merger.**

14

49.     After completion of the JBS-Bertin S.A. merger, Colorado's interest in Bertin FIP converted from an indirect interest in Bertin S.A. to an indirect interest in JBS.  The post-merger company's true corporate structure then looked like this:



**Figure 6:  The accurate corporate structure of JBS S.A. immediately post-merger.**

50.     Tinto should have held nearly 28.7% of JBS after the merger.  But because of the First Share-Transfer Agreement, Tinto was instead left with 9.81% of the company—a USD$3.27 billion reduction in value traded away for nothing.

### B.     *Second Share Transfer.*

51.     Nearly a year later, on November 11, 2010, and again under the direction and control of the Bertins, the Batistas, and Colorado, Tinto executed another share-transfer agreement (the "Second Share-Transfer Agreement") with Colorado.  Under the Second Share-Transfer Agreement, Tinto transferred a 19.51% interest in Bertin FIP (which represented more than half its remaining interest in the fund) to Colorado.  At the time, 19.51% of Bertin FIP equaled an approximate 5.16% stake in JBS.  This interest was worth approximately R$1.7

billion (USD$993.65 million).  In exchange, Colorado agreed to transfer to Tinto R$17,000.00 (USD$9,883.72)—an amount that, again, Tinto never received.  Once again, because Tinto sold its shares at a loss, it did not incur capital gains in this transaction.  At this time, Tinto remained unaware that the Batistas were the true beneficial owners of Colorado.  Again, the Second Share-Transfer Agreement included a provision directing the parties to keep the existence of the agreement confidential.

52.    After the Second Share Transfer, JBS's true corporate structure looked like this:



**Figure 7:  The accurate corporate structure of JBS S.A. immediately after the Second Share Transfer.**

53.    The First and Second Share-Transfer Agreements together stripped away the majority of Tinto's assets, with nothing given in return.  Yet Joesley Batista, Wesley Batista, and Colorado profited greatly.  Through the First and Second Share-Transfer Agreements, Colorado received an asset worth R$7.46 billion (USD$4.26 billion) in exchange for R$34,620 (USD$19,883.72), which Colorado never paid.  Joesley Batista, Wesley Batista, and their corporate groups successfully increased their collective majority stake in JBS from 50.11% to 50.63%, despite *issuing new equity* in the merger.

54.     But for Tinto, only a sliver remained of its once-valuable meatpacking business. The harm was considerable:  In 2008, Tinto reported consolidated gross revenues of more than R$8.42 *billion* (USD$4.73 billion).  By 2011, after the merger and First and Second Share Transfers, that figure had dropped to R$93.69 *million* (USD$51.59 million).   This despite Tinto's considerable liabilities remaining in the hundreds of millions of reais.  By April 2012, the Bertins had moved Tinto out of their core holding company, Heber, and transferred it to Riober Participações Ltda., a secondary Bertin-affiliated holding company owned by Natalino Bertin.

### C.     *Events Between the Second and Third Share Transfers.*

55.     Tinto's remaining interest in Bertin FIP was transferred away in 2014.  But before that third transfer, two notable events took place.

56.     *First*, having seen a dramatic decrease in revenue because of the First and Second Share Transfers, Tinto began to financially struggle and took out a loan from Banco do Brasil S.A. in order to meet its obligations as they became due.  This loan was collateralized on certain of Tinto's shares of Bertin FIP.

57.     *Second*, on December 31, 2013, Bertin FIP—by this point, majority-owned by Colorado—became a shareholder of J&F, as part of the Batistas' reorganization of the corporate structure of various Batista-affiliated entities.  Before, Bertin FIP and J&F shared ownership of FB Par.  But under the direction and control of the Bertins, the Batistas, and Colorado, Bertin FIP used its shares of FB Par to raise the equity needed to join J&F.  Going into 2014, the actual corporate structure of JBS thus looked like this:



**Figure 8:  The accurate corporate structure of JBS S.A. immediately before the Third Share Transfer.**

### D.    *Third Share Transfer.*

58.    A few months later, on June 15, 2014, Tinto, Comapi (another agribusiness company in the Bertin corporate group), the Bertins, J&F, and the Batistas executed a third share-transfer agreement (the "Third Share-Transfer Agreement").  Under the Third Share-Transfer Agreement, the Bertins transferred to J&F the rest of Tinto's ownership interest in Bertin FIP (which amounted to around 1.5% of JBS), Tinto's equity stake in Mafrip (another agribusiness company in the Bertin corporate group), and some real estate.

59.    In exchange, J&F agreed to pay Tinto R$334 million (USD$149.51 million) in cash.[8]  Under the Third Share-Transfer Agreement, Tinto was directed to use R$130 million (USD$58.19 million) of those proceeds to repay the prior loan it had taken out from Banco do

---

[8] The Third Share-Transfer Agreement listed a total purchase price to J&F of R$346 million (USD$154.89 million), but stipulated that R$12 million (USD$5.37 million) of that price was already satisfied by previous payments made by J&F to Tinto.

Brasil. Tinto's repayment of those debts would eliminate Banco do Brasil's security interest over Bertin FIP shares that, by the time of the Third Share-Transfer Agreement, were held by Colorado.

60.    As a result of the Third Share-Transfer Agreement, Tinto relinquished the rest of its interest in Bertin FIP (and indirectly in JBS). After losing its interest in Bertin FIP, Tinto slid into insolvency. Batista-controlled entities became the full owners of Bertin FIP.

61.    Shortly after, J&F transferred its stake of Bertin FIP into two holding companies owned by Joesley Batista and Wesley Batista: JJMB and WWMB. JBS's true corporate structure then looked like this[9]:



**Figure 9: The accurate corporate structure of JBS S.A. after the Third Share Transfer and the transfer of Bertin FIP interests to JJMB and WWMB.**

62.    Through the three Share-Transfer Agreements, the Batistas successfully gained a significant asset—functionally, all of former Bertin S.A.—for a fraction of its actual value.

---

[9] By 2014, as a result of continued mergers and acquisitions, the Batistas had lost their majority stake in JBS.

63.     The Bertins (either personally or through their primary holding company, Heber) received cash and strengthened their ongoing business relationship with the Batistas.  In the midst of these transactions, Silmar Bertin and Natalino Bertin incorporated several offshore entities (including companies in the United Kingdom and the British Virgin Islands), for still-unknown reasons.

64.     But Tinto received scraps.  And now, to right this wrong, Plaintiff brings this case on behalf of the estate of Tinto and its many creditors, who were harmed by Defendants' scheme to strip Tinto of its most significant asset, which pushed Tinto into financial decline and insolvency.

### E.     Plaintiff Uncovers the Cover-up.

65.     The JBS-Bertin S.A. merger involved a series of transactions that resulted in Tinto's complete loss of ownership of Bertin FIP, and indirectly JBS, in 2014.  But during and following the transactions, each Defendant denied and concealed the Batistas' ownership of Colorado.

66.     Colorado changed its on-paper ownership several times.  Each time, the Batistas used offshore and shell companies to ensure Colorado did not appear linked to the family.  At the time of Colorado's creation in Delaware, the Batistas beneficially owned Colorado through Lunsville International Inc.—a Panamanian company that served as Colorado's sole member.

67.     By March 2010, ownership of Colorado had moved to Graal Trust ("Graal"), a Bahamian trust formed to hold and manage Colorado stock.  There were no settlors listed for the trust, but it had been formed at the direction of the Batistas.  The Private Trust Corporation Limited, a Bahamian entity, was the named trustee.

68.     In April 2010, Graal engaged Lighthouse Capital Insurance Company ("Lighthouse") and U.S. Commonwealth Life, A.I. ("U.S. Commonwealth")—based out of the

Cayman Islands and Puerto Rico, respectively—to issue 12 life-insurance policies for the secret

benefit of Batista family members, and then transferred to Lighthouse and U.S. Commonwealth

its shares of Colorado.

69.     At the end of April 2010, Lighthouse and U.S. Commonwealth each owned 50%

of the shares of Colorado through Blessed Holdings Cayman Ltd. ("Blessed Cayman"), a

special-purpose vehicle created to maintain and manage both the shares of Colorado and the life

insurance policies issued to Graal for the benefit of the Batista family members.

70.     It wasn't until October 31, 2016 that the Batistas directly acquired Blessed

Cayman, rather than beneficially owning it through a complex network of offshore companies

and insurance policies.

71.     While Defendants varied Colorado's structure to disguise its true nature,

Defendants also outwardly denied their connection to Colorado.

   a. In 2014, JBS (under the direction and control of J&F and the Batistas) told

the Securities and Exchange Commission of Brazil that it did not know the

identity of Colorado's owners.

   b. Brazilian law required JBS to list in its public year-end filings the ultimate

beneficial owners of shareholders who held more than 5% of JBS's total

equity.  JBS (under the direction and control of J&F and the Batistas)

listed the insurance companies Lighthouse and U.S. Commonwealth in its

2014, 2015, and 2016 year-end public filings, and omitted the Batistas as

Colorado's owners.  The omission in JBS's 2016 filing is especially

troubling given that the Batistas had officially purchased Blessed Cayman

several months earlier.

      c.      On May 23, 2017, Wesley Batista testified to the Brazilian federal police that only his brother Joesley Batista knew the identity of Colorado's owner.

      d.      Even as recently as 2020, Wesley Batista stated that, at the time of the merger, Colorado did not belong to JBS "or people related to the JBS group" and claimed he did not know "who it used to belong to."

72.     The Securities and Exchange Commission of Brazil learned of the Batistas' acquisition of Blessed Cayman only from JBS's 2016 tax filings.  Upon learning of the acquisition, the commission questioned JBS about Colorado's ownership, and on May 25, 2017, JBS finally amended its public shareholder-disclosure filing to show that the Batistas owned Colorado.

73.     Tinto did not learn Colorado's true ownership until after it became insolvent and was placed under the judicial administrator's control.  The judicial administrator was alerted to Colorado's true identity through a motion that a Tinto creditor filed in the bankruptcy action on February 13, 2019.  Many other details about the merger and transactions remain unknown to Plaintiff.

74.     The Brazilian tax authorities subsequently uncovered the illicit use of the Bertin FIP structure, including the misreporting of Bertin S.A.'s value, and issued a tax debt certificate against Tinto.  The tax authority has now levied R$5,162,248,946.57 (USD$1,045,243,570.62) in tax liability and fines against Tinto.  Under Brazilian law, a significant part of this liability receives payment priority, and thus must be satisfied before certain other creditors of Tinto can be paid.  This liability would not have existed but for the Batistas directing the Bertins to place Tinto's shares of Bertin S.A. into Bertin FIP.

**FIRST CAUSE OF ACTION:**
**UNJUST ENRICHMENT**

75.     Plaintiff brings this cause of action against Defendants Colorado Investment

Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., WWMB Participações Ltda.,

Joesley Batista, and Wesley Batista.

76.     Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

77.     Each of these Defendants was enriched as a result of the Share-Transfer

Agreements described above.

78.     Each of these Defendants received the proceeds of the Share-Transfer

Agreements, which amounted in aggregate to all of Tinto's equity stake in Bertin FIP.  These

shares were worth more than R$8.76 billion (USD$4.84 billion).  The proceeds received by these

Defendants eclipsed, by a staggering sum, the amounts that should have been paid by these

Defendants to Tinto under those same Share-Transfer Agreements.

79.     Defendants Colorado, J&F, JJMB, and WWMB received the Bertin FIP shares.

Joesley Batista and Wesley Batista, as the ultimate beneficial owners of these aforementioned

Defendants, received beneficial ownership of the same.

80.     By draining Tinto of a majority of its assets for minimal or no payments, each of

these Defendants was enriched at the expense of Tinto and Tinto's creditors, on whose behalf

and for whose benefit Plaintiff now acts.

81.     Each of these Defendants knew the true value of Tinto's Bertin FIP shares.  These

Defendants entered or caused Tinto to enter into the Share-Transfer Agreements, which on their

face transferred Tinto's Bertin FIP shares to these Defendants for far below their true market

value.  Each of these Defendants stripped Tinto of its Bertin FIP shares without providing just

compensation in return.  And each of these Defendants caused Tinto to transfer its assets in violation of Brazilian law through a series of null and void contracts.

82.     Tinto and its creditors suffered harm as a result.  If not for the transfer of the shares to these Defendants, Tinto may have been able to avoid bankruptcy and pay its creditors. Even if Tinto had still entered bankruptcy, the Bertin FIP shares would have been sold and their value would have been divided among Tinto's creditors according to Brazilian bankruptcy law.

83.     These Defendants engineered the JBS-Bertin S.A. merger and related transactions so that, by the end, Tinto would have transferred (directly or indirectly) to these Defendants its ownership in Bertin FIP.  These Defendants knew or should have known, when they (directly or indirectly) received the Bertin FIP shares, that they were receiving wrongfully obtained property at the expense of Tinto and its creditors.

84.     It is against equity and good conscience to permit these Defendants to retain the Bertin FIP shares.

### SECOND CAUSE OF ACTION:
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

85.     Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, Joesley Batista, Wesley Batista, JJMB Participações Ltda., WWMB Participações Ltda., and J&F Investimentos S.A.

86.     Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

87.     As officers of Tinto, Silmar Bertin and Natalino Bertin owed fiduciary duties to Tinto, including the duty of care to preserve corporate assets and prevent insolvency, and the duty of loyalty.  In their capacity as fiduciaries, Silmar Bertin and Natalino Bertin had the obligation to supervise and monitor corporate affairs, and to exercise independent judgment to benefit Tinto and its creditors.

88.     Silmar Bertin and Natalino Bertin violated their duty of care and duty of loyalty when they directed Tinto to enter into the Share-Transfer Agreements.  Silmar Bertin and Natalino Bertin, as sophisticated businessmen and the founders of Bertin S.A., were aware of the true value of the Bertin FIP shares, and knew that they were substantially underpriced in the Share-Transfer Agreements.  In these transactions, Silmar Bertin and Natalino Bertin acted to benefit Defendants, not Tinto.

89.     Silmar Bertin and Natalino Bertin also violated their duty of care and duty of loyalty when they directed Tinto to transfer its shares of Bertin S.A. into Bertin FIP.  Silmar Bertin and Natalino Bertin, as sophisticated businessmen and the founders of Bertin S.A., were aware that the creation of Bertin FIP could only serve to benefit these Defendants and their illicit scheme.  They instead acted to benefit these Defendants by use of the FIP structure—a decision that resulted in significant tax liability.

90.     Joesley Batista, Wesley Batista, Colorado, and J&F aided and abetted Silmar Bertin and Natalino Bertin in these breaches of their fiduciary duties when they participated in or directed the Share-Transfer Agreements.  Joesley Batista, Wesley Batista, Colorado, and J&F were aware of the Bertin FIP shares' true value when they entered into the Share-Transfer Agreements and knew that they were substantially underpriced.  Joesley Batista, Wesley Batista, and J&F also instructed Tinto to place its assets into Bertin FIP, knowing that, if discovered, the scheme would subject Tinto to massive tax liability.  Each of these Defendants also aided and abetted Silmar Bertin and Natalino Bertin in acts that violated Brazilian law and Tinto's articles of incorporation by siphoning Tinto's main assets to the detriment of Tinto—a for-profit legal entity—and its creditors.

91.     Tinto suffered harm as a result.  If not for the transfer of the shares to these

Defendants, Tinto may have been able to avoid bankruptcy and pay its creditors.  The Share-Transfer Agreements rendered Tinto insolvent.  And placing the assets of Bertin S.A. into Bertin FIP saddled Tinto with a R$5,162,248,946.57 (USD$1,045,243,570.62) tax liability that it otherwise would not have incurred.  That liability continues to harm other of Tinto's creditors, who cannot be paid until a significant portion of that tax liability is satisfied.

**THIRD CAUSE OF ACTION:**
**ACTION TO DECLARE ABSOLUTE NULLITY OF A TRANSACTION**

92.     Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, Joesley Batista, and Wesley Batista.

93.     Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

94.     Under Article 166 of the Brazilian Civil Code, a transaction is null and void if, among other things, its object is illicit, impossible, or indeterminable; the parties had unlawful motives; the transaction was not performed in the form prescribed by law; or the transaction's purpose evades a mandatory law.

95.     As outlined below, the First and Second Share-Transfer Agreements are null and void under one or more of these standards.

96.     Defendants Colorado, Joesley Batista, and Wesley Batista had at least three unlawful motives in entering into both the First and Second Share-Transfer Agreements.  *First*, these Defendants entered into the First and Second Share-Transfer Agreements to increase the Batistas' majority interest in JBS without informing the market.  By concealing that Joesley Batista and Wesley Batista were the true ultimate beneficial owners of Colorado, these Defendants hid the nature of the benefit to the Batistas from the transactions.  *Second*, Colorado, Joesley Batista, and Wesley Batista intentionally violated Brazilian corporate law and Tinto's own articles of incorporation by siphoning Tinto's main assets to the detriment of Tinto—a for-

profit legal entity—and its creditors.  *Third*, these Defendants intentionally deceived Brazilian

fiscal authorities, both by using a purchase price that did not reflect the value transferred and by

using an investment fund for the transfer of the shares in a manner deemed unlawful under

Brazilian law.  Colorado, Joesley Batista, and Wesley Batista took all of these steps knowing that

their conduct was unlawful.  The parties to the transactions had the unlawful motive to enrich

themselves at the expense of Tinto's creditors while misleading JBS's minority shareholders and

Brazilian fiscal authorities.

97.     The purpose of the First and Second Share-Transfer Agreements was also the

evasion of one or more mandatory law.  *First*, Colorado, Joesley Batista, and Wesley Batista

structured the transactions to avoid taxes, in violation of Brazilian tax law, by using an

investment fund to transfer the Bertin FIP shares, and by transferring them for prices far below

their market value.  *Second*, these Defendants also caused Tinto to improperly dispose of its most

significant asset, violating the Brazilian company law as it applies to for-profit businesses.

98.     Because the First and Second Share-Transfer Agreements are null and void under

Article 166 of the Brazilian Civil Code, this Court should revert the parties to their status prior to

these Share-Transfer Agreements.

### FOURTH CAUSE OF ACTION:
### ACTION TO DECLARE VOID TRANSACTION

99.     Plaintiff brings this cause of action against Defendants Colorado Investment

Holdings LLC, Joesley Batista, and Wesley Batista.

100.     Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

101.     Under Article 167 of the Brazilian Civil Code, a transaction is null and void as a

sham transaction if, among other things, the transaction appears to confer or transmit rights to

persons other than those to whom those rights are really conferred; the contract contains a

statement, condition, or clause that is not true; or the contract is not dated as of the actual date of execution.

102.    The First and Second Share-Transfer Agreements are null and void because they appear to transmit rights to persons other than those to whom those rights are really conferred, and they contain materially false statements.  *First*, as described above, the agreements appear to transmit rights to Colorado—which held itself out as an independent, Delaware-based party—but in reality transferred rights to the Batistas.  *Second*, the agreements contained a false declaration of the purchase price.  They appeared to effectuate a legitimate asset sale, and contained statements indicative of that intent—but in reality, these agreements unlawfully diverted assets away from Tinto and its creditors towards Colorado, Joesley Batista, and Wesley Batista for nothing in return.  The end result was that Colorado, Joesley Batista, and Wesley Batista were enriched at the expense of Tinto and its creditors, and JBS minority shareholders were misled about the true nature of the merger.

103.    Because the First and Second Share-Transfer Agreements are null and void under Article 167 of the Brazilian Civil Code, this Court should revert the parties to their status prior to these Share-Transfer Agreements.

**FIFTH CAUSE OF ACTION:**
**TRANSFER OF ESTABLISHMENT**

104.    Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., WWMB Participações Ltda., Joesley Batista, and Wesley Batista.

105.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

106.    Under Article 129, VI, of the Brazilian Bankruptcy Law, the sale or transfer of a business's establishment is ineffective if (i) it is made without the express consent or payment of

all then-existing creditors; and (ii) if the debtor is left, after the sale or transfer, with insufficient assets to pay its liabilities.  Brazilian law defines an establishment as "any complex of organized goods, for the exercise of the company, by an entrepreneur, or by a company."  Brazilian Civil Code, Article 1142.  "The establishment may be a unitary object of legal and translational or constitutive rights and business, which are compatible with its nature."  Brazilian Civil Code, Article 1143.

107.    Tinto's shares of Bertin FIP constituted an establishment, as they were the core business asset held by Tinto.  Tinto's creditors did not know—and did not provide any form of consent—when these Defendants acquired Tinto's shares of Bertin FIP.  As a result of the transfers, Tinto was left without sufficient assets to satisfy the claims of its creditors.

108.    Alternatively, Tinto's shares of Bertin FIP represented its ownership of tangible assets arranged under single corporate brands in the meat-processing industry—first Bertin S.A., and later JBS—which independently constituted an establishment.  Tinto's creditors did not know—and did not provide any form of consent—when these Defendants acquired Tinto's shares of Bertin FIP, and thus its ownership of the tangible assets these shares represented.  As a result of the transfers, Tinto was left without sufficient assets to satisfy the claims of its creditors.

109.    To remedy this violation of Article 129, VI, of the Brazilian Bankruptcy Law, Plaintiff respectfully requests that this Court order these Defendants to immediately revert the parties to their status prior to the Share-Transfer Agreements.

**SIXTH CAUSE OF ACTION:**
**PIERCING OF THE CORPORATE VEIL**

110.    Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, Joesley Batista, Wesley Batista, JBS S.A., J&F Investimentos S.A., JJMB Participações Ltda., and WWMB Participações Ltda.

111.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

112.    Under Article 50 of the Brazilian Civil Code and Article 82-A, Sole Paragraph, of the Brazilian Bankruptcy Law, Plaintiff may bring a claim to hold a corporation's owners, controllers, and administrators—as well as third parties—personally liable in accordance with Article 50 of the Brazilian Civil Code.  A claim under Article 50 requires that the defendants misused the purpose of the bankrupt company or abused of the legal personality of the bankrupt company.  The legal personality of a company can be abused through a commingling of assets, including a transfer of assets without effective compensation.  It can also be abused in cases of diversion of purpose, such as when the legal entity is used to harm creditors or for the commission of an unlawful act.

113.    As outlined above, Defendants misused Tinto's purpose by diverting Tinto's greatest asset to the detriment of the estate and its creditors as part of an unlawful scheme.  Likewise, Defendants abused Tinto's legal personality by unlawfully causing the transfer of Tinto's assets—its shares of Bertin FIP—without effective compensation, at the expense of Tinto's creditors.

114.    The Batistas directed Tinto to transfer its stake in Bertin FIP—worth R$8.76 billion (USD$4.84 billion)—for very little in return.  This transfer without effective compensation fell within the purview of Article 50.  Colorado, JBS, J&F, JJMB, and WWMB also contributed to this commingling of assets.  Colorado—disguised as a third-party entity—and J&F received the shares and paid nothing in return.  JBS legitimized the planned transfer to the public by misleading the public about the merger's true structure, treating the acquisition of Bertin S.A. as a run-of-the-mill merger rather than a scheme to enrich JBS's principals at the expense of Tinto's creditors.  JJMB and WWMB, for their part, are alter egos of Joesley Batista,

Wesley Batista, and J&F.  Joesley Batista, Wesley Batista, and J&F quickly shuffled the shares

of Bertin FIP they acquired in the Third Share Transfer into JJMB and WWMB.  As these facts

demonstrate, Tinto and Defendants were members of the same economic group for the purposes

of the transactions underlying this lawsuit.

115.    As a result of Defendants' misuse of Tinto's purpose and abuse of Tinto's

personality, Tinto's creditors were harmed by Tinto's financial decline, incurred liability, and

insolvency.  Had Defendants not caused Tinto to unlawfully transfer its greatest asset, or had

Defendants appropriately compensated Tinto for that asset, then Tinto would have been able to

pay its creditors.

116.    Joesley Batista, Wesley Batista, Colorado, J&F, JJMB, and WWMB all benefitted

from their abuse of Tinto's legal personality by obtaining the valuable shares without paying

market value.  They also benefitted because the Batistas increased their equity in JBS.  JBS, in

turn, benefitted by knocking out one of its competitors in Brazil.

117.    Accordingly, each of these Defendants are liable to Plaintiff for the relief sought

by this lawsuit.

**SEVENTH CAUSE OF ACTION:**
**COMPENSATION FOR THE DAMAGES CAUSED BY THE ILLICIT ACTS**

118.    Plaintiff brings this cause of action against Defendants Colorado Investment

Holdings LLC, Joesley Batista, Wesley Batista, J&F Investimentos S.A., JJMB Participações

Ltda., and WWMB Participações Ltda.

119.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

120.    Article 186 of the Brazilian Civil Code imposes liability where a defendant

undertook an illicit act either negligently or with the intention to cause damage (i.e., willful

misconduct), that violates the plaintiff's rights, causing damage.  Article 187 of the Brazilian

31

Civil Code extends liability to the holder of a right who, in exercising it, clearly exceeds the limits imposed by its economic or social purpose, good faith, or good customs.  Article 927 of the Brazilian Civil Code states that a party whose illicit acts damage others is obliged to pay damages.

121.    As detailed above, in September 2020, the Brazilian tax authority assessed R\$1,079,096,994.18 (USD\$218,493,762.49) in taxes against Tinto for transferring its shares of Bertin S.A. into Bertin FIP.  Colorado, Joesley Batista, Wesley Batista, J&F, JJMB, and WWMB caused Tinto to enter into the relevant agreements, which were structured to avoid tax liability, even though Tinto obtained no economic benefit in these transactions.  These Defendants clearly acted not only negligently but deliberately in the structuring, signing, and performance of such Share Transfer Agreements.  By directing Tinto in this manner, these Defendants manifestly exceeded the limits imposed by the economic and social purposes of the rights they held with respect to Tinto, absent good faith or good custom.  These Defendants acted with intent to avoid paying taxes, which ultimately damaged Tinto for their own benefit.

122.    The tax authority also fined Tinto R\$2,479,020,315.70 (USD\$501,947,905.50) for failing to disclose the true nature of the sale and failing to timely pay taxes.  To this day, Tinto continues to accrue interest on the tax liability and fines, which already totals over R\$1,604,131,636.69 (USD\$324,801,902.6).

123.    As a result of the foregoing, Plaintiff has been damaged by the actions of Colorado, Joesley Batista, Wesley Batista, J&F, JJMB, and WWMB in an amount equal to the liability imposed on it—to date, R\$5,162,248,946.57 (USD\$1,045,243,570.62).  Accordingly, these Defendants are liable to Plaintiff for that damage.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.      Entry of an order requiring the imposition of a constructive trust in favor of

Plaintiff over all shares derived by Defendants under the unlawful transactions

alleged above, to prevent unjust enrichment to Defendants, and an order that such

shares be paid over and transferred to Plaintiff in full;

B.      Entry of an order awarding damages for the tax liability Tinto incurred because of

Defendants' actions;

C.      Entry of an order holding Defendants liable for the debts sought by Tinto's

creditors;

D.      Awarding Plaintiff all damages according to proof; and

E.      Any other relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues properly triable.

Dated:  September 8, 2023                    Respectfully submitted,

SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
Email: ggrossman@sequorlaw.com
nmiller@sequorlaw.com
jmosquera@sequorlaw.com


By:      */s/ Nyana Abreu Miller*
Gregory S. Grossman
Florida Bar No.: 896667
Nyana Abreu Miller
Florida Bar No. 92903
Jennifer Mosquera
Florida Bar No.: 1018656

33

Derek T. Ho (*pro hac vice*)
Andrew E. Goldsmith (*pro hac vice*)
Grace W. Knofczynski (*pro hac vice*)
Eden M. Bernstein (*pro hac vice*)
Chase H. Robinett (*pro hac vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dho@kellogghansen.com
agoldsmith@kellogghansen.com
gknofczynski@kellogghansen.com
ebernstein@kellogghansen.com
crobinett@kellogghansen.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via electronic filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such filing to all CM/ECF participants in this case, as indicated on the service list on September 8, 2023.

*/s/ Nyana Abreu Miller*
Nyana Abreu Miller


## SERVICE LIST

**Electronic Mail Notice List**

- **Daniel Humphrey**    danielhumphrey@quinnemanuel.com

- **Office of the US Trustee**    USTPRegion21.MM.ECF@usdoj.gov

- **Olga M Vieira**    olgavieira@quinnemanuel.com,  ivettegalante@quinnemanuel.com

**Manual Notice List**

- (No manual recipients)