# EXHIBIT 2

**Bichara**

A D V O G A D O S

EXCELENTÍSSIMO SENHOR DOUTOR JUIZ DE DIREITO DA 2ª VARA DE FALÊNCIAS E RECUPERAÇÕES JUDICIAIS DO FORO CENTRAL DO ESTADO DE SÃO PAULO

Processo nº 1088030-29.2016.8.26.0100

    **JBS S.A.** ("JBS"), sociedade anônima inscrita sob o CNPJ/MF nº 02.916.265/0001-60, com sede na Avenida Marginal Direta do Tietê, nº 500, 3º andar, bloco I, Vila Jaguara, na cidade de São Paulo, Estado de São Paulo, CEP: 05.118-100, devidamente habilitada no Quadro Geral de Credores nos autos da falência decretada contra **TINTO HOLDING LTDA.** ("TINTO"), vem, por seus advogados (**Doc. 01**), expor e requerer o quanto segue.

1.    A presente falência, decretada em 29.11.2018, tramita há nada menos do que 7 anos, sem que tenha ocorrido qualquer relevante arrecadação em favor da massa falida, a despeito de já terem atuado dois Administradores Judiciais ("AJ" ou "AJs") distintos: **(i)** a DELOITTE TOUCHE TOHMATSU CONSULTORES LTDA ("DELOITTE"), e **(ii)** a AJ RUIZ CONSULTORIA EMPRESARIAL S.A ("AJ RUIZ").

2.    A **JBS**, integrante de um dos principais grupos econômicos credores da **TINTO** ("**Grupo JBS**") e com crédito habilitado na Classe III[1], apresenta a presente manifestação com o intuito de endereçar flagrantes incongruências na forma com que os AJs – antigo e atual – conduzem o presente processo de falência.

---

[1] Conjuntamente, as empresas integrantes do Grupo JBS relacionadas na última versão do Quadro Geral de Credores desta falência são credoras quirografárias da **TINTO** no valor total de R$ 2.445.789,20 (JBS S.A: R$ 77.344,47; JBS S.A. Curtume e Lins: R$ 2.364.052,01 e; JBS Frigorífica Lins: R$ 4.392,72).



3.        Como será aqui demonstrado, o AJ instaurou um procedimento nos Estados Unidos contra empresas e pessoas físicas relacionadas ao **Grupo JBS**, enquanto não se tem notícia de medida alguma adotada contra os antigos controladores e administradores da própria **TINTO**.

4.        E isso apesar de a **TINTO** ter a sua falência decretada a partir de requerimento de um credor – a BS Factoring Fomento Comercial Ltda. – por não honrar com o pagamento de dívida voluntariamente assumida por ela[2] em favor de outra empresa vinculada ao Grupo Bertin, a Infinity Bio-Energy do Brasil S.A. que, igualmente, encontra-se em processo de falência[3].

5.        Houve, nitidamente, uma decisão corporativa na assunção da aludida dívida pela **TINTO**, o que justificaria, no mínimo, um olhar mais atento para a conduta daqueles que, à época, decidiram adotar a curiosa medida de assumir para a empresa que controlavam uma dívida de **<u>R$ 55 milhões</u>**.

6.        Até porque, quando requerida a falência, o valor em aberto era de nada menos do que R$ 40 milhões, ou seja, a **TINTO** efetivamente foi capaz de honrar com uma parte mínima da dívida, o que acrescenta estranheza à opção de assumir uma obrigação de pagamento tão desproporcional à capacidade financeira da empresa. A toda evidência, tal operação não se deu no melhor interesse da **TINTO** – que veio a falir em razão dela – mas, na realidade, do grupo econômico que ela integra.

7.        Com as devidas vênias, não é admissível que AJs conduzam esta falência por 7 anos, acumulando significativo valor a título de honorários de mais de R$ 400 mil, e se furtem a investigar as estranhíssimas circunstâncias desta falência e a adotar qualquer medida contra os sujeitos que, de fato, causaram a quebra da **TINTO**, deixando de adotar todos os expedientes possíveis para viabilizar a satisfação dos seus credores.

8.        É o que se passa a demonstrar.

---

[2] "Instrumento Particular de Assunção Parcial de Dívida com Alienação Fiduciária de Ações em Garantia e Outras Avenças" - fl. 17/51.
[3] Processo nº 0151873-29.2009.8.26.0100 - 2ª Vara de Falências do Foro Central de São Paulo.



**BICHARA**

A D V O G A D O S

## I.        A ATUAÇÃO DO AJ

### O PROCEDIMENTO ESTRANGEIRO INSTAURADO PELA DELOITTE

9.        A partir do Agravo de Instrumento nº 2194823-37.2023.8.26.0000, interposto pela **TINTO**, a **JBS** tomou conhecimento de que a antiga AJ, DELOITTE, <u>em procedimento sigiloso</u> – Habilitação de Crédito nº 1095595-34.2022.8.26.0100 – requereu e obteve autorização judicial desse MM. Juízo[4] para (i) a contratação de escritórios nos Estados Unidos e no Reino Unido, (ii) a nomeação de representante da massa falida no exterior, e (iii) a formulação de requerimento de falência auxiliar nos Estados Unidos e na Inglaterra**.**

10.        Mais recentemente, ainda no referido Agravo de Instrumento, a atual administradora, a AJ RUIZ, defende que a **TINTO** não pode participar do incidente, <u>pois o que se busca com ele é iniciar procedimentos investigativos transnacionais e medidas para recuperar ativos, com a possível responsabilização dos antigos controladores e sócios da **TINTO**</u>, como se vê do seguinte trecho (**Doc. 02**):

> *"o incidente originário foi instaurado para viabilizar a apuração dos indícios de desvios de patrimônio, possivelmente orquestrados inclusive pela antiga administração da Falida, seus sócios, ex-controladores e/ou demais envolvidos."*

11.        Embora seja louvável a atitude do AJ de apurar ativos da **TINTO** no exterior, fato é que a contratação foi autorizada, a massa falida foi onerada, mas jamais foi esclarecido o que se pretende reaver dos "*sócios, ex-controladores e/ou demais envolvidos*" na antiga administração

---

[4] "Portanto, autorizo a contratação dos escritórios Kellog, Hansen Todd, Figel Frederick PLLC; SEQUOR LAW e GOWLING WLG (UK) LLP, devendo o Administrador, em nome da massa falida, providenciar a formalização dos contratos (fls. 338/342; 342/344 e 352/358) e juntá-los nesse incidente. Defiro ainda: **(i)** a nomeação, na pessoa de Luis Vasco Elias, da Administradora Judicial, como representante da Massa Falida no exterior, mediante o DFA, os escritórios norte-americanos e britânico acima e outros que a Administradora Judicial venha a nomear; **(ii)** o requerimento de falência auxiliar nos Estado Unidos da América sob o Chapter 15 (Ancillary and Other Cross - Border Cases), Title 11 (Bankruptcy) do United States Code; **(iii)** a assinatura do Drawbridge Agreement pela Massa Falida, a qual, ao amparo de tal contrato, fica autorizada a realizar a transferência da importância de US$1.500,00 (mil e quinhentos dólares), para crédito na conta de cliente a ser mantida junto ao SEQUOR LAW, conforme as exigências legais locais. Determino ao cartório que expeça ofício ao Banco do Brasil, com urgência, para que o mesmo realize a transferência à seguinte conta, cujo código de natureza, para fins do câmbio, é o seguinte: Código de Natureza 47128-00-N-05-90 (Serviços Jurídicos) Dados da conta de onde o valor deverá ser debitado: Processo nº 0151873-29.2009.8.26.0100 - Conta Judicial: 3300104659568 - Banco do Brasil S/A Código/Número 001 -Agência Pagadora: 6815 Clovis Bevilacqua **(iv)** o requerimento de falência brasileira na Inglaterra, para que realize o pedido de restauração, perante o registro corporativo local, das sociedades METROPOLITAN ASSETS LLP, CONCORD GLOBAL LLP e GALLATAS LLP; **(v)** Por fim, defiro a expedição de certidão neste incidente nos seguintes termos: MASSA FALIDA DE TINTO HOLDING LTDA., por sua administradora judicial DELOITTE TOUCHE TOHMATSU CONSULTORES LTDA, representada por seu sócio administrador, Sr. Luis Vasco Elias, está autorizada ajuizar pedido de falência auxiliar nos Estados Unidos da América, bem como na Inglaterra, nos termos e limites das Leis das respectivas jurisdições. Providencie a serventia com urgência. Int. - ADV: ANTONIO MANUEL FRANCA AIRES (OAB 63191/SP)"

**Bichara**

A D V O G A D O S

da **TINTO**, já que não há notícia alguma a respeito da efetiva adoção de medida contra qualquer um deles.

12.        **O que se tem, por outro lado, é um gravíssimo procedimento instaurado unicamente contra credor da TINTO e terceiros nos Estados Unidos**.

13.        Como já noticiado nos autos desta falência, em 24.05.2023, a DELOITTE pleiteou sua substituição da função de AJ por ter verificado conflito de interesses, afirmando que "*em razão das recentes medidas para a busca de ativos no exterior, identificou haver conflito de interesses para a continuidade das suas atribuições na falência, o que impede de imediato a sua permanência no cargo, constituindo relevante razão para sua substituição*[5]". Tal pedido foi deferido, em 25.05.2023, tendo sido nomeada como AJ, em substituição, a empresa AJ RUIZ CONSULTORIA EMPRESARIAL S.A. ("AJ RUIZ"), que aceitou o encargo.

14.        No mesmo dia em que peticionou nos autos da falência da **TINTO** pedindo sua substituição, a DELOITTE ajuizou, na qualidade de AJ e representante estrangeira da **TINTO**, o procedimento No 23-01118-MAM perante a Corte Americana de Falência do Distrito Sul da Flórida ("Procedimento Estrangeiro"). Nele, faz referência ao procedimento No 23-11719-MAM, ajuizado em 03.03.2023, com vistas ao reconhecimento da transacionalidade da falência da **TINTO**.

15.        Nota-se que o AJ extrapolou os limites da autorização concedida por esse MM. Juízo, que, na forma da já mencionada decisão proferida na Habilitação de Crédito nº 1095595-34.2022.8.26.0100, foi para a instauração de falência auxiliar no exterior[6] e, ainda, violou o instituto do juízo universal, previsto no Art. 76, da LREF, ao instaurar o Procedimento Estrangeiro.

16.        Com efeito, a pretensão deduzida no Procedimento Estrangeiro é de uma típica ação revocatória, por meio da qual se busca revogar os "*atos praticados com a intenção de prejudicar credores, provando-se o conluio fraudulento entre o devedor e o terceiro que com ele contratar e o efetivo prejuízo sofrido pela massa falida*", conforme dispõe o Art. 132, da LREF,

---

[5] Fls. 5.271/5.272.
[6] "*Defiro ainda: (i) a nomeação, na pessoa de Luis Vasco Elias, da Administradora Judicial, como representante da Massa Falida no exterior, mediante o DFA, os escritórios norte-americanos e britânico acima e outros que a Administradora Judicial venha a nomear; (ii) o requerimento de falência auxiliar nos Estado Unidos da América sob o Chapter 15 (Ancillary and Other Cross - Border Cases), Title 11 (Bankruptcy) do United States Code; (...)*".



sendo certo que o prazo legal para o ajuizamento dessa medida – de 3 anos a partir da quebra, na forma do Art. 135, da LREF – há muito se escoou.

17.        Afinal, independentemente da roupagem jurídica ao anormal Procedimento Estrangeiro, o que se pretende nele é revogar um negócio jurídico que foi firmado no Brasil há quase 10 anos, a partir do reconhecimento da nulidade de operações societárias ocorridas entre os anos de 2009 e 2014, para responsabilizar credores e terceiros por atos praticados pelos próprios representantes da **TINTO**, isto é, pretensões que devem ser deduzidas pela via da ação revocatória, cujo processamento deve, obrigatoriamente, se dar no juízo falimentar, na forma do art. 134[7], da LREF.

18.        O AJ procurou a incompetente justiça americana para lá ajuizar ação que deveria ser aqui proposta (mas cujo prazo já se encerrou) para anular negócio jurídico firmado pela TINTO e empresas do grupo JBS.

19.        Seja como for, o Procedimento Estrangeiro foi, originalmente, ajuizado contra as seguintes pessoas jurídicas: Colorado Investment Holding's LLC ("Colorado"), J&F Investimentos S.A (J&F), JJMB Participações Ltda ("JJMB") e WWMB Participações Ltda ("WWMB"). Posteriormente, a AJ Ruiz ainda requereu a inclusão da **JBS** no polo passivo daquela demanda.

20.        **Por mais incrível que isso possa parecer, o AJ visa desconstituir negócio jurídico realizado entre dois grupos econômicos, mas só ajuizou a ação contra um dos grupos. Não há, um único membro da família Bertin, nem nenhuma empresa do Grupo Bertin no polo passivo da ação.** O que o AJ alega a todo tempo é que a família Bertin, na gestão da **TINTO**, **descumpriu seus deveres fiduciários**, mas quem é incluído no polo passivo são empresas e pessoas físicas atreladas à **JBS.**

21.        No referido procedimento, o AJ da massa falida da **TINTO** se insurge contra operações societárias que, na sua (deturpada) visão, teriam sido fraudulentas e causado prejuízo aos credores da **TINTO**. Mais especificamente, o AJ questiona a transação do Fundo de Investimento em Participações ("FIP Bertin"), adquirido pelas rés Colorado, J&F, JJMB e WWMB por valores alegadamente insignificantes.

---

[7] Art. 134. A ação revocatória correrá perante o juízo da falência e obedecerá ao procedimento ordinário previsto na Lei nº 5.869, de 11 de janeiro de 1973 - Código de Processo Civil



22.        De acordo com a narrativa do AJ, embora a **TINTO** tenha recebido uma parcela significativa da participação acionária **JBS** em decorrência da fusão do seu maior ativo – que consistia na participação majoritária na empresa Bertin S.A, –, em virtude de uma <u>suposta manobra dos membros das famílias Batista e Bertin ao omitir as referidas operações e transações paralelas realizadas durante o período da fusão</u> (entre os anos 2009 e 2014), ocorreu a pulverização do valor do direito acionário e, ato contínuo, a transferência das ações se deu por valores muito abaixo do mercado, em prejuízo da **TINTO**, de seu principal ativo e dos credores no âmbito da falência.

23.        E é com base nessa operação societária tida como fraudulenta que o AJ formula os seguintes pedidos nos EUA: **(i)** o reconhecimento de enriquecimento ilícito pelos réus, além de **<u>descumprimento de deveres fiduciários pelos réus e administradores da TINTO</u>**; **(ii)** a **<u>declaração de nulidade das transações realizadas e do negócio jurídico como um todo</u>**; e **(iii)** a desconsideração da personalidade jurídica dos réus, com a subsequente condenação pelos danos e supostas práticas ilícitas praticadas.

24.        Aliás, diversos são os equívocos na propositura do referido Procedimento Estrangeiro, merecendo destaque, já de antemão, o fato de que uma das causas de pedir é, exatamente, **a quebra do dever fiduciário pela família Bertin**.

25.        No Procedimento Estrangeiro, <u>o AJ sustenta, expressamente, o descumprimento do dever fiduciário pelos irmãos **Silmar Bertin** e **Natalino Bertin**, por violação dos deveres de gestão à frente da **TINTO**, incluindo-se, a preservação do patrimônio, prevenção de insolvência e de lealdade, tendo, ainda, supervisão em os assuntos de gestão corporativa</u>.

26.        Veja-se, abaixo, o teor original e, em tradução livre, do que alegou o AJ nesse ponto:

| <u>Trecho Original em inglês</u> | <u>Tradução livre para Português</u> |
|---|---|
| *"87. As officers of Tinto, **Silmar Bertin** and **Natalino Bertin** owed fiduciary duties to Tinto, including the duty of care to preserve corporate assets and prevent insolvency, and the duty of loyalty. In their capacity as fiduciaries, **Silmar Bertin** and **Natalino Bertin** had the obligation to supervise and monitor corporate affairs, and to exercise independent judgment to benefit Tinto and its creditors.* | "87. Na qualidade de administradores da Tinto, **Silmar Bertin** e **Natalino Bertin** tinham deveres fiduciários para com a Tinto, incluindo o dever de cuidado para preservar os ativos da empresa e evitar a insolvência, e o dever de lealdade. Na sua qualidade de fiduciários, **Silmar Bertin** e **Natalino Bertin** tinham a obrigação de supervisionar e monitorizar os assuntos da empresa e de exercer um juízo independente para beneficiar a Tinto e os seus credores. |

| | |
|---|---|
| 88. **Silmar Bertin** and **Natalino Bertin** violated their duty of care and duty of loyalty when they directed Tinto to enter into the Share-Transfer Agreements. Silmar Bertin and Natalino Bertin, as sophisticated businessmen and the founders of Bertin S.A., were aware of the true value of the Bertin FIP shares, and knew that they were substantially underpriced in the Share-Transfer Agreements. In these transactions, Silmar Bertin and Natalino Bertin acted to benefit Defendants, not Tinto. | 88. **Silmar Bertin** e **Natalino Bertin** violaram o seu dever de cuidado e o seu dever de lealdade quando orientaram a Tinto a celebrar os Acordos de Transferência de Ações. **Silmar Bertin** e **Natalino Bertin**, na qualidade de empresários sofisticados e fundadores da Bertin S.A., tinham conhecimento do verdadeiro valor das ações do FIP Bertin e sabiam que estas estavam substancialmente subavaliadas nos Acordos de Transferência de Ações. Nestas transações, **Silmar Bertin** e **Natalino Bertin** agiram para beneficiar os Réus e não a Tinto. |
| 89. **Silmar Bertin** and **Natalino Bertin** also violated their duty of care and duty of loyalty when they directed Tinto to transfer its shares of Bertin S.A. into Bertin FIP. **Silmar Bertin** and **Natalino Bertin**, as sophisticated businessmen and the founders of Bertin S.A., were aware that the creation of Bertin FIP could only serve to benefit these Defendants and their illicit scheme. They instead acted to benefit these Defendants by use of the FIP structure—a decision that resulted in significant tax liability. | 89. **Silmar Bertin** e **Natalino Bertin** também violaram o seu dever de cuidado e o seu dever de lealdade quando instruíram a Tinto a transferir as suas ações da Bertin S.A. para o Bertin FIP. **Silmar Bertin** e **Natalino Bertin**, como empresários sofisticados e fundadores da Bertin S.A., sabiam que a criação do Bertin FIP só poderia servir para beneficiar estes Réus e o seu esquema ilícito. Em vez disso, atuaram para beneficiar estes Réus através da utilização da estrutura do FIP - uma decisão que resultou numa responsabilidade fiscal significativo". |

27.        Os membros da família Bertin são, ainda, mencionados em diversas outras relevantes passagens do Procedimento Estrangeiro, como se vê dos trechos abaixo, também em tradução livre:

| Trecho Original em inglês | Tradução livre para Português |
|---|---|
| "6. [...] Brothers **Silmar Bertin** and **Natalino Bertin** managed Tinto until the Brazilian bankruptcy court appointed a judicial administrator on November 29, 2018". | "6. [...] Os irmãos **Silmar Bertin** e **Natalino Bertin** geriram a Tinto até que o juízo falimentar brasileiro nomeou um administrador judicial em 29 de novembro de 2018". |
| "13. Bertin S.A. was a Brazilian agribusiness company indirectly owned, through Tinto, by brothers **Silmar Bertin** and **Natalino Bertin** and their families. Tinto's equity stake in Bertin S.A. was its most significant asset". | "13. A Bertin S.A. era uma empresa brasileira de agronegócios detida indiretamente, através da Tinto, pelos irmãos **Silmar Bertin** e **Natalino Bertin** e respectivas famílias. A participação da Tinto no capital da Bertin S.A. era o seu ativo mais significativo". |
| "54. [...] By April 2012, the Bertins had moved Tinto out of their core holding company, Heber, and transferred it to Riober Participações Ltda., a secondary Bertin-affiliated holding company owned by **Natalino Bertin**". | "54. [...] Em abril de 2012, os Bertin tinham retirado a Tinto da sua principal sociedade gestora de participações sociais, a Heber, e transferiram-na para a Riober Participações Ltda., uma sociedade gestora de participações sociais secundária afiliada aos Bertin, propriedade de **Natalino Bertin**." |
| "63. The **Bertins** (either personally or through their primary holding company, **Heber**) received cash and strengthened their ongoing business relationship with the Batistas. In the midst of these transactions, **Silmar Bertin** and **Natalino Bertin** | "63. Os **Bertin** (pessoalmente ou através da sua holding principal, a **Heber**) receberam dinheiro e reforçaram a sua relação comercial contínua com os Batistas. No meio destas transações, **Silmar Bertin** e **Natalino Bertin** |



| *incorporated several offshore entities (including companies in the United Kingdom and the British Virgin Islands), for still-unknown reasons".* | constituíram várias entidades offshore (incluindo empresas no Reino Unido e nas Ilhas Virgens Britânicas), por razões ainda desconhecidas." |

28.        E, mesmo **deduzindo causa de pedir específica contra membros da família Bertin,** o AJ, pasme-se, entendeu por bem não os incluir como réus no Procedimento Estrangeiro, mas, sob a alegação de que as empresas ali já inseridas como rés teriam CONTRIBUÍDO com o descumprimento dos deveres fiduciários, os incluiu. **É dizer: quem "contribui" para a conduta deve ser penalizado, mas quem a pratica diretamente, não. É realmente incompreensível, para se dizer o mínimo, a conduta do AJ.**

29.        Inclusive, abrem-se aqui breves parênteses para pontuar que, justamente pela própria impertinência da inserção da **JBS** no polo passivo do aludido Procedimento Estrangeiro, é que esta está se valendo da competente medida judicial perante a justiça americana para obter sua regular exclusão daquele procedimento.

30.        É fato público e notório que diversas empresas do Grupo Bertin estão em processos de recuperação judicial ou falência, revelando, no mínimo, uma má-gestão por parte da família Bertin.

31.        Por exemplo, no caso da Infinity, o processo de recuperação judicial foi convolado em falência exatamente porque a empresa não cumpriu com as obrigações assumidas no plano de recuperação judicial[8]. Houve, ainda, outra empresa – a CIBE SANEAMENTO E PARTICIPAÇÕES

---

[8] Processo nº 0151873-29.2009.8.26.0100 – 2ª Vara de Falências e Recuperações Judiciais do Foro Central da Comarca da Capital/SP. Veja-se trecho da decisão de convolação em falência, assim como, da decisão em grau de recurso (Agravo de Instrumento nº 2147004-17.2017.8.26.0000) que manteve a sentença de falência, respectivamente:

"(...) *A recuperanda não possui qualquer atividade, qualquer operação, qualquer faturamento, e seus únicos empregados, como informado pela própria empresa, são apenas os seguranças para que não haja furto de bens dessas usinas.* (...). *Desse modo, a recuperanda descumpre assim todos os pressupostos da recuperação judicial, haja vista não ter atividade a ser preservada, não gerar função social. A recuperanda não promove riqueza, não emprega pessoas e não satisfaz suas obrigações extraconcursais e, inclusive, está inadimplente com relação às concursais, inclusive trabalhista.* Nesta audiência sequer apresentou justificativa razoável a tanto. Por todos os argumentos, decreto a falência".

"Convolação de recuperação judicial em falência. Agravo de instrumento das recuperandas. *Provas da reiterada mora no cumprimento das obrigações do plano de reestruturação durante o biênio de supervisão, sendo que sequer os créditos trabalhistas foram quitados,* a despeito do comando do art. 54 da Lei de Recuperações e Falências. *Atrasos na implementação de medidas necessárias para a recuperação – que se arrasta há mais de 8 anos – que são imputáveis às recuperandas.* Relatórios da administradora judicial, atestando a falta de atividade produtiva. Inviabilidade econômica que, desse modo, torna imperioso o decreto de quebra, na medida em que não há empresas a preservar. (...)".



S.A. – que, assim com a **TINTO**, teve a sua quebra decretada por não honrar com assunção de dívida, no valor de R$ 63.444.453,76[9].

32.         Ademais, no âmbito da recuperação judicial[10] requerida por 10 (dez) empresas[11] integrantes do denominado "Grupo Heber" – um dos maiores sob a gestão do Grupo Bertin –, acumulam-se inúmeros escândalos envolvendo alegações de credores e do administrador judicial sobre indícios de má-gestão, prática de irregularidades contábeis por representantes do Grupo Bertin, afastamento de administradores, confusão societária e financeira, ocultação de patrimônio entre as empresas do Grupo Bertin[12] a ensejar potencial prática de crimes falimentares.

33.         Não fosse tudo isso o bastante, são inúmeros os procedimentos judiciais propostos por credores do Grupo Bertin nos quais, inclusive, se tem notícia de deferimento da desconsideração da personalidade jurídica[13] e a responsabilização de representantes e outras empresas do Grupo Bertin pela prática de atos ilícitos destinados a lesar seus credores.

34.         Essas são apenas algumas das situações envolvendo empresas e subgrupos integrantes do Grupo Bertin, que envolve diversas de pessoas jurídicas distintas que têm por praxe repassar obrigações entre elas, o que, somado aos diversos processos de quebra ou de recuperação judicial, levanta suspeitas – que merecem ser investigadas pelo AJ – sobre eventual ocultação de patrimônio e condutas destinadas a fraudar credores.

---

[9] Processo nº 1021934-32.2016.8.26.0100 – 2ª Vara de Falências e Recuperações Judiciais do Foro Central da Comarca da Capital/SP.

[10] Processo nº 1080871-98.2017.8.26.0100, em curso perante a 1ª Vara de Recuperações Judiciais, Falências e Conflitos Relacionados à Arbitragem, do Foro Central da Comarca da Capital do Estado de São Paulo.

[11] Heber Participações S.A., Comapi Agropecuária S.A., Contern Construções e Comércio Ltda., Compacto Participações S.A., Cibe Participações e Empreendimentos S.A., Cibe Investimentos e Participações S.A., Doreta Empreendimentos E Participações S.A., Infra Bertin Empreendimentos S.A., Concessionária Spmar S.A., Águas De Itú Gestão Empresarial S.A.

[12] É atualmente objeto de discussão nos autos da Recuperação Judicial do Grupo Heber indícios de possível ocultação de patrimônio pelos seus representantes, em razão da omissão de receitas e faturamento de seus principais ativos e, falta de transparência nos atos inerentes à alienação de um de seus principais ativos, avaliado em cerca de R$ 3 bilhões.

[13] No âmbito da Execução nº 0027644-31.2007.8.26.0564, por exemplo e, de relevante para a presente manifestação, foi deferida a desconsideração da personalidade jurídica e inclusão no polo passivo de **Natalino Bertin, Silmar Bertin, Roberto Bertin** e, do Grupo Bertin em si: "*Inclua-se então tais empresas (BRACOL, GRUPO BERTIN, BERTIN S/A, JBS e BSB) no polo passivo da demanda, bem como seus sócios (NATALINO BERTIN, CPF 250. 015. 238-34; FERNANDO ANTÔNIO BERTIN, CPF 001. 854. 328-76; SILMAR ROBERTO BERTIN, CPF 015. 751. 668-79). Desnecessária a citação dessas empresas e dos devedores solidários*".



35.      É evidente, portanto, que o AJ, em atenção aos deveres que a ele são impostos pelo Art. 22, da LREF, e de forma a maximizar os recursos para a satisfação dos credores da **TINTO**, precisa ter uma postura mais ativa e eficiente.

36.      O AJ pediu autorização do juiz para contratar advogados estrangeiros *"para viabilizar a apuração dos indícios de desvios de patrimônio, possivelmente orquestrados inclusive pela antiga administração da Falida, seus sócios, ex-controladores e/ou demais envolvidos"* mas inexplicavelmente não fez isso, tendo ajuizado uma ação nos EUA sem incluir nenhum membro do Grupo Bertin, controladores da falida.

37.      Diante do notório cenário de insolvência de empresas do Grupo Bertin, o AJ deveria estar investigando e buscando a responsabilização dos antigos administradores e controladores, com medidas para reaver ativos desviados ou ocultados.

38.      Considerando, ainda, que o maior débito da massa falida decorre de um único auto de infração relacionado à mesma operação societária questionada na ação americana, o AJ deveria estar, inclusive, atuando na ação judicial que pode desconstituir o referido crédito tributário. Mas não. Como se viu, e já foi apontado por outro credor da massa, o AJ sequer está acompanhando a ação tributária que, com desfecho favorável, pode reduzir em mais de 90% o valor da dívida da **TINTO**, em benefício de todos os credores.

39.      Explicações precisam ser urgentemente dadas aos credores, pois o que parece é que o AJ protege os antigos administradores e controladores que causaram a quebra da **TINTO**, em prejuízo dos seus credores.

40.      Veja-se, Exa., que nesta petição, a **JBS**, como credora interessada no bom andamento da falência, se prestou a buscar informações mínimas sobre o cenário do **Grupo Bertin** e, a partir delas, já identificou indícios fortes de má-gestão e abuso da personalidade jurídica pela família Bertin. Esse trabalho, evidentemente, deve ser aprofundado pelo AJ, com a responsabilização dos controladores da TINTO pela falência da empresa.

## VI.      PEDIDO

41.      À luz de todos os elementos aqui apresentados, a **JBS** requer:

   **(i)**      a intimação das AJs DELOITTE e RUIZ para que esclareçam:



**a.** qual foi o "conflito de interesses" que motivou o pedido de da DELOITTE para ser substituída da função de AJ;

**b.** se foram adotadas, no Brasil e/ou no exterior, medidas contra outras pessoas físicas ou jurídicas relacionadas ao Grupo Bertin e, em caso positivo, qual o status de cada uma dessas medidas;

**c.** se foram adotadas medidas contra os controladores e administradores da **TINTO** e, em caso negativo, por qual razão não foram implementadas até a presente data.

42.        Nos termos do Art. 272, §2º, do CPC, requer que todas as publicações e intimações deste processo sejam feitas <u>exclusivamente</u> em nome de **ADRIANA ASTUTO PEREIRA**, inscrita na OAB/RJ sob o nº **80.696**, com escritório à Avenida General Justo, 365, 02º e 09º andares, Centro, Rio de Janeiro/RJ, CEP: 20.021-130, com endereço de correio eletrônico: intimacoes.civel@bicharalaw.com.br, sob pena de nulidade.

Termos em que,

pede deferimento.

São Paulo, 19 de janeiro de 2024

**ADRIANA ASTUTO PEREIRA**
**OAB/RJ 80.696**

**SAMANTHA MENDES LONGO**
**OAB/RJ 104.119**

**MARINA FURTADO DE M. T. DE MACEDO**
**OAB/RJ 177.432**

**GUILHERME ALVARES FERREIRA DE SOUZA**
**OAB/RJ 201.810**



# Bichara

LAWYERS

**HONORABLE JUDGE OF LAW OF THE 2ND COURT FOR BANKRUPTCIES AND COURT-SUPERVISED REORGANIZATIONS OF THE CENTRAL JUDICIAL DISTRICT OF THE STATE OF SÃO PAULO**

Case no. 1088030-29.2016.8.26.0100

**JBS S.A. ("JBS"),** a corporation registered under CNPJ/MF (*Cadastro Nacional da Pessoa Jurídica/Ministério da Fazenda* [Corporate Taxpayer Registration Number/Ministry of Finance]) No. 02.916.265/0001-60, with headquarters at Avenida Marginal Direct do Tietê, No. 500, 3rd floor, block I, Vila Jaguara, in the city of São Paulo, State of São Paulo, CEP: 05.118-100, duly qualified under the General List of Creditors in the bankruptcy proceedings decreed against **TINTO HOLDING LTDA. ("<u>TINTO</u>"**), through its lawyers **(Doc. 01),** hereby submits and requests the following.

1. This bankruptcy, decreed on 11/29/2018, has been ongoing for no less than 7 years, without any relevant collection in favor of the bankruptcy estate, despite two distinct Judicial Administrators ("AJ" or "AJs") having already operated: **(i)** DELOITTE TOUCHE TOHMATSU CONSULTORES LTDA ("<u>DELOITTE</u>"), and **(ii)** AJ RUIZ CONSULTORIA EMPRESARIAL S.A. ("<u>AJ RUIZ</u>").

2. **JBS,** a member of one of the main financial creditor groups of **TINTO ("JBS Group")** and with receivables qualified under Class III[1], presents this statement with the purpose of addressing flagrant inconsistencies in the way that the AJs - old and current - have been conducting this bankruptcy case.

---

[1] Collectively, the companies that are members of the JBS Group listed in the last version of the General List of Creditors of this bankruptcy are unsecured creditors of **TINTO** in the total amount of BRL 2,445,789.20 (<u>JBS S.A.</u>: BRL 77,344.47; <u>JBS S.A. Curtume e Lins</u>: BRL 2,364,052.01 and; <u>JBS Frigorífica Lins</u>: BRL 4,392.72).



Bichara

LAWYERS

3.　　　　As will be demonstrated here, the AJ initiated a procedure in the United States against companies and individuals related to the **JBS Group,** while there is no news of any action taken against the former controllers and administrators of **TINTO** itself.

4.　　　　And this is despite **TINTO** having its bankruptcy decreed based on the request of a creditor - BS Factoring Fomento Comercial Ltda. - for not honoring the payment of debt voluntarily accepted by it[2] in favor of another company linked to the Bertin Group, Infinity Bio-Energy do Brasil S.A., which is also in bankruptcy case[3].

5.　　　　There was, clearly, a corporate decision in the acceptance of the aforementioned debt by **TINTO,** which would justify, at least, a closer look at the conduct of those who, at the time, decided to adopt the curious measure of accepting for the company that they controlled a debt of **BRL 55 million.**

6.　　　　Especially because, when the bankruptcy was requested, the outstanding amount was nothing less than BRL 40 million, that is, **TINTO** was effectively able to honor a minimum part of the debt, which makes strange the decision to accept a payment obligation so disproportionate to the financial capacity of the company. As far as one can see, this operation was not in the best interest of **TINTO** - which became bankrupt due to it - but, in reality, of the business group that it is part of.

7.　　　　With due respect, it is not admissible for the AJs to oversee this bankruptcy for 7 years, accumulating significant amount in fees of more than BRL 400 thousand, and refrain from investigating the very strange circumstances of this bankruptcy and adopting any measure against the parties which, in fact, caused the **TINTO** to go bankrupt**,** failing to adopt all possible measures to enable the satisfaction of its creditors.

8.　　　　This is what is shown below.

---

[2] "Private Instrument of Partial Acceptance of Debt with Fiduciary Transfer of Shares as Guarantee and Other Covenants" – pp. 17/51.
[3] Case No. 0151873-29.2009.8.26.0100 - 2§ Bankruptcy Court of the Central Judicial District of São Paulo.



**Bichara**

LAWYERS

## I.    THE WORK OF THE AJ

**THE FOREIGN PROCEDURE INITIATED BY DELOITTE**

9.        Based on the Bill of Review No. 2194823-37.2023.8.26.0000, filed by **TINTO, JBS** became aware that the former AJ, DELOITTE, <u>in a confidential procedure</u> - Credit Qualification No. 1095595-34.2022.8.26.0100 - requested and obtained judicial permission from this Honorable Court[4] for (i) the hiring of firms in the United States and the United Kingdom, (ii) the appointment of a representative of the bankruptcy estate abroad, and (iii) the submission of an auxiliary bankruptcy application in the United States and England.

10.        More recently, also under the aforementioned Bill of Review, the current administrator, AJ RUIZ, defends that **TINTO** cannot participate in the proceeding, <u>because what is sought from it is to initiate transnational investigative procedures and measures to recover assets, with the possible liability of the former controllers and partners of **TINTO**,</u> as can be seen from the following excerpt **(Doc. 02):**

> *"the original proceeding was initiated to enable the investigation of evidence of misappropriation of assets, possibly orchestrated including by the former management of the Bankrupt Company, its partners, former controllers and/or others involved."*

11.        Although the AJ's attitude of investigating **TINTO**'s assets abroad is commendable, the fact is that the contracting was authorized, the bankrupt estate was

---

[4] "Therefore, I authorize the hiring of the firms Kellog, Hansen Todd, Figel Frederick PLLC; SEQUOR LAW and GOWLING WLG (UK) LLP, the Administrator, on behalf of the bankrupt company, having to arrange for the formalization of the agreements (pp. 338/342; 342/344 and 352/358) and attach them to this proceeding. I also hereby grant: **(i)** the appointment, in the person of Luis Vasco Elias, of the Judicial Administrator, as representative of the Bankruptcy Estate abroad, through DFA, the above U.S. and British firms and such others as the Judicial Administrator may appoint; **(ii)** the <u>application for auxiliary bankruptcy in the United States under Chapter 15 (Ancillary and Other Cross - Border Cases), Title 11 (Bankruptcy) of the United States</u> Code; **(iii)** the signing of the Drawbridge Agreement by the Bankruptcy Estate, which, under the terms of such agreement, is authorized to transfer the amount of BRL 1,500.00 (one thousand, five hundred dollars), for credit to the customer account to be held with SEQUOR LAW, as per local legal requirements. I hereby order the notary office to issue a letter to Banco do Brasil, urgently, so that it may transfer to the following account, whose nature code, for exchange purposes, is as follows: Nature Code 47128-00-N-05-90 (Legal Services) Details of the account from which the amount must be debited: Case No. 015187329.2009.8.26.0100 - Judicial Account: 3300104659568 - Banco do Brasil S/A Code/Number 001 - Paying Agency: 6815 Clovis Bevilacqua **(iv)** the application for Brazilian bankruptcy in England, in order to make the request for restoration, before the local corporate registry, of the companies METROPOLITAN ASSETS LLP, CONCORD GLOBAL LLP and GALLATAS LLP; **(v)** Finally, I grant the issuance of a certificate in this proceeding as follows: MASSA FALIDA DE TINTO HOLDING LTDA., through its judicial administrator DELOITTE TOUCHE TOHMATSU CONSULTORES LTDA, represented by its managing partner, Mr. Luis Vasco Elias, is authorized to file an application for auxiliary bankruptcy in the United States of America, as well as in England, under the terms and limits of the Laws of the respective jurisdictions. Oversee the service urgently. Int. - ATTORNEY: ANTONIO MANUEL FRANCA AIRES (OAB 63191/SP)"



## Bichara

LAWYERS

encumbered, but it was never clarified what was intended to be recovered from the "partners, former controllers and/or others involved" in the former management of **TINTO**, as there is no information regarding the effective adoption of measures against any of them.

12.        **On the other hand, this is a very serious procedure filed solely against creditor of TINTO and third parties in the United States.**

13.        As already reported in the case files of this bankruptcy, on 04/24/2023, DELOITTE requested to be replaced as AJ for having observed a conflict of interest, stating that "*due to recent measures for the search for assets abroad, it identified a conflict of interest for the continuation of its duties in the bankruptcy, which immediately prevents it from remaining in office, constituting a relevant reason for its replacement[5]"*. This request was granted, on 05/25/2023, the company AJ RUIZ CONSULTORIA EMPRESARIAL S.A. ("AJ RUIZ"), having been appointed as AJ, in replacement, which accepted the role.

14.        On the same day that it petitioned in the **TINTO** bankruptcy proceedings, requesting its replacement, DELOITTE filed, as AJ and foreign representative of the **TINTO,** procedure No. 23-01118-MAM before the US Bankruptcy Court of the Southern District of Florida ("Foreign Procedure"). In it, it refers to procedure No. 23-11719-MAM, filed on 03/03/2023, with a view to recognizing the transactional nature of the **TINTO** bankruptcy**.**

15.        It is noted that the AJ extrapolated the limits of the permission granted by this Honorable Court, which, in the form of the aforementioned decision handed down in Credit Qualification No. 109559534.2022.8.26.0100, was for the establishment of auxiliary bankruptcy abroad[6] and also violated the institution of universal judgment, provided for in Art. 76 of the LREF (Lei de Recuperação de Empresas e Falência [Business Recovery and Bankruptcy Law]), when establishing the Foreign Procedure.

16.        Indeed, the claim put forward in the Foreign Procedure is a typical revocatory action, through which one seeks to revoke *"acts committed with the intent to harm creditors, proving fraudulent collusion between the debtor and the third party contracting with it and the*

---

[5]Pp. 5.271/5.272.

[6] *"I further grant: **(i)** the appointment, in the person of Luis Vasco Elias, of the Judicial Administrator, as representative of the Bankruptcy Estate abroad, through the DFA, the above U.S. and British firms and others that the Judicial Administrator may appoint; **(ii)** the application for auxiliary bankruptcy in the United States of America under Chapter 15 (Ancillary and Other Cross - Border Cases), Title 11 (Bankruptcy) of the United States Code; (...)"*.



LAWYERS

*actual loss suffered by the bankrupt estate"*, as set forth in Art. 132, of the LREF, being certain that the legal deadline for filing this measure - 3 years from the bankruptcy, as per Art. 135, of LREF - long since expired.

17.	After all, regardless of the legal guise of the abnormal Foreign Procedure, what is intended is to revoke a legal transaction that was signed in Brazil almost 10 years ago, based on the recognition of the nullity of corporate transactions that occurred between the years 2009 and 2014, to hold creditors and third parties responsible for acts carried out by **TINTO**'s own representatives, that is, claims that must be put forward through a revocation action, the handling of which must necessarily take place in the bankruptcy court, in accordance with art. 134[7], of the LREF.

18.	The AJ sought the American court without jurisdiction to file a lawsuit that should have been filed here (but whose deadline has already expired) to annul the legal transaction signed by TINTO and companies of the JBS group.

19.	In any event, the Foreign Procedure was originally brought against the following legal entities: Colorado Investment Holding's LLC ("Colorado"), J&F Investimentos S.A. (J&F ), JJMB Participações Ltda ("JJMB ") and WWMB Participações Ltda ("WWMB "). Subsequently, AJ Ruiz also requested the inclusion of **JBS** as a defendant for that claim.

20.	**As incredible as this may seem, the AJ aims to dismantle the legal transaction carried out between two business groups, but only filed the action against one of the groups. There is not a single member of the Bertin family, nor any Bertin Group company, as defendant in the action.**What the AJ alleges at all times is that the Bertin family, in the management of **TINTO**_, breached its fiduciary duties,_ but those included as defendants are companies and individuals linked to **JBS.**

21.	In the aforementioned procedure, the AJ of the bankrupt estate of **TINTO** protests against corporate transactions that, in its (distorted) view, were fraudulent and caused losses to **TINTO**'s creditors**.** More specifically, the AJ questions the transaction of the Equity Investment Fund ("Bertin FIP"), acquired by Defendants Colorado, J&F, JJMB and WWMB for allegedly insignificant amounts.

---

[7] Art. 134. The revocatory action will take place before the bankruptcy court and will comply with the ordinary procedure provided for in Law No. 5,869, of January 11, 1973 - Code of Civil Procedure



# Bichara

LAWYERS

22.        According to the AJ narrative, although **TINTO** received a significant portion of the **JBS** shareholding as a result of the merger of its largest asset - which consisted of the majority stake in the company Bertin S.A., -, by virtue of an <u>alleged maneuver by members of the Batista and Bertin families in omitting the referred transactions and parallel transactions carried out during the merger period</u> (between 2009 and 2014), the value of the shareholding rights was dispersed and, subsequently, the transfer of shares took place at values far below of the market, to the detriment of **TINTO**, its main asset and creditors in the context of bankruptcy.

23.        And it is based on this corporate transaction deemed fraudulent that the CA puts forward the following requests in the US: **(i)** the recognition of illicit enrichment by the defendants, in addition to non<u>**-compliance with fiduciary duties by the defendants and administrators of TINTO; (ii)** the **declaration of nullity of the transactions carried out and the legal transaction as a whole;**</u> and **(iii)** the

disregarding of the legal status of the defendants, with subsequent judgment for damages and alleged unlawful practices carried out.

24.        In fact, there are several misconceptions in the filing of the aforementioned Foreign Procedure, and it is worth highlighting, in advance, the fact that one of the causes of action is, exactly, **breach of fiduciary duty by the Bertin family.**

25.        In the Foreign Procedure, <u>the CA expressly maintains the breach of the fiduciary duty by the brothers **Silmar Bertin** and **Natalino Bertin,** for breach of the management duties in relation to **TINTO**, including the preservation of assets, prevention of insolvency and loyalty, also having oversight in corporate management matters.</u>

26.        See below the original content and, freely translated, what the AJ claimed at this point:

| **Original Excerpt in English** | **Free translation into Portuguese** |
| --- | --- |
| *"87. As officers of Tinto, **Silmar Bertin** and **Natalino Bertin** owed fiduciary duties to Tinto, including the duty of care to preserve corporate assets and prevent insolvency, and the duty of loyalty. In their capacity as fiduciaries, **Silmar Bertin** and **Natalino Bertin** had the obligation to supervise and monitor corporate affairs, and to* | "87. As officers of Tinto, **Silmar Bertin** and **Natalino Bertin** owed fiduciary duties to Tinto, including the duty of care to preserve corporate assets and prevent insolvency, and the duty of loyalty. In their capacity as fiduciaries, **Silmar Bertin** and **Natalino Bertin** had the obligation to supervise and monitor corporate affairs, and to exercise independent |

# Bichara

LAWYERS

| | |
|---|---|
| *exercise independent judgment to benefit Tinto and its creditors.* | judgment to benefit Tinto and its creditors. |
| *88. **Silmar Bertin** and **Natalino Bertin** violated their duty of care and duty of loyalty when they directed Tinto to enter into the Share-Transfer Agreements. Silmar Bertin and Natalino Bertin, as sophisticated businessmen and the founders of Bertin S.A., were aware of the true value of the Bertin FIP shares, and knew that they were substantially underpriced in the Share-Transfer Agreements. In these transactions, Silmar Bertin and Natalino Bertin acted to benefit Defendants, not Tinto.* | 88. **Silmar Bertin** and **Natalino Bertin** violated their duty of care and duty of loyalty when they directed **Tinto** to enter into the Share-Transfer Agreements. Silmar Bertin and Natalino Bertin, as sophisticated businessmen and the founders of the Bertin FIP shares, were aware of the true value of the Bertin FIP shares, and knew that they were substantially underpriced in the Share-Transfer Agreements. In these transactions, **Silmar Bertin** and **Natalino Bertin** acted to benefit Defendants, not Tinto. |
| *89. **Silmar Bertin** and **Natalino Bertin** also violated their duty of care and duty of loyalty when they directed Tinto to **transfer** its shares of Bertin S.A. into Bertin FIP. **Silmar Bertin** and **Natalino Bertin,** as sophisticated businessmen and the founders of Bertin S.A., were aware that the creation of Bertin FIP could only serve to benefit these Defendants and their illicit scheme. They instead acted to benefit these Defendants by use of the FIP structure—a decision that resulted in significant tax liability.* | 89. **Silmar Bertin** and **Natalino Bertin** also violated their duty of care and duty of loyalty when they directed Tinto to transfer its shares of Bertin S.A. into Bertin FIP. **Silmar Bertin** and **Natalino Bertin**, as sophisticated businessmen and the founders of Bertin S.A., were aware that the creation of Bertin FIP could only serve to benefit these *Defendants* and their illicit scheme. They instead acted to benefit these Defendants by use of the FIP structure—a decision that resulted in significant tax liability." |

27.        The members of the Bertin family are also mentioned in several other relevant

passages of the Foreign Procedure, as seen in the excerpts below, also freely translated:

| Original Excerpt in English | Free translation into Portuguese |
|---|---|
| *"6. [...] Brothers **Silmar Bertin** and **Natalino Bertin** managed Tinto until the Brazilian bankruptcy court appointed a judicial administrator on November 29, 2018".* | "6. [...] Brothers **Silmar Bertin** and **Natalino Bertin** managed Tinto until the Brazilian bankruptcy court appointed a judicial administrator on November 29, 2018." |
| *"13. Bertin S.A. was a Brazilian agribusiness company indirectly owned, through Tinto, by brothers **Silmar Bertin** and **Natalino Bertin** and their families. Tinto's equity stake in Bertin S.A. was its most significant asset".* | "13. Bertin S.A. was a Brazilian *agribusiness* company indirectly owned, through Tinto, by brothers **Silmar Bertin** and **Natalino Bertin** and their families. Tinto's equity stake in Bertin S.A. was its most significant asset". |
| *"54. [...] By April 2012, the Bertins had moved Tinto out of their core holding company, Heber, and transferred it to Riober Participações Ltda., a secondary Bertin-affiliated holding company owned by **Natalino Bertin".*** | "54. [...] By April 2012, the Bertins had moved Tinto out of their core holding company, Heber, and transferred it to Riober Participações Ltda., a secondary Bertin-affiliated holding company owned by **Natalino Bertin."** |
| *"63. The **Bertins** (either personally or through their primary holding company, **Heber**) received cash and strengthened their ongoing business relationship with the Batistas. In the midst of these transactions, **Silmar Bertin** and **Natalino Bertin** incorporated several offshore entities (including companies in the United Kingdom and* | "63. The **Bertins** (either personally or through their primary holding company, **Heber**) received cash and strengthened their ongoing business relationship with the Batistas. In the midst of these transactions, **Silmar Bertin** and **Natalino Bertin** incorporated several offshore entities (including companies in the United Kingdom and the British Virgin Islands), for |

---



# Bichara

LAWYERS

| | |
|---|---|
| *the British Virgin Islands), for still-unknown reasons".* | *still-unknown reasons".* |

28.        And, even **putting forward a specific cause of action against members of the Bertin family,** the AJ, surprisingly, decided not to include them as defendants in the Foreign Procedure, but, on the grounds that the companies already included therein as defendants CONTRIBUTED with failure to comply with fiduciary duties, included them. **That is: whoever "contributes" to the conduct should be penalized, but whoever commits it directly no. The conduct of the AJ is really incomprehensible, to say the least.**

29.        Also, brief parentheses are opened here to point out that, precisely due to the impertinence itself of the insertion of **JBS** as a defendant in the aforementioned Foreign Procedure, it is that it is taking advantage of the competent judicial measure before the US courts to obtain its regular exclusion from that procedure.

30.        It is a public and notable fact that several companies of the Bertin Group are in court-supervised reorganization or bankruptcy proceedings, revealing, at least, mismanagement by the Bertin family.

31.        For example, in Infinity's case, the court-supervised reorganization process was converted into bankruptcy exactly because the company failed to comply with the obligations assumed in the court-supervised reorganization plan[8]. There was also another company - CIBE

---

[8] Case No. 0151873-29.2009.8.26.0100 - 2§ Bankruptcy and Court-Supervised Reorganizations Court of the Central Judicial District of the Capital/SP. See an excerpt from the decision for conversion into bankruptcy, as well as the appeal decision (Bill of Review No. 2147004-17.2017.8.26.0000) that upheld the bankruptcy judgment, respectively: "(...) *The company under reorganization does not have any activity, any operations, any revenue, and its only employees, as informed by the company itself, are only security guards so that there is no theft of assets from these plants.* (...). *Thus, the company under reorganization thus violates all the requirements of court-supervised reorganization, given that it has no activity to be preserved and does not generate a social function. The company under reorganization does not promote wealth, does not employ people and does not satisfy its obligations not subject to bankruptcy rules and, even, is in default with regard to the obligations subject to bankruptcy rules, including labor-related.* At this hearing, it did not even provide a reasonable justification for this. Based on all arguments, I decree bankruptcy."
"Conversion of court-supervised reorganization into bankruptcy. Bill of review of the companies under reorganization. *Evidence of repeated delays in fulfilling the obligations of the restructuring plan during the two-year supervision period, with labor claims not even being settled,* despite the requirement of Art. 54 of the Reorganization and Bankruptcies Law. *Delays in the implementation of measures necessary for recovery - which has been dragging for more than 8 years - which are attributable to the restructuring parties.* Reports from the judicial administrator, attesting to the lack of productive activity. Economic unfeasibility which, in this way, makes the bankruptcy decree imperative, insofar as there are no companies to preserve. (...)".



# Bichara

LAWYERS

SANEAMENTO E PARTICIPAÇÕES S.A. - which, as with **TINTO,** had its bankruptcy decreed for not honoring the assumption of debt, in the amount of BRL 63,444,453.76[9].

32.          In addition, within the scope of the court-supervised reorganization [10] requested by 10 (ten) companies[11] that are part of the so-called "Heber Group" - one of the largest companies under the management of the Bertin Group -, numerous scandals have accumulated involving allegations from creditors and the judicial administrator about evidence of mismanagement, the commission of accounting irregularities by representatives of the Bertin Group, removal of directors, corporate and financial co-mingling, concealment of assets among the Bertin[12] Group companies giving rise to the potential commission of bankruptcy crimes.

33.          If all of this were not enough, there are countless legal proceedings brought by creditors of the Bertin Group in which there even news of granting of the piercing of the corporate veil[13] and the holding liable of representatives and other companies of the Bertin Group for the commission of unlawful acts intended to harm their creditors.

34.          These are just a few of the situations involving companies and subgroups that are part of the Bertin Group, which involve several different legal entities that have the practice of passing on obligations between them, which, added to the various bankruptcy or court-supervised reorganization cases, raises suspicions - which deserve be investigated by the AJ - regarding possible concealment of assets and conduct intended to defraud creditors.

---

[9] Case No. 1021934-32.2016.8.26.0100 - 2§ Bankruptcy and Court-Supervised Reorganizations Court of the Central Judicial District of the Capital/SP.

[10] Case No. 1080871-98.2017.8.26.0100, in progress before the 1st Court of Court-Supervised Reorganizations, Bankruptcies and Conflicts Related to Arbitration, of the Central Judicial District of the Capital of the State of São Paulo.

[11] Heber Participações S.A., Comapi Agropecuária S.A., Contern Construções e Comércio Ltda., Compacto Participações S.A., Cibe Participações e Empreendimentos S.A., Cibe Investimentos e Participações S.A., Doreta Empreendimentos E Participações S.A., Infra Bertin Empreendimentos S.A., Concessionária Spmar S.A., Águas De Itú Gestão Empresarial S.A.

[12] Currently under discussion in the proceedings of the Court-Supervised Reorganization regarding the Heber Group is evidence of possible concealment of assets by its representatives, due to the omission of revenues and billing of its main assets and lack of transparency in the acts inherent to the disposal of one of its main assets, valued at around BRL 3 billion.

[13] Within the scope of Execution No. 0027644-31.2007.8.26.0564, for example and, relevant to this statement, the piercing of the corporate veil and inclusion among the defendants of **Natalino Bertin, Silmar Bertin, Roberto Bertin** and, of the Bertin Group itself was granted: *"Therefore such companies (BRACOL, GRUPO BERTIN, BERTIN S/A, JBS and BSB) are to be included as defendants of the claim, as well as their partners (NATALINO BERTIN, CPF 250. 015. 238-34; FERNANDO BERTIN ANTONY, CPF 001. 854. 328-76; SILMAR ROBERTO BERTIN, CPF 015. 751. 668-79). It is unnecessary to summon these companies and joint debtors."*



**Bichara**

LAWYERS

35.        It is clear, therefore, that the AJ, in consideration of the duties imposed on it by Art. 22 of the LREF, and in order to maximize the resources for the satisfaction of the creditors of **TINTO,** needs to have a more active and efficient stance.

36.        The AJ asked for permission from the judge to hire foreign lawyers *"to enable the investigation of evidence of misappropriation of assets, possibly orchestrated even by the former management of the Bankrupt Company, its partners, former controllers and/or others involved"* but unexplainably did not do so, having <u>filed a lawsuit in the USA without including any member of the Bertin Group,</u> controllers of the bankrupt company.

37.        In view of the notorious insolvency scenario of Bertin Group companies, the AJ should be investigating and seeking the accountability of the former directors and controllers, with measures to recover misappropriated or concealed assets.

38.        Considering, furthermore, that the largest debt of the bankrupt company stems from a single tax assessment notice related to the same corporate operation questioned in the American lawsuit, the AJ should even be acting in the legal action that could set aside the aforementioned tax credit. But no. As we have seen and has already been pointed out by another estate creditor, the AJ is not even monitoring the tax action which, with a favorable outcome, could reduce the value of **TINTO**'s debt by more than 90%, for the benefit of all creditors.

39.        Explanations need to be given urgently to creditors, as it appears that the AJ protects the former directors and controllers who caused **TINTO**'s bankruptcy, to the detriment of its creditors.

40.        It should be noted, Your Honor, that in this petition, **JBS,** as a creditor interested in the good progress of the bankruptcy, seeks minimal information on the scenario of the **Bertin Group** and, based on that, has already identified strong evidence of mismanagement and abuse of the legal status by the Bertin family. This work, of course, must be taken further by the AJ, with the controllers of TINTO being held liable for the bankruptcy of the company.

**VI.        REQUEST**

41.        In light of all the factors presented herein, **JBS** requests:

---



# Bichara

LAWYERS

**(i)** the summons of the AJs, DELOITTE and RUIZ, to clarify:

**a.** the nature of the "conflict of interest" that justified DELOITTE's request to be replaced in the AJ role;

**b.** whether measures have been adopted in Brazil and/or abroad against other individuals or legal entities related to the Bertin Group and, if so, the status of each of these measures;

**c.** whether measures have been taken against the controllers and directors of **TINTO** and, if not, why they have not been implemented to date.

42.        Pursuant to Art. 272, §2, of the Code of Civil Procedure, it requires that all publications and summons of this case be made <u>exclusively</u> on behalf of **ADRIANA ASTUTO PEREIRA,** registered with the OAB (*Ordem dos Advogados do Brasil* [Brazilian Bar Association])/RJ under No**. 80.696,** with an office at Avenida General Justo, 365, 02nd and 09th floors, Centro, Rio de Janeiro/RJ, ZIP: 20.021-130, with an e-mail address: <u>intimacoes.civel@bicharalaw.com.br</u>, under penalty of nullity.

Respectfully

submitted.

Sao Paulo, January 19, 2024

**ADRIANA ASTUTO PEREIRA**
**OAB/RJ 80.696**

**SAMANTHA MENDES LONGO**
**OAB/RJ 104.119**

**MARINA FURTADO DE M. T. DE MACEDO**
**OAB/RJ 177.432**

**GUILHERME ALVARES FERREIRA DE SOUZA**
**OAB/RJ 201.810**



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**JBS - Falência TINTO**" is, to the best of my knowledge and belief, a true and accurate translation from Portuguese into English.

_____
Jacqueline Yorke=

Sworn to before me this
February 5, 2024

_____
Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

_____
Stamp, Notary Public