# EXHIBIT 3

fls. 6123

**A** **J** **RUIZ**
ADMINISTRAÇÃO JUDICIAL

**EXCELENTÍSSIMO SENHOR DOUTOR JUIZ DE DIREITO DA 2ª VARA DE FALÊNCIAS E RECUPERAÇÕES JUDICIAIS DO FORO CENTRAL CÍVEL DA COMARCA DA CAPITAL – SP.**

**Processo nº 1088030-29.2016.8.26.0100**
**Falência**

        **AJ RUIZ CONSULTORIA EMPRESARIAL S.A.**, Administradora Judicial nomeada na **FALÊNCIA** de **TINTO HOLDING LTDA.**, vem respeitosamente à presença de Vossa Excelência, em atenção à r. decisão de fls. 5878/5881 (item 3), manifestar-se acerca da petição de fls. 5533/5649, bem como da petição de fls. 5884/5892, nos seguintes termos:

**I – MANIFESTAÇÃO DE BRASIL SPECIAL SITUATIONS I FUNDO DE INVESTIMENTOS EM DIREITOS CREDITÓRIOS (FLS. 5533/5649)**

        Às fls. 5533/5649, o credor BRASIL SPECIAL SITUATIONS I FUNDO DE INVESTIMENTOS EM DIREITOS CREDITÓRIOS se manifestou para noticiar que adquiriu por meio de cessão o crédito outrora detido por IPIRANGA PRODUTOS DE PETRÓLEO S/A, que foi inicialmente cedido para MONTBLANC PARTICIPAÇÕES S/A e posteriormente à BRASIL SPECIAL SITUATIONS, conforme termo de cessão de fls. 5645/5649, requerendo a substituição processual e a alteração da titularidade do crédito arrolado em favor de IPIRANGA PRODUTOS DE PETRÓLEO S/A.

1

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16, sob o número WJMJ24401243765
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

fls. 6124



Além da notícia quanto à cessão de crédito mencionada, o credor afirmou não ter localizado dentre as ações judiciais relacionadas na petição da Administradora Judicial de fls. 5428/5437 o processo nº 1044546-79.2019.4.01.3400, em que se discute o crédito detido pela Fazenda Nacional oriundo do processo administrativo fiscal nº 16561.720170/2014-01, no importe de mais de R$ 6 bilhões. Neste tocante, ressalta a existência de precedentes favoráveis ao cancelamento de cobranças administrativas decorrentes de voto de qualidade em favor da União e a necessidade de acompanhamento estratégico do referido processo.

Ademais, mencionou a publicação da Lei Federal nº 14.689/2023 que prevê reduções de encargos para débitos tributários decorrentes do voto de qualidade em favor da Fazenda Nacional, alegando ser fundamental a solicitação das reduções pela auxiliar do Juízo.

O credor também questiona a contratação da banca de advogados Scalzilli Advogados para atuar em defesa dos interesses da Massa Falida nas ações de natureza cível e tributária, alegando a necessidade de que os processos deveriam ser conduzidos por "*escritório com mais expertise e atuação focada em demandas e assuntos tributários complexos*" (*sic*).

Finalmente, o credor menciona a existência de **incidente sigiloso,** cujo objeto seria a apuração de eventuais condutas fraudulentas pelos antigos administradores, sócios e controladores da Falida, requerendo a intimação da Administradora Judicial para informar as medidas adotadas contra a antiga administração da Falida no Brasil e no exterior.

## II – MANIFESTAÇÃO DE BERF PARTICIPAÇÕES S/A (FLS. 5884/5892)

Também se manifestou nos autos BERF Participações S/A (fls. 5884/5892), "*sócia minoritária do Grupo Bertin*" (*sic*), reiterando as notícias acerca de

2

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

supostas condutas ilícitas praticadas pelos ex-administradores da Falida e requerendo esclarecimentos da Administradora Judicial acerca (i) dos atos praticados visando o cancelamento do auto de infração relativo ao processo nº 1044546-79.2019.01.3400; (ii) das diligências adotadas para a adesão a programas de parcelamento objetivando a redução do passivo fiscal; (iii) do andamento e estratégia adotada na ação ajuizada nos Estados Unidos.

Requereu, ainda, a instauração de incidente para a apuração de eventuais crimes falimentares nos termos dos artigos 167 e 172 da LRE.

### III – Esclarecimentos da Administradora Judicial

Inicialmente, importa esclarecer que, desde o momento de sua nomeação nos presentes autos, esta Administradora Judicial dispendeu especial atenção ao passivo tributário da Massa Falida, não só pela vultuosidade, mas principalmente pela complexidade das questões envolvidas.

Neste sentido, além da contratação de escritório especializado em Direito Tributário e em Direito da Insolvência – que somente a partir de setembro de 2023 começou a tomar conhecimento da situação dos processos de natureza fiscal e tributária, majoritariamente através das informações fornecidas pela anterior Administradora Judicial –, foi empreendida análise preliminar e elaborado relatório[1] do contexto jurídico-processual fiscal da Massa, identificando-se não só o volume (identificável) dos processos judiciais e

_____

[1] O documento teve por base (i) informações prestadas e documentos fornecidos pela anterior Administradora Judicial, a Deloitte; (ii) cópias de processos judiciais tributários aos quais conseguiu acesso a atual AJ; (iii) informações disponíveis para consulta pública em sites do Judiciário e da Fazenda Federal. Registre-se, no entanto, que o estado do lastro documental e informacional fornecido pela Deloitte apresenta dados, em alguns casos, contraditórios (número total de ações), insuficientes (estágio dos processos), obscuros (habilitação da representação da massa) e até por vezes inconsistentes (processos tributários classificados como civis, número de processos judiciais listados menor do que evidenciaram as consultas processuais públicas). Quanto aos autos processuais, o acesso deu-se estritamente àqueles obtidos pela atual AJ, notadamente em função da classificação sigilosa que a grande maioria detinha e ainda detém, o que impede acessos públicos, por advogados, nos sistemas informatizados dos tribunais.

3

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.



administrativos[2], como também os mais sensíveis e suas possíveis repercussões patrimoniais para a Massa.

Cumpre informar que no referido relatório preliminar apresentado foram identificados aproximadamente 200 processos, sendo sinalizado que tal quantidade poderia sofrer acréscimos posteriores com melhor acesso aos processos administrativos. A partir de 07 de novembro de 2023, quando o escritório contratado pela Massa Falida passou a ter acesso à consulta dos processos administrativos federais pelo sistema E-CAC, foi verificada a existência de outros 618 processos administrativos ativos contra a Massa.

De todo modo, já na oportunidade da apresentação do relatório preliminar, foi externado o entendimento desta Administração Judicial de que o passivo tributário merece tratamento permanente e próximo às ocorrências fático-processuais, não apenas, mas também em função dos andamentos correntes e potenciais relacionados a possíveis redirecionamentos das cobranças para o Grupo JBS e das medidas de rastreamento de ativos que estão sendo implementadas.

Dito isso, passa-se aos esclarecimentos solicitados.

### III.I – Ação Nº 1044546-79.2019.01.3400

Com relação ao Pedido de Tutela Provisória Cautelar Antecedente nº 1044546-79.2019.01.3400, que tramita no TRF-1, em sigilo, sob relatoria do Des. Roberto Carvalho Veloso, em grau de apelação, cumpre informar que, conjuntamente

---

[2] A consulta pública de processos administrativos federais (Comprot) dá conta apenas da existência dos processos e procedimentos e das principais movimentações não sigilosas; disponibiliza apenas os andamentos e as decisões a partir da instância recursal (CARF). Não há como acessar conteúdo dos autos de procedimentos em curso e das decisões de piso (DRJs), o que somente é viável com certificado digital. Após decisão judicial, o acesso à consulta desses processos deu-se a partir de 07 de novembro de 2023.

4

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16, sob o número WJMJ24401243765. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

com a ação anulatória ajuizada em 2015 pela Procuradoria-Geral da Fazenda Nacional[3], os processos foram indicados para acompanhamento especial pelo escritório responsável pelos processos tributários da Massa.

Em suma, cabe destacar que, uma vez indeferida a tutela requerida pela então Tinto Holding Ltda., foi o procedimento convertido em ordinário. Deve-se notar que a ação,[4] ajuizada com o processo administrativo ainda ativo, visava à anulação do auto de infração única e exclusivamente por alegados vícios formais no julgamento havido no CARF, que manteve a condenação da empresa por "voto de qualidade"[5]. Note-se mais: a falida expressamente afirmou na inicial que, na ação "*não se discute* [o] *objeto do processo administrativo*", ou seja, não se prestava a ação a tratar do mérito da autuação e a anulação desta sob argumentos de ordem material[6].

Registre-se que o pedido de habilitação nos autos pelo escritório contratado foi feito em 22 de setembro de 2023. No entanto, mesmo sob incansável insistência em diligências junto à Secretaria da 13ª Turma do TRF-1, o pedido foi apreciado apenas em

---

[3] Processo nº 5001944-96.2019.4.03.6100, atualmente em vias de retomada da fase de conhecimento após cassação, pelo TRF3, da sentença de procedência anteriormente proferida.

[4] Da inicial, colhe-se o seguinte trecho: "(...) a Requerente está a discutir a higidez de uma autuação fiscal lavrada contra si nos autos do Processo Administrativo Tributário (PAT) n. 16561.720170/2014-01 (...), em cujo bojo foi realizado julgamento de recurso especial pela Câmara Superior de Recursos Fiscais do CARF, dirimido pelo 'voto de qualidade' proferido pela eminente Presidente do CARF e, na assentada, Presidente da própria Colenda 1ª Turma da Câmara Superior de Recursos Fiscais do órgão administrativo. Embora o referido feito administrativo esteja, com embargos de declaração pendentes em face dessa última decisão colegiada, há o fundado receio de que a Requerente venha a se sujeitar aos efeitos deletérios da manutenção do lançamento tributário, mesmo quando pendente a discussão referente à validade sistêmica, ou não, do 'voto de qualidade', ou 'voto duplo', proferido no âmbito de órgão administrativo de composição paritária".

[5] Dada a ausência de efeito suspensivo aos recursos apresentados, o débito foi inscrito em dívida ativa e a correspondente execução fiscal foi ajuizada (processo nº 5019776-56.2020.4.03.6182, valor R$ 6 bilhões), também sob acompanhamento especial e com tramitação suspensa desde seu ajuizamento, em 2020. A União informou que buscaria a habilitação de seu crédito junto ao processo falimentar, o que efetivamente foi feito. Os autos não tiveram movimentações relevantes desde então e a Massa não foi citada.

[6] Da inicial: "a presente demanda objetiva tutela desconstitutiva, porquanto anulatória, única e exclusivamente do 'voto de qualidade', ou 'voto duplo', proferido pela eminente Presidente da C. 1ª Turma da Câmara Superior de Recursos Fiscais do CARF, de modo a fazer valer a garantia constitucional do devido processo legal e a regra inserta no artigo 112 do CTN. Não se tem, pois, sob nenhum aspecto, discussão voltada ao objeto do PAT n. 16561.720170/2014-01, ao seu mérito. A discussão aqui é específica e refere-se à invalidade apenas do 'voto de qualidade' (...)".

5

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

28 de novembro de 2023, oportunidade em que se teve integral acesso aos autos. Identificou-se, então, que foram julgados improcedentes os pedidos em 13/04/2021, sendo a falida Tinto condenada ao pagamento de honorários de sucumbência fixados em 10% sobre o valor atualizado da causa (R$ 100.000,00). **A Tinto não apelou da decisão**. De sua parte, a União opôs embargos contra a sentença, requerendo a fixação dos honorários sobre o valor do proveito econômico pretendido pela Tinto (valor integral da autuação), os quais foram julgados improcedentes. Apresentou, então, recurso de apelação em junho de 2022 e a Tinto, devidamente intimada, **não apresentou contrarrazões** à apelação da União, **tampouco recurso adesivo à apelação**, sendo certo que a Administradora Judicial antecessora estava habilitada nos autos desde 13/05/2021, quando juntou procuração nos autos[7]. Após a distribuição da apelação, não houve novas movimentações processuais.

Nesses termos, ressalta-se que, além de **a ação estar, para a Massa Falida, transitada em julgado no que respeita a seus pedidos principais**, mesmo que assim não fosse, a discussão estaria possivelmente prejudicada pela superveniência da Lei

---

[7] Interessa observar curioso apontamento sobre este processo, feito pela anterior Administração Judicial (Deloitte) em uma das planilhas de controle fornecidas na transição: "Não houve a interposição de recurso pela Massa Falida quando da sentença de improcedência, pois não caberia insistir na discussão acerca do voto de qualidade, uma vez que a redação do artigo 54 do RI-CARF torna indiscutível o fato de que o 'voto de qualidade' equivale a uma prerrogativa do conselheiro Presidente para votar duas vezes sobre o mesmo recurso quando há empate entre os Conselheiros, sendo que essa era a legislação vigente à época em que ocorreu o julgamento administrativo (com relação a aplicação retroativa da lei, com base em vários julgados e juristas, a AJ não encontrou nenhuma tese cabível aos argumentos trazidos pelos ex-sócios quando da propositura da ação). Além disso, eventual medida recursal pela Massa Falida atenderia somente aos interesses dos ex-sócios da Massa Falida, que aos olhos da Administradora Judicial seria uma medida totalmente procratisnatória, com o único objetivo de postergar a cobrança do débito e alongar a discussão por anos nos tribunais, impondo sérios riscos à Massa Falida quanto a eventual aplicação de multa por litigância de má-fé, além do ônus quanto ao custeio de tais medidas e dar à União argumento sólido para justificar seu pedido de majoração da sucumbência ante o aumento significativo de trabalho de seus procuradores com eventual alongamento do litígio. Ademais, já havia ação de execução fiscal (processo n. 5019776-56.2020.4.03.6182) transitada em julgado, que foi objeto de habilitação do crédito na falência conforme se depreende do quadro de credores de fls. 5.008/5.014. Além disso, o tema central da discussão se depreende na operação [fraudulenta] cometida entre os ex-sócios (Família Bertin) e a Blessed (Família Batista), que é o cerne da investigação que gerou a abertura de incidente sigiloso nº 1095595-34.2022.8.26.0100 e as medidas legais nos Estados Unidos e Reino Unido, ou seja, a interposição de recurso sem fundamento legal para embasar tal medida, além de procrastinatória, seria também um contrassenso com relação a tais medidas".

6

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4VNU.



nº 14.689/2023, a "Lei do CARF"[8]. Após recalcitrante atividade legislativa[9], relegou-se novamente ao Decreto nº 70.235/72 o tratamento da matéria, cujo art. 25, § 9º, ainda que não preveja expressamente que os votos de desempate serão proferidos necessariamente em favor do Fisco, assegura que tais votos serão proferidos pelos Conselheiros representantes da Fazenda Nacional, ou seja, muito provavelmente a favor do fisco.

Na jurisprudência, além da escassez de decisões relevantes e no mesmo sentido sobre o tema, é bem verdade que o Supremo Tribunal Federal ainda não se manifestou, em definitivo, acerca da matéria[10], sendo possível, dado o contexto de análise de proposições legislativas similares e a composição da Corte, que num eventual futuro julgamento sobre o tema, seja externado entendimento em favor da constitucionalidade do voto de qualidade em favor do fisco[11]. Ademais, sequer o recente entendimento externado, em decisão monocrática, pelo STJ[12], no sentido da cogência do critério paritário para composição das Turmas julgadoras do CARF poderia ser suscitado, porquanto inaplicável ao caso concreto.

Não obstante, ainda que **esteja a Massa Falida impedida de prosseguir com a discussão relativa ao voto de qualidade**,[13] no mérito haveria, em tese,

---

[8] Entre outras disposições, disciplina a proclamação de resultados de julgamentos na hipótese de empate na votação no âmbito do Conselho Administrativo de Recursos Fiscais (Carf) e medidas de redução do impacto financeiro dessas decisões para os contribuintes, seja com expedientes de negociação e pagamento diferenciados, bem como a redução de certos encargos e penalidades.

[9] A Lei nº 13.988/2020 havia alterado o panorama ao instituir o "voto de qualidade em favor do contribuinte", inserindo o art. 19-E da Lei nº 10.522/2002, que garantia vitória do contribuinte em caso de empate. Foi, então, editada a MP nº 1.160/2023, que restabelecia o voto de qualidade pró fisco. A MP não foi analisada e, assim, não convertida em lei, perdendo validade e voltando ao cenário anterior da Lei nº 13.988/2020. E, em 20 de setembro de 2023, foi publicada a referida Lei nº 14.689/2023, que revogou o art. 19-E da Lei nº 10.522/2002.

[10] ADIs 6.399, 6.403 e 6.415. A mais recente discussão está ADI 7548, ajuizada em dezembro de 2023 para se ver declarados inconstitucionais os artigos 1º e 17, inciso II, da Lei 14.689/2023, restaurando-se a vigência do artigo 19-E da Lei 10.522/2002.

[11] Nos votos até agora proferidos nas três primeiras ADIs acima mencionadas, conquanto feitas relevantes menções quanto à controvérsia e até à ilegitimidade da sistemática, faz-se, por outro lado, referência à liberalidade legislativa no que toca ao tratamento desta matéria.

[12] Petição nº 16.334, Min. Rel. Regina Helena Costa, 14 de dezembro de 2023. Há, no entanto, decisões em sentido contrário à imperatividade do critério paritário.

[13] Em princípio, o contexto legislativo, mesmo sucessivamente alterado – circunstância que poderia dar ensejo à alegação de fato novo e renovação da discussão – retornou ao status quo existentes quando do ajuizamento da

7

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

# AJRUIZ
ADMINISTRAÇÃO JUDICIAL

condições de elaborar-se e desenvolver-se contundente discussão, inclusive mediante a oposição de embargos à execução fiscal do crédito tributário constituído pela autuação. A melhor estratégia jurídica a ser adotada quanto à questão, sempre no benefício da coletividade de credores, será avaliada juntamente com seus assessores jurídicos especializados, inclusive mediante a oposição/interposição de embargos à execução fiscal do crédito tributário constituído pela autuação, ou outras medidas adequadas.

Ademais, já está em tramitação medida judicial nos Estados Unidos – que será abordada com maior profundidade em tópico posterior - a fim de, entre outras medidas, apurar a eventual ocorrência de condutas ilícitas que implicariam na responsabilização dos envolvidos inclusive pelo passivo fiscal, o que teria o potencial de assegurar o pagamento dos credores, notadamente em função do porte e do perfil dos terceiros lá demandados.

Aliás, e como já apontado acima, há provas contundentes de que os envolvidos empreenderam massiva fraude fiscal, de modo que cabe à Administradora Judicial (e seus auxiliares), na forma da legislação falimentar, analisar os fatos ocorridos e propor as medidas cabíveis com vistas a tutelar os interesses dos credores desta falência, dentre os quais se inclui o próprio Fisco.

Ante todo o exposto, objetivamente esclarece-se que, momentaneamente, a par da medida judicial internacional e do controle ativo das movimentações processuais tributárias e da apresentação das devidas manifestações e intervenções quando necessárias, e também pela recentíssima tomada de ciência plena e integral da ação nº 1044546-79.2019.01.3400, a Administradora Judicial está tomando todas as medidas que julga adequadas, conjuntamente com seus assessores jurídicos, a fim de tutelar os interesses da Massa Falida.

---

ação, fragilizando ou mesmo impedindo o ajuizamento de eventual ação rescisória da sentença, ao menos até que seja proferido julgamento de mérito, pelo STF, nas ADIs.

8

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

fls. 6131



### III.II – MEDIDAS PARA REDUÇÃO DO PASSIVO FISCAL

No que toca à adoção de medidas que visem a redução do débito tributário "*notadamente em razão dos inúmeros programas específicos de parcelamento com benefícios notoriamente vantajosos aos contribuintes*", esta Administradora Judicial informa que, desde a discussão do PL que redundou na Lei nº 14.689/2023 (objeto de vetos presidenciais, posteriormente derrubados pelo Congresso), monitoravam-se as potenciais repercussões que as normas poderiam ter no caso da Massa Falida.

E, de fato, diante do novo contexto normativo atinente aos autos de infração mantidos por voto de qualidade, estudava-se a adoção de medidas, inclusive administrativas, voltadas à redução de parte do débito, especialmente multas e eventualmente juros. Eis, então, que a própria PGFN antecipou-se e disponibilizou aos contribuintes a apresentação de Pedido de Revisão de Dívida Inscrita (PRDI), previsto na Portaria PGFN nº 33/2018, para fins de adequação à Lei nº 14.689/2023, art. 15[14], e do novo art. 25, § 9º-A, do Decreto nº 70.235/72[15].

Sob tal contexto, tendo sido recentemente finalizada[16] a etapa de tomada precisa de informações e de conhecimento, em princípio, de todo o contexto jurídico-

---

[14] Art. 15. O disposto no § 9º-A do art. 25 do Decreto nº 70.235, de 6 de março de 1972, aplica-se inclusive aos casos já julgados pelo Carf e ainda pendentes de apreciação do mérito pelo Tribunal Regional Federal competente na data da publicação desta Lei.

[15] § 9º-A. Ficam excluídas as multas e cancelada a representação fiscal para os fins penais de que trata o art. 83 da Lei nº 9.430, de 27 de dezembro de 1996, na hipótese de julgamento de processo administrativo fiscal resolvido favoravelmente à Fazenda Pública pelo voto de qualidade previsto no § 9º deste artigo.   (Incluído pela Lei nº 14.689, de 2023).

[16] O despacho de autorização da contratação do escritório foi proferido em 05 de setembro de 2023 e, embora algumas informações (imprecisas e esparsas) tenham sido fornecidas pela antiga AJ, somente a partir de então se pode solicitar as habilitações dos procuradores nos processos, o que, especialmente nos sigilosos (e todos os relevantes assim estão caracterizados) levou tempo até as efetivações. Relativamente aos processos administrativos federais, somente em 07 de novembro de 2023 foi franqueado, pela RFB, o acesso ao e-Cac (exclusivamente para consultas aos processos).

9

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765 Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

processual tributário da Massa Falida, o PRDI acima mencionado será elaborado e protocolado de acordo com as exigências legais, cujo resultado será oportunamente noticiado.

É relevante notar, contudo, a possibilidade de o pedido ser negado, tendo em conta que o texto normativo exige, para aplicação do benefício, "pendência de discussão perante o Tribunal Regional Federal" de ação que vise a anular o crédito constituído definitivamente pelo voto de qualidade no CARF favorável à Fazenda Nacional. Considerando que, para a Massa Falida, estaria preclusa a discussão de mérito travada no processo nº 1044546-79.2019.01.3400 (decidido de forma desfavorável), fica-se na dependência de a PGFN entender que, diante da pendência de julgamento da apelação da União interposta exclusivamente para discutir a fixação de honorários, a concessão das reduções seria legítima[17].

Ademais, esta Administradora Judicial tem plena ciência dos mecanismos atualmente em vigor para equacionamento de passivos tributários, especialmente federais. No mínimo desde 2016[18] a Fazenda Pública Federal tem promovido uma aproximação mais racional à cobrança da dívida ativa, direcionando seus esforços para entender o perfil dos devedores e, assim, adequar as estratégias de cobrança para cada segmento, sem descurar de, ao mesmo tempo, oferecer medidas de pagamento facilitadas por meio da transação tributária[19]. O instrumento, já larga e exitosamente utilizado em todo o país,

---

[17] Embora o texto da Lei não seja claro (ver nota 17 acima), no site da PGFN dedicado ao tema, consta que "serão imediatamente indeferidos os pedidos de revisão protelatórios, apresentados sem a documentação exigida ou *fundados em questão já decidida na esfera judicial de forma desfavorável ao contribuinte*". Ver: https://www.gov.br/pgfn/pt-br/servicos/orientacoes-contribuintes/Revisao%20de%20Divida%20Inscrita%20%28PRDI%29

[18] Institui-se o Regime Diferenciado de Cobrança de Créditos (RDCC) na Portaria PGFN nº 396/2016; a dação em pagamento (Portaria nº 32/2018) e os procedimentos pré-executórios (Portaria nº 33/2018); o Negócio Jurídico Processual em âmbito fazendário (Portaria nº 742/2018).

[19] Lei nº 13.988/2020 e sucessivas regulamentações, até a mais atual Portaria PGFN nº 6.757/2022, além de diversas modalidades especiais (para empresas em RJ e FGTS, por exemplo) excepcionais e extraordinárias (para o período de pandemia) e as pontuais disponibilizadas via Editais da PGFN. As transações, à diferença dos parcelamentos, são concedidas por juízo de conveniência e oportunidade da PGFN, não estando o Órgão obrigado a concedê-la em todo e qualquer caso e mediante qualquer requerimento, mas sim apenas em função de decisão fundamentada que impreterivelmente observe as condições particulares de cada contribuinte.

10

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765 Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

fls. 6133

# A|RUIZ
ADMINISTRAÇÃO JUDICIAL

incorpora e manifesta, com sucesso, renovadas diretrizes[20], prevendo mesmo para casos ordinários descontos, prazos, uso de prejuízo fiscal e outras concessões de amortização, para empresas em crise e falidas.

Sob influxo dessas ideias, a própria sistemática da recuperação judicial, por exemplo, foi recentemente repaginada em substancial modificação legislativa, incorporando o que de há muito se requeria: a presença direta do fisco no equacionamento da crise e de seus créditos, ainda que não sujeitos ao regime concursal. A transação tributária vem a compor, ao lado dos instrumentos de reestruturação, o arcabouço recuperatório nacional[21] e, ao inserir a Administração Tributária Federal na seara da consensualidade, admitindo a adoção de métodos adequados de solução de conflitos tributários, satisfaz o ente público credor e, ao mesmo tempo, afasta, tanto quanto possível, a desagregação da organização produtiva da empresa (ou da massa) devedora.

No entanto, deve-se ter em mente que, no âmbito das falências há uma ordem cogente de pagamento de credores – desde que isso seja possível e jamais em desrespeito ao escalonamento que começa com os créditos de disponibilidade imediata, passa pelos extraconcursais e, somente então, chega aos concursais –, de modo que nem sempre se mostra viável e factível para Massa destinar qualquer valor para pagamento de débitos tributários, mesmo que em condições altamente atrativas. Isso, não só em razão do inarredável respeito à ordem de pagamento de credores, mas fundamentalmente pela escassez ou mesmo

---

[20] São princípios da transação: presunção de boa-fé do contribuinte; concorrência leal entre os contribuintes; estímulo à autorregularização e conformidade fiscal; redução de litigiosidade; menor onerosidade dos instrumentos de cobrança; adequação dos meios de cobrança à capacidade de pagamento dos devedores inscritos em dívida ativa da União; autonomia de vontade das partes na celebração do acordo de transação; atendimento ao interesse público; publicidade e transparência ativa, respeitado o sigilo.

[21] São objetivos da transação: viabilizar a superação da situação transitória de crise econômico-financeira do sujeito passivo, a fim de permitir a manutenção da fonte produtora e do emprego dos trabalhadores, promovendo, assim, a preservação da empresa, sua função social e o estímulo à atividade econômica; assegurar fonte sustentável de recursos para execução de políticas públicas; assegurar que a cobrança dos créditos inscritos em dívida ativa seja realizada de forma a equilibrar os interesses da União e dos contribuintes e destes com os do FGTS; assegurar que a cobrança de créditos inscritos em dívida ativa seja realizada de forma menos gravosa para União, para o FGTS e para os contribuintes; e assegurar aos contribuintes em dificuldades financeiras nova chance para retomada do cumprimento voluntário das obrigações tributárias e fundiárias correntes.

11

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

inexistência de recursos bastantes e suficientes para se realizar mínimos pagamentos, pois, mesmo com todas as concessões, descontos, etc., a transação pressupõe que pagamentos e valores em espécie devem ser vertidos ao Fisco.

Note-se que, somente para atendimento de créditos decorrentes de restituições, a Massa possui valores comprometidos na ordem de R$ 37,5 milhões. Relativamente aos créditos concursais, na classe trabalhista, R$ 1.125.832,62; e, no passivo tributário, um total de aproximadamente R$ 10 bilhões. Em contrapartida, em termos de ativos já realizados, não atingem a quantia de R$ 48 milhões e de ativos potencialmente realizáveis conhecidos até o momento outros R$ 12 milhões.

É importante registrar, por fim, que no âmbito dos processos judiciais e administrativos fiscais em curso e futuros estão e permanecerão sendo envidados os maiores e melhores esforços no sentido de resguardar os interesses patrimoniais da Massa, sempre com a adoção de medidas lícitas voltadas não apenas à redução dos valores, como também ao impedimento a investidas ilegítimas das autoridades fazendárias, se for o caso.

Assim sendo, em que pese a existência de facilidades, outrora impensáveis, na legislação tributária federal, neste momento não estão sendo tomadas providências negociais junto à PGFN pelas razões acima expostas. Contudo, todas as possibilidades permanecerão sendo consideradas por esta Administração Judicial para eventual adoção, dada a realidade ainda dinâmica da falência, inclusive em função da ação movida nos Estados Unidos, que será melhor abordada a seguir.

### III.III – DOS TRABALHOS DE RASTREAMENTO E RECUPERAÇÃO DE ATIVOS

Em 05.09.2022, a então Administradora Judicial da Massa Falida, Deloitte Touche Tohmatsu Consultores Ltda., instaurou incidente processual expondo indícios de dilapidação do patrimônio da Falida, a fim de que fossem adotadas providências em benefício da coletividade de credores. Desde já, destaca-se que o incidente processual

12

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765 Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

referido acima tramita sob segredo de justiça, justamente para preservar as investigações em andamento e atribuir efetividade às medidas judiciais que foram propostas e àquelas que futuramente serão adotadas ao passo em que a Massa Falida obtiver novas informações e provas a respeito das fraudes ocorridas.

Naqueles autos, a Deloitte recomendou a contratação de escritórios de advocacia especializados, tanto no âmbito nacional, quanto internacional, com a finalidade de iniciar procedimentos investigativos e medidas de recuperação de ativos, em especial para identificar indícios de fraude e/ou ilícitos a justificar a adoção de medidas de responsabilização dos envolvidos.

Com a chancela deste MM. Juízo, foram propostas duas medidas judiciais pela Massa Falida nos Estados Unidos da América, nomeadamente: (*i*) Pedido de Reconhecimento de Falência Estrangeira (sob o *Chapter 15*, *Title 11*, *U.S.C.*) (**Doc. 01**); e (*ii*) ação judicial (*Complaint*) para fins de responsabilização de terceiros e recuperação de ativos desviados em detrimento dos credores (**Doc. 02**).

Após o deferimento do pedido de reconhecimento da falência principal (brasileira) naquela jurisdição (**Doc. 03**), a Massa Falida pôde então propor a ação judicial indicada no item "*ii*" acima. Atualmente, aguarda-se a apresentação de defesa preliminar (*motion to dismiss*) por parte dos Réus.

Ademais, com relação às alegações de BERF Participações S/A (fls. 5884/5892), cumpre destacar que a medida proposta nos Estados Unidos da América não possui qualquer identidade com o Processo n. 1055320-43.2022.8.26.0100, uma vez que possui várias causas de pedir para além da declaração de nulidade, conforme se depreende da documentação ora acostada. Ainda, a ação foi proposta por parte distinta contra diferentes Réus e em outra jurisdição, inexistindo, portanto, qualquer tipo de óbice ao seu processamento e julgamento.

13

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

AJRUIZ
ADMINISTRAÇÃO JUDICIAL

Por fim, a Administradora Judicial não considera prudente expor a estratégia de rastreamento e recuperação de ativos à BERF Participações S/A, autodenominada "*terceira juridicamente interessada*" e "*sócia minoritária do Grupo Bertin*" (*sic*) – portanto, **sócia indireta da Falida à época dos fatos**.

### III.IV – ESCRITÓRIO CONTRATADO PARA A DEFESA DOS INTERESSES DA MASSA FALIDA NOS PROCESSOS TRIBUTÁRIOS

No tocante ao acompanhamento das demandas tributárias pelo escritório contratado, esta Administradora Judicial esclarece, antes de mais nada, que compreende as preocupações externadas pelo credor e, mais do que isso, comunga do entendimento pela necessidade de acompanhamento estratégico e especializado da conjuntura tributária da Massa Falida.

Entretanto, com a devida vênia, reitera o já afirmado perante o Juízo relativamente à experiência do escritório contratado, que atua há mais de 40 anos no mercado, e dos profissionais que dele fazem parte. Na área tributária, o sócio coordenador conta com mais de 20 anos de atuação exclusiva na área, em âmbito consultivo e, em larga medida, contencioso judicial e administrativo, em casos de alta complexidade. Ainda, há mais de 10 anos passou a atuar em situações tributárias em meio a processos de recuperação judicial e de falência, assegurando o bom fluxo técnico e prático entre as duas áreas do conhecimento jurídico. Na esfera acadêmica, destaca-se que desde 2014 é Mestre em Direito Tributário pela UFGRS, sob orientação do prof. Dr. Humberto Ávila e é, também, professor em cursos de extensão e de pós-graduação da Pontifícia Universidade Católica do Rio Grande do Sul (PUCRS)[22], da Universidade do Vale do Rio dos Sinos (Unisinos) e da Universidade de Caxias

---

[22] https://educon.pucrs.br/cursos/direito-empresarial/

14

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.



do Sul (UCS)[23]. Nesta última, ao lado de outros professores e profissionais, fundou o Observatório das Relações Tributárias, lançado oficialmente ainda em 2023.[24]-[25]

Impende ressaltar, ainda, que há muito, distâncias (as grandes e, também, as curtas, como entre Porto Alegre e São Paulo, frequentemente percorrida pelos profissionais do escritório) são vencidas num átimo de tempo, a baixos custos e a qualquer momento. Com o triste advento da pandemia, tudo isso ficou ainda mais relativizado, a par da massiva digitalização de processos, expedientes e atos interativos os mais variados. Assim, o fato de a sede do escritório estar localizada em Porto Alegre em nada interfere na já destacada expertise dos profissionais na esfera tributária e capacitação para atuação em defesa dos interesses da Massa Falida.

Do mesmo modo, esclarece-se que as informações constantes do site do escritório são exemplificativas e não dão conta exata de todo o trabalho desenvolvido pelas áreas que o compõe, dentre elas a tributária, a qual, repita-se, conta com sócio especializado e experiente, além de equipe altamente capacitada para atendimento dos casos.

Outrossim, vale observar de que são poucas as bancas de advogados que contam, como o escritório contratado, com áreas profunda e conjuntamente atuantes em insolvência e direito tributário, circunstância que parece atender aos requisitos para o presente caso e oferecer vantagem na condução estratégica dos casos em favor da Massa Falida.

Ainda, entende esta auxiliar que notoriedade não é condição para excelência e expertise, mas apenas uma eventual decorrência destas, de modo que o

---

[23] Entre outras, cativo da disciplina de Processo Judicial Tributário, em diversos dos campi (por exemplo, https://www.ucs.br/site/especializacao/detalhes/direito-tributario-guapore/)
[24] https://www.ucs.br/site/noticias/lancamento-do-observatorio-das-relacoes-tributarias-da-ucs-tera-debate-sobre-a-reforma-tributaria/
[25] https://www.ucs.br/site/noticias/juristas-e-economistas-analisam-a-reforma-tributaria-no-lancamento-do-observatorio-das-relacoes-tributarias-da-ucs/

15

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

desconhecimento pelo credor da atuação do escritório contratado não desqualifica o profundo conhecimento dos temas tributários sensíveis pelos profissionais envolvidos no caso e sua extensa experiência na defesa dos interesses de Massas Falidas.

Isto posto, esta Administradora Judicial reitera seu entendimento sobre o necessário acompanhamento especial das demandas fiscais e processos administrativos envolvendo a Massa Falida, o que vem sendo realizado com presteza pelo escritório contratado[26], plenamente capacitado para tanto.

## IV – CESSÃO DE CRÉDITO DE IPIRANGA PRODUTOS DE PETRÓLEO S/A EM FAVOR DE BRASIL SPECIAL SITUATIONS I FUNDO DE INVESTIMENTOS EM DIREITOS CREDITÓRIOS

Finalmente, com relação à cessão de crédito noticiada às fls. 5533/5649 pelo Fundo Brasil Special Situations referente ao crédito arrolado em nome de IPIRANGA PRODUTOS DE PETRÓLEO S/A, apesar de a cessionária apresentar a documentação relativa ao crédito cedido (fls. 5630/5644) e os Termos de Cessão de fls. 5641/5644 e 5645/5649, impende destacar que não foram juntados aos autos os documentos de representação das partes que figuraram como cedentes nas cessões de crédito formalizadas.

Assim, para que seja possível atestar a regularidade formal da cessão de crédito e realizar a alteração da titularidade do crédito no Quadro Geral de Credores, requer-se a intimação da cessionária BRASIL SPECIAL SITUATIONS I FUNDO DE INVESTIMENTOS EM DIREITOS CREDITÓRIOS para juntar aos autos os documentos de representação das partes cedentes, de modo a demonstrar que as cessões foram celebradas pelos respectivos representantes legais com poderes para tanto.

---

[26] Rememore-se, a título de exemplo, que, como já narrado nesses autos, após a assunção da carteira de processos pelo escritório contratado e a concessão do acesso ao sistema e-cac, os patronos da Massa Falida localizaram mais de 600 processos administrativos ativos contra a Massa, além daqueles identificados na triagem inicial, subsidiada majoritariamente nas informações repassadas pela Administradora Judicial antecessora e consultas processuais públicas, os quais foram incorporados na carteira de acompanhamento do escritório e já vem sendo por ele conduzidos.

16

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4VNU.



**V – CONCLUSÃO**

Pelo exposto no tópico acima, <u>requer-se a intimação da cessionária BRASIL SPECIAL SITUATIONS I FUNDO DE INVESTIMENTOS EM DIREITOS CREDITÓRIOS para juntar aos autos os documentos de representação das partes que figuraram como cedentes nos termos de cessão de crédito de fls. 5641/5644 e 5645/5649.</u>

Ademais, nos termos dos esclarecimentos prestados nos tópicos anteriores, restam elucidados os pontos suscitados por BRASIL SPECIAL SITUATIONS I FUNDO DE INVESTIMENTOS EM DIREITOS CREDITÓRIOS (Fls. 5533/5649) e BERF Participações S/A (Fls. 5884/5892).

Sendo o que cumpria para o momento, a Administradora Judicial se coloca à inteira disposição deste MM. Juízo para quaisquer esclarecimentos que se façam necessários.

Nesses termos,

Pede deferimento.

São Paulo, 29 de janeiro de 2024.

**JOICE RUIZ BERNIER**
**OAB/SP 126.769**

**LUIS EDUARDO M. RUIZ**
**OAB/SP 317.547**

**RENAN ALMEIDA LESSA**
**OAB/SP 341.089**

**JÉSSICA BRAGA VAL**
**OAB/SP 400.136**

**NATÁLIA ARANTES G. CHAVES**
**OAB/SP 448.971**

**MARIA OLÍVIA G. FRANCO**
**OAB/SP 473.491**

**JOYCE CRISTINA RODILHA HASS**
**OAB/SP 401.316**

17

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código N3uL4WNU.

| Fill in this information to identify the case: |
|---|

United States Bankruptcy Court for the:

Southern District of Florida

Case number (*If known*): _____ Chapter 15

☐ Check if this is an
amended filing

## Official Form 401

# Chapter 15 Petition for Recognition of a Foreign Proceeding   12/15

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write debtor's name and case number (if known).

| | | |
|---|---|---|
| **1.** | **Debtor's name** | Tinto Holding Ltda. |

| | | |
|---|---|---|
| **2.** | **Debtor's unique identifier** | **For non-individual debtors:** |

☐ Federal Employer Identification Number (EIN)   ___ ___ – ___ ___ ___ ___ ___ ___ ___

☑ Other Tay Payer ID _____ . Describe identifier 02.189.924/0001-03 _____ .

**For individual debtors:**

☐ Social Security number:   xxx – xx– ____ ____ ____ ____

☐ Individual Taxpayer Identification number (ITIN): **9** xx – xx – ____ ____ ____ ____

☐ Other _____ . Describe identifier _____ .

| | | |
|---|---|---|
| **3.** | **Name of foreign representative(s)** | Deloitte Touche Tohmatsu Consultores Ltda as Judicial Admin. for the Estate |

| | | |
|---|---|---|
| **4.** | **Foreign proceeding in which appointment of the foreign representative(s) occurred** | 2nd Bankruptcy and Judicial Reorganization Ct. in Judicial Distr São Paulo Brazil |

| | | |
|---|---|---|
| **5.** | **Nature of the foreign proceeding** | *Check one:* |

☑ Foreign main proceeding
☐ Foreign nonmain proceeding
☐ Foreign main proceeding, or in the alternative foreign nonmain proceeding

| | | |
|---|---|---|
| **6.** | **Evidence of the foreign proceeding** | |

☑ A certified copy, translated into English, of the decision commencing the foreign proceeding and appointing the foreign representative is attached.

☐ A certificate, translated into English, from the foreign court, affirming the existence of the foreign proceeding and of the appointment of the foreign representative, is attached.

☐ Other evidence of the existence of the foreign proceeding and of the appointment of the foreign representative is described below, and relevant documentation, translated into English, is attached.

_____

_____

| | | |
|---|---|---|
| **7.** | **Is this the only foreign proceeding with respect to the debtor known to the foreign representative(s)?** | ☐ No. (Attach a statement identifying each country in which a foreign proceeding by, regarding, or against the debtor is pending.) |
| | | ☑ Yes |

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2021 às 20:16 , sob o número WJM.124401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código W69I3wAB.

fls. 6141

| Debtor | Tinto Holding Ltda. | Case number *(if known)* _____ |
|---|---|---|
| | Name | |

**8. Others entitled to notice**  Attach a list containing the names and addresses of:

    (i)   all persons or bodies authorized to administer foreign proceedings of the debtor,

    (ii)   all parties to litigation pending in the United States in which the debtor is a party at the time of filing of this petition, and

    (iii)   all entities against whom provisional relief is being sought under § 1519 of the Bankruptcy Code.

**9. Addresses**

**Country where the debtor has the center of its main interests:**

Brazil

**Debtor's registered office:**

Doutor Chucri Zaidan AV , 1240
Number      Street

Edifício Golden Tower, 4º ao 12º floor
P.O. Box

Santo Amaro, São Paulo   04711-130
City      State/Province/Region   ZIP/Postal Code

Brazil
Country

**Individual debtor's habitual residence:**

Number      Street

P.O. Box

City      State/Province/Region   ZIP/Postal Code

Country

**Address of foreign representative(s):**

Doutor Chucri Zaidan AV , 1240
Number      Street

Edifício Golden Tower, 4º ao 12º floor
P.O. Box

Santo Amaro, São Paulo   04711-130
City      State/Province/Region   ZIP/Postal Code

Brazil
Country

**10. Debtor's website** (URL)   _____

**11. Type of debtor**

*Check one:*

☑ Non-individual (*check one*):

    ☑ Corporation. Attach a corporate ownership statement containing the information described in Fed. R. Bankr. P. 7007.1.

    ❑ Partnership

    ❑ Other. Specify: _____

❑ Individual

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código W69f3wAB.

| Debtor | Tinto Holding Ltda. | Case number (if known) |
|---|---|---|
| | Name | |

**12. Why is venue proper in this district?**

Check one:

☐ Debtor's principal place of business or principal assets in the United States are in this district.

☐ Debtor does not have a place of business or assets in the United States, but the following action or proceeding in a federal or state court is pending against the debtor in this district:

_____.

☑ If neither box is checked, venue is consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative, because:

Debtor has assets in this District._____.

**13. Signature of foreign representative(s)**

I request relief in accordance with chapter 15 of title 11, United States Code.

I am the foreign representative of a debtor in a foreign proceeding, the debtor is eligible for the relief sought in this petition, and I am authorized to file this petition.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct,

✖ *Luis Vasco Elias*
DocuSigned by:
7E5CEB02B584F1...
Signature of foreign representative

Luis Vasco Elias, for
Printed name
DELOITTE TOUCHE TOHMATSU
CONSULTORES LTDA., solely in its capacity
as the court appointed Judicial Administrator
of the Estate of Tinto Holding Ltda.

Executed on _____
MM / DD / YYYY

✖ _____
Signature of foreign representative

Printed name

Executed on _____
MM / DD / YYYY

**14. Signature of attorney**

✖ _____
Signature of Attorney for foreign representative

Date 03/03/2023
MM / DD / YYYY

Nyana Abreu Miller
Printed name

Sequor Law
Firm name

1111 Brickell Ave., Ste. 1250
Number        Street

| Miami | Florida | 33131 |
|---|---|---|
| City | State | ZIP Code |

| (305) 372-8282 | nmiller@sequorlaw.com |
|---|---|
| Contact phone | Email address |

| 92903 | FL |
|---|---|
| Bar number | State |

**DocuSign**

## Certificado de Conclusão

Identificação de envelope: 2E01074DB1A94EF8A3CDBEEBC40343CD
Assunto: Complete com a DocuSign: Tinto Form 401 Revised (00354768-2x9F5D7).pdf
Envelope fonte:

| | | |
|---|---|---|
| Documentar páginas: 3 | Assinaturas: 1 | Status: Concluído |
| Certificar páginas: 2 | Rubrica: 0 | Remetente do envelope: |
| Assinatura guiada: Ativado | | Cheila Rodrigues Ferreira |
| Selo com EnvelopeId (ID do envelope): Ativado | | Av. Dr. Chucri Zaidan |
| Fuso horário: (UTC-03:00) Brasília | | 1.240 From 4th to 12th floors – Golden Tower |
| | | São Paulo, SP  04711130 |

Endereço IP: 191.19.131.196

## Rastreamento de registros

| Status: Original | Portador: Cheila Rodrigues Ferreira | Local: DocuSign |
|---|---|---|
| 02/03/2023 18:19:29 | | |

| **Eventos do signatário** | **Assinatura** | **Registro de hora e data** |
|---|---|---|
| Luis Vasco Elias | *Luis Vasco Elias* | Enviado: 02/03/2023 18:20:36 |
| | 76E5CEB02B584F1... | Visualizado: 02/03/2023 18:28:57 |
| Nível de segurança: E-mail, Autenticação da conta (Nenhuma) | | Assinado: 02/03/2023 18:29:04 |
| | Adoção de assinatura: Estilo pré-selecionado | |
| | Usando endereço IP: 34.95.146.232 | |

**Termos de Assinatura e Registro Eletrônico:**
    Não disponível através da DocuSign

| **Eventos do signatário presencial** | **Assinatura** | **Registro de hora e data** |
|---|---|---|

| **Eventos de entrega do editor** | **Status** | **Registro de hora e data** |
|---|---|---|

| **Evento de entrega do agente** | **Status** | **Registro de hora e data** |
|---|---|---|

| **Eventos de entrega intermediários** | **Status** | **Registro de hora e data** |
|---|---|---|

| **Eventos de entrega certificados** | **Status** | **Registro de hora e data** |
|---|---|---|

| **Eventos de cópia** | **Status** | **Registro de hora e data** |
|---|---|---|
| Ana Maria Rodrigues Ferreira | **Copiado** | Enviado: 02/03/2023 18:29:10 |
| Deloitte Brasil | | |
| Nível de segurança: E-mail, Autenticação da conta (Nenhuma) | | |

**Termos de Assinatura e Registro Eletrônico:**
    Não disponível através da DocuSign

| **Eventos com testemunhas** | **Assinatura** | **Registro de hora e data** |
|---|---|---|

| **Eventos do tabelião** | **Assinatura** | **Registro de hora e data** |
|---|---|---|

| **Eventos de resumo do envelope** | **Status** | **Carimbo de data/hora** |
|---|---|---|
| Envelope enviado | Com hash/criptografado | 02/03/2023 18:20:36 |
| Entrega certificada | Segurança verificada | 02/03/2023 18:28:57 |
| Assinatura concluída | Segurança verificada | 02/03/2023 18:29:04 |
| Concluído | Segurança verificada | 02/03/2023 18:29:11 |

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código W69f3wAB.

| Eventos de pagamento | Status | Carimbo de data/hora |
| --- | --- | --- |

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJM.I24401243765
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código W69l3wAB.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código W69f3wAB.

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:

TINTO HOLDING LTDA.,

          Debtor in a Foreign Proceeding.

_____/

Chapter 15
Case No.:

## VERIFIED MOTION FOR ORDER OF RECOGNITION OF FOREIGN MAIN PROCEEDING PURSUANT TO §§ 1515 AND 1517 AND REQUEST FOR HEARING

      Deloitte Touche Tohmatsu Consultores Ltda. ("Deloitte") (the "Foreign Representative" or "Judicial Administrator"), in its capacity as judicial administrator of the bankruptcy estate of Tinto Holding Ltda., (the "Debtor"), files this *Verified Motion for Order Granting Recognition of Foreign Main Proceeding Pursuant to §§ 1515 and 1517 of the Bankruptcy Code and Request for Hearing* (the "Motion").  The Motion seeks entry of an Order granting (i) recognition, pursuant to 11 U.S.C. § 1517[1], of the Debtor's liquidation proceeding (the "Brazilian Proceeding") pending before the 2nd Bankruptcy and Judicial Reorganization Court in the Judicial District of São Paulo, Brazil  ("Brazilian Bankruptcy Court"); (ii) related relief pursuant to sections 1520 and 1521 of the Bankruptcy Code; and (iii) any other and further relief which may be available under the Bankruptcy Code.  The Judicial Administrator further requests a hearing on the initial petition (ECF No. 1) ("Petition") and this Motion no earlier than (21) days after the date the Court issues its notice of hearing but, in any event, "at the earliest possible time" thereafter.  See Fed. R. Bankr. P. 2002(q); § 1517(c). In support of the Motion, the Judicial Administrator respectfully states as follows:

---

[1] Unless otherwise specified herein, all statutory references shall be to Title 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

SEQUOR LAW, P.A.

## PRELIMINARY STATEMENT

1.      The Judicial Administrator files the Petition and this Verified Motion under § 1504 to seek recognition of the Brazilian Proceeding as a "foreign main proceeding," as defined in § 1502(4).

2.      The Petition and the Verified Motion are supported by the Declaration under penalty of perjury of Henrique Forssell ("<u>Declaration</u>") attached as **Exhibit "1"**.[2] The Declaration itself contains exhibits referred to and incorporated herein. The Declaration also provides a summary of the Brazilian Proceeding and Liquidation Decree entered by the Brazilian Bankruptcy Court (Ex. 1 ¶¶ 5-6; 10-11).

3.      A true and correct copy of the Order dated November 29, 2018 placing the Debtor into liquidation and appointing Deloitte Touche Tohmatsu Consultores Ltda. as Judicial Administrator is attached to the Declaration as **Exhibit 1-A**. Deloitte has acted in the capacity as judicial administrator in the Brazilian Proceeding continuously since accepting the appointment.

4.      As required by Fed. R. Bankr. P. 1007(a)(4), a Statement of Corporate Ownership, in conformity with Fed. R. Bankr. P. 7007.1 is being filed concurrently herewith.

5.      The Petition, this Motion, and the Declaration demonstrate that the Debtor's liquidation should be recognized as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code.

6.      The Judicial Administrator seeks the type of relief that Chapter 15 was designed to provide, and the Debtor's liquidation, the Petition, and this Motion meet all the requirements for recognition and the requested relief.

---

[2] Capitalized terms not otherwise defined shall have the meaning set forth in the Declaration.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJM.J24401243765 Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código W69f3wAB.

fls. 6147

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and sections 109 and 1501 of the Bankruptcy Code.

8.     This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(P), and the Court may enter a final order consistent with Article III of the United States Constitution.

9.     Brazil is the Debtor's center of main interests.

10.    The Debtor's registered office is and was located in Brazil during the entire time that it was operational.

11.    Venue is proper in this district under 28 U.S.C. § 1410. The Estate of Tinto has retained Sequor Law, P.A. ("Sequor Law"), in this district and Sequor Law holds in its trust account in this district approximately US$ 1,500.00 on behalf of and for the benefit of the Debtor, to which funds Sequor Law has no rights of setoff, charging lien, or similar right.

## BACKGROUND AND BASIS FOR RECOGNITION

12.    The Declaration sets forth in detail the background and basis for recognition and it is incorporated by reference as if fully set forth here. See Ex. 1.

13.    The Judicial Administrator has satisfied each of the requirements for recognition of the Brazilian Proceeding under Chapter 15 of the Bankruptcy Code, as follows:

(a)     The Judicial Administrator qualifies as a "foreign representative" as defined in 11 U.S.C. §101(24) because it is a body authorized in the Brazilian Proceeding to administer the liquidation of the Debtors' assets and affairs and to act as a representative of the Brazilian Proceeding. See Ex. 1 ¶ 14.

(b)     The Brazilian Proceeding is a "foreign main proceeding" as defined in 11 U.S.C. § 101(23) and 1502(4) because it is (i) pending in Brazil, which is the Debtors'

3

SEQUOR LAW, P.A.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 10880030-29.2016.8.26.0100 e código W69f3wAB.

center of main interests; and (ii) a collective judicial proceeding under a law relating to insolvency or adjustment of debt in which proceeding the Debtors' assets and affairs are subject to the supervision of the Brazilian Bankruptcy Court for the purpose of liquidation. See Id. ¶¶ 8-9, 15.

(c)     The Debtors meet the requirements of a "debtor" as defined in sections 109(a), if applicable, and 1502 because the Debtors are the subject of a foreign proceeding and have assets in the United States, including property of the Debtors in trust with Sequor Law in the amount of US $1,500.  See Id. 1 ¶ 13.

(d)     This Verified Motion is accompanied by the Liquidation Decree of the Brazilian Bankruptcy Court dated November 29, 2018 placing the Debtor into a liquidation. Ex. 1-A.

(e)     Additionally, the Declaration contains the list of all foreign proceedings, persons, or entities that must be identified pursuant to 11 U.S.C. § 1515 and Fed. R. Bankr. P. 1007.  See Ex. 1 ¶¶ 19-21.

### RELIEF REQUESTED

14.     The Judicial Administrator seeks an Order pursuant to §§ 105(a), 1507, 1517, 1520, and 1521 of the Bankruptcy Code, substantially in the form of the Proposed Order, attached as **Exhibit "2"** hereto, granting the following relief:

(a) Recognizing the Debtor's liquidation as a "foreign main proceeding" and the Judicial Administrator as the Foreign Representative of the Debtor;

(b) Granting the relief allowable as of right upon recognition of a foreign main proceeding under section 1520 of the Bankruptcy Code;

(c) Granting all necessary and appropriate relief under section 1521 of the Bankruptcy Code,

4

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código W69f3wAB.

including:

(1) staying the commencement or continuation of any action or proceeding without the consent of the Foreign Representative concerning the rights, obligations or liabilities of the Debtor, the Debtor's estate to the extent not stayed under section 1520(a) of the Bankruptcy Code;

(2) staying execution against the Debtor to the extent not stayed under § 1520(a);

(3) suspending the right to transfer or otherwise dispose of any assets of the Debtor to the extent this right has not been suspended under section 1520(a);

(4) providing for the examination of witnesses, the taking of evidence, and the delivery of information concerning the assets, affairs, rights, obligations or liability of the Debtor and the Debtor's estate under § 1521(a)(4), the Federal Rules of Bankruptcy Procedure, including Fed. R. Bankr. P. 2004, and Local Rule 2004-1;

(5) entrusting the administration or realization of all of the assets of the Debtor within the territorial jurisdiction of the United States to the Foreign Representative;

(6) entrusting the distribution of all or part of the assets of the Debtor located within the United States to the Foreign Representative and finding that the interests of the creditors of the Debtors are sufficiently protected thereby;

(7) requiring that other than a counterclaim to a suit brought by the Judicial Administrator, no person or entity may commence suit against the Judicial Administrator in any court, including this Court, in the United States without first obtaining leave of this Court;

(8) otherwise granting comity to and giving full force and effect to the orders and documents attached to this Motion; and

5

SEQUOR LAW, P.A.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJM.J2440124376S . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código W69f3wAB.

(d) granting the Foreign Representative such other and further relief as this Court may deem just and proper.

## **CONCLUSION**

WHEREFORE, the Judicial Administrator respectfully requests that the Court enter an Order, substantially in the form attached as **Exhibit 2**, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: March 3, 2023      Respectfully submitted,

                SEQUOR LAW, P.A.
                1111 Brickell Avenue, Suite 1250
                Miami, Florida 33131
                Telephone: (305) 372-8282
                Facsimile: (305) 372-8202
                Email: ggrossman@sequorlaw.com
                nmiller@sequorlaw.com
                jmosquera@sequorlaw.com

By:    */s/ Gregory Grossman*
           Gregory S. Grossman
           Florida Bar No.: 896667
           Nyana Abreu Miller
           Florida Bar No. 92903
           Jennifer Mosquera
           Florida Bar No.: 1018656

SEQUOR LAW, P.A.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJM.I24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código W69f3wAB.

fls. 6150

fls. 6151

## 28 U.S.C. § 1746 VERIFICATION

I verify under penalty of perjury under the laws of the United States of America that the facts stated in the foregoing *Verified Motion for Order Granting Recognition of Foreign Main Proceeding Pursuant to §§ 1515 and 1517 of the Bankruptcy Code and Request for Hearing* are true and correct to the best of my knowledge and belief.

Executed in São Paulo, Brazil on 03RD MARCH , 2023

By: _____

Henrique Forssell
For and on behalf of the Estate of Tinto Holding Ltda.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código W69f3wAB.

fls. 6152

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In re:

TINTO HOLDING LTDA.,                                    Chapter 15
                                                        Case No.:  23-11719-MAM
     Debtor in a Foreign Proceeding.
_____/

AJ RUIZ CONSULTORIA
EMPRESARIAL S.A., solely as Judicial
Administrator and foreign representative of
TINTO HOLDING LTDA.,
     Plaintiff,                                    Adv. Case No. 23-01118-MAM

v.                                                      **JURY TRIAL DEMANDED**

COLORADO INVESTMENT HOLDINGS
LLC, J&F INVESTIMENTOS S.A., JJMB
PARTICIPAÇÕES LTDA., WWMB
PARTICIPAÇÕES LTDA., JOESLEY
MENDONÇA BATISTA, WESLEY
MENDONÇA BATISTA, and JBS S.A.,
     Defendants.
_____/

**AMENDED COMPLAINT**

     Plaintiff AJ Ruiz Consultoria Empresarial S.A., solely as Judicial Administrator and

foreign representative of Tinto Holding Ltda. ("Tinto"), brings this Amended Complaint against

Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB Participações

Ltda., WWMB Participações Ltda., Joesley Mendonça Batista, Wesley Mendonça Batista, and

JBS S.A.

**NATURE OF THE ACTION**

     1.    Plaintiff seeks to recover an ownership interest in JBS S.A. ("JBS") that

Defendants unlawfully obtained from Tinto, a Brazilian agribusiness company.  When obtained

fls. 6153

by Defendants, Tinto's interest in JBS was worth approximately R$8.76 billion (USD$4.84 billion).[1]

2.      Tinto should have obtained a large share of JBS by merging its greatest asset—a majority equity stake in Bertin S.A., a large Brazilian meat-processing company—with JBS.  But through a series of transactions between 2009 and 2014 connected to that merger, Defendants siphoned significant value out of Tinto, to the detriment of Tinto's estate and creditors.

3.      Defendants Joesley Mendonça Batista and Wesley Mendonça Batista (together, the "Batistas") are the ultimate beneficial owners of Defendant Colorado Investment Holdings LLC (formerly known as Blessed Holdings LLC) ("Colorado").  They also own (wholly or in significant part) Defendants J&F Investimentos S.A. (formerly known as J&F Participações S.A.) ("J&F"), JJMB Participações Ltda. ("JJMB"), WWMB Participações Ltda. ("WWMB"), and JBS.  The Batistas—by and through Colorado and J&F—engineered the transactions that drained Tinto of its value for their personal benefit.  That value is now in the possession of Colorado, JJMB, and WWMB.

4.      Mainly because of these transactions, which stripped away Tinto's most critical asset, a Brazilian bankruptcy court placed Tinto into liquidation on November 29, 2018.  That court appointed Plaintiff as Tinto's judicial administrator.  On May 24, 2023, that court authorized Plaintiff to bring this suit; on September 5, 2023, that court authorized Plaintiff to file this Amended Complaint.

5.      Plaintiff now brings claims for unjust enrichment, claims for aiding and abetting breach of fiduciary duty, and claims under the Brazilian Bankruptcy Law and the Brazilian Civil

---

[1] Plaintiff provides approximate conversions of monetary figures from Brazilian reals into U.S. dollars (using the historic conversion rate on or about the relevant dates at issue) only for the Court's convenience.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

Code, including claims under Articles 166 and 167 of the Brazilian Civil Code (null and void transaction); Article 129 VI of the Brazilian Bankruptcy Law (transfer of establishment); and Articles 186, 187, and 927 of the Brazilian Civil Code (illicit acts) to recover from Defendants the shares they wrongfully obtained and the tax liability Tinto incurred as a result. Plaintiff also brings a veil-piercing claim under Article 50 of the Brazilian Civil Code and Article 82-A of the Brazilian Bankruptcy Law to hold Defendants liable for the debts of Tinto's creditors.

## PARTIES

6. Plaintiff AJ Ruiz Consultoria Empresarial S.A. has its principal place of business at Rua Lincoln Albuquerque, No. 259, 13th Floor, Suite 131, São Paulo, Brazil 05004-010. It appears solely as judicial administrator and foreign representative of Tinto. Brothers Silmar Bertin and Natalino Bertin managed Tinto until the Brazilian bankruptcy court appointed a judicial administrator on November 29, 2018.

7. Defendant Colorado Investment Holdings LLC is a domestic limited-liability company organized and existing under the laws of the State of Delaware.

8. Defendants Joesley Mendonça Batista and Wesley Mendonça Batista, Brazilian nationals, are the ultimate beneficial owners of Colorado. Until 2011, the Batistas, along with certain of their family members, were also the majority shareholders of JBS. Since then, they have continued to be the largest shareholders of the company. Joesley Batista was the Chief Executive Officer and Chairman of JBS from 2007 to 2011. Wesley Batista was the Chief Executive Officer of JBS from 2011 to 2017. Joesley Batista maintains a residence in New York. Until recently, and during all relevant times, Wesley Batista maintained a residence in Colorado, which he periodically lived in and frequently visited for business and personal reasons.

3

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6155

9.      Defendant JBS S.A. is a Brazilian agribusiness company.  It is publicly traded, with its American Depositary Shares listed on the New York Stock Exchange under the ticker symbol "JBSAY."  It is currently seeking to directly list its shares on the New York Stock Exchange, and has filed a registration request with the United States Securities and Exchange Commission to accomplish this goal.

10.     Defendant J&F Investimentos S.A. is a Brazilian entity that, during the events described below, was majority-owned and controlled by the Batistas and their affiliates.  Today, it is wholly owned and controlled by Defendants Joesley and Wesley Batista.  At all times during the events described below, J&F held a significant indirect stake in JBS.

11.     Defendants JJMB Participações Ltda. and WWMB Participações Ltda. are Brazilian entities.  Together, the Batistas wholly own JJMB and WWMB, with Joesley Batista owning 99.999% of JJMB and Wesley Batista owning 99.999% of WWMB.

12.     The Batistas, JBS, J&F, JJMB, and WWMB all directly or indirectly hold (or held during the events described below) significant stakes in major U.S. companies, including Smithfield Beef Group Inc., Swift & Company, and Pilgrim's Pride Corporation.  On information and belief, both Joesley Batista and Wesley Batista traveled to the United States numerous times to conduct business, including with J.P. Morgan in New York, in their capacities as (i) directors and officers of J&F, JJMB, and WWMB; and (ii) the ultimate beneficial owners of Colorado.

## RELEVANT NONPARTIES

13.     Bertin S.A. was a Brazilian agribusiness company indirectly owned, through Tinto, by brothers Silmar Bertin and Natalino Bertin and their families.  Tinto's equity stake in Bertin S.A. was its most significant asset.

14.     Silmar Bertin and Natalino Bertin are Brazilian nationals who, alongside their

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJM.J24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

families, will be referred to as the "Bertins."  The Bertins founded, own, and manage a large

Brazilian conglomerate operating in multiple sectors, including agriculture, energy, and

infrastructure.

15.     Specific corporate entities beneficially owned by the Bertins that are relevant to

this Amended Complaint include:  (i) the Bertin family's main holding company, Heber

Participações S.A. ("Heber"); and (ii) two other Bertin-affiliated agribusiness companies,

Comapi Agropecuaria S.A. ("Comapi") and Mafrip Matadouro Frigorífico Rio Pardo S.A.

("Mafrip").

16.     ZMF Fundo de Investimento em Participações ("ZMF FIP") is another Batista-

owned fund that appears in several transactions detailed below.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1334(b), as this is a

civil proceeding related to a case under title 11, Case No. 23-11719-MAM (Chapter 15), and the

outcome of this proceeding substantially affects Tinto's estate.[2]

18.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1409(a)

because Plaintiff is a foreign representative in a chapter 15 proceeding under title 11 in this

District.

## STATEMENT OF FACTS

### I.     Background.

19.     José Batista Sobrinho, patriarch of the Batista family, founded JBS in 1953.  It

has grown ever since.  Today, JBS operates globally—including in the United States—and is

among the world's largest meat-processing companies.  José Batista Sobrinho has several

---

[2] Plaintiff consents to the Bankruptcy Court's entry of final orders, except that Plaintiff
reserves the right to move to withdraw the reference to request a jury trial.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado en 29/01/2024 as 20:16 , sob o número WJ.MJ24401243765
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

children, including Defendants Joesley Batista and Wesley Batista, who have helped run the company.  Since JBS's founding, the number of entities owned by and affiliated with the Batistas has grown to include—among many others—Colorado, J&F, JJMB, WWMB, and nonparty ZMF FIP.

20.      During the late 2000s, the Batistas led JBS on a spree of international expansion. JBS bought a series of agribusiness and meat-processing companies across the globe, including the U.S.-based companies Smithfield Beef Group Inc., Swift & Company, and Pilgrim's Pride Corporation.

21.      Many of these acquisitions relied on funding from BNDES Participações S.A. ("BNDES"), Brazil's National Bank for Economic and Social Development.  BNDES funding helped the Batistas and JBS acquire Bertin S.A. in 2009—the transaction that lies at the heart of this Amended Complaint.

22.      The Bertins incorporated Bertin S.A. in October 2007.  Shortly after, the Bertins directed Tinto (then known as Bracol Ltda.) to transfer all its operating assets to the newly formed Bertin S.A.  At the time, Tinto held a large meatpacking business and about R$1 billion (USD$550 million)  in agricultural real estate.  After the transfer, Bertin S.A. became a direct subsidiary of Tinto—and Tinto's primary asset.

23.      Later that year, Bertin S.A. applied to BNDES for financial support.  The application to BNDES requested capital for several purposes, including the acceleration of Bertin S.A.'s contemplated initial public offering.  BNDES agreed to provide the requested capital.

24.      Market downturns in 2008 made it difficult for the Bertins to take the company public.  Instead, the Bertins considered partnering Bertin S.A. with a company that was already public.  The Bertins first approached Marfrig Global Foods S.A., a large, publicly traded

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6158

Brazilian meatpacker, about a potential merger. But the conversations did not pan out. By 2009, Defendant Joesley Batista had approached the Bertins and suggested that Bertin S.A. merge with JBS. Joesley Batista and Wesley Batista soon after reached an agreement with the Bertins.[3]

## II.  Public Merger Structure.

25.    On September 16, 2009, JBS and Bertin S.A. announced the signing of an association agreement memorializing their intent to merge (the "Association Agreement"). A JBS press release disclosed portions of the intended merger structure.

26.    Under the Association Agreement, the controlling shareholders of JBS—J&F and ZMF FIP—would contribute all their shares of JBS to a newly formed holding company. Similarly, Tinto would contribute all its shares of Bertin S.A.—representing 73.1% of Bertin S.A.—to the same holding company. The newly formed holding company would thus be the controlling shareholder of both JBS and Bertin S.A. JBS would then absorb the operations of Bertin S.A.

27.    The merger depended on JBS successfully obtaining a USD$2.5 billion private subscription in its U.S. subsidiary from an undisclosed party (later revealed as BNDES). JBS would use the funds to acquire Pilgrim's Pride Corporation in the United States.

28.    At the time of the Association Agreement, the ownership of Bertin S.A. looked like this:

---

[3] This was not the first collaboration between the Bertins and the Batistas. Natalino Bertin, for example, partnered with Defendant Joesley Batista in a business venture six years earlier. The relationship would continue to develop. In 2011, J&F acquired another Bertin-affiliated company, Higiene e Limpeza, in the cosmetics and cleaning-products industry. Natalino Bertin would also later sit on the board of directors of JBS from 2011 to 2013.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16, sob o número WJM.J2440124376.5 Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6159



**Figure 1: The accurate and represented corporate structure of Bertin S.A. prior to signing of the Association Agreement.**

29.     At that same time, JBS was majority-owned by the Batistas—but just barely.  To raise capital for the purchase of several U.S. meatpackers, JBS had issued new equity to BNDES and other Brazilian state-owned entities, including the investment fund PROT Fundo de Investimento em Participações ("PROT FIP").  These issuances had significantly diluted the Batistas' ownership.  In fact, at the time of the Association Agreement, the Batistas maintained majority control over JBS with a mere 50.11% stake through holding entities J&F (44%) and ZMF FIP (6.11%):



**Figure 2: The accurate and represented corporate structure of JBS S.A. prior to signing of the Association Agreement.**

30.     The Batistas created several entities in anticipation of the merger, as contemplated by the Association Agreement.  A week after signing the Association Agreement, the Batistas incorporated FB Participações ("FB Par"), the holding company that would later receive the

8

fls. 6160

majority interests of JBS and Bertin S.A.  In December 2009, at the direction of the Batistas and their corporate group, the Bertins also incorporated a new entity, Bertin Fundo de Investimento em Participações ("Bertin FIP"),[4] to hold Tinto's interest in Bertin S.A. and to later receive the Bertins' interest in FB Par.

31.     As a result, in preparation for the merger, JBS's and Bertin S.A.'s corporate structures looked like this:



**Figure 3:  Both the accurate and represented corporate structures of Bertin S.A. and JBS S.A. in December 2009, in preparation for the JBS-Bertin S.A. merger.**

32.     Tinto, J&F, and ZMF FIP contributed their respective Bertin S.A. and JBS shares to FB Par in December 2009.  On December 31, 2009, at a special general meeting of JBS shareholders, the company's controlling shareholders approved the merger and dissolution of Bertin S.A. by JBS.

---

[4] Bertin FIP has since been renamed Pinheiros Fundo de Investimiento em Participações Multiestratégia.

9

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16, sob o número WJM.J24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

33.     Under the merger structure disclosed to the public, Tinto was to receive nearly

28.7% of JBS[5] in exchange for 73.1% of Bertin S.A:



**Figure 4: The post-merger corporate structure of JBS S.A. that the Batistas and the Bertins represented to the public.**

34.     But that is not what happened.

## III.     Concealed Merger Structure and Share Transfers.

35.     The public statements by JBS and Bertin S.A. obscured the true, hidden merger

structure conceived by the Batistas and the Bertins, which neither family has (to this day) ever

fully disclosed.  Indeed, the companies' public statements failed to disclose several steps and

transactions taken by the Batistas, the Bertins, and their corporate groups in connection with the

merger.  As a result of three covert, below-market share transfers, which Tinto entered into under

the direction and control of the Bertins and Defendants, Tinto transferred its expected 28.7%

stake in JBS away in exchange for nearly nothing.

_____

[5] Under the proposed merger structure disclosed to the public, and in line with the value
ascribed to the two companies, Tinto would hold 100% of Bertin FIP, which would in turn hold
48.52% of FB Par, which would in turn hold 59.13% of JBS.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJ.MJ244001243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJJM.24401243765. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6162

36.    Four months before the merger, on August 12, 2009, the Bertins entered into a private and undisclosed agreement with the Batistas and J&F (the "Initial Merger Agreement"), which functioned as a letter of intent for the future JBS-Bertin S.A. merger.  Tinto, despite holding the entirety of the Bertins' interest in Bertin S.A., was not a signatory to the Initial Merger Agreement.

37.    Under the Initial Merger Agreement, Tinto would transfer its entire equity stake in Bertin S.A. to the Batistas.  In exchange, the Batistas and J&F agreed to pay R$750 million (USD$409.43 million) in cash to the Bertins' primary holding company, Heber.  Heber would receive the remaining balance of the purchase price—which, at that point, was still undecided—in JBS shares.  Tinto would receive nothing.

38.    The parties also agreed to cap the ownership stake in JBS that the Bertins could acquire through the transaction.  They executed an amendment to the Initial Merger Agreement on the same day that granted J&F the option to repurchase, for the nominal sum of R$1.00 (USD$0.55), any ownership of JBS in excess of 10% that the Bertins received from the transaction.

39.    To facilitate that transfer of assets, the Batistas and J&F directed the Bertins to place Bertin S.A. into a Fundo de Investimento em Participações ("FIP"), a Brazilian investment fund—Bertin FIP.  But this, too, benefited only the Batistas.

40.    Joesley Batista, Wesley Batista, Colorado, J&F, JJMB, and WWMB ultimately acquired Tinto's interest in Bertin FIP for trivial amounts.  But JBS was obligated to publicly declare the value of new equity issued during the JBS-Bertin S.A. merger—and by extension, the value of Bertin S.A. during the merger.  The FIP structure allowed the Batistas to disguise the discrepancy between that value and the amount that Joesley Batista, Wesley Batista, Colorado,

fls. 6163

and J&F paid for the shares of Bertin FIP in private transactions.  Under Brazilian law, a purchaser of shares in a FIP does not need to disclose the price of those shares.  By purchasing shares of Bertin FIP—which was formed only to hold shares of Bertin S.A., and functionally comprised only those shares—instead of directly purchasing Bertin S.A., the Batistas could avoid reporting a value contradictory to the value of Bertin S.A. implicitly declared during the merger.

41.     The FIP also provided secrecy.  Bertin FIP was not subject to the same reporting requirements as Tinto.  The Batistas would have had to report their acquisition of Tinto shares—but not their acquisition of Bertin FIP shares.

42.     Use of the FIP structure caused Tinto to accrue significant tax liability.  The transfers of Bertin FIP shares took place at prices so far below the market value of Bertin S.A. that Tinto incurred no capital gains taxes.  Once the discrepancy between these prices and the publicly declared value of Bertin S.A. during the JBS-Bertin S.A. merger came to light, the Brazilian tax authority levied significant fines and interest charges on Tinto, far in excess of any capital gains taxes that Tinto would have initially owed.

43.     Once this necessary corporate structure was in place, Defendants began their covert scheme.

### A.     *First Share Transfer.*

44.     On December 24, 2009, one week before the merger, the beneficial ownership of Bertin S.A.—through Bertin FIP—underwent a dramatic change.  Under the direction and control of the Bertins and the Batistas, Tinto entered into a share-transfer agreement (the "First Share-Transfer Agreement") with the Delaware-based Colorado, then known as Blessed Holdings LLC.

45.     Under the First Share-Transfer Agreement, Tinto transferred 65.8% of Bertin FIP

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6164

to Colorado.  At that time, 65.8% of Bertin FIP amounted to 48.1% of Bertin S.A.  Bertin S.A. was valued at R$11.988 billion (USD$6.8 billion), meaning that a 65.8% stake in Bertin FIP was worth R$5.76 billion (USD$3.27 billion).  Yet Colorado agreed to pay just USD$10,000[6] to Tinto in exchange for it.  And Tinto never received even this trivial sum.  The First Share-Transfer Agreement included a confidentiality clause, under which the parties agreed to keep even the *existence* of the agreement a secret.

46.     According to Natalino Bertin's July 2019 formal testimony before the Brazilian Chamber of Deputies, Joesley Batista first introduced Colorado as a U.S.-based investor to the Bertins during the merger negotiations.  J.P. Morgan in New York served as Colorado's global custodian during the events.[7]  But Joesley Batista's representation was a lie:  Colorado was in fact a Batista-controlled entity, established by J.P. Morgan as a Delaware entity barely a week before the parties signed the First Share-Transfer Agreement.  Joesley Batista directed his J.P. Morgan bankers in New York to structure Colorado as a hidden Delaware vehicle for the Batista family.  The Batistas purposefully concealed their control of Colorado, which J.P. Morgan and the Batistas designed solely to receive Tinto's interest in Bertin FIP for the Batistas' benefit.

47.     Furthermore, because Tinto sold its shares at a loss, it avoided paying capital gains on the transaction.

---

[6] The First Share-Transfer Agreement stated this purchase price in U.S. dollars. USD$10,000 was approximately equivalent to R$17,620 at the time.

[7] J.P. Morgan has been a major financial advisor of JBS and the Batistas since JBS's IPO.

13

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

48.     After the First Share Transfer and before the JBS-Bertin S.A. merger, JBS's and Bertin S.A.'s true corporate structures looked like this:



**Figure 5:  The accurate corporate structures of Bertin S.A. and JBS S.A.,
immediately after the First Share Transfer and before the merger.**

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6166

49.     After completion of the JBS-Bertin S.A. merger, Colorado's interest in Bertin FIP

converted from an indirect interest in Bertin S.A. to an indirect interest in JBS.  The post-merger

company's true corporate structure then looked like this:



**Figure 6:  The accurate corporate structure of JBS S.A. immediately post-merger.**

50.     Tinto should have held nearly 28.7% of JBS after the merger.  But because of the

First Share-Transfer Agreement, Tinto was instead left with 9.81% of the company—a

USD$3.27 billion reduction in value traded away for nothing.

### B.     Second Share Transfer.

51.     Nearly a year later, on November 11, 2010, and again under the direction and

control of the Bertins, the Batistas, and Colorado, Tinto executed another share-transfer

agreement (the "Second Share-Transfer Agreement") with Colorado.  Under the Second Share-

Transfer Agreement, Tinto transferred a 19.51% interest in Bertin FIP (which represented more

than half its remaining interest in the fund) to Colorado.  At the time, 19.51% of Bertin FIP

equaled an approximate 5.16% stake in JBS.  This interest was worth approximately R$1.7

billion (USD$993.65 million).  In exchange, Colorado agreed to transfer to Tinto R$17,000.00

(USD$9,883.72)—an amount that, again, Tinto never received.  Once again, because Tinto sold

its shares at a loss, it did not incur capital gains in this transaction.  At this time, Tinto remained

unaware that the Batistas were the true beneficial owners of Colorado.  Again, the Second Share-

Transfer Agreement included a provision directing the parties to keep the existence of the

agreement confidential.

52.     After the Second Share Transfer, JBS's true corporate structure looked like this:



**Figure 7:  The accurate corporate structure of JBS S.A. immediately after the Second Share Transfer.**

53.     The First and Second Share-Transfer Agreements together stripped away the

majority of Tinto's assets, with nothing given in return.  Yet Joesley Batista, Wesley Batista, and

Colorado profited greatly.  Through the First and Second Share-Transfer Agreements, Colorado

received an asset worth R$7.46 billion (USD$4.26 billion) in exchange for R$34,620

(USD$19,883.72), which Colorado never paid.  Joesley Batista, Wesley Batista, and their

corporate groups successfully increased their collective majority stake in JBS from 50.11% to

50.63%, despite *issuing new equity* in the merger.

fls. 6168

54.     But for Tinto, only a sliver remained of its once-valuable meatpacking business. The harm was considerable:  In 2008, Tinto reported consolidated gross revenues of more than R$8.42 *billion* (USD$4.73 billion).  By 2011, after the merger and First and Second Share Transfers, that figure had dropped to R$93.69 *million* (USD$51.59 million).   This despite Tinto's considerable liabilities remaining in the hundreds of millions of reais.  By April 2012, the Bertins had moved Tinto out of their core holding company, Heber, and transferred it to Riober Participações Ltda., a secondary Bertin-affiliated holding company owned by Natalino Bertin.

### *C.*     *Events Between the Second and Third Share Transfers.*

55.     Tinto's remaining interest in Bertin FIP was transferred away in 2014.  But before that third transfer, two notable events took place.

56.     *First*, having seen a dramatic decrease in revenue because of the First and Second Share Transfers, Tinto began to financially struggle and took out a loan from Banco do Brasil S.A. in order to meet its obligations as they became due.  This loan was collateralized on certain of Tinto's shares of Bertin FIP.

57.     *Second*, on December 31, 2013, Bertin FIP—by this point, majority-owned by Colorado—became a shareholder of J&F, as part of the Batistas' reorganization of the corporate structure of various Batista-affiliated entities.  Before, Bertin FIP and J&F shared ownership of FB Par.  But under the direction and control of the Bertins, the Batistas, and Colorado, Bertin FIP used its shares of FB Par to raise the equity needed to join J&F.  Going into 2014, the actual corporate structure of JBS thus looked like this:

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.



**Figure 8:** **The accurate corporate structure of JBS S.A. immediately before the Third Share Transfer.**

### D. *Third Share Transfer.*

58.     A few months later, on June 15, 2014, Tinto, Comapi (another agribusiness company in the Bertin corporate group), the Bertins, J&F, and the Batistas executed a third share-transfer agreement (the "Third Share-Transfer Agreement"). Under the Third Share-Transfer Agreement, the Bertins transferred to J&F the rest of Tinto's ownership interest in Bertin FIP (which amounted to around 1.5% of JBS), Tinto's equity stake in Mafrip (another agribusiness company in the Bertin corporate group), and some real estate.

59.     In exchange, J&F agreed to pay Tinto R$334 million (USD$149.51 million) in cash.[8] Under the Third Share-Transfer Agreement, Tinto was directed to use R$130 million (USD$58.19 million) of those proceeds to repay the prior loan it had taken out from Banco do

---

[8] The Third Share-Transfer Agreement listed a total purchase price to J&F of R$346 million (USD$154.89 million), but stipulated that R$12 million (USD$5.37 million) of that price was already satisfied by previous payments made by J&F to Tinto.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

Brasil. Tinto's repayment of those debts would eliminate Banco do Brasil's security interest over Bertin FIP shares that, by the time of the Third Share-Transfer Agreement, were held by Colorado.

60. As a result of the Third Share-Transfer Agreement, Tinto relinquished the rest of its interest in Bertin FIP (and indirectly in JBS). After losing its interest in Bertin FIP, Tinto slid into insolvency. Batista-controlled entities became the full owners of Bertin FIP.

61. Shortly after, J&F transferred its stake of Bertin FIP into two holding companies owned by Joesley Batista and Wesley Batista: JJMB and WWMB. JBS's true corporate structure then looked like this[9]:




**Figure 9: The accurate corporate structure of JBS S.A. after the Third Share Transfer and the transfer of Bertin FIP interests to JJMB and WWMB.**

62. Through the three Share-Transfer Agreements, the Batistas successfully gained a significant asset—functionally, all of former Bertin S.A.—for a fraction of its actual value.

[9] By 2014, as a result of continued mergers and acquisitions, the Batistas had lost their majority stake in JBS.



Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6171

63.     The Bertins (either personally or through their primary holding company, Heber) received cash and strengthened their ongoing business relationship with the Batistas.  In the midst of these transactions, Silmar Bertin and Natalino Bertin incorporated several offshore entities (including companies in the United Kingdom and the British Virgin Islands), for still-unknown reasons.

64.     But Tinto received scraps.  And now, to right this wrong, Plaintiff brings this case on behalf of the estate of Tinto and its many creditors, who were harmed by Defendants' scheme to strip Tinto of its most significant asset, which pushed Tinto into financial decline and insolvency.

### E.     Plaintiff Uncovers the Cover-up.

65.     The JBS-Bertin S.A. merger involved a series of transactions that resulted in Tinto's complete loss of ownership of Bertin FIP, and indirectly JBS, in 2014.  But during and following the transactions, each Defendant denied and concealed the Batistas' ownership of Colorado.

66.     Colorado changed its on-paper ownership several times.  Each time, the Batistas used offshore and shell companies to ensure Colorado did not appear linked to the family.  At the time of Colorado's creation in Delaware, the Batistas beneficially owned Colorado through Lunsville International Inc.—a Panamanian company that served as Colorado's sole member.

67.     By March 2010, ownership of Colorado had moved to Graal Trust ("Graal"), a Bahamian trust formed to hold and manage Colorado stock.  There were no settlors listed for the trust, but it had been formed at the direction of the Batistas.  The Private Trust Corporation Limited, a Bahamian entity, was the named trustee.

68.     In April 2010, Graal engaged Lighthouse Capital Insurance Company ("Lighthouse") and U.S. Commonwealth Life, A.I. ("U.S. Commonwealth")—based out of the

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16, sob o número WJMJ24401243765. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6172

Cayman Islands and Puerto Rico, respectively—to issue 12 life-insurance policies for the secret benefit of Batista family members, and then transferred to Lighthouse and U.S. Commonwealth its shares of Colorado.

69.    At the end of April 2010, Lighthouse and U.S. Commonwealth each owned 50% of the shares of Colorado through Blessed Holdings Cayman Ltd. ("Blessed Cayman"), a special-purpose vehicle created to maintain and manage both the shares of Colorado and the life insurance policies issued to Graal for the benefit of the Batista family members.

70.    It wasn't until October 31, 2016 that the Batistas directly acquired Blessed Cayman, rather than beneficially owning it through a complex network of offshore companies and insurance policies.

71.    While Defendants varied Colorado's structure to disguise its true nature, Defendants also outwardly denied their connection to Colorado.

      a.    In 2014, JBS (under the direction and control of J&F and the Batistas) told the Securities and Exchange Commission of Brazil that it did not know the identity of Colorado's owners.

      b.    Brazilian law required JBS to list in its public year-end filings the ultimate beneficial owners of shareholders who held more than 5% of JBS's total equity.  JBS (under the direction and control of J&F and the Batistas) listed the insurance companies Lighthouse and U.S. Commonwealth in its 2014, 2015, and 2016 year-end public filings, and omitted the Batistas as Colorado's owners.  The omission in JBS's 2016 filing is especially troubling given that the Batistas had officially purchased Blessed Cayman several months earlier.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

    c.    On May 23, 2017, Wesley Batista testified to the Brazilian federal police that only his brother Joesley Batista knew the identity of Colorado's owner.

    d.    Even as recently as 2020, Wesley Batista stated that, at the time of the merger, Colorado did not belong to JBS "or people related to the JBS group" and claimed he did not know "who it used to belong to."

72.    The Securities and Exchange Commission of Brazil learned of the Batistas' acquisition of Blessed Cayman only from JBS's 2016 tax filings.  Upon learning of the acquisition, the commission questioned JBS about Colorado's ownership, and on May 25, 2017, JBS finally amended its public shareholder-disclosure filing to show that the Batistas owned Colorado.

73.    Tinto did not learn Colorado's true ownership until after it became insolvent and was placed under the judicial administrator's control.  The judicial administrator was alerted to Colorado's true identity through a motion that a Tinto creditor filed in the bankruptcy action on February 13, 2019.  Many other details about the merger and transactions remain unknown to Plaintiff.

74.    The Brazilian tax authorities subsequently uncovered the illicit use of the Bertin FIP structure, including the misreporting of Bertin S.A.'s value, and issued a tax debt certificate against Tinto.  The tax authority has now levied R$5,162,248,946.57 (USD$1,045,243,570.62) in tax liability and fines against Tinto.  Under Brazilian law, a significant part of this liability receives payment priority, and thus must be satisfied before certain other creditors of Tinto can be paid.  This liability would not have existed but for the Batistas directing the Bertins to place Tinto's shares of Bertin S.A. into Bertin FIP.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJM.J24401243765
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6174

## FIRST CAUSE OF ACTION:
## UNJUST ENRICHMENT

75.     Plaintiff brings this cause of action against Defendants Colorado Investment

Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., WWMB Participações Ltda.,

Joesley Batista, and Wesley Batista.

76.     Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

77.     Each of these Defendants was enriched as a result of the Share-Transfer

Agreements described above.

78.     Each of these Defendants received the proceeds of the Share-Transfer

Agreements, which amounted in aggregate to all of Tinto's equity stake in Bertin FIP.  These

shares were worth more than R$8.76 billion (USD$4.84 billion).  The proceeds received by these

Defendants eclipsed, by a staggering sum, the amounts that should have been paid by these

Defendants to Tinto under those same Share-Transfer Agreements.

79.     Defendants Colorado, J&F, JJMB, and WWMB received the Bertin FIP shares.

Joesley Batista and Wesley Batista, as the ultimate beneficial owners of these aforementioned

Defendants, received beneficial ownership of the same.

80.     By draining Tinto of a majority of its assets for minimal or no payments, each of

these Defendants was enriched at the expense of Tinto and Tinto's creditors, on whose behalf

and for whose benefit Plaintiff now acts.

81.     Each of these Defendants knew the true value of Tinto's Bertin FIP shares.  These

Defendants entered or caused Tinto to enter into the Share-Transfer Agreements, which on their

face transferred Tinto's Bertin FIP shares to these Defendants for far below their true market

value.  Each of these Defendants stripped Tinto of its Bertin FIP shares without providing just

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

compensation in return.  And each of these Defendants caused Tinto to transfer its assets in violation of Brazilian law through a series of null and void contracts.

82.     Tinto and its creditors suffered harm as a result.  If not for the transfer of the shares to these Defendants, Tinto may have been able to avoid bankruptcy and pay its creditors. Even if Tinto had still entered bankruptcy, the Bertin FIP shares would have been sold and their value would have been divided among Tinto's creditors according to Brazilian bankruptcy law.

83.     These Defendants engineered the JBS-Bertin S.A. merger and related transactions so that, by the end, Tinto would have transferred (directly or indirectly) to these Defendants its ownership in Bertin FIP.  These Defendants knew or should have known, when they (directly or indirectly) received the Bertin FIP shares, that they were receiving wrongfully obtained property at the expense of Tinto and its creditors.

84.     It is against equity and good conscience to permit these Defendants to retain the Bertin FIP shares.

### SECOND CAUSE OF ACTION:
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

85.     Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, Joesley Batista, Wesley Batista, JJMB Participações Ltda., WWMB Participações Ltda., and J&F Investimentos S.A.

86.     Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

87.     As officers of Tinto, Silmar Bertin and Natalino Bertin owed fiduciary duties to Tinto, including the duty of care to preserve corporate assets and prevent insolvency, and the duty of loyalty.  In their capacity as fiduciaries, Silmar Bertin and Natalino Bertin had the obligation to supervise and monitor corporate affairs, and to exercise independent judgment to benefit Tinto and its creditors.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16, sob o número WJMJ24401243765.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

88.     Silmar Bertin and Natalino Bertin violated their duty of care and duty of loyalty when they directed Tinto to enter into the Share-Transfer Agreements.  Silmar Bertin and Natalino Bertin, as sophisticated businessmen and the founders of Bertin S.A., were aware of the true value of the Bertin FIP shares, and knew that they were substantially underpriced in the Share-Transfer Agreements.  In these transactions, Silmar Bertin and Natalino Bertin acted to benefit Defendants, not Tinto.

89.     Silmar Bertin and Natalino Bertin also violated their duty of care and duty of loyalty when they directed Tinto to transfer its shares of Bertin S.A. into Bertin FIP.  Silmar Bertin and Natalino Bertin, as sophisticated businessmen and the founders of Bertin S.A., were aware that the creation of Bertin FIP could only serve to benefit these Defendants and their illicit scheme.  They instead acted to benefit these Defendants by use of the FIP structure—a decision that resulted in significant tax liability.

90.     Joesley Batista, Wesley Batista, Colorado, and J&F aided and abetted Silmar Bertin and Natalino Bertin in these breaches of their fiduciary duties when they participated in or directed the Share-Transfer Agreements.  Joesley Batista, Wesley Batista, Colorado, and J&F were aware of the Bertin FIP shares' true value when they entered into the Share-Transfer Agreements and knew that they were substantially underpriced.  Joesley Batista, Wesley Batista, and J&F also instructed Tinto to place its assets into Bertin FIP, knowing that, if discovered, the scheme would subject Tinto to massive tax liability.  Each of these Defendants also aided and abetted Silmar Bertin and Natalino Bertin in acts that violated Brazilian law and Tinto's articles of incorporation by siphoning Tinto's main assets to the detriment of Tinto—a for-profit legal entity—and its creditors.

91.     Tinto suffered harm as a result.  If not for the transfer of the shares to these

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6177

Defendants, Tinto may have been able to avoid bankruptcy and pay its creditors. The Share-Transfer Agreements rendered Tinto insolvent. And placing the assets of Bertin S.A. into Bertin FIP saddled Tinto with a R$5,162,248,946.57 (USD$1,045,243,570.62) tax liability that it otherwise would not have incurred. That liability continues to harm other of Tinto's creditors, who cannot be paid until a significant portion of that tax liability is satisfied.

## THIRD CAUSE OF ACTION:
## ACTION TO DECLARE ABSOLUTE NULLITY OF A TRANSACTION

92. Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, Joesley Batista, and Wesley Batista.

93. Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

94. Under Article 166 of the Brazilian Civil Code, a transaction is null and void if, among other things, its object is illicit, impossible, or indeterminable; the parties had unlawful motives; the transaction was not performed in the form prescribed by law; or the transaction's purpose evades a mandatory law.

95. As outlined below, the First and Second Share-Transfer Agreements are null and void under one or more of these standards.

96. Defendants Colorado, Joesley Batista, and Wesley Batista had at least three unlawful motives in entering into both the First and Second Share-Transfer Agreements. *First*, these Defendants entered into the First and Second Share-Transfer Agreements to increase the Batistas' majority interest in JBS without informing the market. By concealing that Joesley Batista and Wesley Batista were the true ultimate beneficial owners of Colorado, these Defendants hid the nature of the benefit to the Batistas from the transactions. *Second*, Colorado, Joesley Batista, and Wesley Batista intentionally violated Brazilian corporate law and Tinto's own articles of incorporation by siphoning Tinto's main assets to the detriment of Tinto—a for-

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

profit legal entity—and its creditors. *Third*, these Defendants intentionally deceived Brazilian fiscal authorities, both by using a purchase price that did not reflect the value transferred and by using an investment fund for the transfer of the shares in a manner deemed unlawful under Brazilian law. Colorado, Joesley Batista, and Wesley Batista took all of these steps knowing that their conduct was unlawful. The parties to the transactions had the unlawful motive to enrich themselves at the expense of Tinto's creditors while misleading JBS's minority shareholders and Brazilian fiscal authorities.

97. The purpose of the First and Second Share-Transfer Agreements was also the evasion of one or more mandatory law. *First*, Colorado, Joesley Batista, and Wesley Batista structured the transactions to avoid taxes, in violation of Brazilian tax law, by using an investment fund to transfer the Bertin FIP shares, and by transferring them for prices far below their market value. *Second*, these Defendants also caused Tinto to improperly dispose of its most significant asset, violating the Brazilian company law as it applies to for-profit businesses.

98. Because the First and Second Share-Transfer Agreements are null and void under Article 166 of the Brazilian Civil Code, this Court should revert the parties to their status prior to these Share-Transfer Agreements.

## FOURTH CAUSE OF ACTION:
## ACTION TO DECLARE VOID TRANSACTION

99. Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, Joesley Batista, and Wesley Batista.

100. Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

101. Under Article 167 of the Brazilian Civil Code, a transaction is null and void as a sham transaction if, among other things, the transaction appears to confer or transmit rights to persons other than those to whom those rights are really conferred; the contract contains a

statement, condition, or clause that is not true; or the contract is not dated as of the actual date of execution.

102.     The First and Second Share-Transfer Agreements are null and void because they appear to transmit rights to persons other than those to whom those rights are really conferred, and they contain materially false statements.  *First*, as described above, the agreements appear to transmit rights to Colorado—which held itself out as an independent, Delaware-based party—but in reality transferred rights to the Batistas.  *Second*, the agreements contained a false declaration of the purchase price.  They appeared to effectuate a legitimate asset sale, and contained statements indicative of that intent—but in reality, these agreements unlawfully diverted assets away from Tinto and its creditors towards Colorado, Joesley Batista, and Wesley Batista for nothing in return.  The end result was that Colorado, Joesley Batista, and Wesley Batista were enriched at the expense of Tinto and its creditors, and JBS minority shareholders were misled about the true nature of the merger.

103.     Because the First and Second Share-Transfer Agreements are null and void under Article 167 of the Brazilian Civil Code, this Court should revert the parties to their status prior to these Share-Transfer Agreements.

### FIFTH CAUSE OF ACTION:
### TRANSFER OF ESTABLISHMENT

104.     Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., WWMB Participações Ltda., Joesley Batista, and Wesley Batista.

105.     Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

106.     Under Article 129, VI, of the Brazilian Bankruptcy Law, the sale or transfer of a business's establishment is ineffective if (i) it is made without the express consent or payment of

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJM244012437765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6180

all then-existing creditors; and (ii) if the debtor is left, after the sale or transfer, with insufficient assets to pay its liabilities. Brazilian law defines an establishment as "any complex of organized goods, for the exercise of the company, by an entrepreneur, or by a company." Brazilian Civil Code, Article 1142. "The establishment may be a unitary object of legal and translational or constitutive rights and business, which are compatible with its nature." Brazilian Civil Code, Article 1143.

107.   Tinto's shares of Bertin FIP constituted an establishment, as they were the core business asset held by Tinto. Tinto's creditors did not know—and did not provide any form of consent—when these Defendants acquired Tinto's shares of Bertin FIP. As a result of the transfers, Tinto was left without sufficient assets to satisfy the claims of its creditors.

108.   Alternatively, Tinto's shares of Bertin FIP represented its ownership of tangible assets arranged under single corporate brands in the meat-processing industry—first Bertin S.A., and later JBS—which independently constituted an establishment. Tinto's creditors did not know—and did not provide any form of consent—when these Defendants acquired Tinto's shares of Bertin FIP, and thus its ownership of the tangible assets these shares represented. As a result of the transfers, Tinto was left without sufficient assets to satisfy the claims of its creditors.

109.   To remedy this violation of Article 129, VI, of the Brazilian Bankruptcy Law, Plaintiff respectfully requests that this Court order these Defendants to immediately revert the parties to their status prior to the Share-Transfer Agreements.

## SIXTH CAUSE OF ACTION:
## PIERCING OF THE CORPORATE VEIL

110.   Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, Joesley Batista, Wesley Batista, JBS S.A., J&F Investimentos S.A., JJMB Participações Ltda., and WWMB Participações Ltda.

fls. 6181

111.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

112.    Under Article 50 of the Brazilian Civil Code and Article 82-A, Sole Paragraph, of the Brazilian Bankruptcy Law, Plaintiff may bring a claim to hold a corporation's owners, controllers, and administrators—as well as third parties—personally liable in accordance with Article 50 of the Brazilian Civil Code.  A claim under Article 50 requires that the defendants misused the purpose of the bankrupt company or abused of the legal personality of the bankrupt company.  The legal personality of a company can be abused through a commingling of assets, including a transfer of assets without effective compensation.  It can also be abused in cases of diversion of purpose, such as when the legal entity is used to harm creditors or for the commission of an unlawful act.

113.    As outlined above, Defendants misused Tinto's purpose by diverting Tinto's greatest asset to the detriment of the estate and its creditors as part of an unlawful scheme. Likewise, Defendants abused Tinto's legal personality by unlawfully causing the transfer of Tinto's assets—its shares of Bertin FIP—without effective compensation, at the expense of Tinto's creditors.

114.    The Batistas directed Tinto to transfer its stake in Bertin FIP—worth R$8.76 billion (USD$4.84 billion)—for very little in return.  This transfer without effective compensation fell within the purview of Article 50.  Colorado, JBS, J&F, JJMB, and WWMB also contributed to this commingling of assets.  Colorado—disguised as a third-party entity—and J&F received the shares and paid nothing in return.  JBS legitimized the planned transfer to the public by misleading the public about the merger's true structure, treating the acquisition of Bertin S.A. as a run-of-the-mill merger rather than a scheme to enrich JBS's principals at the expense of Tinto's creditors.  JJMB and WWMB, for their part, are alter egos of Joesley Batista,

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJM.J24401243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

Wesley Batista, and J&F.  Joesley Batista, Wesley Batista, and J&F quickly shuffled the shares

of Bertin FIP they acquired in the Third Share Transfer into JJMB and WWMB.  As these facts

demonstrate, Tinto and Defendants were members of the same economic group for the purposes

of the transactions underlying this lawsuit.

115.    As a result of Defendants' misuse of Tinto's purpose and abuse of Tinto's

personality, Tinto's creditors were harmed by Tinto's financial decline, incurred liability, and

insolvency.  Had Defendants not caused Tinto to unlawfully transfer its greatest asset, or had

Defendants appropriately compensated Tinto for that asset, then Tinto would have been able to

pay its creditors.

116.    Joesley Batista, Wesley Batista, Colorado, J&F, JJMB, and WWMB all benefitted

from their abuse of Tinto's legal personality by obtaining the valuable shares without paying

market value.  They also benefitted because the Batistas increased their equity in JBS.  JBS, in

turn, benefitted by knocking out one of its competitors in Brazil.

117.    Accordingly, each of these Defendants are liable to Plaintiff for the relief sought

by this lawsuit.

### SEVENTH CAUSE OF ACTION:
### COMPENSATION FOR THE DAMAGES CAUSED BY THE ILLICIT ACTS

118.    Plaintiff brings this cause of action against Defendants Colorado Investment

Holdings LLC, Joesley Batista, Wesley Batista, J&F Investimentos S.A., JJMB Participações

Ltda., and WWMB Participações Ltda.

119.    Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

120.    Article 186 of the Brazilian Civil Code imposes liability where a defendant

undertook an illicit act either negligently or with the intention to cause damage (i.e., willful

misconduct), that violates the plaintiff's rights, causing damage.  Article 187 of the Brazilian

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJM.I24401243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

Civil Code extends liability to the holder of a right who, in exercising it, clearly exceeds the limits imposed by its economic or social purpose, good faith, or good customs. Article 927 of the Brazilian Civil Code states that a party whose illicit acts damage others is obliged to pay damages.

121.    As detailed above, in September 2020, the Brazilian tax authority assessed R$1,079,096,994.18 (USD$218,493,762.49) in taxes against Tinto for transferring its shares of Bertin S.A. into Bertin FIP. Colorado, Joesley Batista, Wesley Batista, J&F, JJMB, and WWMB caused Tinto to enter into the relevant agreements, which were structured to avoid tax liability, even though Tinto obtained no economic benefit in these transactions. These Defendants clearly acted not only negligently but deliberately in the structuring, signing, and performance of such Share Transfer Agreements. By directing Tinto in this manner, these Defendants manifestly exceeded the limits imposed by the economic and social purposes of the rights they held with respect to Tinto, absent good faith or good custom. These Defendants acted with intent to avoid paying taxes, which ultimately damaged Tinto for their own benefit.

122.    The tax authority also fined Tinto R$2,479,020,315.70 (USD$501,947,905.50) for failing to disclose the true nature of the sale and failing to timely pay taxes. To this day, Tinto continues to accrue interest on the tax liability and fines, which already totals over R$1,604,131,636.69 (USD$324,801,902.6).

123.    As a result of the foregoing, Plaintiff has been damaged by the actions of Colorado, Joesley Batista, Wesley Batista, J&F, JJMB, and WWMB in an amount equal to the liability imposed on it—to date, R$5,162,248,946.57 (USD$1,045,243,570.62). Accordingly, these Defendants are liable to Plaintiff for that damage.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJM.24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.    Entry of an order requiring the imposition of a constructive trust in favor of

Plaintiff over all shares derived by Defendants under the unlawful transactions

alleged above, to prevent unjust enrichment to Defendants, and an order that such

shares be paid over and transferred to Plaintiff in full;

B.    Entry of an order awarding damages for the tax liability Tinto incurred because of

Defendants' actions;

C.    Entry of an order holding Defendants liable for the debts sought by Tinto's

creditors;

D.    Awarding Plaintiff all damages according to proof; and

E.    Any other relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues properly triable.

Dated:  September 8, 2023                    Respectfully submitted,

SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
Email: ggrossman@sequorlaw.com
nmiller@sequorlaw.com
jmosquera@sequorlaw.com

By:    */s/ Nyana Abreu Miller*
Gregory S. Grossman
Florida Bar No.: 896667
Nyana Abreu Miller
Florida Bar No. 92903
Jennifer Mosquera
Florida Bar No.: 1018656

33

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJM.I2440I243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6185

Derek T. Ho (*pro hac vice*)
Andrew E. Goldsmith (*pro hac vice*)
Grace W. Knofczynski (*pro hac vice*)
Eden M. Bernstein (*pro hac vice*)
Chase H. Robinett (*pro hac vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dho@kellogghansen.com
agoldsmith@kellogghansen.com
gknofczynski@kellogghansen.com
ebernstein@kellogghansen.com
crobinett@kellogghansen.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via electronic filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such filing to all CM/ECF participants in this case**,** as indicated on the service list on September 8, 2023.

*/s/ Nyana Abreu Miller*
Nyana Abreu Miller

## SERVICE LIST

**Electronic Mail Notice List**

- **Daniel Humphrey**    danielhumphrey@quinnemanuel.com

- **Office of the US Trustee**    USTPRegion21.MM.ECF@usdoj.gov

- **Olga M Vieira**    olgavieira@quinnemanuel.com,  ivettegalante@quinnemanuel.com

**Manual Notice List**

- (No manual recipients)

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código kzvL4fRb.

fls. 6186

**Tradução nº I-57071**
**Livro nº 695**
**Folha 373**

*Sandra Regina Mattos Rudzit*

TRADUTORA PÚBLICA

---

*Eu, Sandra Regina Mattos Rudzit, tradutora pública, certifico e dou fé que me foi apresentado um documento, em idioma inglês, que passo a traduzir para o vernáculo no seguinte teor:*

Processo 23-11719-MAM Doc 8 Protocolado em 07/04/23 Página _ de _

**DECISÃO proferida no Distrito Sul da Flórida em 6 de abril de 2023.**

(ass)

**Mindy A. Mora, Juíza**

**Vara de Federal de Falências**

**dos Estados Unidos**

Selo da Vara Federal de Falências dos Estados Unidos – Distrito Sul da Flórida

**VARA FEDERAL DE FALÊNCIAS DOS ESTADOS UNIDOS**

**DISTRITO SUL DA FLÓRIDA**

Na questão referente a:

Capítulo 15

Processo nº: 23-11719-MAM

TINTO HOLDING LTDA.,

Devedora em Processo Estrangeiro. _/

**DECISÃO RECONHECENDO PROCESSO ESTRANGEIRO PRINCIPAL DA TINTO HOLDING LTDA. SEGUNDO OS ARTIGOS 1515 E 1517 DO CÓDIGO DE FALÊNCIA E CONCEDENDO TUTELA RELACIONADA**

Este assunto foi submetido a audiência em 28 de março de 2023 ("Audiência"), mediante *Requerimento Confirmado de Decisão de Reconhecimento de Processo Principal Estrangeiro de acordo com os Artigos 1515 e 1517 e Solicitação de Audiência* ("Pedido Confirmado") [ECF nº 2] de Henrique Forssell, advogado da Deloitte Touche Tohmatsu Consultores Ltda. (a "Administradora Judicial"), a administradora judicial da massa falida da Tinto Holding Ltda. (a "Devedora"), o processo de liquidação da Devedora (o "Processo Brasileiro") sob o controle ou supervisão da 2ª Vara de Falências e Recuperações Judiciais da Comarca de São Paulo, Brasil (a "Vara de Falências e Recuperações Judiciais Brasileira"), pleiteando o reconhecimento e tutela relacionada de acordo com o Capítulo 15 do Código de Falência dos EUA. A Vara considerou a Petição ("Petição") [ECF nº 1], o Pedido Confirmado, a Declaração do advogado brasileiro da Administradora Judicial e seus respectivos anexos, e os argumentos do advogado na Audiência. A Vara considera que:

A. Notificação devida e oportuna do protocolo da Petição do Capítulo 15, Pedido Confirmado e Audiência foi dada pela Administradora Judicial.

B. Esta Vara tem competência sobre este assunto nos termos do Volume 28 do Código Federal Norte-Americano (U.S.C.), Artigos 157 e 1334, e do Volume 11 do U.S.C., Artigos 109 e 1501.

C. O Foro deste processo é competente nesta comarca nos termos do Volume 28 do U.S.C., Artigo 1410.

D. Trata-se de um processo central segundo o Volume 28 do U.S.C., Artigo 157(b)(2)(P).

E. A Administradora Judicial qualifica-se como "representante estrangeira" conforme definido no Volume 11 do U.S.C., Artigo 101(24).

F. O processo deste Capítulo 15 foi devidamente instaurado segundo o Volume 11 do U.S.C., Artigos 1504, 1515, 1517.

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.018-08- RG 8.222.837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just.trd.br- www.just.trd.br

Esta certidão de tradução pública foi assinada digitalmente pela Tradutora Pública Sandra Regina Mattos Rudzit, JUCESP 1688. O código de verificação em https://oab.portaldeassinaturas.com.br:443 é 2095-16F2-BBC5-E65B.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765 Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código pNVvn961.



Tradução nº I-57071
Livro nº 695
Folha 374

fls. 6187

G. A Administradora Judicial atendeu aos requisitos do Volume 11 do U.S.C., Artigos 1515(b), 1515(c), 1515(d) e Norma 1007(a)(4) das Normas Federais de Processo Falimentar.

H. O Processo Brasileiro é um processo estrangeiro segundo o Volume 11 do U.S.C., Artigos 101(23) e 1502(4).

I. O Processo Brasileiro tem direito a reconhecimento por esta Vara segundo o Volume 11 do U.S.C., Artigo 1517.

J. O Processo Brasileiro está pendente no Brasil. A Devedora tem seu centro de interesse principal no Brasil e, portanto, o Processo Brasileiro é um processo principal estrangeiro nos termos do Volume 11 do U.S.C., Artigo 1502(4) com direito a reconhecimento como um processo principal estrangeiro nos termos do Volume 11 do U.S.C., Artigo 1517(b)(1).

K. A Administradora Judicial tem direito a todas as tutelas previstas no Volume 11 do U.S.C., Artigo 1520(a).

L. A Administradora Judicial também tem direito à tutela expressamente estabelecida no Volume 11 do U.S.C., Artigo 1521(a)(1), (2), (3), (4) e (5).

M. A tutela neste ato concedida é necessária e conveniente, nos interesses da cooperação judicial pública e internacional, consistente com a política pública dos Estados Unidos, garantida segundo o Volume 11 do U.S.C., Artigo 1521, e não causará qualquer dificuldade aos credores da Devedora ou a outras partes que não sejam compensadas pelos benefícios da tutela concedida.

N. A Vara considera que os interesses dos credores, das entidades interessadas, da Devedora e da massa falida da Devedora estão suficientemente protegidos pelos direitos e obrigações de acordo com as Normas Federais de Processo Falimentar e/ou o Código de Processo Civil da Justiça Federal Norte-Americana que regem a obtenção de provas.

Isso posto, fica DECIDIDO e JULGADO que:

1. É conferido ao Processo Brasileiro reconhecimento como "processo estrangeiro principal" segundo o Volume 11 do U.S.C., Artigo 1517.

2. O Processo Brasileiro terá pleno vigor e efeito e será obrigatório e exequível nos Estados Unidos contra todas as pessoas físicas e jurídicas. A menos que a Vara determine de outra forma, as Decisões da Vara de Falência e Recuperação Judicial Brasileira terão pleno vigor e efeito e serão vinculantes e exequíveis nos Estados Unidos contra todas as pessoas físicas e jurídicas. Isso inclui, sem limitação, a Decisão da Vara de Falências e Recuperações Judiciais Brasileira que coloca a Devedora em liquidação e nomeia a Administradora Judicial, cuja Decisão está anexada ao Pedido Confirmado.

3. A Administradora Judicial terá poderes para agir de forma independente na realização de quaisquer das funções e dos poderes conferidos por esta Decisão.

4. As disposições do Volume 11 do U.S.C., Artigo 1520(a), aplicam-se a este processo, incluindo, sem limitação, a aplicação da suspensão automática do Volume 11 do U.S.C., Artigo 362, com relação à Devedora e aos bens da Devedora que estão dentro da jurisdição territorial dos Estados Unidos.

5. De acordo com o Volume 11 do U.S.C., Artigo 1521(a)(1), todas as pessoas físicas e jurídicas são impedidas de instaurar ou dar continuidade a qualquer ação ou processo relativo aos ativos, direitos, obrigações ou responsabilidades de qualquer Devedor ou da massa falida da Devedora, localizados nos Estados Unidos.

6. De acordo com o Volume 11 do U.S.C., Artigo 1521(a)(2), todas as pessoas físicas e jurídicas estão impedidas de executar os ativos da Devedora ou da massa falida da Devedora localizados nos Estados Unidos.

7. De acordo com o Volume 11 do U.S.C., Artigo 1521(a)(3), todas as pessoas físicas e jurídicas estão proibidas de transferir, onerar ou de outro modo alienar quaisquer ativos da Devedora ou da massa falida da Devedora localizados nos Estados Unidos.

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.018-08- RG 8.222.837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just.trd.br- www.just.trd.br

Esta certidão de tradução pública foi assinada digitalmente pela Tradutora Pública Sandra Regina Mattos Rudzit, JUCESP 1688. O
código de verificação em https://oab.portaldeassinaturas.com.br:443 é 2095-16F2-BBC5-E65B.                    Página 2 de 2

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código pNVvn961.

fls. 6188

**Tradução nº I-57071**
**Livro nº 695**
**Folha 375**

8. Todas as pessoas físicas e jurídicas notificadas desta Decisão que estejam de posse, custódia ou controle de bens, ou o respectivo produto, da Devedora ou da massa falida da Devedora, localizados dentro da jurisdição territorial dos Estados Unidos, deverão informar imediatamente a Administradora Judicial mediante notificação por escrito enviada para os seguintes endereços:

Deloitte Touche Tohmatsu Consultores Ltda.

Doutor Chucri Zaidan AV, 1240,

Edifício Golden Tower, 4º ao 12º andar

Santo Amaro

04711-130

São Paulo - Brasil

Com cópia para:

A/C Gregory Grossman, Nyana Miller, e Jennifer Mosquera

Sequor Law, P.A.

1111 Brickell Avenue, Suite 1250

Miami, Flórida 33131

notificação por escrito essa que deverá estabelecer: (i) a natureza desses bens ou recursos; (ii) quando e como esses bens ou recursos passaram à custódia, posse ou controle dessa pessoa física ou jurídica; e (iii) a identidade completa e informações de contato dessa pessoa física ou jurídica. A Administradora Judicial deverá protocolar na Vara, periodicamente, informações que demonstrem as pessoas físicas ou jurídicas a quem se notificou desta Decisão.

9. A Administradora Judicial está autorizada a interrogar testemunhas, obter provas ou obter a entrega de informações relativas aos bens, negócios, direitos, obrigações ou responsabilidades da Devedora ou da massa falida da Devedora de acordo com o Artigo 1521(a)(4), das Normas Federais de Processo Falimentar, incluindo, sem limitação, o procedimento da *Fed. R. Bankr. P. 2004* e Norma Local 2004-1, sem determinação adicional desta Vara.

10. A Administradora Judicial está autorizada a pedir exibição de provas em relação a um bem, negócio, direito, obrigação ou responsabilidade da Devedora ou da massa falida da Devedora que consista em uma reivindicação ou direito intangível, instaurado ou não, ou outro processo em que a Devedora ou a massa falida da Devedora seja uma parte. Em caso de exibição de provas solicitada para fins de um processo pendente, a Notificação da Administradora Judicial sobre o Exame da Norma 2004 e qualquer Intimação nos termos da *Fed. R. Civ. P. 45* deverá identificar o pedido, coisa litigiosa ou processo ao qual tal exibição de provas se refere. A Vara poderá considerar a estrutura fornecida pelo Volume 28 do U.S.C., Artigo 1782, e as autoridades decididas com relação à exibição de provas segundo este parágrafo.

11. Nos termos do Volume 11 do U.S.C., Artigo 1521(a)(5), a Administradora Judicial é encarregada da administração total e realização de toda ou parte da massa falida e dos ativos da Devedora dentro da jurisdição territorial dos Estados Unidos.

12. Exceto uma reconvenção a uma ação movida pela Administradora Judicial, nenhuma pessoa física ou jurídica poderá mover uma ação contra a Administradora Judicial em qualquer juízo, incluindo esta Vara, nos Estados Unidos sem primeiro obter permissão desta Vara.

13. A Administradora Judicial está ainda autorizada a operar e poderá exercer os poderes de um administrador fiduciário segundo e nos casos previstos no Volume 11 do U.S.C., Artigos 363 e 552.

14. Não obstante qualquer disposição em contrário das Normas Falimentares, (i) esta Decisão entrará em vigor imediatamente e poderá ser executada após o proferimento, e constituirá uma decisão definitiva, na acepção do Volume 28 do U.S.C., Artigo 158(a); (ii) a Administradora Judicial não está

Esta certidão de tradução pública foi assinada digitalmente pela Tradutora Pública Sandra Regina Mattos Rudzit, JUCESP 1688. O código de verificação em https://oab.portaldeassinaturas.com.br:443 é 2095-16F2-BBC5-E65B.

**Tradução nº I-57071**
**Livro nº 695**
**Folha 376**

*Sandra Regina Mattos Rudzit*

TRADUTORA PÚBLICA

sujeita a qualquer interrupção na implementação, execução ou realização da tutela concedida nesta Decisão; e (iii) a Administradora Judicial está autorizada e habilitada, e poderá, a seu critério e sem demora, tomar qualquer medida e executar qualquer ato necessário para implementar e efetivar os termos desta Decisão.

15. Nenhum ato da Administradora Judicial na preparação, disseminação, solicitação, implementação ou de outra forma agindo em favor do Processo Brasileiro ou de qualquer decisão proferida no ou por meio do Processo do Capítulo 15 (incluindo qualquer processo contrário ou assuntos contestados) será considerada uma renúncia ao direito de imunidade concedida à Administradora Judicial, inclusive nos termos do Volume 11 do U.S.C., Artigos 306 e 1510.

16. Uma cópia desta Decisão, confirmada como verdadeira e correta, será entregue eletronicamente a qualquer pessoa física ou jurídica que tenha constado neste processo até o momento.

17. Esta Vara terá competência com relação à execução, alteração ou modificação desta Decisão, quaisquer pedidos de tutela adicional ou qualquer processo contrário instaurado no ou por meio do processo deste Capítulo 15, observando-se as limitações determinadas pelo Volume 11 do U.S.C., Artigo 1521(a)(7), e qualquer pedido de tutela por qualquer pessoa física ou jurídica das disposições desta Decisão.

18. Esta Vara terá competência em relação à administração, realização e distribuição dos ativos da Devedora dentro da jurisdição territorial dos Estados Unidos.

19. A Administradora Judicial é instruída a fornecer uma cópia verdadeira e correta desta Decisão por correio, de acordo com a Norma 2002(q) das Normas Federais de Processos Falimentares.

Enviado por:

Jennifer Mosquera, Esq.

SEQUOR LAW, P.A.

1111 Brickell Avenue, Suite 1250

Miami, Flórida 33131

nmiller@sequorlaw.com

jmosquera@sequorlaw.com

Telefone: (305) 372-8282

Fax: (305) 372-8202

*(A advogada Mosquera enviará uma cópia da decisão acima a todas as partes interessadas e protocolará nesta Vara uma Certidão de Citação)*
*NADA MAIS. LI, conferi, achei conforme e dou fé desta tradução.*

*São Paulo, 12 de abril de 2023*

*Emolumentos: R$447,60*
*Recibo Nº 25033*

SANDRA REGINA MATTOS RUDZIT
Tradutora Pública

all/336144.doc

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688 - CPF 082.060.018-08- RG 8.222.837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just.trd.br- www.just.trd.br

Esta certidão de tradução pública foi assinada digitalmente pela Tradutora Pública Sandra Regina Mattos Rudzit, JUCESP 1688. O código de verificação em https://oab.portaldeassinaturas.com.br:443 é 2095-16F2-BBC5-E65B.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJIMJ24401243765. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código pNVvn961.

fls. 6190



**ORDERED in the Southern District of Florida on April 6, 2023.**

**Mindy A. Mora, Judge**
**United States Bankruptcy Court**

---

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

</div>

In re:

                                   Chapter 15

TINTO HOLDING LTDA.,              Case No.: 23-11719-MAM

       Debtor in a Foreign Proceeding.

_____/

<div align="center">

**ORDER GRANTING RECOGNITION OF FOREIGN**
**MAIN PROCEEDING OF TINTO HOLDING LTDA. PURSUANT TO §§ 1515 AND**
**1517 OF THE BANKRUPTCY CODE AND GRANTING RELATED RELIEF**

</div>

       This matter came on for hearing on March 28, 2023 ("Hearing"), upon the *Verified Motion for Order of Recognition of Foreign Main Proceeding Pursuant to §§1515 and 1517 and Request for Hearing* ("Verified Motion") [ECF No. 2] of Henrique Forssell, counsel to Deloitte Touche Tohmatsu Consultores Ltda. (the "Judicial Administrator"), the judicial administrator of the bankruptcy estate Tinto Holding Ltda. (the "Debtor"), Debtor's liquidation proceeding (the "Brazilian Proceeding") under the control or supervision of the 2nd Bankruptcy and Judicial Reorganization Court in the Judicial District of São Paulo, Brazil (the "Brazilian Bankruptcy Court"), seeking recognition and related relief pursuant to Chapter 15 of the U.S. Bankruptcy

Esta certidão de tradução pública foi assinada digitalmente pela Tradutora Pública Sandra Regina Mattos Rudzit, JUCESP 1688. O código de verificação em https://oab.portaldeassinaturas.com.br:443 é 2095-16F2-BBC5-E65B.

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código pNVvn961.

Code. The Court has considered the Petition ("Petition") [ECF No. 1], the Verified Motion, the Declaration of the Judicial Administrator's Brazilian counsel and its respective attachments, and the arguments of counsel at the Hearing.  The Court finds that:

A.     Due and timely notice of the filing of the Chapter 15 Petition, Verified Motion, and the Hearing was given by the Judicial Administrator.

B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 109 and 1501.

C.     Venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1410.

D.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

E.     The Judicial Administrator qualifies as a "foreign representative" as defined in 11 U.S.C. §101(24).

F.     This Chapter 15 case was properly commenced pursuant to 11 U.S.C. §§ 1504, 1515, 1517.

G.     The Judicial Administrator has met the requirements of 11 U.S.C. §§ 1515(b), 1515(c), 1515(d), and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

H.     The Brazilian Proceeding is a foreign proceeding under 11 U.S.C. §§ 101(23) and 1502(4).

I.     The Brazilian Proceeding is entitled to recognition by this Court under 11 U.S.C. § 1517.

J.     The Brazilian Proceeding is pending in Brazil. The Debtor has its center of main interests in Brazil, and, accordingly, the Brazilian Proceeding is a foreign main proceeding under 11 U.S.C. § 1502(4) entitled to recognition as a foreign main proceeding under 11 U.S.C. § 1517(b)(1).

2

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código pNVvn9k1.

K.     The Judicial Administrator is entitled to all relief provided under 11 U.S.C. § 1520(a).

L.     The Judicial Administrator is further entitled to the relief expressly set forth in 11 U.S.C. § 1521(a)(1), (2), (3), (4), and (5).

M.     The relief granted by this Order is necessary and appropriate, in the interests of public and international comity, consistent with the public policy of the United States, warranted pursuant to 11 U.S.C. § 1521, and will not cause any hardship to the creditors of the Debtor or other parties that is not outweighed by the benefits of the relief being granted.

N.     The Court finds that the interests of the creditors, interested entities, the Debtor, and the Debtor's estate are sufficiently protected by the rights and obligations under the Federal Rules of Bankruptcy Procedure and/or Federal Rules of Civil Procedure governing the taking of discovery.

Accordingly, it is ORDERED AND ADJUDGED that:

1.     The Brazilian Proceeding is granted recognition as a "foreign main proceeding" under 11 U.S.C. § 1517.

2.     The Brazilian Proceeding shall be given full force and effect and be binding on and enforceable in the United States against all persons and entities. Unless the Court orders otherwise, Orders of the Brazilian Bankruptcy Court shall be given full force and effect and be binding on and enforceable in the United States against all persons and entities. This includes without limitation the Order of the Brazilian Bankruptcy Court placing the Debtor into a liquidation and appointing the Judicial Administrator, which Order is attached to the Verified Motion.

3.     The Judicial Administrator shall have the authority to act independently to carry out any of the duties and powers granted by this Order.

3

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código pNVvn961.

4.      The provisions of 11 U.S.C. § 1520(a) apply to this proceeding, including without limitation, the application of the automatic stay of 11 U.S.C. § 362 with respect to the Debtor and the property of the Debtor that is within the territorial jurisdiction of the United States.

5.      Under 11 U.S.C §1521(a)(1), all persons and entities are stayed from commencing or continuing any action or proceeding concerning the assets, rights, obligations, or liabilities of any Debtor or the Debtor's bankruptcy estate located in the United States.

6.      Under 11 U.S.C § 1521(a)(2), all persons and entities are stayed from executing against the assets of the Debtor or the Debtor's bankruptcy estate located in the United States.

7.      Under 11 U.S.C § 1521(a)(3), all persons and entities are prohibited from transferring, encumbering, or otherwise disposing of any assets of the Debtor or the Debtor's bankruptcy estate located in the United States.

8.      All persons and entities provided notice of this Order who are in possession, custody, or control of property, or the proceeds thereof, of the Debtor or the Debtor's bankruptcy estate, located within the territorial jurisdiction of the United States, shall immediately advise Judicial Administrator by written notice sent to the following addresses:

> Deloitte Touche Tohmatsu Consultores Ltda.
> Doutor Chucri Zaidan AV , 1240,
> Edificio Golden Tower, 4º ao 12º floor
> Santo Amaro
> 04711-130
> São Paulo – Brazil

With a copy to:

> Attn: Gregory Grossman, Nyana Miller, and Jennifer Mosquera
> Sequor Law, P.A.
> 1111 Brickell Avenue, Suite 1250
> Miami, Florida 33131

which written notice shall set forth: (i) the nature of such property or proceeds; (ii) when and how such property or proceeds came into the custody, possession, or control of such person or entity;

4

Esta certidão de tradução pública foi assinada digitalmente pela Tradutora Pública Sandra Regina Mattos Rudzit, JUCESP 1688. O código de verificação em https://oab.portaldeassinaturas.com.br:443 é 2095-16F2-BBC5-E65B.

Página 0 de 0

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código pNVvn961.

and (iii) the full identity and contact information for such person or entity. The Judicial Administrator shall file with the Court, from time to time, information demonstrating those persons or entities to whom he has provided notice of this Order.

9. The Judicial Administrator is authorized to examine witnesses, take evidence, or seek the delivery of information concerning the assets, affairs, rights, obligations, or liabilities of the Debtor or the Debtor's bankruptcy estate pursuant to §1521(a)(4), the Federal Rules of Bankruptcy Procedure, including without limitation the procedure of Fed. R. Bankr. P. 2004 and Local Rule 2004-1, without further order of this Court.

10. The Judicial Administrator is authorized to take discovery in connection with an asset, affair, right, obligation, or liability of the Debtor or the Debtor's bankruptcy estate that consists of a claim or chose in action, whether or not filed, or other proceeding in which the Debtor or the Debtor's bankruptcy estate is a party. In case of discovery sought in aid of a pending proceeding, the Judicial Administrator's Notice of Rule 2004 Examination and any Subpoena under Fed. R. Civ. P. 45 shall identify the claim, chose in action, or proceeding to which such discovery relates. The Court may consider the framework provided by 28 U.S.C. § 1782 and authorities decided thereunder regarding discovery under this paragraph.

11. Under 11 U.S.C § 1521(a)(5), the Judicial Administrator is entrusted with the full administration and realization of all or a part of the Debtor's bankruptcy estate and assets within the territorial jurisdiction of the United States.

12. Other than a counterclaim to a suit brought by the Judicial Administrator, no person or entity may commence suit against the Judicial Administrator in any court, including this Court, in the United States without first obtaining leave of this Court.

13. The Judicial Administrator is further authorized to operate and may exercise the powers of a trustee under, and to the extent provided by 11 U.S.C. §§ 363 and 552.

5

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justiça do Estado de São Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 . Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código pNVvn961.

14.     Notwithstanding any provision in the Bankruptcy Rules to the contrary, (i) this Order shall be effective immediately and enforceable upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a); (ii) the Judicial Administrator is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (iii) the Judicial Administrator is authorized and empowered and may in its discretion and without further delay take any action and perform any act necessary to implement and effectuate the terms of this Order.

15.     No action taken by the Judicial Administrator in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the Brazilian Proceeding or any order entered in or in respect of the Chapter 15 Case (including any adversary proceedings or contested matters) will be deemed to constitute a waiver of immunity afforded the Judicial Administrator, including pursuant to 11 U.S.C. §§ 306 and 1510.

16.     A copy of this Order, confirmed to be true and correct, shall be served electronically on any person or entity that has appeared in this case to date.

17.     This Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through this Chapter 15 case subject to the limitations set forth in 11 U.S.C. §1521(a)(7), and any request by any person or entity for relief from the provisions of this Order.

18.     This Court shall retain jurisdiction with respect to the administration, realization, and distribution of the assets of the Debtor within the territorial jurisdiction of the United States.

19.     The Judicial Administrator is directed to serve a true and correct copy of this Order by mail in accordance with Rule 2002(q) of the Federal Rules of Bankruptcy Procedure.

# # #

6

Submitted by:
Jennifer Mosquera, Esq.
SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, Florida 33131
nmiller@sequorlaw.com
jmosquera@sequorlaw.com
Telephone:      (305) 372-8282
Facsimile:      (305) 372-8202

*(Attorney Mosquera shall serve a conformed copy of the foregoing order upon all interested parties and file a Certificate of Service with this Court)*

7

Esta certidão de tradução pública foi assinada digitalmente pela Tradutora Pública Sandra Regina Mattos Rudzit, JUCESP 1688. O código de verificação em https://oab.portaldeassinaturas.com.br:443 é 2095-16F2-BBC5-E65B.                    Página 11 de

Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 às 20:16 , sob o número WJMJ24401243765 .
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código pNVvn961.

fls. 6197

# PROTOCOLO DE ASSINATURA(S)

Para verificar a assinatura, clique em https://oab.portaldeassinaturas.com.br/Verificar/2095-16F2-BBC5-E65B ou acesse https://oab.portaldeassinaturas.com.br:443 e use o código abaixo para verificar se este documento é válido.

## Código para verificação: 2095-16F2-BBC5-E65B



**Hash do Documento**

A3B88B02EB6F879D9A9ED22EB9AB20FEE57CBD98A7808174F9DEC73AA5F37F11

O(s) nome(s) indicado(s) para assinatura, bem como seu(s) status em 12/04/2023 é(são) :

☑ Sandra Regina Mattos Rudzit (Signatário) - 082.060.018-08  em
12/04/2023 14:58 UTC-03:00
**Tipo:** Certificado Digital



Este documento é cópia do original, assinado digitalmente por JOICE RUIZ BERNIER e Tribunal de Justica do Estado de Sao Paulo, protocolado em 29/01/2024 as 20:16 , sob o número WJMJ24401243765
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1088030-29.2016.8.26.0100 e código pNVvn961.



This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJM2440124376S To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

**TO THE HONORABLE JUDGE OF THE 2ND BANKRUPTCY AND JUDICIAL REORGANIZATION COURT OF THE CENTRAL CIVIL JURISDICTION OF THE CAPITAL DISTRICT - SP.**

**Case No. 1088030-29.2016.8.26.0100**

**Bankruptcy**

**AJ RUIZ CONSULTORIA EMPRESARIAL S.A.**,

Judicial Administrator appointed in the **BANKRUPTCY** of **TINTO HOLDING LTDA.**, respectfully appears before this Honorable Court, in compliance with the ruling found on pages 5878/5881 of the case file (subsection 3), to file a statement regarding the petition found on pages 5533/5649, as well as the petition found on pages 5884/5892 of the case file, as follows:

**I - STATEMENT BY BRASIL SPECIAL SITUATIONS I FUNDO DE INVESTIMENTOS EM DIREITOS CREDITÓRIOS (PAGES 5533/5649 OF THE CASE FILE)**

On pages 5533/5649 of the case file, creditor BRASIL SPECIAL SITUATIONS I, FUNDO DE INVESTIMENTOS EM DIREITOS CREDITÓRIOS (CREDIT RIGHTS INVESTMENT FUND) has issued a statement announcing that it has acquired by way of assignment the credit formerly held by IPIRANGA PRODUTOS DE PETRÓLEO S/A, which was initially assigned to MONTBLANC PARTICIPAÇÕES S/A and subsequently to BRASIL SPECIAL SITUATIONS, pursuant to the assignment agreement found on pages 5645/5649 of the case file, requesting procedural substitution and a change in the ownership of the credit listed in favor of IPIRANGA PRODUTOS DE PETRÓLEO S/A.

1



This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765
To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

In addition to the notice of the aforementioned assignment of credit, the creditor stated that, among the lawsuits listed in the petition filed by the Judicial Administrator found on pages 5428/5437 of the case file, it had not found lawsuit no. 1044546-79.2019.4.01.3400, which discusses the credit held by the National Treasury arising from tax administrative proceedings No. 16561.720170/2014-01, totaling more than R$6 billion. In that regard, it points to the existence of precedent favorable to the cancellation of administrative charges resulting from the deciding vote cast in favor of the Federal Government and the need for strategic monitoring of the proceedings in question.

It also mentioned the publication of Federal Law No. 14,689/2023, which provides for reductions in charges for tax debts resulting from deciding votes cast in favor of the National Treasury, claiming that it was essential for the judicial administrator to request the reductions.

The creditor also questions the hiring of the Scalzilli Advogados law firm to defend the interests of the Bankruptcy Estate in civil and tax lawsuits, claiming that the proceedings should be conducted by "*a firm with more expertise and focused on complex tax claims and issues.*" (*sic*)

Finally, the creditor mentions the existence of **confidential ancillary proceedings**, the purpose of which would be to investigate possible fraudulent conduct by the former administrators, shareholders and controllers of the bankrupt company, requesting that the Judicial Administrator be summoned to report the measures taken against the former administration of the bankrupt company in Brazil and abroad.

## II - Statement by BERF Participações S/A (pages 5884/5892 of the case file)

BERF Participações S/A (pages 5884/5892 of the case file), "a *minority shareholder of the Bertin Group*" (*sic*), also made a statement for the record,

2

# AJRUIZ
ADMINISTRAÇÃO JUDICIAL

reiterating the news regarding the alleged unlawful conduct by the former administrators of the Bankrupt Company and requesting clarification from the Judicial Administrator with regard to (i) the actions taken to cancel the notice of infraction related to case no. 1044546-79.2019.01.3400; (ii) the steps taken to adhere to installment payment programs aimed at reducing tax liabilities; (iii) the progress and strategy adopted in the lawsuit filed in the United States.

It also requested that ancillary proceedings be opened to investigate possible bankruptcy crimes under the terms of articles 167 and 172 of the LRE.

## III - Clarifications from the Judicial Administrator

Initially, it is important to clarify that, from the moment it was appointed in these proceedings, the Judicial Administrator has paid special attention to the Bankruptcy Estate's tax liabilities, not only due to their magnitude, but primarily because of the complexity of the issues involved.

To that end, in addition to hiring a firm specialized in Tax Law and Bankruptcy Law – since it only became aware of the status of tax and fiscal proceedings from September 2023 onwards, primarily through information provided by the previous Judicial Administrator - a preliminary analysis was completed and a report[1] was prepared on the legal-procedural context of the Bankruptcy Estate, identifying not only the (identifiable) volume of legal and administrative

---

[1] The document was based on (i) information provided and documents supplied by the previous Judicial Administrator, Deloitte; (ii) copies of tax lawsuits to which the current JA had access; (iii) information available for public consultation on the websites of the Judiciary and the Federal Treasury. It should be noted, however, that the status of the documentary and informational support provided by Deloitte presents data that is, in some cases, contradictory (total number of lawsuits), insufficient (stage of the lawsuits), obscure (qualification of the representatives of the estate) and even sometimes inconsistent (tax lawsuits categorized as civil, number of lawsuits listed which is lower than those evidenced by the public procedural consultations). With regard to procedural cases, access was strictly limited to those obtained by the current JA, notably due to the confidential classification that the vast majority had and still have, which prevents public access by attorneys in the computerized systems of the courts.

3

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765
To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

proceedings,[2] but also the most sensitive proceedings and possible repercussions on the assets of the Bankruptcy Estate.

It should be noted that approximately 200 legal actions were identified in the preliminary report that was presented, and it was pointed out that this number could subsequently increase with better access to administrative proceedings. As of November 7, 2023, when the law firm hired by the Bankruptcy Estate began to have access to consult federal administrative proceedings through the E-CAC system, the existence of an additional 618 active administrative proceedings against the Estate was verified.

In any case, when the preliminary report was presented, the Judicial Administrator expressed the view that the tax liability warrants ongoing treatment closely related to the factual-procedural events, not only due to the current and potential developments related to possible redirections of the charges for the JBS Group and the asset tracking measures that are being implemented.

Having said that, we will now move on to address the requested clarifications.

### III.I - ACTION NO. 1044546-79.2019.01.3400

With regard to the Request for Preliminary Injunctive Relief No. 1044546-79.2019.01.3400, which is being confidentially processed at the appellate level by TRF-1, based on the report of Judge Roberto Carvalho Veloso, it is important to report that,

---

[2] The public consultation of federal administrative proceedings (Comprot) only provides information on the existence of proceedings and procedures and the primary nonconfidential activities; it only provides progress and decisions at the appellate instance (CARF). There is no way to access the contents of the records of ongoing proceedings or decisions at the lower court level (DRJs), which is only possible with a digital certificate. Following a court ruling, access to these proceedings was granted as of November 7, 2023.

4

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJJMJ24401243765
To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.



This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765
To compare with the original, visit https://esaj.jsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

together with the annulment action filed in 2015 by the Attorney General of the National Treasury,[3] the cases were flagged for special monitoring by the law firm responsible for the tax cases involving the Bankruptcy Estate.

In summary, it should be noted that once the injunction requested by Tinto Holding Ltda. was denied, the case was converted into ordinary proceedings. It should be noted that the lawsuit,[4] which was filed while the administrative proceedings were still active, was aimed at annulling the notice of infraction solely and exclusively based on alleged formal defects in the CARF judgment, which upheld the judgment against the company by a "deciding vote."[5] It should also be noted that the bankrupt company expressly stated in the initial petition that the legal action "*does not deal with* [the] *subject matter of the administrative proceedings*," i.e. the lawsuit was not intended to address the merits of the assessment and its annulment on substantive grounds.[6]

It should be noted that the request by the contracted law firm to be provided access to the case file was made on September 22, 2023. However, even after repeatedly bringing the matter to the Office of the Court Clerk of the 13th Division of the

---

[3] Case No. 5001944-96.2019.4.03.6100, currently in the process of resuming the substantiation phase after TRF3 annulled the judgment that had previously been issued in the case.

[4] The following excerpt is taken from the initial statement: "(...) the Petitioner is disputing the validity of a tax assessment issued against it in Administrative Tax Proceedings (PAT) No. 16561.720170/2014-01 (...), in which a special appeal was heard by the CARF Superior Division of Tax Appeals and ruled on by the President of the CARF), in the course of which a special appeal was heard by the CARF Superior Division of Tax Appeals, resolved by the 'deciding vote' cast by the President of CARF and, at the time, the President of the 1st Court of the Superior Division of Tax Appeals of the administrative body. Although the aforementioned administrative proceedings have pending motions requesting clarification in view of this last decision by the full court, there is a well-founded fear that the Petitioner will be subject to the deleterious effects of maintaining the tax assessment, even when the discussion regarding the systemic validity, or lack thereof, of the 'deciding vote', or 'double vote', handed down within the scope of an administrative body with an even number of members, remains pending."

[5] Given the lack of suspensive effect of the appeals that have been filed, the debt was registered as an active debt and the corresponding tax enforcement action was filed (case no. 5019776-56.2020.4.03.6182, value R$6 billion), also under special monitoring and with proceedings suspended since it was filed in 2020. The Federal Government has said that it would seek to have its credit recognized in the bankruptcy proceedings, which it did. There have been no significant activities in the case since then, and the Bankruptcy Estate has not been served.

[6] From the initial statement: "This petition seeks objective interim injunctive relief, with regard to the sole and exclusive annulment of the 'deciding vote' or 'double vote' cast by the President of the 1st Court of the Superior Division of Tax Appeals of CARF, in order to enforce the constitutional guarantee of due process of law and the rule contained in article 112 of the CTN. There is therefore no discussion of the object of PAT no. 16561.720170/2014-01, regarding its merits. The discussion here is specific and refers solely to the invalidity of the 'deciding vote' (...)."

5

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765
To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4VNU.

TRF-1, the request was only considered on November 28, 2023, when full access to the case file was granted. It was then identified that the petitions were dismissed on 04/13/2021, and Tinto, the bankrupt company, was ordered to pay attorney's fees set at 10% of the adjusted value of the case (R$100,000.00). **Tinto did not appeal the decision**. For its part, the Federal Government filed motions against the judgment, demanding that the fees be set on the amount of the economic gain claimed by Tinto (the full amount of the assessment), which was dismissed. It then filed an appeal in June 2022 and Tinto, duly served with the appeal, **did not file a reply** to the Federal Government's appeal, **nor did it file a special additional appeal against the appeal**, and the truth of the matter is that the preceding Judicial Administrator had been authorized in the case since 05/13/2021 when its power of attorney was filed in the case. [7] No new procedural actions were taken after the appeal was distributed.

In these terms, it should be emphasized that, in addition to the fact that the lawsuit is **res judicata for the Bankruptcy Estate with regard to its primary claims,** and even if this were not the case, the discussion would possibly be prejudiced by the supervening force of Law

---

[7] It is interesting to note a curious remark regarding this case made by the previous Judicial Administrator (Deloitte) in one of the control spreadsheets provided during the transition: "The Bankruptcy Estate filed no appeal when the judgment was dismissed, since it would not be appropriate to insist on the discussion regarding the deciding vote, since the text of article 54 of RI-CARF makes it indisputable that the 'deciding vote' is equivalent to a prerogative of the presiding director to vote twice on the same appeal when there is a tie between the Directors. and this was the legislation in force at the time the administrative judgment was issued (with regard to the retroactive application of the law, based on various judgments and jurists, the JA found no theory that would fit the arguments brought by the former shareholders when the lawsuit was filed). Moreover, any appeal by the Bankruptcy Estate would only serve the interests of the former shareholders of the Bankruptcy Estate, which in the view of the Judicial Administrator would be a totally dilatory measure, with the sole aim of postponing the collection of the debt and prolonging the discussion for years in the courts, imposing serious risks to the Bankruptcy Estate in terms of the possible imposition of a fine for bad faith litigation, in addition to the burden of funding such measures and giving the Federal Government a solid argument to justify its request for an increase in the burden of the losing party to pay fees in view of the significant increase in the workload of its attorneys with the possible increase in the duration of the litigation. In addition, there was already a final and binding tax enforcement action (case no. 5019776-56.2020.4.03.6182), which was the subject of a bankruptcy claim, as can be seen from the list of creditors found on pages 5,008/5,014 of the record in that case. In addition, the central focus of the discussion lies in the [fraudulent] transaction between the former shareholders (Bertin Family) and Blessed (Batista Family), which is at the heart of the investigation that resulted in the opening of confidential proceedings No. 1095595- 34.2022.8.26.0100 and the legal measures in the United States and the United Kingdom, in other words, the filing of an appeal without legal grounds to support such a measure, in addition to being dilatory, would also be incongruous with those measures."

6



No. 14.689/2023, the "CARF Law."[8] After recalcitrant legislative activity,[9] the matter was once again relegated to Decree 70.235/72, whose article 25, § 9, although it does not expressly state that tie-breaking votes will necessarily be cast in favor of the tax authorities, ensures that such votes will be cast by the Board Members representing the National Treasury, i.e. most likely in favor of the tax authorities.

In legal precedent, in addition to the scarcity of relevant rulings in the same sense on the topic, it is true that the Federal Supreme Court has yet to definitively rule on the matter[10] and it is possible that, given the context of the analysis of similar legislative proposals and the composition of the Court, in any future judgment on the subject, an opinion will be expressed in favor of the constitutionality of the deciding vote being cast in favor of the tax authorities.[11] Furthermore, not even the recent opinion expressed by the STJ in a monocratic decision,[12] in the sense of the cogency of the even-number members criterion for the composition of the CARF judging panels could be raised, since it is inapplicable to the specific case.

However, even **if the Bankruptcy Estate is prevented from proceeding with the discussion regarding the deciding vote**,[13] in theory

---

[8] Among other provisions, it regulates the announcement of the results of judgments in the event of a tie vote within the scope of the Administrative Council for Tax Appeals (Carf) and measures to reduce the financial impact of these decisions on taxpayers, whether through differentiated negotiation and payment procedures, as well as the reduction of certain charges and penalties.

[9] Law No. 13.988/2020 had changed the landscape and established the "deciding vote in favor of the taxpayer", inserting article 19-E of Law No. 10.522/2002, which guaranteed that the taxpayer would prevail in the event of a tie. MP 1.160/2023 was then issued, reestablishing the deciding vote in favor of the tax authorities. The MP was not analyzed and thus did not become law, losing validity and returning to the previous scenario of Law No. 13,988/2020. And on September 20, 2023, Law 14,689/2023 was published, repealing article 19-E of Law 10,522/2002.[10] ADIs 6.399, 6.403 and 6.415. The most recent discussion is ADI 7548, filed in December 2023 seeking to have articles 1 and 17, subsection II, of Law 14.689/2023 declared unconstitutional, restoring the validity of article 19-E of Law 10.522/2002.

[11] In the votes cast so far in the first three ADIs mentioned above, while relevant mentions were made of the dispute and even the illegality of the system, on the other hand, reference is made to legislative liberality in dealing with this matter.

[12] Petition no. 16.334, Rapporteur Regina Helena Costa, December 14, 2023. There are, however, decisions contrary to the imperative of the even-number criterion.

[13] In principle, the legislative context, even if successively altered - a circumstance that could give rise to the allegation of a new fact and renewal of the discussion - returned to the status quo that existed when the lawsuit

7

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765
To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765
To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

conditions would exist on the merits for preparing and developing a strong argument, including by opposing enforcement by the tax authorities of the tax credit created by the assessment. The best legal strategy to be adopted on the issue, always for the benefit of the collective of creditors, will be evaluated together with their specialized legal advisors, including by filing an objection/motion to stay the enforcement by the tax authorities of the tax credit created by the assessment, or other appropriate measures.

In addition, a judicial measure has already been processed in the United States - which will be discussed in greater depth in a later topic - in order, among other measures, to investigate the possible occurrence of unlawful conduct that would imply the liability of those involved, including for tax liabilities, which would have the potential to ensure that creditors are paid, particularly given the size and profile of the third parties sued in that case.

In fact, and as pointed out above, there is overwhelming evidence that those involved have engaged in massive tax fraud, therefore it is the responsibility of the Judicial Administrator (and its support staff), in the manner specified in bankruptcy legislation, to analyze the facts that have occurred and propose the appropriate measures with a view to protecting the interests of the creditors in this bankruptcy, including the tax authorities themselves.

In view of the above, it is objectively clear that, for the time being, in addition to the international judicial measure and the active monitoring of procedural activities in tax cases and the presentation of the appropriate statements and interventions when necessary, and also due to the very recent full and complete awareness of lawsuit No. 1044546-79.2019.01.3400, the Judicial Administrator is taking all the measures deemed appropriate, in conjunction with its legal advisors, to protect the interests of the Bankruptcy Estate.

---

was filed, weakening or even preventing the filing of any action to rescind the judgment, at least until the STF has ruled on the merits of the ADIs.

8



This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765
To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

**III.II - MEASURES TO REDUCE TAX LIABILITY**

     With regard to the adoption of measures aimed at reducing the tax debt "*notably due to the numerous specific installment payment programs with notoriously advantageous benefits for taxpayers,*" the Judicial Administrator reports that, since the discussion of the Bill that resulted in Law No. 14,689/2023 (subject to presidential vetoes, later overturned by Congress), the potential repercussions that the rules could have in the case of the Bankruptcy Estate were monitored.

     And, in fact, given the new regulatory context regarding notices of infraction upheld by a deciding vote, consideration was given to adopting measures, including administrative ones, aimed at reducing part of the debt, particularly fines and possibly interest. This is when the PGFN itself stepped in and provided taxpayers with the option to submit a Request for Review of Registered Debt (PRDI), provided for in PGFN Order No. 33/2018, for the purpose of complying with Law No. 14.689/2023, article 15[14] and the new article 25, § 9º-A, of Decree No. 70.235/72.[15]

     In this context, having recently completed[16] the stage of obtaining precise information and understanding, in principle, of the entire legal-procedural

---

[14] Article 15 The provisions of § 9-A of article 25 of Decree 70.235, of March 6, 1972, apply even to cases already judged by Carf and still pending a ruling on the merits by the corresponding Federal Regional Court on the date of publication of this Law.

[15] § 9-A. Fines shall be excluded and the tax representation for criminal purposes referred to in article 83 of Law No. 9430, of December 27, 1996, shall be canceled in the event of a judgment in an administrative tax proceeding resolved in favor of the Public Treasury by the deciding vote provided for in paragraph 9 of this article. (Included by Law 14.689, of 2023).

[16] The order authorizing the hiring of the firm was issued on September 5, 2023 and, although some (imprecise and sparse) information was provided by the former JA, it was only after that time that the qualifications of the attorneys in the cases could be requested, which, particularly in the confidential cases (and all the relevant ones are characterized as such) took time to complete. With regard to federal administrative proceedings, it was only on November 7, 2023 that the RFB granted access to e-Cac (exclusively for case consultations).

R: LINCOLN ALBUQUERQUE, 259 | 13º ANDAR | CJ. 131 PERDIZES | SÃO PAULO | 05004-010 T +55 11
3864-4332 | WWW.AJRUIZ.COM.BR | CONTATO@AJRUIZ.COM.BR



context applicable to the tax procedures for the Bankruptcy Estate, the aforementioned PRDI will be prepared and filed in accordance with the legal requirements, the outcome of which will be announced in due course.

However, it is important to note that it is possible that the request may be denied, taking into account that, in order for the benefit to apply, the regulatory text requires "pending discussion before the Federal Regional Court" of an action aimed at annulling the credit definitively created by the CARF casting a deciding vote in favor of the National Treasury. Considering that, for the Bankruptcy Estate, the discussion on the merits in Case No. 1044546-79.2019.01.3400 (decided unfavorably) would be precluded, it is up to the PGFN to rule that, in view of the pending judgment of the Federal Government's appeal filed exclusively to discuss the setting of fees, the granting of the reductions would be legitimate.[17]

Furthermore, the Judicial Administrator is fully aware of the mechanisms currently in place for settling tax liabilities, especially federal ones. At least since 2016,[18] the Federal Treasury has been promoting a more rational approach to the collection of active debt, directing its efforts towards understanding the profile of debtors and thus adapting collection strategies for each segment of the population, while at the same time without failing to offer facilitated payment measures through tax settlement.[19] The instrument, which is already widely and successfully used throughout the country,

---

[17] Although the text of the law is not clear (see note 17 above), the PGFN website dedicated to the subject states that "requests for review that are delayed, submitted without the required documentation or *based on an issue that has already been decided in court in a manner unfavorable to the taxpayer* will be immediately denied." See: https://www.gov.br/pgfn/pt-br/servicos/orientacoes-contribuintes/Revisao%20de%20Divida%20Inscrita%20%20%28PRDI%29

[18] The Differentiated Credit Collection Regime (RDCC) is established in PGFN Order No. 396/2016; the payment in kind (Order No. 32/2018) and the pre-enforcement procedures (Order No. 33/2018); the Procedural Legal Business within the scope of the federal treasury (Order No. 742/2018).

[19] Law No. 13.988/2020 and successive regulations, up to the most current PGFN Order No. 6.757/2022, in addition to various special modalities (for companies in RJ and FGTS, for example), exceptional and extraordinary (for the pandemic period) and specific ones made available via PGFN Public Notices. Settlements, unlike installment payments, are granted at the discretion of the PGFN, which is not obliged to grant them in each and every case and upon receipt of any request, but solely on the basis of a reasoned decision that must take into account the particular conditions of each taxpayer.

10

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765 To confirm with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

**AJRUIZ**
ADMINISTRAÇÃO JUDICIAL

successfully incorporates and sets forth renewed guidelines,[20] providing discounts, deadline extensions, use of tax losses and other amortization concessions for companies in crisis and bankruptcy, even in ordinary cases.

Under the influence of these ideas, the judicial reorganization system itself, for example, was recently revamped through a substantial legislative change, incorporating what had long been required: the direct involvement of the tax authorities in the resolution of the crisis and their credits, even if not subject to the judicial reorganization system. Alongside the restructuring instruments, tax settlement is now part of the national recovery framework[21] and, by inserting the Federal Tax Administration into the area of consensual agreements, admitting the adoption of appropriate methods for resolving tax disputes, it satisfies the creditor public entity and, at the same time, prevents, to the extent possible, the breakdown of the productive organization of the debtor company (or estate).

However, it should be borne in mind that, in the context of bankruptcies, there is a cogent order for the payment of creditors - as long as this is possible and never disregarding the ranked order that begins with immediately available credits, passes through extrajudicial credits and, only then, arrives at bankruptcy credits - therefore it is not always viable or feasible for the estate to allocate any amount to the payment of tax debts, even under highly attractive conditions. This is not only due to the inarguable respect for the order of payment of creditors, but fundamentally due to the scarcity or even

───────────────────

[20] The principles of the settlement are: presumption of good faith on the part of the taxpayer; fair competition between taxpayers; encouragement of self-regularization and tax compliance; reduction of litigation; less onerous collection instruments; adaptation of the means of collection to the payment capacity of the debtors registered in the Federal Government's active debt; autonomy of the will of the parties when entering into the settlement agreement; compliance with the requirements of public interest; publicity and active transparency, respect for confidentiality.

[21] The purposes of settlement include: to make it possible to overcome the transitory situation of economic and financial crisis of the taxpayer, in order to allow the maintenance of the source of production and the employment of workers, thus promoting the preservation of the company, its social function and the stimulus to economic activity; to ensure a sustainable source of resources for the implementation of public policies; to ensure that the collection of credits registered as active debt is carried out in such a way as to balance the interests of the Federal Government and taxpayers, and of the latter with those of the FGTS; to ensure that the collection of credits registered as active debt is carried out in a way that is less burdensome for the Federal Government, the FGTS and taxpayers; and ensure that taxpayers in financial difficulties have another chance to resume voluntary compliance with current tax and national insurance obligations.

11

R: LINCOLN ALBUQUERQUE, 259 | 13º ANDAR | CJ. 131 PERDIZES | SÃO PAULO | 05004-010 T +55 11
3864-4332 | WWW.AJRUIZ.COM.BR | CONTATO@AJRUIZ.COM.BR

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765. To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

the absence of sufficient resources to make minimum payments, because even with all the concessions, discounts, etc., a settlement presupposes that payments and amounts in kind must be paid to the tax authorities.

It should be noted that, for claims resulting from restitutions alone, the Bankruptcy Estate has committed amounts in the range of R$37.5 million. With regard to bankruptcy credits, in the labor category, R$1,125,832.62; and in tax liabilities, a total of approximately R$10 billion. On the other hand, in terms of assets already capitalized, these do not reach the total of R$48 million and potentially capitalizable assets known to date total another R$12 million.

Finally, it is important to note that in the context of ongoing and future judicial and administrative tax proceedings, the greatest and best efforts are being made and will continue to be made to protect the assets of the Bankruptcy Estate, always through the adoption of lawful measures aimed not only at reducing the amounts, but also at preventing illegitimate attacks by the tax authorities, if applicable.

Therefore, despite the existence of previously unthinkable facilities in federal tax legislation, no negotiating measures are being taken at the moment with the PGFN for the reasons explained above. However, all possibilities will continue to be considered by the Judicial Administrator for possible adoption, given the still dynamic reality of bankruptcy, including as a result of the lawsuit filed in the United States, which will be addressed in further detail below.

### III.III - ASSET TRACING AND RECOVERY WORK

On September 5, 2022, Deloitte Touche Tohmatsu Consultores Ltda., the Judicial Administrator of the Bankruptcy Estate at that time, filed a procedural motion explaining indications of depreciation of the assets of the Bankruptcy Estate, so that measures could be taken for the benefit of the collective of creditors. It should be noted that the procedural motion in question

12

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765 To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

is being processed under judicial secrecy, precisely to preserve the ongoing investigations and make the judicial measures that have been proposed and those that will be adopted in the future effective as the Bankruptcy Estate obtains new information and evidence regarding the fraud that occurred.

In the records in that case, Deloitte recommended the hiring of specialized law firms, both nationally and internationally, in order to initiate investigative procedures and asset recovery measures, particularly to identify indications of fraud and/or unlawful acts that would justify the adoption of measures to hold those involved accountable.

With the approval of this Honorable Court, two legal measures were proposed by the Bankruptcy Estate in the United States of America, namely: (*i*) Request for Recognition of Foreign Bankruptcy (under *Chapter 15*, *Title 11*, *U.S.C.*) (**Doc. 01**); and (*ii*) legal action (*Complaint*) for the purpose of holding third parties responsible and recovering assets misappropriated to the detriment of creditors (**Doc. 02**).

After the request for recognition of the main (Brazilian) bankruptcy in that jurisdiction was granted (**Doc. 03**), the Bankruptcy Estate was then able to file the lawsuit indicated in subsection "*ii*" above. The filing by the Defendants of the preliminary defense (motion to dismiss) is currently pending.

Furthermore, with regard to the allegations made by BERF Participações S/A (pages 5884/5892 of the case file), it should be noted that the action brought in the United States of America has no identity whatsoever with Case No. 1055320-43.2022.8.26.0100, since it has several causes of action in addition to the declaration of nullity, as can be seen from the documentation provided herein. Furthermore, the action was brought by different parties against different Defendants and in another jurisdiction, therefore there is no impediment to processing and issuing a judgment.

13

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765
To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.



Finally, the Judicial Administrator does not believe it is prudent to expose the asset tracking and recovery strategy to BERF Participações S/A, since it is a self-described "*legally interested third party*" and "*minority partner of the Bertin Group*" (*sic*) – and therefore, an **indirect partner of the Bankrupt Company at the time of the facts**.

### III.IV - LAW FIRM HIRED TO DEFEND THE INTERESTS OF THE BANKRUPTCY ESTATE IN TAX PROCEEDINGS

With regard to the monitoring of tax claims by the contracted law firm, this Judicial Administrator clarifies, first of all, that it understands the concerns expressed by the creditor and, beyond that, it shares the understanding of the need for strategic and specialized monitoring of the tax situation of the Bankruptcy Estate.

However, with all due respect, it reiterates what it has already stated to the Court regarding the experience of the contracted firm, which has been operating in the market for over 40 years, and the professionals who are part of it. In the tax area, the coordinating partner has worked exclusively in the area for more than 20 years, in advisory capacity and, to a large extent, in judicial and administrative litigation, in highly complex cases. In addition, more than 10 years ago he began to work in tax situations in the midst of judicial reorganization and bankruptcy proceedings, ensuring a good technical and practical flow between the two areas of legal knowledge. In the academic sphere, it is worth noting that in 2014 he was granted a Master's degree in Tax Law from UFGRS, under the guidance of Prof. Dr. Humberto Ávila, and is also a lecturer in extension and postgraduate courses at the Pontifical Catholic University of Rio Grande do Sul (PUCRS),[22] the Vale do Rio dos Sinos University (Unisinos) and the Caxias do Sul

---

[22] https://educon.pucrs.br/cursos/direito-empresarial/

14

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765 To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

University (UCS).[23] In the latter, together with other professors and professionals, he founded the Tax Relations Observation Group, officially launched in 2023.[24]–[25]

It is also important to note that distances (both long and short, such as between Porto Alegre and São Paulo, to which the firm's professionals frequently travel) have long been overcome in a very short time, at low cost and at any time. With the sad advent of the pandemic, all this has become even more relativized, along with the massive digitization of processes, filings and the most varied interactive activities. Thus, the fact that the firm's offices are located in Porto Alegre in no way interferes with the professionals' already outstanding expertise in the tax sphere and their ability to act in defense of the interests of the Bankruptcy Estate.

Likewise, it should be clarified that the ongoing information provided on the website of the firm is given by way of example and does not provide an exact account of all the work carried out by the departments of the firm, including the tax department, which, it should be repeated, has a specialized and experienced partner, as well as a highly qualified team to handle the cases.

Furthermore, it is important to note that there are few law firms that, like the contracted firm, have departments that are deeply and jointly active in bankruptcy and tax law, a circumstance that seems to meet the requirements for the present case and offer an advantage in the strategic handling of cases on behalf of the Bankruptcy Estate.

Furthermore, this judicial administrator believes that notoriety is not a condition for excellence and expertise, but only a possible consequence of them,

---

[23] Among other things, the subject of Tax Judicial Proceedings on several campuses (e.g. https://www.ucs.br/site/especializacao/detalhes/direito-tributario-guapore/).

[24] https://www.ucs.br/site/noticias/lancamento-do-observatorio-das-relacoes-tributarias-da-ucs-tera-debate-about-tax-reform/

[25] https://www.ucs.br/site/noticias/juristas-e-economistas-analisam-a-reforma-tributaria-no-lancamento-do-observatorio-das-relacoes-tributarias-da-ucs/

15

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765 To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

AJRUIZ
ADMINISTRAÇÃO JUDICIAL

therefore the creditor's lack of knowledge of the work of the contracted law firm does not negate the in-depth knowledge of sensitive tax issues by the professionals involved in the case and their extensive experience in defending the interests of bankruptcy estates.

This being the case, the Judicial Administrator reiterates its understanding of the need for special monitoring of tax claims and administrative proceedings involving the Bankruptcy Estate, which has been carried out promptly by the contracted law firm,[26] which is fully qualified to perform such activities.

### IV - Assignment of credit from Ipiranga Produtos de Petróleo S/A to Brasil Special Situations I Fundo de Investimentos em Direitos Creditórios

Finally, with regard to the assignment of credit reported on pages 5533/5649 of the case file by Fundo Brasil Special Situations regarding the credit listed in the name of IPIRANGA PRODUTOS DE PETRÓLEO S/A, although the assignee presented the documentation relating to the assigned credit (pages 5630/5644 of the case file) and the Assignment Agreement on pages 5641/5644 and 5645/5649 of the case file, it should be noted that the representation documents of the parties who appeared as assignors in the formalized credit assignments were not added to the case file.

Therefore, in order to be able to attest to the formal regularity of the assignment of credit and change the ownership of the credit in the General List of Creditors, we request that assignee BRASIL SPECIAL SITUATIONS I FUNDO DE INVESTIMENTOS EM DIREITOS CREDITÓRIOS be instructed to include the representation documents of the assignors in the case file, in order to demonstrate that the assignments were made by the respective legal representatives with powers to do so.

---

[26] It should be noted, by way of example, that, as already mentioned in these proceedings, after the contracted law firm took over the case portfolio and was granted access to the e-cac system, the attorneys of the Bankruptcy Estate located more than 600 active administrative proceedings against the Estate, in addition to those identified in the initial screening, mostly based on information passed on by the previous Judicial Administrator and public procedural consultations, which were incorporated into the law firm's monitoring portfolio and are already being handled by it.

16

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765
To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.



## V - Conclusion

For the reasons set forth above, <u>assignee BRASIL SPECIAL SITUATIONS I FUNDO DE INVESTIMENTOS EM DIREITOS CREDITORIOS should be instructed to attach representation documents to the case file for the parties that appeared as assignors under the terms of the assignment of credit on pages 5641/5644 and 5645/5649 of the case file.</u>

Furthermore, under the terms of the clarifications provided in the previous topics, the points raised by BRASIL SPECIAL SITUATIONS I FUNDO DE INVESTIMENTOS EM DIREITOS CREDITÓRIOS (Pages 5533/5649 of the case file) and BERF Participações S/A (Pages 5884/5892 of the case file) have been clarified.

That being all that is required for the time being, the Judicial Administrator makes itself fully available to this Honorable Court for any clarifications that may be necessary.

Respectfully submitted.

São Paulo, January 29, 2024.

**JOICE RUIZ BERNIER**
**OAB/SP 126.769**

**LUIS EDUARDO M. RUIZ**
**OAB/SP 317.547**

**RENAN ALMEIDA LESSA**
**OAB/SP 341.089**

**JÉSSICA BRAGA VAL**
**OAB/SP 400.136**

**NATÁLIA ARANTES G. CHAVES**
**OAB/SP 448.971**

**MARIA OLÍVIA G. FRANCO**
**OAB/SP 473.491**

**JOYCE CRISTINA RODILHA HASS**
**OAB/SP 401.316**

17

This document is a copy of the original, digitally signed by JOICE RUIZ BERNIER and Court of Justice of the State of Sao Paulo, filed on 01/29/2024 at 20:16 , under number WJMJ24401243765 , under the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU. To compare with the original, visit https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter the case number 1088030-29.2016.8.26.0100 and code N3uL4WNU.

e

## AFFIDAVIT OF ACCURACY

BEFORE ME, the undersigned authority, on this day personally appeared <u>Ana Cristina Didoné</u>, who, by oath and by presentation of identification, is personally known to me to be the person subscribing her name below and, after being by me duly sworn according to law, upon her oath deposes and says in due form of law that to the best of her knowledge, information and belief:

1. "My name is Ana Cristina Didoné and I am over the age of twenty-one years and competent to make this affidavit.

2. I am President of TransLite Solutions LLC.

3. I have been a certified sworn translator since 1988 with a M.A. in Legal Translations from the University of Salvador, Argentina. I am certified by the Argentine Association of Sworn Public Translators to translate from English into Spanish and Spanish into English. I am also certified by the American Translators Association for English to Spanish translations. I hold a degree in Executive Business Management from Rice University.

4. I hereby certify that the translator that performed the translation of the document in Portuguese into English, titled "*Doc. 02 - Manifestação AJ*", has worked as a professional legal translator since 1997, and holds a degree in Paralegal Studies from Southwestern Paralegal Institute. I hereby state that she is qualified to render an accurate translation from Portuguese into English. Furthermore, she is a member at the American Translators Association and at the National Association of Legal Assistants.

Translator: ___Harriet Bosley_____

_____
ANA CRISTINA DIDONE, MA
Certified by American Translators Association

Sworn to before me this the 5th day of February, 2024

_____
Notary Public in and for the State of Texas
My commission expires: _____

TODD CAMERON FEDER
Notary Public, State of Texas
Comm. Expires 05-19-2025
Notary ID 129411929