**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In re:

TINTO HOLDING LTDA.,                                          Chapter 15

      Debtor in a Foreign Proceeding.                    Case No.: 23-11719-MAM
_____/                    Adversary No.: 23-01118-MAM

AJ RUIZ CONSULTORIA
EMPRESARIAL S.A., solely as Judicial
Administrator and foreign representative of
TINTO HOLDING LTDA,

      Plaintiff,

v.

COLORADO INVESTMENT HOLDINGS
LLC, J&F INVESTIMENTOS S.A., JJMB
PARTICIPAÇÕES LTDA., and WWMB
PARTICIPAÇÕES LTDA.

      Defendants.
_____/

## NOTICE OF FILING

    Plaintiff AJ Ruiz Consultoria Empresarial S.A., solely as Judicial Administrator and foreign representative of Tinto Holding Ltda. ("Tinto"), ("Plaintiff"), hereby gives notice of filing the attached Redline of the Second Amended Complaint (DE190) compared to the Amended Complaint (DE56).

Dated: October 24, 2024                              Respectfully submitted,

                                              SEQUOR LAW, P.A.
                                              1111 Brickell Avenue, Suite 1250
                                              Miami, Florida 33131
                                              Telephone: (305) 372-8282
                                              Facsimile: (305) 372-8202
                                              Email: ggrossman@sequorlaw.com
                                              nmiller@sequorlaw.com

jmosquera@sequorlaw.com

By:     *s/ Nyana A. Miller*
       Nyana Abreu Miller
       Florida Bar No. 92903
       Gregory S. Grossman
       Florida Bar No.: 896667
       Jennifer Mosquera
       Florida Bar No.: 1018656

## <u>SERVICE LIST</u>

**23-11719-MAM Notice will be electronically mailed to:**

Daniel Humphrey on behalf of Defendant Colorado Investment Holdings, LLC
danielhumphrey@quinnemanuel.com, michaelalvarez@quinnemanuel.com

Gabriela Ruiz on behalf of Defendant JBS S.A. gruiz@fordobrien.com

Jessey J Krehl on behalf of Defendant Colorado Investment Holdings, LLC
jessey@packlaw.com

Joseph A Pack on behalf of Defendant Colorado Investment Holdings, LLC joe@packlaw.com

Olga M Vieira on behalf of Defendant Colorado Investment Holdings, LLC
olgavieira@quinnemanuel.com, ivettegalante@quinnemanuel.com

Jason Zakia on behalf of Defendants J&F Investimentos S.A., JJMB Participacoes LTDA,
WWMB Participacoes LTDA, Joesley Mendonca Batista, and Wesley Mendonca Batista
jzakia@whitecase.com, mco@whitecase.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In re:

TINTO HOLDING LTDA.,                                        Chapter 15
                                                           Case No.:  23-11719-MAM
     Debtor in a Foreign Proceeding.
_____/

AJ RUIZ CONSULTORIA
EMPRESARIAL S.A., solely as Judicial
Administrator and foreign representative of
TINTO HOLDING LTDA.,
     Plaintiff,                                        Adv. Case No. 23-01118-MAM

v.                                                         **JURY TRIAL DEMANDED**

COLORADO INVESTMENT HOLDINGS
LLC, J&F INVESTIMENTOS S.A., JJMB
PARTICIPAÇÕES LTDA., WWMB
PARTICIPAÇÕES LTDA., JOESLEY
MENDONÇA BATISTA, WESLEY
MENDONÇA BATISTA, and JBS S.A.,
     Defendants.
_____/

**SECOND AMENDED COMPLAINT**

     Plaintiff AJ Ruiz Consultoria Empresarial S.A., solely as Judicial Administrator and

foreign representative of Tinto Holding Ltda. ("Tinto"), brings this Second Amended Complaint

against Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB

Participações Ltda., WWMB Participações Ltda., Joesley Mendonça Batista, Wesley Mendonça

Batista, and JBS S.A.

**NATURE OF THE ACTION**

     1.    Plaintiff seeks to recover an ownership interest in JBS S.A. ("JBS") that

Defendants unlawfully obtained from Tinto, a Brazilian agribusiness company.  When obtained

by Defendants, Tinto's interest in JBS was worth approximately R$8.76 billion (USD$4.84 billion).[1]

2.    Tinto should have obtained a large share of JBS by merging its greatest asset—a majority equity stake in Bertin S.A., a large Brazilian meat-processing company—with JBS.  But through a series of transactions between 2009 and 2014 connected to that merger, Defendants siphoned significant value out of Tinto, to the detriment of Tinto's estate and creditors.

3.    Defendants Joesley Mendonça Batista and Wesley Mendonça Batista (together, the "Batistas") are the ultimate beneficial owners of Defendant Colorado Investment Holdings LLC (formerly known as Blessed Holdings LLC) ("Colorado").  They also own (wholly or in significant part) Defendants J&F Investimentos S.A. (formerly known as J&F Participações S.A.) ("J&F"), JJMB Participações Ltda. ("JJMB"), WWMB Participações Ltda. ("WWMB"), and JBS.  The Batistas—by and through Colorado and J&F—engineered the transactions that drained Tinto of its value for their personal benefit.  That value is now in the possession of Colorado, JJMB, and WWMB.

4.    Mainly because of these transactions, which stripped away Tinto's most critical asset, a Brazilian bankruptcy court placed Tinto into liquidation on November 29, 2018.  That court appointed Plaintiff as Tinto's judicial administrator.  On May 24, 2023, that court authorized Plaintiff to bring this suit; on September 5, 2023, that court authorized Plaintiff to file this̶an Amended Complaint; and on September 13, 2024, this Court authorized Plaintiff to file this Second Amended Complaint.

5.    Plaintiff now brings claims for unjust enrichment,̶ ̶c̶l̶a̶i̶m̶s̶ ̶f̶o̶r̶ and aiding and

---

[1] Plaintiff provides approximate conversions of monetary figures from Brazilian reals into U.S. dollars (using the historic conversion rate on or about the relevant dates at issue) only for the Court's convenience.

abetting breach of fiduciary duty under New York law, and claims under the Brazilian

Bankruptcy Law and the Brazilian Civil Code, including claims under Articles 166 and 167 of

the Brazilian Civil Code (null and void transaction); Article 129 VI of the Brazilian Bankruptcy

Law (transfer of establishment); and Articles 186, 187, and 927 of the Brazilian Civil Code

(illicit acts) to recover from Defendants the shares they wrongfully obtained and the tax liability

Tinto incurred as a result.  Plaintiff also brings a veil-piercing claim under Article 50 of the

Brazilian Civil Code and Article 82-A of the Brazilian Bankruptcy Law to hold Defendants

liable for the debts of Tinto's debts to its creditors.

## PARTIES

6.      Plaintiff AJ Ruiz Consultoria Empresarial S.A. has its principal place of business

at Rua Lincoln Albuquerque, No. 259, 13th Floor, Suite 131, São Paulo, Brazil 05004-010.  It

appears solely as judicial administrator and foreign representative of Tinto.  Brothers Silmar

Bertin and Natalino Bertin managed Tinto until the Brazilian bankruptcy court appointed a

judicial administrator on November 29, 2018.

7.      Defendant Colorado Investment Holdings LLC is a domestic limited-liability

company organized and existing under the laws of the State of Delaware.

8.      Defendants Joesley Mendonça Batista and Wesley Mendonça Batista, Brazilian

nationals, are the ultimate beneficial owners of Colorado.  Until 2011, the Batistas, along with

certain of their family members, were also the majority shareholders of JBS.  Since then, they

have continued to be the largest shareholders of the company.  Joesley Batista was the Chief

Executive Officer and Chairman of JBS from 2007 to 2011.  Wesley Batista was the Chief

Executive Officer of JBS from 2011 to 2017.  Joesley Batista owns a residence in New York.

Wesley Batista maintains a residence in New York.  Until recently, and during all relevant times,

Wesley Batista maintained a residence in Colorado, which he periodically lived in and frequently

3

~~visited~~visits for business and personal reasons.

9.      Defendant JBS S.A. is a Brazilian agribusiness company.  It is publicly traded, with its American Depositary ~~Shares~~Receipts listed on the New York Stock Exchange under the ticker symbol "JBSAY."  It is currently seeking to directly list its shares on the New York Stock Exchange~~,~~ and has filed a registration request with the United States Securities and Exchange Commission to accomplish this goal.  JBS has more than 75 subsidiaries in 18 different U.S. states, including one located in Miami, Florida; employs almost 70,000 people in the United States; and makes more than 50% of its worldwide revenue in this country.

10.     Defendant J&F Investimentos S.A. is a Brazilian entity that, during the events described below, was majority-owned and controlled by the Batistas and their affiliates.  Today, it is wholly owned and controlled by Defendants Joesley and Wesley Batista.  At all times during the events described below, J&F held a significant indirect stake in JBS.

11.     Defendants JJMB Participações Ltda. and WWMB Participações Ltda. are Brazilian entities.  Together, the Batistas wholly own JJMB and WWMB, with Joesley Batista owning 99.999% of JJMB and Wesley Batista owning 99.999% of WWMB.

12.     The Batistas, JBS, J&F, JJMB, and WWMB all directly or indirectly hold (or held during the events described below) significant stakes in major U.S. companies, including Smithfield Beef Group Inc., Swift & Company, and Pilgrim's Pride Corporation.  On information and belief, both Joesley Batista and Wesley Batista traveled to the United States numerous times to conduct business, including with J.P. Morgan in New York, in their capacities as (i) directors and officers of J&F, JJMB, ~~and~~ WWMB, and JBS; and (ii) the ultimate beneficial owners of Colorado.

**RELEVANT NONPARTIES**

13.     Bertin S.A. was a Brazilian agribusiness company indirectly owned, through

4

Tinto, by brothers Silmar Bertin and Natalino Bertin and their families.  Tinto's equity stake in Bertin S.A. was its most significant asset.  Silmar and Natalino Bertin managed Tinto until the Brazilian bankruptcy court appointed a judicial administrator on November 29, 2018.

14.    Silmar Bertin and Natalino Bertin are Brazilian nationals who, alongside their families, will be referred to as the "Bertins."  The Bertins founded, own, and manage a large Brazilian conglomerate operating in multiple sectors, including agriculture, energy, and infrastructure.

15.    Specific corporate entities beneficially owned by the Bertins that are relevant to this Second Amended Complaint include:  (i) the Bertin family's main holding company, Heber Participações S.A. ("Heber"); and (ii) two other Bertin-affiliated agribusiness companies, Comapi Agropecuaria S.A. ("Comapi") and Mafrip Matadouro Frigorífico Rio Pardo S.A. ("Mafrip").

16.    ZMF Fundo de Investimento em Participações ("ZMF FIP") is another Batista-owned fund that appears in several transactions detailed below.

## JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1334(b), as this is a civil proceeding related to a case under title 11, Case No. 23-11719-MAM (Chapter 15), and the outcome of this proceeding substantially affects Tinto's estate.[2] in the Brazilian Bankruptcy Proceedings.[2]  The location of relevant property interests does not affect the Court's subject-matter jurisdiction to hear claims in adversary proceedings like this one.  A foreign representative may "sue in a court in the United States or to collect or recover a claim which is

---

[2] Plaintiff consents to the Bankruptcy Court's entry of final orders, except that Plaintiff reserves the right to move to withdraw the reference to request a jury trial.

[2] Plaintiff consents to the Bankruptcy Court's entry of final orders, except that Plaintiff reserves the right to move to withdraw the reference to request a jury trial.

the property of the debtor" regardless of whether there is a pending Chapter 15 proceeding.  11 U.S.C. § 1509(f).  If a Chapter 15 proceeding is recognized, as here, 11 U.S.C. § 1521(a)(5) provides that one of the forms of relief a court may grant at a foreign representative's request is "entrusting the administration or realization" of assets "within the territorial jurisdiction of the United States."  But it does not limit the Court's subject-matter jurisdiction to hear claims under § 1334(b).

18.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1409(a) because Plaintiff is a foreign representative in a ~~chapter~~Chapter 15 proceeding under title 11 in this District.  That is all that is required to establish venue for this case.

19.     Venue for the underlying Chapter 15 proceeding is also appropriate.  The Chapter 15 case could be commenced wherever "the debtor has its principal place of business or principal assets in the United States."  28 U.S.C. § 1410(1).  If the debtor "does not have a place of business or assets in the United States," then venue is appropriate wherever there is an action "pending against the debtor."  28 U.S.C. § 1410(2).  If no such district court existed, then the case could proceed wherever "venue w[ould] be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative."  28 U.S.C. § 1410(3).  Venue in this district is appropriate because the estate of Tinto has retained Sequor Law, P.A. ("Sequor Law"), in this district and Sequor Law holds in its trust account in this district approximately USD$1,500.00 on behalf of and for the benefit of Tinto, to which funds Sequor Law has no rights of setoff, charging lien, or similar right.

20.     Venue here is also appropriate for the convenience of the parties.  Miami is one of only six cities in the United States with direct flights to São Paulo (which will benefit the parties and any Brazilian witnesses who appear at trial).  And a private jet registered to J&F, and used

almost exclusively by the Batistas, has landed in Miami six times this year. Moreover, JBS has a subsidiary in Miami, the Batistas previously used J&F to purchase a condominium in Miami, and Joesley Batista moved his superyacht to Miami, where it appears currently to be available for charter.

21.    This Court has personal jurisdiction over each Defendant. Bankruptcy Rule 7004 authorizes personal jurisdiction to the extent consistent with due process requirements. If a bankruptcy court has subject-matter jurisdiction under 28 U.S.C. § 1334, the relevant forum is the United States and not the state where the court is located.

22.    The Court has general personal jurisdiction over Defendants Colorado Investment Holdings LLC and JBS S.A. because these Defendants are at home in the United States. Colorado is a domestic limited-liability company organized and existing under the laws of the State of Delaware. JBS has such continuous and systematic contacts with the United States that it is essentially at home. For example, JBS receives fifty-one percent of its revenue and forty-nine percent of its income from the United States—double the revenue and almost four times as much income as it receives from its place of incorporation. In short, the United States is, by far, JBS's biggest market. Indeed, over a quarter of JBS's global workforce is in the United States. Currently, JBS is a publicly traded company with American Depositary Receipts trading in the U.S. over-the-counter securities market, and it is a public reporting company in the United States, subject to reporting, disclosure control, and other applicable obligations under the Exchange Act, Sarbanes-Oxley Act, and Dodd-Frank Act. But JBS is seeking to list its shares on the New York Stock Exchange, the flagship stock exchange located in the country where JBS does most of its business. And JBS has represented in filings related to its proposed listing that it has significant ties to the U.S. market, including by naming the United States as a key

geographical location where it operates its business.  In fact, the United States is the only location JBS listed as a key geography it operates in for all three divisions of the global protein market:  beef, pork, and chicken.

23.    As explained under each count of this Second Amended Complaint, the Court also has specific jurisdiction as to each Defendant because Defendants purposefully availed themselves of the benefits of conducting activity in the United States, and Plaintiff's claims arise out of or relate to Defendants' contacts with the United States.

## STATEMENT OF FACTS

**I.    Background.**

24.    19. José Batista Sobrinho, patriarch of the Batista family, founded JBS in 1953.  It has grown ever since.  Today, JBS operates globally—including in the United States—and is among the world's largest meat-processing companies.  José Batista Sobrinho has several children, including Defendants Joesley Batista and Wesley Batista, who have helped run the company.  Since JBS's founding, the number of entities owned by and affiliated with the Batistas has grown to include—among many others—Colorado, J&F, JJMB, WWMB, and nonparty ZMF FIP.

25.    20. During the late 2000s, the Batistas led JBS on a spree of international expansion.  JBS bought a series of agribusiness and meat-processing companies across the globe, including the U.S.-based companies Smithfield Beef Group Inc., Swift & Company, and Pilgrim's Pride Corporation.

26.    21. Many of these acquisitions relied on funding from BNDES Participações S.A. ("BNDES"), Brazil's National Bank for Economic and Social Development.  That funding, in turn, relied on outright corruption.  As Joesley Batista explained in sworn deposition testimony, the Batistas bribed the then-Brazilian Minister of Finance (who also happened to be the former

President of BNDES) to obtain loans from BNDES.  The Batistas paid some of these illicit bribes through a hidden, wholly owned Panamanian company—Lunsville International, through which, as discussed below, they beneficially owned Colorado.  The Batistas also paid some of these bribes to a J.P. Morgan bank account in the United States.  And they relied on their bribes to receive the BNDES funding ~~helped the Batistas and~~ necessary for JBS to acquire Bertin S.A. in 2009—the transaction that lies at the heart of this Second Amended Complaint.

27.  ~~22.~~ The Bertins incorporated Bertin S.A. in October 2007.  Shortly after, the Bertins directed Tinto (then known as Bracol Ltda.) to transfer all its operating assets to the newly formed Bertin S.A.  At the time, Tinto held a large meatpacking business and about R$1 billion (USD$550 million) in agricultural real estate.  After the transfer, Bertin S.A. became a direct subsidiary of Tinto—and Tinto's primary asset.

28.  ~~23.~~ Later that year, Bertin S.A. applied to BNDES for financial support.  The application to BNDES requested capital for several purposes, including the acceleration of Bertin S.A.'s contemplated initial public offering.  BNDES agreed to provide the requested capital.

29.  ~~24.~~ Market downturns in 2008 made it difficult for the Bertins to take the company public.  Instead, the Bertins considered partnering Bertin S.A. with a company that was already public.  The Bertins first approached Marfrig Global Foods S.A., a large, publicly traded Brazilian meatpacker, about a potential merger.  But the conversations did not pan out.  By 2009, Defendant Joesley Batista had approached the Bertins and suggested that Bertin S.A. merge with JBS.  Joesley Batista and Wesley Batista soon after reached an agreement with the Bertins.[3]

---

[3] This was not the first collaboration between the Bertins and the Batistas.  Natalino Bertin, for example, partnered with Defendant Joesley Batista in a business venture six years earlier.  The relationship would continue to develop.  In 2011, J&F acquired another Bertin-affiliated company, Bertin Higiene e Limpeza, in the cosmetics and cleaning-products industry.  Natalino Bertin would also later sit on the board of directors of JBS from 2011 to 2013.

## II.    Public Merger Structure.

30.    25. On September 16, 2009, JBS and Bertin S.A. announced the signing of an association agreement memorializing their intent to merge (the "Association Agreement").  A JBS press release disclosed portions of the intended merger structure.

31.    26. Under the Association Agreement, the controlling shareholders of JBS—J&F and ZMF FIP—would contribute all their shares of JBS to a newly formed holding company. Similarly, Tinto would contribute all its shares of Bertin S.A.—representing 73.1% of Bertin S.A.—to the same holding company.  The newly formed holding company would thus be the controlling shareholder of both JBS and Bertin S.A.  JBS would then absorb the operations of Bertin S.A.

32.    27. The merger depended on JBS successfully obtaining a USD$2.5 2 billion private subscription in its U.S. subsidiary from an undisclosed party (.  This undisclosed party was later revealed as to be BNDES).  As discussed, the Batistas later admitted to paying bribes to key Brazilian government and BNDES officials to obtain these funds.  The Batistas paid these bribes through U.S. bank accounts.  JBS would use the these ill-gotten funds to acquire Pilgrim's Pride Corporation in the United States.

33.    28. At the time of the Association Agreement, the ownership of Bertin S.A. looked like this:

10



**Figure 1:  The accurate and represented corporate structure of Bertin S.A. prior to signing of the Association Agreement.**

34.   ~~29.~~ At that same time, JBS was majority-owned by the Batistas—but just barely. To raise capital for the purchase of several U.S. meatpackers, JBS had issued new equity to BNDES and other Brazilian state-owned entities, including the investment fund PROT Fundo de Investimento em Participações ("PROT FIP").  These issuances had significantly diluted the Batistas' ownership.  In fact, at the time of the Association Agreement, the Batistas maintained majority control over JBS with a mere 50.11% stake through holding entities J&F (44%) and ZMF FIP (6.11%):



**Figure 2:  The accurate and represented corporate structure of JBS S.A. prior to signing of the Association Agreement.**

35.   ~~30.~~ The Batistas created several entities in anticipation of the merger, as contemplated by the Association Agreement.  A week after signing the Association Agreement, the Batistas incorporated FB Participações ("FB Par"), the holding company that would later

11

receive the majority interests of JBS and Bertin S.A.  In December 2009, at the direction of the Batistas and their corporate group, the Bertins also incorporated a new entity, Bertin Fundo de Investimento em Participações ("Bertin FIP"),[4] to hold Tinto's interest in Bertin S.A. and to later receive the Bertins' interest in FB Par.

36.    31. As a result, in preparation for the merger, JBS's and Bertin S.A.'s corporate structures looked like this:



**Figure 3:  Both the accurate and represented corporate structures of Bertin S.A. and JBS S.A. in December 2009, in preparation for the JBS-Bertin S.A. merger.**

37.    32. Tinto, J&F, and ZMF FIP contributed their respective Bertin S.A. and JBS shares to FB Par in December 2009.  On December 31, 2009, at a special general meeting of JBS shareholders, the company's controlling shareholders approved the merger and dissolution of Bertin S.A. by JBS.

---

[4] Bertin FIP has since been renamed Pinheiros Fundo de Investimiento Investimento em Participações Multiestratégia.

38.    33. Under the merger structure disclosed to the public, Tinto was to receive nearly 28.7% of JBS[5] in exchange for 73.1% of Bertin S.A:



Figure 4:  The post-merger corporate structure of JBS S.A. that the Batistas and the Bertins represented to the public.

39.    34. But that is not what happened.

## III.    Concealed Merger Structure and Share Transfers.

40.    35. The public statements by JBS and Bertin S.A. obscured the true, hidden merger structure conceived by the Batistas and the Bertins, which neither family has (to this day) ever fully disclosed.  Indeed, the companies' public statements failed to disclose several steps and transactions taken by the Batistas, the Bertins, and their corporate groups in connection with the merger.  As a result of at least three covert, below-market share transfers, which Tinto entered into under the direction and control of the Bertins and Defendants, and at least one of which appears potentially to be a sham transaction intended to conceal the true purchase price for

---

[5] Under the proposed merger structure disclosed to the public, and in line with the value ascribed to the two companies, Tinto would hold 100% of Bertin FIP, which would in turn hold 48.52% of FB Par, which would in turn hold 59.13% of JBS.

some of Tinto's shares, to conceal JBS's role in the transfers, or both, Tinto transferred its

expected 28.7% stake in JBS away in exchange for nearly nothing.

41.    36. Four months before the merger, on August 12, 2009, the Bertins entered into a

private and undisclosed agreement with the Batistas and J&F (the "Initial Merger Agreement"),

which functioned as a letter of intent for the future JBS-Bertin S.A. merger.  Tinto, despite

holding the entirety of the Bertins' interest in Bertin S.A., was not a signatory to the Initial

Merger Agreement.

42.    37. Under the Initial Merger Agreement, Tinto would transfer its entire equity

stake in Bertin S.A. to the Batistas.  In exchange, the Batistas and J&F agreed to pay R$750

million (USD$409.43 million) in cash to the Bertins' primary holding company, Heber.  Heber

would receive the remaining balance of the purchase price—which, at that point, was still

undecided—in JBS shares.  Tinto would receive nothing.

43.    38. The parties also agreed to cap the ownership stake in JBS that the Bertins

could acquire through the transaction.  They executed an amendment to the Initial Merger

Agreement on the same day that granted J&F the option to repurchase, for the nominal sum of

R$1.00 (USD$0.55), any ownership of JBS in excess of 10% that the Bertins received from the

transaction.

44.    39. To facilitate that transfer of assets, the Batistas and J&F directed the Bertins to

place Bertin S.A. into a Fundo de Investimento em Participações ("FIP"), a Brazilian investment

fund—Bertin FIP.  But this, too, benefited only the Batistas.

45.    40. Joesley Batista, Wesley Batista, Colorado, J&F, JJMB, and WWMB

ultimately acquired Tinto's interest in Bertin FIP for trivial amounts.  But JBS was obligated to

publicly declare the value of new equity issued during the JBS-Bertin S.A. merger—and by

14

extension, the value of Bertin S.A. during the merger.  The Batistas corrupted the FIP structure allowed the Batistas toto unlawfully disguise the discrepancy between that value and the amount that Joesley Batista, Wesley Batista, Colorado, and J&F paid for the shares of Bertin FIP in private transactions.  Under Brazilian law, a purchaser of shares in a FIP does not need to disclose the price of those shares.  By purchasing shares of Bertin FIP—which was formed only to hold shares of Bertin S.A., and functionally comprised only those shares—instead of directly purchasing Bertin S.A., the Batistas could avoid reporting a value contradictory to the value of Bertin S.A. implicitly declared during the merger.

46.     41. The FIP also provided secrecy.  Bertin FIP was not subject to the same reporting requirements as Tinto.  The Batistas would have had to report their acquisition of TintoBertin S.A. shares—but not their acquisition of Bertin FIP shares.

47.     42. Use of the FIP structure caused Tinto to accrue significant tax liability.  The transfers of Bertin FIP shares took place at prices so far below the market value of Bertin S.A. that Tinto incurred no capital gains taxes.  Once the discrepancy between these prices and the publicly declared value of Bertin S.A. during the JBS-Bertin S.A. merger came to light, the Brazilian tax authority levied significant fines and interest charges on Tinto, far in excess of any capital gains taxes that Tinto would have initially owed.

48.     43. Once this necessary corporate structure was in place, Defendants began their covert scheme.

**A.     *First Share Transfer.***

49.     44. On December 24, 2009, one week before the merger, the beneficial ownership of Bertin S.A.—through Bertin FIP—underwent a dramatic change.  Under the direction and control of the Bertins and the Batistas, Tinto entered into a share-transfer agreement (the "First Share-Transfer Agreement") with the Delaware-based Colorado, then known as Blessed

Holdings LLC.

50. ~~45.~~ Under the First Share-Transfer Agreement, Tinto transferred 65.8% of Bertin FIP to Colorado.  At that time, 65.8% of Bertin FIP amounted to 48.1% of Bertin S.A.  Bertin S.A. was valued at R$11.988 billion (USD$6.8 billion), meaning that a 65.8% stake in Bertin FIP was worth R$5.76 billion (USD$3.27 billion).  Yet Colorado agreed to pay just USD$10,000[6] to Tinto in exchange for it.  And Tinto never received even this trivial sum.  The First Share-Transfer Agreement included a confidentiality clause, under which the parties agreed to keep even the *existence* of the agreement a secret.

51. ~~46.~~ According to Natalino Bertin's July 2019 formal testimony before the Brazilian Chamber of Deputies, Joesley Batista first introduced Colorado as a U.S.-based investor to the Bertins during the merger negotiations.  J.P. Morgan in New York served as Colorado's global custodian during the events.[7]  But Joesley Batista's representation was a lie: Colorado was in fact a Batista-controlled entity, established by J.P. Morgan as a Delaware entity barely a week before the parties signed the First Share-Transfer Agreement.  Joesley Batista directed his J.P. Morgan bankers in New York to structure Colorado as a hidden Delaware vehicle for the Batista family.  The Batistas purposefully concealed their control of Colorado, which J.P. Morgan and the Batistas designed solely to receive Tinto's interest in Bertin FIP for the Batistas' benefit.

52. ~~47.~~ Furthermore, because Tinto sold its shares at a loss, it avoided paying capital gains on the transaction.

---

[6] The First Share-Transfer Agreement stated this purchase price in U.S. dollars. USD$10,000 was approximately equivalent to R$17,620 at the time.

[7] J.P. Morgan has been a major financial advisor of JBS and the Batistas since JBS's IPO.

53. 48. After the First Share Transfer and before the JBS-Bertin S.A. merger, JBS's

and Bertin S.A.'s true corporate structures looked like this:



**Figure 5:  The accurate corporate structures of Bertin S.A. and JBS S.A.,
immediately after the First Share Transfer and before the merger.**

54. 49. After completion of the JBS-Bertin S.A. merger, Colorado's interest in Bertin FIP converted from an indirect interest in Bertin S.A. to an indirect interest in JBS. The post-merger company's true corporate structure then looked like this:



**Figure 6:  The accurate corporate structure of JBS S.A. immediately post-merger.**

55. 50. Tinto should have held nearly 28.7% of JBS after the merger. But because of the First Share-Transfer Agreement, Tinto was instead left with 9.81% of the company—a USD$3.27 billion reduction in value traded away for nothing.

### B.   *Second Share Transfer.*

56. 51. Nearly a year later, on November 11, 2010, and again under the direction and control of the Bertins, the Batistas, and Colorado, Tinto executed another share-transfer agreement (the "Second Share-Transfer Agreement") with Colorado. Under the Second Share-Transfer Agreement, Tinto transferred a 19.51% interest in Bertin FIP (which represented more than half its remaining interest in the fund) to Colorado. At the time, 19.51% of Bertin FIP equaled an approximate 5.16% stake in JBS. This interest was worth approximately R$1.7

18

billion (USD$993.65 million).  In exchange, Colorado agreed to transfer to Tinto R$17,000.00 (USD$9,883.72)—an amount that, again, Tinto never received.  Once again, because Tinto sold its shares at a loss, it did not incur capital gains in this transaction.  At this time, Tinto remained unaware that the Batistas were the true beneficial owners of Colorado.  Again, the Second Share-Transfer Agreement included a provision directing the parties to keep the existence of the agreement confidential.

57.   52. After the Second Share Transfer, JBS's true corporate structure looked like this:



**Figure 7:  The accurate corporate structure of JBS S.A. immediately after the Second Share Transfer.**

58.   53. The First and Second Share-Transfer Agreements together stripped away the majority of Tinto's assets, with nothing given in return.  Yet Joesley Batista, Wesley Batista, and Colorado profited greatly.  Through the First and Second Share-Transfer Agreements, Colorado received an asset worth R$7.46 billion (USD$4.26 billion) in exchange for R$34,620 (USD$19,883.72), which Colorado never paid.  Joesley Batista, Wesley Batista, and their corporate groups successfully increased their collective majority stake in JBS from 50.11% to

19

50.63%, despite *issuing new equity* in the merger.

59.    ~~54.~~ But for Tinto, only a sliver remained of its once-valuable meatpacking business.  The harm was considerable:  In 2008, Tinto reported consolidated gross revenues of more than R$8.42 *billion* (USD$4.73 billion).  By 2011, after the merger and First and Second Share Transfers, that figure had dropped to R$93.69 *million* (USD$51.59 million).  This despite Tinto's considerable liabilities remaining in the hundreds of millions of reais.  By April 2012, the Bertins had moved Tinto out of their core holding company, Heber, and transferred it to Riober Participações Ltda., a secondary Bertin-affiliated holding company owned by Natalino Bertin.

### C.    *Events Between the Second and Third Share Transfers.*

60.    ~~55.~~ Tinto's remaining interest in Bertin FIP was transferred away in 2014.  But before that third transfer, two notable events took place.

61.    ~~56.~~ *First*, having seen a dramatic decrease in revenue because of the First and Second Share Transfers, Tinto began to financially struggle and took out a loan from Banco do Brasil S.A. in order to meet its obligations as they became due.  This loan was collateralized on certain of Tinto's shares of Bertin FIP.

62.    ~~57.~~ *Second*, on December 31, 2013, Bertin FIP—by this point, majority-owned by Colorado—became a shareholder of J&F, as part of the Batistas' reorganization of the corporate structure of various Batista-affiliated entities.  Before, Bertin FIP and J&F shared ownership of FB Par.  But under the direction and control of the Bertins, the Batistas, and Colorado, Bertin FIP used its shares of FB Par to raise the equity needed to join J&F.  Going into 2014, the actual corporate structure of JBS thus looked like this:



**Figure 8:  The accurate corporate structure of JBS S.A. immediately before the Third Share Transfer.**

### D. *Original* Third Share Transfer.

63. ~~58.~~ A few months later, on ~~June 15, 2014, Tinto, Comapi (another agribusiness company in the Bertin corporate group), the Bertins,~~ November 18, 2013, once more under the direction and control of the Bertins, the Batistas, and Colorado, Tinto executed another share-transfer agreement, this time with J&F~~,~~ and JBS, with the Batistas ~~executed a third share-transfer agreement (the "~~ joining as guarantors of J&F (the "Original Third Share-Transfer Agreement").

64. Under ~~the Third Share-Transfer Agreement,~~ this agreement (and pursuant to various ancillary settlement instruments and fund-transfer agreements) the Bertins transferred ~~to J&F~~ the rest of Tinto's ownership interest in Bertin FIP (which amounted to around 1.5% of JBS)~~,~~ to J&F.  They also transferred Tinto's equity stake in Mafrip (another agribusiness company in the Bertin corporate group) and other property to J&F, and ~~some~~ multiple parcels of

21

real estate to JBS.  And Tinto agreed to file a petition to withdraw from certain litigation involving the shares.

65.    59. In exchange, J&F agreed to pay Tinto R$334620 million (USD$149.51277.51 million) in cash.[8] Under the Third Share-Transfer Agreement, Tinto was directed to use, of which R$130 million (USD$58.19 million) of those proceeds was to be used to repay the prior loan it Tinto had taken out from with Banco do Brasil (and thereby release a lien that Banco do Brasil had on Tinto's remaining shares in Bertin FIP).  Tinto's repayment of those debts would eliminate Banco do Brasil's security interest over Bertin FIP shares that, by the time of the Third Share-Transfer Agreement, were held by Colorado. Tinto's remaining shares in Bertin FIP.  An additional R$60 million was to be used to purchase two parcels of land, one of which would be transferred to JBS, and one to Tinto.  The remainder was to be paid in installments over approximately 30 months.

66.    60. As a result of the this Third Share-Transfer Agreement, Tinto relinquished the rest of its interest in Bertin FIP (and indirectly in JBS).  After losing its interest in Bertin FIP, Tinto slid into insolvency.  Batista-controlled entities became the full owners of Bertin FIP.

### E.    Revised Third Share Transfer.

67.    Seven months after the Original Third Share-Transfer Agreement, on June 15, 2014, the Bertins, J&F, and the Batistas executed what appears to be a revised, or possibly a sham, third share-transfer agreement (the "Revised Third Share-Transfer Agreement") with Tinto and Comapi (another agribusiness company in the Bertin corporate group).  Under this version of the agreement, the Bertins purported to transfer to J&F the same ownership interest in

---

[8] The Third Share-Transfer Agreement listed a total purchase price to J&F of R$346 million (USD$154.89 million), but stipulated that R$12 million (USD$5.37 million) of that price was already satisfied by previous payments made by J&F to Tinto.

Bertin FIP they already had given to J&F in the original version of the agreement, along with Tinto's equity stake in Mafrip, which Tinto had already given to **JBS** in the original agreement. (Indeed, JBS currently lists Mafrip as one of its subsidiaries.)  Tinto also agreed to transfer three parcels of real estate to J&F (including one parcel it had already agreed in the Original Third Share-Transfer Agreement to give to JBS), and to transfer to JBS two of the same parcels of land it already had agreed to give to JBS.

68.    In this version of the Agreement, J&F agreed to pay Tinto only R$334 million (USD$149.51 million), R$130 million of which, once again, was to repay the loan Tinto had taken out from Banco do Brasil.  JBS was not a signatory to this version of the agreement, even though it received two parcels of real estate as part of the transfer, and even though JBS had already received Tinto's equity stake in Mafrip and a parcel of real estate Tinto was now—purportedly—transferring to J&F.

23

69.    61. Shortly after signing the Revised Third Share-Transfer Agreement, J&F transferred its stake of Bertin FIP into two holding companies owned by Joesley Batista and Wesley Batista:  JJMB and WWMB.  JBS's true corporate structure then looked like this[98]:



**Figure 9:  The accurate corporate structure of JBS S.A. after the Third Share Transfer and the transfer of Bertin FIP interests to JJMB and WWMB.**

70.    62. Through the three Share-Transfer Agreements, the Batistas successfully gained a significant asset—functionally, all of former Bertin S.A.—for a fraction of its actual value.

71.    63. The Bertins (either personally or through their primary holding company, Heber) received cash and strengthened their ongoing business relationship with the Batistas.  In the midst of these transactions, Silmar Bertin and Natalino Bertin incorporated several offshore entities (including companies in the United Kingdom and the British Virgin Islands), for still-

---

[98] By 2014, as a result of continued mergers and acquisitions, the Batistas had lost their majority stake in JBS.  The Batistas have since returned to their positions on JBS's board, expanded their ownership interest in JBS to 48.34%, and are converting to a dual class stock structure that will give them 84.77% voting power.

unknown reasons.

72. 64. But Tinto received scraps.  And now, to right this wrong, Plaintiff brings this case on behalf of the estate of Tinto and its many creditors, who were harmed by Defendants' scheme to strip Tinto of its most significant asset, which pushed Tinto into financial decline and insolvency.

### F. E. Plaintiff Uncovers the Cover-up.

73. 65. The JBS-Bertin S.A. merger involved a series of transactions that resulted in Tinto's complete loss of ownership of Bertin FIP, and indirectly JBS, in 2014.  But during and following the transactions, each Defendant denied and concealed the Batistas' ownership of Colorado.

74. 66. Joesley Batista originally instructed JP Morgan's New York office to create Colorado as a vehicle to receive Tinto's interest in Bertin FIP and protect his family's control of JBS.  Colorado changed its on-paper ownership several times.  Each time, the Batistas used offshore and shell companies to ensure Colorado did not appear linked to the family.  At the time of Colorado's creation in Delaware, the Batistas beneficially owned Colorado through Lunsville International Inc.—a Panamanian company that served as Colorado's sole member, and the same company through which the Batistas illicit bribed key officials through U.S. bank accounts to obtain funding from BNDES.

75. 67. By March 2010, ownership of Colorado had moved to Graal Trust ("Graal"), a Bahamian trust formed to hold and manage Colorado stock.  There were no settlors listed for the trust, but it had been formed at the direction of the Batistas.  The Private Trust Corporation Limited, a Bahamian entity, was the named trustee.

76. 68. In April 2010, Graal engaged Lighthouse Capital Insurance Company ("Lighthouse") and U.S. Commonwealth Life, A.I. ("U.S. Commonwealth")—based out of the

Cayman Islands and Puerto Rico, respectively—to issue 12 life-insurance policies for the secret benefit of Batista family members, and then transferred to Lighthouse and U.S. Commonwealth its shares of Colorado.

77.    69. At the end of April 2010, Lighthouse and U.S. Commonwealth each owned 50% of the shares of Colorado through Blessed Holdings Cayman Ltd. ("Blessed Cayman"), a special-purpose vehicle created to maintain and manage both the shares of Colorado and the life insurance policies issued to Graal for the benefit of the Batista family members.

78.    70. It wasn't until October 31, 2016 that the Batistas directly acquired Blessed Cayman, rather than beneficially owning it through a complex network of offshore companies and insurance policies.

79.    71. While Defendants varied Colorado's structure to disguise its true nature, Defendants also outwardly denied their connection to Colorado.

a.    In 2014, JBS (under the direction and control of J&F and the Batistas) told the Securities and Exchange Commission of Brazil that it did not know the identity of Colorado's owners.

b.    Brazilian law required JBS to list in its public year-end filings the ultimate beneficial owners of shareholders who held more than 5% of JBS's total equity. JBS (under the direction and control of J&F and the Batistas) listed the insurance companies Lighthouse and U.S. Commonwealth in its 2014, 2015, and 2016 year-end public filings, and omitted the Batistas as Colorado's owners. The omission in JBS's 2016 filing is especially troubling given that the Batistas had officially purchased Blessed Cayman several months earlier.

26

    c.       On May 23, 2017, Wesley Batista testified to the Brazilian federal police that only his brother Joesley Batista knew the identity of Colorado's owner.

    d.       Even as recently as 2020, Wesley Batista stated that, at the time of the merger, Colorado did not belong to JBS "or people related to the JBS group" and claimed he did not know "who it used to belong to."

80.    72. The Securities and Exchange Commission of Brazil learned of the Batistas' acquisition of Blessed Cayman only from JBS's 2016 tax filings.  Upon learning of the acquisition, the commission questioned JBS about Colorado's ownership, and on May 25, 2017, JBS finally amended its public shareholder-disclosure filing to show that the Batistas owned Colorado through Blessed Cayman.

81.    73. Tinto did not learn Colorado's true ownership until after it became insolvent and was placed under the judicial administrator's control.  The judicial administrator was alerted to Colorado's true identity through a motion that a Tinto creditor filed in the bankruptcy action on February 13, 2019.  Many other details about the merger and transactions remain unknown to Plaintiff.  To this day, Plaintiff is unaware where the stock certificates for Colorado, JJMB, and WWMB's ill-gotten shares of Bertin FIP are located.

82.    74. The Brazilian tax authorities subsequently uncovered the illicit use of the Bertin FIP structure, including the misreporting of Bertin S.A.'s value, and issued a tax debt certificate against Tinto.  The tax authority has now levied R$5,162,248,946.57 (USD$1,045,243,570.62) in tax liability and fines against Tinto.  Under Brazilian law, a significant part of this liability receives payment priority, and thus must be satisfied before certain other creditors of Tinto can be paid.  This liability would not have existed but for the

Batistas directing the Bertins to place Tinto's shares of Bertin S.A. into Bertin FIP, and to transfer it for far below its market value.

**FIRST CAUSE OF ACTION:**
**UNJUST ENRICHMENT UNDER NEW YORK LAW**

83. 75. Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., WWMB Participações Ltda., Joesley Batista, and Wesley Batista.

84. 76. Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

85. 77. Each of these Defendants was enriched as a result of the Share-Transfer Agreements described above.

86. 78. Each of these Defendants received the proceeds of the Share-Transfer Agreements, which amounted in aggregate to all of Tinto's equity stake in Bertin FIP and in turn a significant interest in JBS. These shares were worth more than R$8.76 billion (USD$4.84 billion). The proceeds received by these Defendants eclipsed, by a staggering sum, the amounts that should have been paid by these Defendants to Tinto under those same Share-Transfer Agreements.

87. 79. Defendants Colorado, J&F, JJMB, and WWMB received the Bertin FIP shares. Joesley Batista and Wesley Batista, as the ultimate beneficial owners of these aforementioned Defendants, received beneficial ownership of the same.

88. 80. By draining Tinto of a majority of its assets for minimal or no payments, each of these Defendants was enriched at the expense of Tinto and Tinto's creditors, on whose behalf and for whose benefit Plaintiff now acts.

89. 81. Each of these Defendants knew the true value of Tinto's Bertin FIP shares. These Defendants entered or caused Tinto to enter into the Share-Transfer Agreements, which on

28

their face transferred Tinto's Bertin FIP shares to these Defendants for far below their true market value.  Each of these Defendants stripped Tinto of its Bertin FIP shares without providing just compensation in return.  And each of these Defendants caused Tinto to transfer its assets in violation of Brazilian law through a series of null and void contracts.

90.    82. Tinto and its creditors suffered harm as a result.  If not for the transfer of the shares to these Defendants, Tinto may have been able to avoid bankruptcy and pay its creditors.  Even if Tinto had still entered bankruptcy, the Bertin FIP shares would have been sold and their value would have been divided among Tinto's creditors according to Brazilian bankruptcy law.

91.    83. These Defendants engineered the JBS-Bertin S.A. merger and related transactions so that, by the end, Tinto would have transferred (directly or indirectly) to these Defendants its ownership in Bertin FIP.  These Defendants knew or should have known, when they (directly or indirectly) received the Bertin FIP shares, that they were receiving wrongfully obtained property at the expense of Tinto and its creditors.

92.    84. It is against equity and good conscience to permit these Defendants to retain the Bertin FIP shares and the corresponding interest in JBS.  The Court should order a constructive trust over that interest as requested in the Prayer for Relief.

93.    New York has the most significant relationship with this claim, because Defendants engineered this scheme in New York to enrich themselves at the expense of Tinto.  Joesley Batista directed J.P. Morgan in New York to establish Colorado as a new United States LLC and J.P. Morgan served as Colorado's global custodian during the transactions.

94.    With respect to this cause of action, this Court has general jurisdiction as to Defendant Colorado Investment Holdings LLC.  Colorado is a domestic limited-liability

company organized and existing under the laws of the State of Delaware.  Colorado is therefore at home in the United States and the court can adjudicate any and all claims brought against it.

95.    With respect to this cause of action, the Court has specific jurisdiction as to Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., WWMB Participações Ltda., Joesley Batista, and Wesley Batista because these Defendants purposefully availed themselves of the privilege of conducting activities in the United States, and the claim arises out of or relates to Defendants' contacts with the United States.  Among other things:

   a. The Batistas intentionally used a U.S. bank to create a U.S. company to divert Tinto's assets and hide their illicit gains from the share-transfer agreements.

   b.  Joesley Batista (JBS's CEO) used bankers at J.P. Morgan in New York to create Colorado in Delaware, a U.S. entity through which the Batistas (JBS's majority owners) would loot Tinto of its assets (shares of Bertin FIP that represent an interest in JBS) to increase their majority ownership of JBS.

   c. The First and Second Share Transfer Agreements transferred shares of Bertin FIP to Colorado, a U.S. entity.

   d. During and after the transactions, the Batistas took active steps to hide the truth about the scheme from JBS's investors, including U.S. investors in

its American Depositary Receipts, which traded on the New York Stock Exchange.

e.      On information and belief, in connection with the share-transfer scheme, the Batistas traveled to and were physically present in the United States many times, including in their capacities as officers and directors of Defendants J&F Investimentos S.A., JJMB Participações Ltda., and/or WWMB Participações Ltda., as well as the ultimate beneficial owners of Colorado, making the United States familiar territory and a convenient forum.  On information and belief, the Batistas continue to travel to the U.S. regularly.  A private jet registered to J&F, and used almost exclusively by the Batistas, has made 22 trips to cities in the United States in the past year.

f.      On October 14, 2020, J&F entered a guilty plea in *United States v. J&F Investimentos SA*, No. 20-cr-00365 (MKB) (E.D.N.Y.), in which the agreed Statement of Facts states that J&F, in the persons of Joesley and Wesley Batista, traveled to the United States, and used New York financial institutions and bank accounts in furtherance of a bribery conspiracy in violation of the Foreign Corrupt Practices Act, including by opening accounts in New York and purchasing property in the United States that was then given to Brazilian officials.[9]

---

[9] The Statement of Facts does not refer to the Batistas by name, but instead refers to "J&F Executive 1" and "J&F Executive 2," each of whom was an "individual whose identity is known to the United States and J&F, [and] was a Brazilian citizen who was a high-level executive and partial owner of J&F."  *See* https://www.justice.gov/criminal/criminal-fraud/file/1334241/dl?inline.  Joesley and Wesley Batista are officers and directors of J&F, and

g.    Together, the Batistas are among the largest shareholders in Pilgrim's Pride, and, on February 8, 2024, were appointed as directors of that company. Pilgrim's Pride stated that they will bring "expertise in protein production operations," "extensive operational expertise," and "business management experience to the company." The Batistas only acquired their substantial ownership interest in Pilgrim's Pride as a result of the transfer scheme.

h.    The Batistas also have been directors of JBS since 2024.

i.    On information and belief, Joesley Batista borrowed money from J.P. Morgan in New York to purchase shares in Defendant JBS S.A.

j.    The Batistas have owned property in the United States (and discovery is likely to show that they still do own some or all of this property), including:

(i)    Through JBS, the Batistas have a significant stake in JBS Wisconsin Properties, LLC, a Wisconsin corporation, with its principal address in Greeley, Colorado.

(ii)    As of at least 2016 and 2017, respectively, Wesley and Joesley Batista each owned 50% of the equity in J&F USA Capital LLC, a Delaware company.

(iii)    Through J&F, the Batistas acquired a $4.75 million condominium in Miami in 2017.

---

JBS has publicly stated that J&F is "wholly owned by" the Batistas. Since the Batistas are the only owners of J&F, they must be J&F Executives 1 and 2.

(iv)    Joesley and Wesley Batista were listed in filings for 2015 and 2016 with the Illinois Secretary of State as managers of JBS Live Pork LLC, registered in Illinois, with their address shown as 1770 Promontory Circle, Greeley, Colorado.

(v)    Joesley Batista has owned during the relevant period all or part of PH 20 West 53rd LLC, a New York LLC formed on or about May 26, 2016.  PH 20 West 53rd LLC purchased a $42,500,000 penthouse apartment at 28 West 53rd Street in Manhattan on June 9, 2016.

(vi)    Joesley Batista has also owned during the relevant period all or part of PH 641 Holdings LLC, a Delaware LLC formed on or about June 19, 2012.  PH 641 Holdings LLC purchased a $14,000,000 penthouse apartment at 641 5th Avenue in Manhattan on August 22, 2012, which it sold in 2018 for $15,150,000.

(vii)    Shortly before entering a plea agreement in Brazil relating to the aforementioned bribery scheme, Joesley Batista moved his superyacht, "Why Not," to Miami.  It appears currently to be available for charter for $24,000 per week.

(viii)   Wesley Batista maintains a residence in Colorado, which he periodically lived in and frequently visits for business and personal reasons.

(ix)    Wesley Batista during the relevant period maintained a United States bank account with Wells Fargo, which, in 2016, held more than $40,000.

k.  The Batistas and Defendants J&F Investimentos S.A., JJMB Participações Ltda., and WWMB Participações Ltda. are one and the same.  Both Batistas are officers and directors of J&F; Joesley is an officer and director of JJMB (which bears his initials and serves as his personal investment vehicle); and Wesley is an officer and director of WWMB (which is his eponymous investment vehicle).  JBS has publicly stated that "J&F is controlled by" and "wholly owned by [JBS's] ultimate controlling shareholders, Messrs. Joesley Mendonça Batista and Wesley Mendonça Batista."  Each Batista brother owns 99.999% of JJMB or WWMB.  J&F, JJMB, and WWMB were vital to the share-transfer scheme, which was focused and reliant on the United States.  J&F was a signatory to the initial secret merger agreement, conducted one of the share transfers, and helped conceal the entire scheme.  And JJMB and WWMB provided J&F a place to stash its illicitly acquired shares from the Third Share-Transfer Agreement shortly after it occurred.

l.  The scheme to take Tinto's billions of dollars in assets for next to nothing also facilitated the Batistas expansion into the U.S.  It allowed the Batistas (through JBS) to acquire Bertin S.A.'s U.S. operations.  And it provided the Batistas a means to ensure they maintained majority control over JBS as it gobbled up more U.S. companies.  In its press release announcing the Bertin S.A. merger, the Batistas made clear that the merger depended on JBS getting $2.5 billion (subsequently revised down to $2 billion) to fund its acquisition of American poultry giant Pilgrim's Pride Corporation—

which it did, thanks to the bribery payments Joesley Batista admitted to
making using a U.S. account.

**SECOND CAUSE OF ACTION:**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY UNDER NEW YORK**
**LAW**

96. ~~85.~~ Plaintiff brings this cause of action against Defendants Colorado Investment
Holdings LLC, ~~Joesley Batista, Wesley Batista~~ J&F Investimentos S.A., JJMB Participações
Ltda., WWMB Participações Ltda., ~~and J&F Investimentos S.A~~ Joesley Batista, and Wesley
Batista.

97. ~~86.~~ Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

98. ~~87.~~ As officers of Tinto, Silmar Bertin and Natalino Bertin owed fiduciary duties
to Tinto, including the duty of care to preserve corporate assets and prevent insolvency, and the
duty of loyalty. In their capacity as fiduciaries, Silmar Bertin and Natalino Bertin had the
obligation to supervise and monitor corporate affairs, and to exercise independent judgment to
benefit Tinto and its creditors.

99. ~~88.~~ Silmar Bertin and Natalino Bertin violated their duty of care and duty of
loyalty when they directed Tinto to enter into the Share-Transfer Agreements. Silmar Bertin and
Natalino Bertin, as sophisticated businessmen and the founders of Bertin S.A., were aware of the
true value of the Bertin FIP shares, and knew that they were substantially underpriced in the
Share-Transfer Agreements. In these transactions, Silmar Bertin and Natalino Bertin acted to
benefit Defendants, not Tinto.

100. ~~89.~~ Silmar Bertin and Natalino Bertin also violated their duty of care and duty of
loyalty when they directed Tinto to transfer its shares of Bertin S.A. into Bertin FIP. Silmar
Bertin and Natalino Bertin, as sophisticated businessmen and the founders of Bertin S.A., were
aware that the creation of Bertin FIP could only serve to benefit these Defendants and their illicit

scheme.  They instead acted to benefit these Defendants by use of the FIP structure and the underpriced sale of Bertin S.A.—a decision that resulted in significant tax liability.

101.    90. Joesley Batista, Wesley Batista, JJMB, WWMB, Colorado, and J&F aided and abetted Silmar Bertin and Natalino Bertin in these breaches of their fiduciary duties when they participated in or directed the Share-Transfer Agreements.  Joesley Batista, Wesley Batista, Colorado, and J&F were aware of the Bertin FIP shares' true value when they entered into the Share-Transfer Agreements and knew that they were substantially underpriced.  Joesley Batista, Wesley Batista, and J&F also instructed Tinto to place its assets into Bertin FIP, knowing that, if discovered, the scheme would subject Tinto to massive tax liability.  Joesley and Wesley Batista were each acting on behalf of their eponymous investment vehicles, WJJMB and WWMB, through which they hold some of the shares.  Each of these Defendants also aided and abetted Silmar Bertin and Natalino Bertin in acts that violated Brazilian law and Tinto's articles of incorporation by siphoning Tinto's main assets to the detriment of Tinto—a for-profit legal entity—and its creditors.

102.    91. Tinto suffered harm as a result.  If not for the transfer of the shares to these Defendants, Tinto may have been able to avoid bankruptcy and pay its creditors.  The Share-Transfer Agreements rendered Tinto insolvent.  And placing the assets of Bertin S.A. into Bertin FIP and selling Bertin S.A. for almost nothing saddled Tinto with a R$5,162,248,946.57 (USD$1,045,243,570.62) tax liability that it otherwise would not have incurred.  That liability continues to harm other of Tinto's creditors, who cannot be paid until a significant portion of that tax liability is satisfied.

103.    As a result of Defendants aiding and abetting the breach of fiduciary duty, Defendants possess all of Tinto's shares of Bertin FIP, which represent a significant interest in

JBS.  The Court should order a constructive trust over that interest as requested in the Prayer for Relief.

104.    New York has the most significant relationship with this claim, because Defendants engineered this scheme to enrich themselves at the expense of Tinto in New York. Joesley Batista directed J.P. Morgan in New York to establish Colorado as a new United States LLC and J.P. Morgan served as Colorado's global custodian during the transactions.

105.    With respect to this cause of action, this Court has general jurisdiction as to Defendant Colorado Investment Holdings LLC.  Colorado is a domestic limited-liability company organized and existing under the laws of the State of Delaware.  Colorado is therefore at home in the United States and the court can adjudicate any and all claims brought against it.

106.    With respect to this cause of action, the Court has specific jurisdiction as to Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., WWMB Participações Ltda., Joesley Batista, and Wesley Batista because these Defendants purposefully availed themselves of the privilege of conducting activities in the United States and the claim arises out of or relates to Defendants' contacts with the United States.  Among other things:

    a.    The Batistas intentionally used a U.S. bank to create a U.S. company to divert Tinto's assets and hide their illicit gains from the share-transfer agreements.

    b.    Joesley Batista (JBS's CEO) used bankers at J.P. Morgan in New York to create Colorado in Delaware, a U.S. entity through which the Batistas (JBS's majority owners) would loot Tinto of its assets (shares of Bertin FIP that represent an interest in JBS) to increase their majority ownership

of JBS.

c.    The First and Second Share Transfer Agreements transferred shares of Bertin FIP to Colorado, a U.S. entity.

d.    During and after the transactions, the Batistas took active steps to hide the truth about the scheme from JBS's investors, including U.S. investors in its American Depositary Receipts, which traded on the New York Stock Exchange.

e.    On information and belief, in connection with the share-transfer scheme, the Batistas traveled to and were physically present in the United States many times, including in their capacities as officers and directors of Defendants J&F Investimentos S.A., JJMB Participações Ltda., and/or WWMB Participações Ltda., as well as the ultimate beneficial owners of Colorado, making the United States familiar territory and a convenient forum.  On information and belief, the Batistas continue to travel to the U.S. regularly.  A private jet registered to J&F, and used almost exclusively by the Batistas, has made 22 trips to cities in the United States in the past year.

f.    On October 14, 2020, J&F entered a guilty plea in *United States v. J&F Investimentos SA*, No. 20-cr-00365 (MKB) (E.D.N.Y.), in which the agreed Statement of Facts states that J&F, in the persons of Joesley and Wesley Batista, traveled to the United States, and used New York financial institutions and bank accounts in furtherance of a bribery conspiracy in violation of the Foreign Corrupt Practices Act, including by

opening accounts in New York and purchasing property in the United States that was then given to Brazilian officials.

g.    Together, the Batistas are among the largest shareholders in Pilgrim's Pride, and, on February 8, 2024, were appointed as directors of that company. Pilgrim's Pride stated that they will bring "expertise in protein production operations," "extensive operational expertise," and "business management experience to the company." The Batistas only acquired their substantial ownership interest in Pilgrim's Pride as a result of the transfer scheme.

h.    The Batistas also have been directors of JBS since 2024.

i.    On information and belief, Joesley Batista borrowed money from J.P. Morgan in New York to purchase shares in Defendant JBS S.A.

j.    The Batistas have owned property in the United States (and discovery is likely to show that they still do own some or all of this property), including:

   (i)    Through JBS, the Batistas have a significant stake in JBS Wisconsin Properties, LLC, a Wisconsin corporation, with its principal address in Greeley, Colorado.

   (ii)    As of at least 2016 and 2017, respectively, Wesley and Joesley Batista each owned 50% of the equity in J&F USA Capital LLC, a Delaware company.

   (iii)    Through J&F, the Batistas acquired a $4.75 million condominium in Miami in 2017.

(iv)    Joesley and Wesley Batista were listed in filings for 2015 and 2016 with the Illinois Secretary of State as managers of JBS Live Pork LLC, registered in Illinois, with their address shown as 1770 Promontory Circle, Greeley, Colorado.

(v)    Joesley Batista has owned during the relevant period all or part of PH 20 West 53rd LLC, a New York LLC formed on or about May 26, 2016.  PH 20 West 53rd LLC purchased a $42,500,000 penthouse apartment at 28 West 53rd Street in Manhattan on June 9, 2016.

(vi)    Joesley Batista has also owned during the relevant period all or part of PH 641 Holdings LLC, a Delaware LLC formed on or about June 19, 2012.  PH 641 Holdings LLC purchased a $14,000,000 penthouse apartment at 641 5th Avenue in Manhattan on August 22, 2012, which it sold in 2018 for $15,150,000.

(vii)    Shortly before entering a plea agreement in Brazil relating to the aforementioned bribery scheme, Joesley Batista moved his superyacht, "Why Not," to Miami.  It appears currently to be available for charter for $24,000 per week.

(viii)    Wesley Batista maintains a residence in Colorado, which he periodically lived in and frequently visits for business and personal reasons.

(ix)    Wesley Batista during the relevant period maintained a United States bank account with Wells Fargo, which, in 2016, held more than $40,000.

40

k.  The Batistas and Defendants J&F Investimentos S.A., JJMB Participações Ltda., and WWMB Participações Ltda. are one and the same. Both Batistas are officers and directors of J&F; Joesley is an officer and director of JJMB (which bears his initials and serves as his personal investment vehicle); and Wesley is an officer and director of WWMB (which is his eponymous investment vehicle). JBS has publicly stated that "J&F is controlled by" and "wholly owned by [JBS's] ultimate controlling shareholders, Messrs. Joesley Mendonça Batista and Wesley Mendonça Batista." Each Batista brother owns 99.999% of JJMB or WWMB. J&F, JJMB, and WWMB were vital to the share-transfer scheme, which was focused and reliant on the United States. J&F was a signatory to the initial secret merger agreement, conducted one of the share transfers, and helped conceal the entire scheme. And JJMB and WWMB provided J&F a place to stash its illicitly acquired shares from the Third Share-Transfer Agreement shortly after it occurred.

l.  The scheme to take Tinto's billions of dollars in assets for next to nothing also facilitated the Batistas expansion into the U.S. It allowed the Batistas (through JBS) to acquire Bertin S.A.'s U.S. operations. And it provided the Batistas a means to ensure they maintained majority control over JBS as it gobbled up more U.S. companies. In its press release announcing the Bertin S.A. merger, the Batistas made clear that the merger depended on JBS getting $2.5 billion (subsequently revised down to $2 billion) to fund its acquisition of American poultry giant Pilgrim's Pride Corporation—

41

which it did, thanks to the bribery payments Joesley Batista admitted to

making using a U.S. account.

**THIRD CAUSE OF ACTION:**
**ACTION TO DECLARE ABSOLUTE NULLITY OF A TRANSACTION UNDER**
**BRAZILIAN LAW**

107. ~~92.~~ Plaintiff brings this cause of action against Defendants Colorado Investment

Holdings LLC, Joesley Batista, and Wesley Batista.

108. ~~93.~~ Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

109. ~~94.~~ Under Article 166 of the Brazilian Civil Code, a transaction is null and void if,

among other things, its object is illicit, impossible, or indeterminable; the parties had unlawful

motives; the transaction was not performed in the form prescribed by law; or the transaction's

purpose evades a mandatory law.

110. ~~95.~~ As outlined below, the First and Second Share-Transfer Agreements are null

and void under one or more of these standards.

111. The purpose of the First and Second Share-Transfer Agreements was the evasion

of one or more mandatory law.  *First*, the Share Transfer Agreements caused Tinto to improperly

dispose of its most significant asset for almost nothing in return, violating the Brazilian company

law as it applies to for-profit businesses and Tinto's limited liability company agreement.

*Second*, the Share Transfer Agreements constitute a fraud on the law, circumventing both

Brazilian corporations law and Brazilian tax law.  Colorado, Joesley, and Wesley Batista

structured the transactions to avoid taxes, by using an investment fund to transfer the Bertin FIP

shares, and by transferring them for prices far below their market value.

112. ~~96. Defendants Colorado, Joesley, and Wesley Batista~~Separately, the First

and Second Share-Transfer Agreements are null and void because the parties had at least

~~three~~two unlawful motives in entering into both ~~the First and Second Share-Transfer~~

Agreements.  *First~~, these Defendants entered into the First and Second Share-Transfer~~* ~~Agreements to increase the Batistas' majority interest in JBS without informing the market.  By~~ ~~concealing that Joesley Batista and Wesley Batista were the true ultimate beneficial owners of~~ ~~Colorado, these Defendants hid the nature of the benefit to the Batistas from the transactions.~~ *~~Second~~*, Colorado, Joesley Batista, and Wesley Batista intentionally violated Brazilian corporate law and Tinto's own articles of incorporation by siphoning Tinto's main assets to the detriment of Tinto—a for-profit legal entity—and its creditors.  *~~Third~~Second*, these Defendants intentionally deceived Brazilian fiscal authorities, both by using a purchase price that did not reflect the value transferred and by using an investment fund for the transfer of the shares in a manner deemed unlawful under Brazilian law.  Colorado, Joesley Batista, and Wesley Batista took all of these steps knowing that their conduct was unlawful.  The parties to the transactions had the unlawful motive to enrich themselves at the expense of Tinto's creditors while misleading JBS's minority shareholders and Brazilian fiscal authorities.

~~97. The purpose of the First and Second Share-Transfer Agreements was also the evasion~~ ~~of one or more mandatory law.  *First*, Colorado, Joesley Batista, and Wesley Batista structured~~ ~~the transactions to avoid taxes, in violation of Brazilian tax law, by using an investment fund to~~ ~~transfer the Bertin FIP shares, and by transferring them for prices far below their market value.~~ ~~*Second*, these Defendants also caused Tinto to improperly dispose of its most significant asset,~~ ~~violating the Brazilian company law as it applies to for-profit businesses.~~

113.   ~~98.~~ Because the First and Second Share-Transfer Agreements are null and void under Article 166 of the Brazilian Civil Code, this Court should revert the parties to their status prior to these Share-Transfer Agreements~~.~~ as requested in the Prayer for Relief seeking

rescission.[10]  Article 169 of the Brazilian Civil Code provides that a null and void legal transaction is not susceptible to ratification, and is not cured by the passage of time.

114.    With respect to this cause of action, this Court has general jurisdiction as to Defendant Colorado Investment Holdings LLC.  Colorado is a domestic limited-liability company organized and existing under the laws of the State of Delaware.  Colorado is therefore at home in the United States and the court can adjudicate any and all claims brought against it.

115.    With respect to this cause of action, the Court has specific jurisdiction as to Defendants Colorado Investment Holdings LLC, Joesley Batista, and Wesley Batista because these Defendants purposefully availed themselves of the privilege of conducting activities in the United States and the claim arises out of or relates to Defendants' contacts with the United States.  Among other things:

      a.    The Batistas intentionally used a U.S. bank to create a U.S. company to divert Tinto's assets and hide their illicit gains from the share-transfer agreements.

      b.     Joesley Batista (JBS's CEO) used bankers at J.P. Morgan in New York to create Colorado in Delaware, a U.S. entity through which the Batistas (JBS's majority owners) would loot Tinto of its assets (shares of Bertin FIP that represent an interest in JBS) to increase their majority ownership of JBS.

---

[10] Under Brazilian law, the appropriate remedy under Articles 166 and 169 would not be referred to as "rescission," which refers to a different remedy in Brazil.  Nonetheless, the substantive remedy under Articles 166 and 169—a declaration that the transactions are null and void and the return of the parties to the status quo before the transactions—is equivalent to rescission as that term is used in the United States.

c.   The First and Second Share Transfer Agreements transferred shares of Bertin FIP to Colorado, a U.S. entity.

d.   During and after the transactions, the Batistas took active steps to hide the truth about the scheme from JBS's investors, including U.S. investors in its American Depositary Receipts, which traded on the New York Stock Exchange.

e.   On information and belief, in connection with the share-transfer scheme, the Batistas traveled to and were physically present in the United States many times, including in their capacities as the ultimate beneficial owners of Colorado, making the United States familiar territory and a convenient forum.  On information and belief, the Batistas continue to travel to the U.S. regularly.  A private jet registered to J&F, and used almost exclusively by the Batistas, has made 22 trips to cities in the United States in the past year.

f.   On October 14, 2020, J&F entered a guilty plea in *United States v. J&F Investimentos SA*, No. 20-cr-00365 (MKB) (E.D.N.Y.), in which the agreed Statement of Facts states that J&F, in the persons of Joesley and Wesley Batista, traveled to the United States, and used New York financial institutions and bank accounts in furtherance of a bribery conspiracy in violation of the Foreign Corrupt Practices Act, including by opening accounts in New York and purchasing property in the United States that was then given to Brazilian officials.

g.    Together, the Batistas are among the largest shareholders in Pilgrim's Pride, and, on February 8, 2024, were appointed as directors of that company.  Pilgrim's Pride stated that they will bring "expertise in protein production operations," "extensive operational expertise," and "business management experience to the company."  The Batistas only acquired their substantial ownership interest in Pilgrim's Pride as a result of the transfer scheme.

h.    The Batistas also have been directors of JBS since 2024.

i.    On information and belief, Joesley Batista borrowed money from J.P. Morgan in New York to purchase shares in Defendant JBS S.A.

j.    The Batistas have owned property in the United States (and discovery is likely to show that they still do own some or all of this property), including:

    (i)    Through JBS, the Batistas have a significant stake in JBS Wisconsin Properties, LLC, a Wisconsin corporation, with its principal address in Greeley, Colorado.

    (ii)    As of at least 2016 and 2017, respectively, Wesley and Joesley Batista each owned 50% of the equity in J&F USA Capital LLC, a Delaware company.

    (iii)    Through J&F, the Batistas acquired a $4.75 million condominium in Miami in 2017.

    (iv)    Joesley and Wesley Batista were listed in filings for 2015 and 2016 with the Illinois Secretary of State as managers of JBS Live Pork LLC,

registered in Illinois, with their address shown as 1770 Promontory Circle, Greeley, Colorado.

(v)    Joesley Batista has owned during the relevant period all or part of PH 20 West 53rd LLC, a New York LLC formed on or about May 26, 2016.  PH 20 West 53rd LLC purchased a $42,500,000 penthouse apartment at 28 West 53rd Street in Manhattan on June 9, 2016.

(vi)    Joesley Batista has also owned during the relevant period all or part of PH 641 Holdings LLC, a Delaware LLC formed on or about June 19, 2012.  PH 641 Holdings LLC purchased a $14,000,000 penthouse apartment at 641 5th Avenue in Manhattan on August 22, 2012, which it sold in 2018 for $15,150,000.

(vii)    Shortly before entering a plea agreement in Brazil relating to the aforementioned bribery scheme, Joesley Batista moved his superyacht, "Why Not," to Miami.  It appears currently to be available for charter for $24,000 per week.

(viii)    Wesley Batista maintains a residence in Colorado, which he periodically lived in and frequently visits for business and personal reasons.

(ix)    Wesley Batista during the relevant period maintained a United States bank account with Wells Fargo, which, in 2016, held more than $40,000.

k.    The scheme to take Tinto's billions of dollars in assets for next to nothing also facilitated the Batistas expansion into the U.S.  It allowed the Batistas

47

(through JBS) to acquire Bertin S.A.'s U.S. operations.  And it provided the Batistas a means to ensure they maintained majority control over JBS as it gobbled up more U.S. companies.  In its press release announcing the Bertin S.A. merger, the Batistas made clear that the merger depended on JBS getting $2.5 billion (subsequently revised down to $2 billion) to fund its acquisition of American poultry giant Pilgrim's Pride Corporation— which it did, thanks to the bribery payments Joesley Batista admitted to making using a U.S. account.

**FOURTH CAUSE OF ACTION:**
**ACTION TO DECLARE VOID TRANSACTION UNDER BRAZILIAN LAW**

116. 99. Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, Joesley Batista, and Wesley Batista.

117. 100. Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

118. 101. Under Article 167 of the Brazilian Civil Code, a transaction is null and void as a sham transaction if, among other things, the transaction appears to confer or transmit rights to persons other than those to whom those rights are really conferred; the contract contains a statement, condition, or clause that is not true; or the contract is not dated as of the actual date of execution.

119. 102. The First and Second Share-Transfer Agreements are null and void because they appear to transmit rights to persons other than those to whom those rights are really conferred, and they contain materially false statements.  *First*, as described above, the agreements appear to transmit rights to Colorado—which held itself out as an independent, Delaware-based party—but in reality transferred rights to the Batistas.  *Second,* the agreements contained a false declaration of the purchase price.  They appeared to effectuate a legitimate

asset sale, and contained statements indicative of that intent—, but in reality, these agreements unlawfully diverted immensely valuable assets away from Tinto and its creditors towards Colorado, Joesley Batista, and Wesley Batista for nothing in return.  The end result was that Colorado, Joesley Batista, and Wesley Batista were enriched at the expense of Tinto and its creditors, and JBS minority shareholders were misled about the true nature of the merger.. *Second*, the agreements were a simulation to avoid mandatory tax law by transferring the interest through shares in Bertin FIP and falsely declaring the purchase price.

120.    103. Because the First and Second Share-Transfer Agreements are null and void under Article 167 of the Brazilian Civil Code, this Court should revert the parties to their status prior to these Share-Transfer Agreements. as requested in the Prayer for Relief seeking rescission.[11]  Article 169 of the Brazilian Civil Code provides that a null and void legal transaction is not susceptible to ratification, and is not cured by the passage of time.

121.    With respect to this cause of action, this Court has general jurisdiction as to Defendant Colorado Investment Holdings LLC.  Colorado is a domestic limited-liability company organized and existing under the laws of the State of Delaware.  Colorado is therefore at home in the United States and the court can adjudicate any and all claims brought against it.

122.    With respect to this cause of action, the Court has specific jurisdiction as to Defendants Colorado Investment Holdings LLC, Joesley Batista, and Wesley Batista because these Defendants purposefully availed themselves of the privilege of conducting activities in the

---

[11] Under Brazilian law, the appropriate remedy under Articles 166 and 169 would not be referred to as "rescission," which refers to a different remedy in Brazil.  Nonetheless, the substantive remedy under Articles 166 and 169—a declaration that the transactions are null and void and the return of the parties to the status quo before the transactions—is equivalent to rescission as that term is used in the United States.

United States and the claim arises out of or relates to Defendants' contacts with the United States.  Among other things:

a.    The Batistas intentionally used a U.S. bank to create a U.S. company to divert Tinto's assets and hide their illicit gains from the share-transfer agreements.

b.     Joesley Batista (JBS's CEO) used bankers at J.P. Morgan in New York to create Colorado in Delaware, a U.S. entity through which the Batistas (JBS's majority owners) would loot Tinto of its assets (shares of Bertin FIP that represent an interest in JBS) to increase their majority ownership of JBS.

c.    The First and Second Share Transfer Agreements transferred shares of Bertin FIP to Colorado, a U.S. entity.

d.    During and after the transactions, the Batistas took active steps to hide the truth about the scheme from JBS's investors, including U.S. investors in its American Depositary Receipts, which traded on the New York Stock Exchange.

e.    On information and belief, in connection with the share-transfer scheme, the Batistas traveled to and were physically present in the United States many times, including in their capacities as the ultimate beneficial owners of Colorado, making the United States familiar territory and a convenient forum.  On information and belief, the Batistas continue to travel to the U.S. regularly.  A private jet registered to J&F, and used almost

exclusively by the Batistas, has made 22 trips to cities in the United States in the past year.

f.      On October 14, 2020, J&F entered a guilty plea in *United States v. J&F Investimentos SA*, No. 20-cr-00365 (MKB) (E.D.N.Y.), in which the agreed Statement of Facts states that J&F, in the persons of Joesley and Wesley Batista, traveled to the United States, and used New York financial institutions and bank accounts in furtherance of a bribery conspiracy in violation of the Foreign Corrupt Practices Act, including by opening accounts in New York and purchasing property in the United States that was then given to Brazilian officials.

g.      Together, the Batistas are among the largest shareholders in Pilgrim's Pride, and, on February 8, 2024, were appointed as directors of that company.  Pilgrim's Pride stated that they will bring "expertise in protein production operations," "extensive operational expertise," and "business management experience to the company."  The Batistas only acquired their substantial ownership interest in Pilgrim's Pride as a result of the transfer scheme.

h.      The Batistas also have been directors of JBS since 2024.

i.      On information and belief, Joesley Batista borrowed money from J.P. Morgan in New York to purchase shares in Defendant JBS S.A.

j.      The Batistas have owned property in the United States (and discovery is likely to show that they still do own some or all of this property), including:

51

(i)    Through JBS, the Batistas have a significant stake in JBS Wisconsin Properties, LLC, a Wisconsin corporation, with its principal address in Greeley, Colorado.

(ii)    As of at least 2016 and 2017, respectively, Wesley and Joesley Batista each owned 50% of the equity in J&F USA Capital LLC, a Delaware company.

(iii)    Through J&F, the Batistas acquired a $4.75 million condominium in Miami in 2017.

(iv)    Joesley and Wesley Batista were listed in filings for 2015 and 2016 with the Illinois Secretary of State as managers of JBS Live Pork LLC, registered in Illinois, with their address shown as 1770 Promontory Circle, Greeley, Colorado.

(v)    Joesley Batista has owned during the relevant period all or part of PH 20 West 53rd LLC, a New York LLC formed on or about May 26, 2016.  PH 20 West 53rd LLC purchased a $42,500,000 penthouse apartment at 28 West 53rd Street in Manhattan on June 9, 2016.

(vi)    Joesley Batista has also owned during the relevant period all or part of PH 641 Holdings LLC, a Delaware LLC formed on or about June 19, 2012.  PH 641 Holdings LLC purchased a $14,000,000 penthouse apartment at 641 5th Avenue in Manhattan on August 22, 2012, which it sold in 2018 for $15,150,000.

(vii)    Shortly before entering a plea agreement in Brazil relating to the aforementioned bribery scheme, Joesley Batista moved his superyacht,

52

"Why Not," to Miami.  It appears currently to be available for charter for $24,000 per week.

(viii)  Wesley Batista maintains a residence in Colorado, which he periodically lived in and frequently visits for business and personal reasons.

(ix)  Wesley Batista during the relevant period maintained a United States bank account with Wells Fargo, which, in 2016, held more than $40,000.

k.  The scheme to take Tinto's billions of dollars in assets for next to nothing also facilitated the Batistas expansion into the U.S.  It allowed the Batistas (through JBS) to acquire Bertin S.A.'s U.S. operations.  And it provided the Batistas a means to ensure they maintained majority control over JBS as it gobbled up more U.S. companies.  In its press release announcing the Bertin S.A. merger, the Batistas made clear that the merger depended on JBS getting $2.5 billion (subsequently revised down to $2 billion) to fund its acquisition of American poultry giant Pilgrim's Pride Corporation— which it did, thanks to the bribery payments Joesley Batista admitted to making using a U.S. account.

**FIFTH CAUSE OF ACTION:**
**TRANSFER OF ESTABLISHMENT UNDER BRAZILIAN LAW**

123.  ~~104.~~ Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., WWMB Participações Ltda., Joesley Batista, and Wesley Batista.

124.  ~~105.~~ Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

125. ~~106.~~ Under Article 129, VI, of the Brazilian Bankruptcy Law, the sale or transfer of a business's establishment is ineffective if (i) it is made without the express consent or payment of all then-existing creditors; and (ii) if the debtor is left, after the sale or transfer, with insufficient assets to pay its liabilities. Brazilian law defines an establishment as "any complex of organized goods, for the exercise of the company, by an entrepreneur, or by a company." Brazilian Civil Code, Article 1142. "The establishment may be a unitary object of ~~legal and translational or constitutive~~ rights and ~~business, which~~ legal transactions, whether transferable or constitutive that are compatible with its nature." Brazilian Civil Code, Article 1143.

126. ~~107.~~ The transfer of Tinto's shares of Bertin FIP ~~constituted~~ was an indirect transfer of an establishment~~, as they were the core business asset held by Tinto~~ because they represented Tinto's ownership of tangible assets—the meat-processing industries/plants owned through Bertin S.A. and later JBS—which independently constituted establishments. Tinto's creditors did not know—and did not provide any form of consent—when these Defendants acquired Tinto's shares of Bertin FIP, and thus its ownership of the tangible assets these shares represented. As a result of the transfers, Tinto was left without sufficient assets to satisfy the claims of its creditors.

127. ~~108.~~ Alternatively, Tinto's shares of Bertin FIP ~~represented its ownership of tangible assets arranged under single corporate brands in the meat-processing industry—first Bertin S.A., and later JBS—which independently~~ constituted an establishment, as Tinto was organized as a holding company and its core business asset was the Bertin FIP shares. Tinto's creditors did not know—and did not provide any form of consent—when these Defendants acquired Tinto's shares of Bertin FIP~~, and thus its ownership of the tangible assets these shares~~

~~represented~~.  As a result of the transfers, Tinto was left without sufficient assets to satisfy the claims of its creditors.

128.    ~~109.~~ To remedy this violation of Article 129, VI, of the Brazilian Bankruptcy Law, Plaintiff respectfully requests that this Court order these Defendants to immediately revert the parties to their status prior to the Share-Transfer Agreements~~.~~ as requested in the Prayer for Relief seeking rescission.[12]  Alternatively, the Court should order a constructive trust over the Bertin FIP shares as requested in the Prayer for Relief.

129.    With respect to this cause of action, this Court has general jurisdiction as to Defendant Colorado Investment Holdings LLC.  Colorado is a domestic limited-liability company organized and existing under the laws of the State of Delaware.  Colorado is therefore at home in the United States and the court can adjudicate any and all claims brought against it.

130.    With respect to this cause of action, the Court has specific jurisdiction as to Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., WWMB Participações Ltda., Joesley Batista, and Wesley Batista because these Defendants purposefully availed themselves of the privilege of conducting activities in the United States and the claim arises out of or relates to Defendants' contacts with the United States.  Among other things:

        a.    The Batistas intentionally used a U.S. bank to create a U.S. company to divert Tinto's assets and hide their illicit gains from the share-transfer agreements.

---

[12] Under Brazilian law, the appropriate remedy for the ineffectiveness of the transfer of establishment would not be referred to as "rescission," which refers to a different remedy in Brazil.  Nonetheless, the substantive remedy—a declaration that the transfer is ineffective and the return of the parties to the status quo before the transfer—is equivalent to rescission as that term is used in the United States.

b.    Joesley Batista (JBS's CEO) used bankers at J.P. Morgan in New York to create Colorado in Delaware, a U.S. entity through which the Batistas (JBS's majority owners) would loot Tinto of its assets (shares of Bertin FIP that represent an interest in JBS) to increase their majority ownership of JBS.

c.    The First and Second Share Transfer Agreements transferred shares of Bertin FIP to Colorado, a U.S. entity.

d.    During and after the transactions, the Batistas took active steps to hide the truth about the scheme from JBS's investors, including U.S. investors in its American Depositary Receipts, which traded on the New York Stock Exchange.

e.    On information and belief, in connection with the share-transfer scheme, the Batistas traveled to and were physically present in the United States many times, including in their capacities as officers and directors of Defendants J&F Investimentos S.A., JJMB Participações Ltda., and/or WWMB Participações Ltda., as well as the ultimate beneficial owners of Colorado, making the United States familiar territory and a convenient forum.  On information and belief, the Batistas continue to travel to the U.S. regularly.  A private jet registered to J&F, and used almost exclusively by the Batistas, has made 22 trips to cities in the United States in the past year.

f.    On October 14, 2020, J&F entered a guilty plea in *United States v. J&F Investimentos SA*, No. 20-cr-00365 (MKB) (E.D.N.Y.), in which the

agreed Statement of Facts states that J&F, in the persons of Joesley and Wesley Batista, traveled to the United States, and used New York financial institutions and bank accounts in furtherance of a bribery conspiracy in violation of the Foreign Corrupt Practices Act, including by opening accounts in New York and purchasing property in the United States that was then given to Brazilian officials.

g.      Together, the Batistas are among the largest shareholders in Pilgrim's Pride, and, on February 8, 2024, were appointed as directors of that company.  Pilgrim's Pride stated that they will bring "expertise in protein production operations," "extensive operational expertise," and "business management experience to the company."  The Batistas only acquired their substantial ownership interest in Pilgrim's Pride as a result of the transfer scheme.

h.      The Batistas also have been directors of JBS since 2024.

i.      On information and belief, Joesley Batista borrowed money from J.P. Morgan in New York to purchase shares in Defendant JBS S.A.

j.      The Batistas have owned property in the United States (and discovery is likely to show that they still do own some or all of this property), including:

    (i)      Through JBS, the Batistas have a significant stake in JBS Wisconsin Properties, LLC, a Wisconsin corporation, with its principal address in Greeley, Colorado.

(ii)    As of at least 2016 and 2017, respectively, Wesley and Joesley

Batista each owned 50% of the equity in J&F USA Capital LLC, a

Delaware company.

(iii)    Through J&F, the Batistas acquired a $4.75 million condominium

in Miami in 2017.

(iv)    Joesley and Wesley Batista were listed in filings for 2015 and 2016

with the Illinois Secretary of State as managers of JBS Live Pork LLC,

registered in Illinois, with their address shown as 1770 Promontory Circle,

Greeley, Colorado.

(v)    Joesley Batista has owned during the relevant period all or part of

PH 20 West 53rd LLC, a New York LLC formed on or about May 26,

2016.  PH 20 West 53rd LLC purchased a $42,500,000 penthouse

apartment at 28 West 53rd Street in Manhattan on June 9, 2016.

(vi)    Joesley Batista has also owned during the relevant period all or

part of PH 641 Holdings LLC, a Delaware LLC formed on or about June

19, 2012.  PH 641 Holdings LLC purchased a $14,000,000 penthouse

apartment at 641 5th Avenue in Manhattan on August 22, 2012, which it

sold in 2018 for $15,150,000.

(vii)    Shortly before entering a plea agreement in Brazil relating to the

aforementioned bribery scheme, Joesley Batista moved his superyacht,

"Why Not," to Miami.  It appears currently to be available for charter for

$24,000 per week.

(viii)   Wesley Batista maintains a residence in Colorado, which he periodically lived in and frequently visits for business and personal reasons.

(ix)    Wesley Batista during the relevant period maintained a United States bank account with Wells Fargo, which, in 2016, held more than $40,000.

k.    The Batistas and Defendants J&F Investimentos S.A., JJMB Participações Ltda., and WWMB Participações Ltda. are one and the same.  Both Batistas are officers and directors of J&F; Joesley is an officer and director of JJMB (which bears his initials and serves as his personal investment vehicle); and Wesley is an officer and director of WWMB (which is his eponymous investment vehicle).  JBS has publicly stated that "J&F is controlled by" and "wholly owned by [JBS's] ultimate controlling shareholders, Messrs. Joesley Mendonça Batista and Wesley Mendonça Batista."  Each Batista brother owns 99.999% of JJMB or WWMB.  J&F, JJMB, and WWMB were vital to the share-transfer scheme, which was focused and reliant on the United States.  J&F was a signatory to the initial secret merger agreement, conducted one of the share transfers, and helped conceal the entire scheme.  And JJMB and WWMB provided J&F a place to stash its illicitly acquired shares from the Third Share-Transfer Agreement shortly after it occurred.

l.    The scheme to take Tinto's billions of dollars in assets for next to nothing also facilitated the Batistas expansion into the U.S.  It allowed the Batistas

(through JBS) to acquire Bertin S.A.'s U.S. operations.  And it provided the Batistas a means to ensure they maintained majority control over JBS as it gobbled up more U.S. companies.  In its press release announcing the Bertin S.A. merger, the Batistas made clear that the merger depended on JBS getting $2.5 billion (subsequently revised down to $2 billion) to fund its acquisition of American poultry giant Pilgrim's Pride Corporation— which it did, thanks to the bribery payments Joesley Batista admitted to making using a U.S. account.

**SIXTH CAUSE OF ACTION:**
**PIERCING OF THE CORPORATE VEIL UNDER BRAZILIAN LAW**

131. ~~110.~~ Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, ~~Joesley Batista, Wesley Batista,~~ JBS S.A., J&F Investimentos S.A., JJMB Participações Ltda., ~~and~~ WWMB Participações Ltda., Joesley Batista, and Wesley Batista.

132. ~~111.~~ Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

133. ~~112.~~ Under Article 50 of the Brazilian Civil Code and Article 82-A, Sole Paragraph, of the Brazilian Bankruptcy Law, Plaintiff may bring a claim to ~~hold a~~ reach the assets of a bankrupt corporation's owners, controllers, and administrators—as well as third parties— ~~personally liable in accordance with Article 50 of the Brazilian Civil Code~~ to satisfy the creditor's claims.  A claim under Article 50 requires ~~that the defendants misused the purpose of the bankrupt company or abused of the legal personality of the bankrupt company.  The legal personality of a company can be abused through a~~ either deviation of purpose or commingling of assets~~, including a transfer of assets without effective compensation.  It can also be abused in cases of diversion of purpose, such as when~~.  Deviation of purpose includes the use of the legal entity ~~is used~~ to harm creditors or for the commission of an unlawful act.  And commingling of

assets includes a transfer of assets without effective compensation.

134. 113. As outlined above, Defendants misused Tinto's purpose by diverting Tinto's greatest asset to the detriment of the estate and its creditors as part of an unlawful scheme. Likewise, Defendants abused Tinto's legal personality persons by unlawfully causing the transfer of Tinto's assets—its shares of Bertin FIP—without effective compensation, at the expense of Tinto's creditors.

135. 114. The Batistas directed Tinto to transfer its stake in Bertin FIP—worth R$8.76 billion (USD$4.84 billion)—for very little in return. This transfer without effective compensation fell within the purview of Article 50 as a clear commingling of assets. Colorado, JBS, J&F, JJMB, and WWMB also contributed to this commingling of assets. Colorado—disguised as a third-party entity—and J&F received the shares and paid nothing in return. JBS legitimized the planned transfer to the public by misleading the public about the merger's true structure, treating the acquisition of Bertin S.A. as a run-of-the-mill merger rather than a scheme to enrich JBS's principals at the expense of Tinto's creditors. JJMB and WWMB, for their part, are alter egos of Joesley Batista, Wesley Batista, and J&F. Joesley Batista, Wesley Batista, and J&F quickly shuffled the shares of Bertin FIP they acquired in the Third Share Transfer into JJMB and WWMB. As these facts demonstrate, Tinto and Defendants were members of the same economic group for the purposes of the transactions underlying this lawsuit.

136. 115. As a result of Defendants' misuse of Tinto's purpose and abuse of Tinto's personality, Tinto's creditors were harmed by Tinto's financial decline, incurred liability, and insolvency. Had Defendants not caused Tinto to unlawfully transfer its greatest asset, or had Defendants appropriately compensated Tinto for that asset, then Tinto would have been able to pay its creditors.

137.    116. Joesley Batista, Wesley Batista, Colorado, J&F, JJMB, and WWMB all benefitted from their abuse of Tinto's legal personality by obtaining the valuable shares without paying market value.  They also benefitted because the Batistas increased their equity in JBS.  JBS, in turn, benefitted by knocking out one of its competitors in Brazil, and by receiving all of the assets (such as farms, cattle, and brand names) that used to belong to Tinto.

138.    117. Accordingly, each of these Defendants are liable to Plaintiff for the relief all debts sought by this lawsuit Tinto's creditors as requested in the Prayer for Relief.

139.    With respect to this cause of action, this Court has general jurisdiction as to Defendants Colorado Investment Holdings LLC and JBS S.A.  Colorado is a domestic limited-liability company organized and existing under the laws of the State of Delaware.  JBS has continuous and systematic contacts with the United States.  For example, JBS receives fifty percent of its revenue from the United States—more than three times as much revenue than it receives from its place of incorporation; the United States is, by far, JBS's biggest market; JBS has represented in filings related to its upcoming listing of shares on the N.Y. Stock Exchange that it has significant ties to the U.S. market, including by naming the United States as a key geographical location where it operates its business; JBS seeks to list its shares on the N.Y. Stock Exchange, the flagship stock exchange located in the country where JBS does most of its business; JBS is a publicly traded company with American Depositary Shares currently trading in the U.S. over-the-counter securities market; and over a quarter of JBS's global workforce is in the United States.  Colorado and JBS are therefore at home in the United States and the court can adjudicate any and all claims brought against them.

140.    With respect to this cause of action, the Court has specific jurisdiction as to Defendants Colorado Investment Holdings LLC, JBS S.A., J&F Investimentos S.A., JJMB

Participações Ltda., WWMB Participações Ltda., Joesley Batista, and Wesley Batista because these Defendants purposefully availed themselves of the privilege of conducting activities in the United States and the claim arises out of or relates to Defendants' contacts with the United States.  Among other things:

     a.    The Batistas intentionally used a U.S. bank to create a U.S. company to divert Tinto's assets and hide their illicit gains from the share-transfer agreements.

     b.    Joesley Batista (JBS's CEO) used bankers at J.P. Morgan in New York to create Colorado in Delaware, a U.S. entity through which the Batistas (JBS's majority owners) would loot Tinto of its assets (shares of Bertin FIP that represent an interest in JBS) to increase their majority ownership of JBS.  Joesley Batista was acting on Behalf of JBS as its CEO and the J.P. Morgan bankers he instructed were JBS's bankers in New York.

     c.    The First and Second Share Transfer Agreements transferred shares of Bertin FIP to Colorado, a U.S. entity.

     d.    During and after the transactions, the Batistas took active steps to hide the truth about the scheme from its investors, including U.S. investors in its American Depositary Receipts, which traded on the New York Stock Exchange.  The Batistas actions and statements to hide this scheme were all performed on behalf of JBS.

     e.    On information and belief, in connection with the share-transfer scheme, the Batistas traveled to and were physically present in the United States many times, including in their capacities as officers and directors of

Defendants JBS S.A., J&F Investimentos S.A., JJMB Participações Ltda., and/or WWMB Participações Ltda., as well as the ultimate beneficial owners of Colorado, making the United States familiar territory and a convenient forum.  On information and belief, the Batistas continue to travel to the U.S. regularly.  A private jet registered to J&F, and used almost exclusively by the Batistas, has made 22 trips to cities in the United States in the past year.

f.      On October 14, 2020, J&F entered a guilty plea in *United States v. J&F Investimentos SA*, No. 20-cr-00365 (MKB) (E.D.N.Y.), in which the agreed Statement of Facts states that J&F, in the persons of Joesley and Wesley Batista, traveled to the United States, and used New York financial institutions and bank accounts in furtherance of a bribery conspiracy in violation of the Foreign Corrupt Practices Act, including by opening accounts in New York and purchasing property in the United States that was then given to Brazilian officials.

g.      Together, the Batistas are among the largest shareholders in Pilgrim's Pride, and, on February 8, 2024, were appointed as directors of that company.  Pilgrim's Pride stated that they will bring "expertise in protein production operations," "extensive operational expertise," and "business management experience to the company."  The Batistas only acquired their substantial ownership interest in Pilgrim's Pride as a result of the transfer scheme.

h.      The Batistas also have been directors of JBS since 2024.

i. On information and belief, the Batistas—acting on behalf of JBS—continue to have contacts with the United States relating to JBS's planned listing of shares on the New York Stock Exchange.

j. On information and belief, Joesley Batista borrowed money from J.P. Morgan in New York to purchase shares in Defendant JBS S.A.

k. The Batistas have owned property in the United States (and discovery is likely to show that they still do own some or all of this property), including:

(i) Through JBS, the Batistas have a significant stake in JBS Wisconsin Properties, LLC, a Wisconsin corporation, with its principal address in Greeley, Colorado.

(ii) As of at least 2016 and 2017, respectively, Wesley and Joesley Batista each owned 50% of the equity in J&F USA Capital LLC, a Delaware company.

(iii) Through J&F, the Batistas acquired a $4.75 million condominium in Miami in 2017.

(iv) Joesley and Wesley Batista were listed in filings for 2015 and 2016 with the Illinois Secretary of State as managers of JBS Live Pork LLC, registered in Illinois, with their address shown as 1770 Promontory Circle, Greeley, Colorado.

(v) Joesley Batista has owned during the relevant period all or part of PH 20 West 53rd LLC, a New York LLC formed on or about May 26,

2016.  PH 20 West 53rd LLC purchased a $42,500,000 penthouse apartment at 28 West 53rd Street in Manhattan on June 9, 2016.

(vi)    Joesley Batista has also owned during the relevant period all or part of PH 641 Holdings LLC, a Delaware LLC formed on or about June 19, 2012.  PH 641 Holdings LLC purchased a $14,000,000 penthouse apartment at 641 5th Avenue in Manhattan on August 22, 2012, which it sold in 2018 for $15,150,000.

(vii)    Shortly before entering a plea agreement in Brazil relating to the aforementioned bribery scheme, Joesley Batista moved his superyacht, "Why Not," to Miami.  It appears currently to be available for charter for $24,000 per week.

(viii)    Wesley Batista maintains a residence in Colorado, which he periodically lived in and frequently visits for business and personal reasons.

(ix)    Wesley Batista during the relevant period maintained a United States bank account with Wells Fargo, which, in 2016, held more than $40,000.

l.    The Batistas and Defendants J&F Investimentos S.A., JJMB Participações Ltda., and WWMB Participações Ltda. are one and the same.  Both Batistas are officers and directors of J&F; Joesley is an officer and director of JJMB (which bears his initials and serves as his personal investment vehicle); and Wesley is an officer and director of WWMB (which is his eponymous investment vehicle).  JBS has publicly stated that "J&F is

66

controlled by" and "wholly owned by [JBS's] ultimate controlling shareholders, Messrs. Joesley Mendonça Batista and Wesley Mendonça Batista." Each Batista brother owns 99.999% of JJMB or WWMB. J&F, JJMB, and WWMB were vital to the share-transfer scheme, which was focused and reliant on the United States. J&F was a signatory to the initial secret merger agreement, conducted one of the share transfers, and helped conceal the entire scheme. And JJMB and WWMB provided J&F a place to stash its illicitly acquired shares from the Third Share-Transfer Agreement shortly after it occurred.

m.   The scheme to take Tinto's billions of dollars in assets for next to nothing also facilitated JBS's (and in turn the Batistas) expansion into the U.S. It allowed the Batistas (through JBS) to acquire Bertin S.A.'s U.S. operations. And it provided the Batistas a means to ensure they maintained majority control over JBS as it gobbled up more U.S. companies. In its press release announcing the Bertin S.A. merger, the Batistas made clear that the merger depended on JBS getting $2.5 billion (subsequently revised down to $2 billion) to fund its acquisition of American poultry giant Pilgrim's Pride Corporation—which it did, thanks to the bribery payments Joesley Batista admitted to making using a U.S. account.

n.   JBS is now seeking to list its shares on the N.Y. Stock Exchange. The Batistas only have a controlling interest in JBS, such that they can direct this action, because of this scheme to take Tinto's interest in JBS.

**SEVENTH CAUSE OF ACTION:**
**COMPENSATION FOR THE DAMAGES CAUSED BY THE ILLICIT ACTS UNDER BRAZILIAN LAW**

141. ~~118.~~ Plaintiff brings this cause of action against Defendants Colorado Investment Holdings LLC, ~~Joesley Batista, Wesley Batista,~~ J&F Investimentos S.A., JJMB Participações Ltda., ~~and~~ WWMB Participações Ltda., Joesley Batista, and Wesley Batista.

142. ~~119.~~ Plaintiff repeats and re-alleges the paragraphs above as if fully stated herein.

143. ~~120.~~ Article 186 of the Brazilian Civil Code imposes liability where a defendant undertook an illicit act either negligently or with the intention to cause damage (i.e., willful misconduct), that violates the plaintiff's rights, causing damage.  Article 187 of the Brazilian Civil Code extends liability to the holder of a right who, in exercising it, clearly exceeds the limits imposed by its economic or social purpose, good faith, or good customs.  Article 927 of the Brazilian Civil Code states that a party whose illicit acts damage others is obliged to pay damages.

144. ~~121.~~ As detailed above, in September 2020, the Brazilian tax authority assessed R$1,079,096,994.18 (USD$218,493,762.49) in taxes against Tinto for ~~transferring~~ placing its shares of Bertin S.A. into Bertin FIP and then transferring them for next to nothing.  Colorado, Joesley Batista, Wesley Batista, J&F, JJMB, and WWMB caused Tinto to enter into the relevant agreements, which were structured to avoid tax liability, even though Tinto obtained no economic benefit in these transactions.  These Defendants clearly acted not only negligently but deliberately in the structuring, signing, and performance of such Share Transfer Agreements.  By directing Tinto in this manner, these Defendants manifestly exceeded the limits imposed by the economic and social purposes of the rights they held with respect to Tinto, absent good faith or good custom.  These Defendants acted with intent to avoid paying taxes, which ultimately damaged Tinto for their own benefit.

145. ~~122.~~ The tax authority also fined Tinto R$2,479,020,315.70 (USD$501,947,905.50) for failing to disclose the true nature of the sale and failing to timely pay taxes.  To this day, Tinto continues to accrue interest on the tax liability and fines, which already totals over R$1,604,131,636.69 (USD$324,801,902.6).

146. ~~123.~~ As a result of the foregoing, Plaintiff has been damaged by the actions of Colorado, Joesley Batista, Wesley Batista, J&F, JJMB, and WWMB in an amount equal to the liability imposed on it—to date, R$5,162,248,946.57 (USD$1,045,243,570.62).  Accordingly, these Defendants are liable to Plaintiff for that damage as requested in the Prayer for Relief.

147. With respect to this cause of action, this Court has general jurisdiction as to Defendant Colorado Investment Holdings LLC.  Colorado is a domestic limited-liability company organized and existing under the laws of the State of Delaware.  Colorado is therefore at home in the United States and the court can adjudicate any and all claims brought against it.

148. With respect to this cause of action, the Court has specific jurisdiction as to Defendants Colorado Investment Holdings LLC, J&F Investimentos S.A., JJMB Participações Ltda., WWMB Participações Ltda., Joesley Batista, and Wesley Batista because these Defendants purposefully availed themselves of the privilege of conducting activities in the United States and the claim arises out of or relates to Defendants' contacts with the United States.  Among other things:

      a. The Batistas intentionally used a U.S. bank to create a U.S. company to divert Tinto's assets and hide their illicit gains from the share-transfer agreements.

      b. Joesley Batista (JBS's CEO) used bankers at J.P. Morgan in New York to create Colorado in Delaware, a U.S. entity through which the Batistas

(JBS's majority owners) would loot Tinto of its assets (shares of Bertin FIP that represent an interest in JBS) to increase their majority ownership of JBS.

c.   The First and Second Share Transfer Agreements transferred shares of Bertin FIP to Colorado, a U.S. entity.

d.   During and after the transactions, the Batistas took active steps to hide the truth about the scheme from JBS's investors, including U.S. investors in its American Depositary Receipts, which traded on the New York Stock Exchange.

e.   On information and belief, in connection with the share-transfer scheme, the Batistas traveled to and were physically present in the United States many times, including in their capacities as officers and directors of Defendants J&F Investimentos S.A., JJMB Participações Ltda., and/or WWMB Participações Ltda., as well as the ultimate beneficial owners of Colorado, making the United States familiar territory and a convenient forum.  On information and belief, the Batistas continue to travel to the U.S. regularly.  A private jet registered to J&F, and used almost exclusively by the Batistas, has made 22 trips to cities in the United States in the past year.

f.   On October 14, 2020, J&F entered a guilty plea in *United States v. J&F Investimentos SA*, No. 20-cr-00365 (MKB) (E.D.N.Y.), in which the agreed Statement of Facts states that J&F, in the persons of Joesley and Wesley Batista, traveled to the United States, and used New York

financial institutions and bank accounts in furtherance of a bribery conspiracy in violation of the Foreign Corrupt Practices Act, including by opening accounts in New York and purchasing property in the United States that was then given to Brazilian officials.

g.   Together, the Batistas are among the largest shareholders in Pilgrim's Pride, and, on February 8, 2024, were appointed as directors of that company.  Pilgrim's Pride stated that they will bring "expertise in protein production operations," "extensive operational expertise," and "business management experience to the company."  The Batistas only acquired their substantial ownership interest in Pilgrim's Pride as a result of the transfer scheme.

h.   The Batistas also have been directors of JBS since 2024.

i.   On information and belief, Joesley Batista borrowed money from J.P. Morgan in New York to purchase shares in Defendant JBS S.A.

j.   The Batistas have owned property in the United States (and discovery is likely to show that they still do own some or all of this property), including:

   (i)   Through JBS, the Batistas have a significant stake in JBS Wisconsin Properties, LLC, a Wisconsin corporation, with its principal address in Greeley, Colorado.

   (ii)   As of at least 2016 and 2017, respectively, Wesley and Joesley Batista each owned 50% of the equity in J&F USA Capital LLC, a Delaware company.

(iii)    Through J&F, the Batistas acquired a $4.75 million condominium in Miami in 2017.

(iv)    Joesley and Wesley Batista were listed in filings for 2015 and 2016 with the Illinois Secretary of State as managers of JBS Live Pork LLC, registered in Illinois, with their address shown as 1770 Promontory Circle, Greeley, Colorado.

(v)    Joesley Batista has owned during the relevant period all or part of PH 20 West 53rd LLC, a New York LLC formed on or about May 26, 2016.  PH 20 West 53rd LLC purchased a $42,500,000 penthouse apartment at 28 West 53rd Street in Manhattan on June 9, 2016.

(vi)    Joesley Batista has also owned during the relevant period all or part of PH 641 Holdings LLC, a Delaware LLC formed on or about June 19, 2012.  PH 641 Holdings LLC purchased a $14,000,000 penthouse apartment at 641 5th Avenue in Manhattan on August 22, 2012, which it sold in 2018 for $15,150,000.

(vii)    Shortly before entering a plea agreement in Brazil relating to the aforementioned bribery scheme, Joesley Batista moved his superyacht, "Why Not," to Miami.  It appears currently to be available for charter for $24,000 per week.

(viii)    Wesley Batista maintains a residence in Colorado, which he periodically lived in and frequently visits for business and personal reasons.

(ix)    Wesley Batista during the relevant period maintained a United States bank account with Wells Fargo, which, in 2016, held more than $40,000.

k.    The Batistas and Defendants J&F Investimentos S.A., JJMB Participações Ltda., and WWMB Participações Ltda. are one and the same.  Both Batistas are officers and directors of J&F; Joesley is an officer and director of JJMB (which bears his initials and serves as his personal investment vehicle); and Wesley is an officer and director of WWMB (which is his eponymous investment vehicle).  JBS has publicly stated that "J&F is controlled by" and "wholly owned by [JBS's] ultimate controlling shareholders, Messrs. Joesley Mendonça Batista and Wesley Mendonça Batista."  Each Batista brother owns 99.999% of JJMB or WWMB.  J&F, JJMB, and WWMB were vital to the share-transfer scheme, which was focused and reliant on the United States.  J&F was a signatory to the initial secret merger agreement, conducted one of the share transfers, and helped conceal the entire scheme.  And JJMB and WWMB provided J&F a place to stash its illicitly acquired shares from the Third Share-Transfer Agreement shortly after it occurred.

l.    The scheme to take Tinto's billions of dollars in assets for next to nothing also facilitated the Batistas expansion into the U.S.  It allowed the Batistas (through JBS) to acquire Bertin S.A.'s U.S. operations.  And it provided the Batistas a means to ensure they maintained majority control over JBS as it gobbled up more U.S. companies.  In its press release announcing the

Bertin S.A. merger, the Batistas made clear that the merger depended on JBS getting $2.5 billion (subsequently revised down to $2 billion) to fund its acquisition of American poultry giant Pilgrim's Pride Corporation—which it did, thanks to the bribery payments Joesley Batista admitted to making using a U.S. account.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.    Entry of an order requiring the imposition of a constructive trust in favor of Plaintiff over all shares representing an ownership interest in JBS derived by ~~Defendants~~Colorado, J&F, JJMB, WWMB, Joesley Batista, and Wesley Batista under the unlawful transactions alleged above, to prevent unjust enrichment to Defendants, and an order that ~~such~~the shares representing that ownership interest be paid over and transferred to Plaintiff in full~~;~~.  Such a constructive trust over the unlawfully obtained ownership interest in JBS may be accomplished through a constructive trust over the Bertin FIP shares transferred to and owned by Colorado and the Bertin FIP shares transferred to J&F and now owned by JJMB and WWMB (for the benefit of Joesley and Wesley Batista).  It may also be accomplished through a constructive trust over the Batistas' ownership interests in Colorado, JJMB, and WWMB, which in turn hold the Bertin FIP shares;

B.    Entry of an order for rescission of the Share Transfer Agreements, thereby returning all Parties to the *status quo* prior to the transactions;

C.    ~~B.~~Entry of an order awarding damages for the tax liability and fines Tinto incurred because of ~~Defendants'~~the actions of Colorado, J&F, JJMB, WWMB, Joesley Batista, and Wesley Batista;

D. ~~C.~~ Entry of an order holding ~~Defendants~~Colorado, J&F, JJMB, WWMB, Joesley Batista, Wesley Batista, and JBS liable for ~~the~~all debts ~~sought~~claimed by Tinto's creditors;

E. ~~D.~~ Awarding Plaintiff all damages according to proof; and

F. ~~E.~~ Any other relief that the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues properly triable.

Dated: ~~September 8, 2023~~October 17, 2024                    Respectfully submitted,

SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
Email: ggrossman@sequorlaw.com
nmiller@sequorlaw.com
jmosquera@sequorlaw.com


By:      */s/ Nyana Abreu Miller*
Gregory S. Grossman
Florida Bar No.: 896667
Nyana Abreu Miller
Florida Bar No. 92903
Jennifer Mosquera
Florida Bar No.: 1018656


Derek T. Ho (*pro hac vice*)
Andrew E. Goldsmith (*pro hac vice*)
Grace W. Knofczynski (*pro hac vice*)
~~Eden M. Bernstein (*pro hac vice*)~~
Chase H. Robinett (*pro hac vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dho@kellogghansen.com

agoldsmith@kellogghansen.com
gknofczynski@kellogghansen.com
ebernstein@kellogghansen.com
crobinett@kellogghansen.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via electronic filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such filing to all CM/ECF participants in this case, as indicated on the service list on ~~September 8, 2023~~October 17, 2024.

/s/ Nyana Abreu Miller
Nyana Abreu Miller

## SERVICE LIST

**23-11719-MAM Notice will be electronically mailed to:**

Gregory S. Grossman, Esq. on behalf of
Debtor TINTO HOLDING LTDA.
ggrossman@sequorlaw.com, ngonzalez@sequorlaw.com
nmiller@sequorlaw.com; mrivera@sequorlaw.com
jmosquera@sequorlaw.com; afalcon@sequorlaw.com

Office of the US Trustee

USTPRegion21.MM.ECF@usdoj.gov

| Summary report: Litera Compare for Word 11.7.0.54 Document comparison done on 10/23/2024 10:14:29 AM | |
| --- | --- |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 2023 09 08 Amended Complaint.docx | |
| **Modified filename:** 2024 10 17 Second Amended Complaint.docx | |
| **Changes:** | |
| Add | 598 |
| Delete | 201 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 799 |