

**ORDERED in the Southern District of Florida on September 25, 2025.**

_____
**Mindy A. Mora, Judge**
**United States Bankruptcy Court**

_____

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA

In re:                                                    Case No.: 23-11719-MAM

Tinto Holding Ltda.,                              Chapter 15
        Debtor.
_____/

Deloitte Touche Tohmatsu Consultores      Adv. Proc. No.: 23-01118-MAM
Ltda. and AJ Ruiz Consultoria
Empresarial S.A.,
        Plaintiffs,
v.

Colorado Investment Holdings, LLC, J&F
Investimentos S.A., JJMB Participações
Ltda., WWMB Participações Ltda.,
Joesley Mendonça Batista, Wesley
Mendonça Batista, and JBS, S.A.,
        Defendants.
_____/

## <u>MEMORANDUM OPINION AND ORDER DISMISSING ADVERSARY PROCEEDING</u>

This proceeding perhaps should not have been filed, but it was. Over the course

of almost two years, the Court has given the plaintiff, AJ Ruiz Consultoria Empresarial S.A., every benefit of the doubt, providing access to justice and comity to a foreign representative. Even so, the procedural obstacles are too great and the due process concerns too significant. Equity plays a role, but the true stumbling block here is lack of connection: lack of assets within the United States, lack of purposeful connection to the selected forum, and lack of necessary parties. Too many essential requirements are missing to justify retention of this adversary proceeding in this Court.

BACKGROUND

**I.    Parties and Claims**

This proceeding involves events that transpired mostly in Brazil. AJ Ruiz acts on behalf of Tinto, a Brazilian-based entity.[1] All defendants[2] except one are Brazilian nationals or Brazilian-based entities. The lone U.S.-based party is defendant Colorado Investment Holdings, LLC, a Delaware business entity. No entity has a principal place of business within the Southern District of Florida. The case involves no U.S. individuals.

This chart summarizes the parties' identities and nationalities:

| Full Name | Short Name | Nationality and Identity |
|---|---|---|
| AJ Ruiz Consultoria Empresarial S.A. | AJ Ruiz | Brazilian judicial administrator and |

---

[1] The Court will describe the plaintiff as Tinto in the balance of this opinion for ease of reference.

[2] To avoid confusion with the defined term "Brazilian Defendants", this Opinion refers to all defendants collectively by the uncapitalized term "defendants" and avoids use of a capital "D" for individual defendants.

| | | foreign representative of Tinto |
|---|---|---|
| Tinto Holding Ltda. | Tinto | Brazilian agribusiness holding entity |
| J&F Investimentos, S.A. | J&F | Brazilian business entity |
| JJMB Participações Ltda. | JJMB | Brazilian business entity |
| WWMB Participações Ltda. | WWMB | Brazilian business entity |
| Joesley Mendonça Batista | Joesley[3] | Brazilian individual |
| Wesley Mendonça Batista | Wesley | Brazilian individual |
| JBS, S.A. | JBS | Brazilian business entity |
| Colorado Investment Holdings LLC | CIH | Delaware entity |

J&F, JJMB, WWMB, Joesley, and Wesley form the litigation group identified in this proceeding as the "Brazilian Defendants".[4] Joesley and Wesley are members of a Brazilian family (the Batista family) that owns interests in J&F, JJMB, WWMB, and CIH. Those entities in turn hold interests in entities that, through a network of other business entities, own a percentage of interests in JBS (another defendant in this proceeding).[5] None of the defendants directly holds 100% of the interests in JBS.

Tinto asserts a total of 7 claims. This chart summarizes the claims, the source of law, and defendants for each claim:

---

[3] The use of given names is for efficiency and parallels the nomenclature the parties adopted in their filings. No disrespect is intended.

[4] The Brazilian Defendants shared counsel, while JBS and CIH retained their own counsel. All defendants pursued the same litigation strategy, with each defendant incorporating by reference pleadings filed by other defendants.

[5] Second Am. Compl., ECF No. 190 at ¶ 69, pdf p. 23 (Tinto's diagram of alleged corporate structure).

| Claim | Description | Source of Law | Defendants |
|---|---|---|---|
| 1 | Unjust Enrichment | NY state | All except JBS |
| 2 | Aiding and Abetting Breach of Fiduciary Duty | NY state | All except JBS |
| 3 | Action to Declare Absolute Nullity of a Transaction | Brazil | Joesley Wesley CIH |
| 4 | Action to Declare Void Transaction | Brazil | Joesley Wesley CIH |
| 5 | Transfer of Establishment | Brazil | All except JBS |
| 6 | Piercing of the Corporate Veil | Brazil | All |
| 7 | Compensation for the Damages Caused by the Illicit Acts | Brazil | All except JBS |

As is immediately apparent from a review of the two charts, Tinto primarily asserts claims under Brazilian law against Brazilian defendants, with the notable exception of CIH. Synthesizing the two charts into one emphasizes this aspect.

| Claim | Source of Law | Defendants' Nationality |
|---|---|---|
| 1 | NY state | Brazil (except CIH) |
| 2 | NY state | Brazil (except CIH) |
| 3 | Brazil | Brazil (except CIH) |
| 4 | Brazil | Brazil (except CIH) |
| 5 | Brazil | Brazil (except CIH) |
| 6 | Brazil | Brazil (except CIH) |
| 7 | Brazil | Brazil (except CIH) |

Another simple way to view the landscape is that CIH serves as the "anchor defendant" for all claims asserted in this United States bankruptcy court. There are no bankruptcy-specific claims, no federal question claims, and no claims under local

state (Florida) law. A $1,500 retainer held by a Miami law firm provides the only notable link to this federal geographic district.[6]

## II.    Additional Background

The full story that AJ Ruiz asserts on behalf of Tinto is complicated, and the Court does not attempt a detailed retelling here. The Court accepts all allegations in the Second Amended Complaint (ECF No. 190) ("Complaint") as true and summarizes only the most salient details.

Tinto is an insolvent Brazilian entity. Tinto contends that a series of share-transfer agreements involving some of the defendants contributed to Tinto's financial decline. A brief recap of the share-transfer agreements' history follows.

Over fifteen years ago, JBS and another Brazilian entity, Bertin S.A. (not a party to this proceeding), announced their intent to merge.[7] To facilitate the merger, JBS and Bertin S.A. entered into a series of agreements that redistributed ownership interests in other Brazilian business entities.

Recounting the story becomes more complicated at this point because Tinto alleges that the "true" merger process was not the one documented in public filings, and that the actual terms of the "true" merger remain unknown. What is known is that Tinto executed a third share-transfer agreement with J&F and JBS in Brazil

---

[6] The Court previously granted recognition of Tinto's Brazilian insolvency proceeding as a foreign main proceeding. ECF No. 8 in Case No. 23-11719; *see generally Al Zawawi v. Diss (In re Al Zawawi)*, 97 F.4th 1244 (11th Cir. 2024) (holding that debtor eligibility under 11 U.S.C. § 109 is not a prerequisite for recognition of a foreign proceeding).

[7] Second Am. Compl. (hereinafter abbreviated as "Compl.", consistent with use of the defined term "Complaint" in the Opinion text), ECF No. 190 at ¶ 30, pdf p. 10.

over ten years ago, and that Joesley and Wesley acted as guarantors for that transaction.[8] Seven months later, the same parties revised their prior agreement, resulting in the "Revised Third Share-Transfer Agreement" (RTSA). The RTSA produced a revised percentage of holdings in various entities.[9]

All share-transfer agreements, including the RTSA, were executed in Brazil.[10]

The hidden purpose of the RTSA, according to the Complaint, was to provide the Batista family with a windfall acquisition of undervalued assets in the form of ownership interests in Bertin S.A. This transfer allegedly strengthened business ties between the Batistas and the Bertins (another Brazilian family, none of whom are named as parties to this proceeding).[11]

The upshot of the RTSA, according to Tinto, is that it bilked Tinto out of valuable interests in JBS.[12] To remedy this situation, Tinto asks this Court to rescind the RTSA and restore Tinto's entitlement to those ownership interests. Tinto bases this request on five counts of Brazilian law and two counts of New York law.

## III.    The Motions to Dismiss (Arguments and Briefing)

The Brazilian Defendants (J&F, JJMB, WWMB, Josely, and Wesley), JBS, and

---

[8] Compl., ECF No. 190 at ¶ 63, pdf p. 21.

[9] Compl., ECF No. 190 at ¶ 97, pdf p. 22.

[10] Tinto has not alleged that the parties executed the share-transfer agreements within the territorial United States. Based on all other facts alleged in the Complaint, Brazil appears to be the locus of execution.

[11] As the names suggest, the Bertins were associated with Bertin S.A.

[12] Compl., ECF No. 190 at ¶ 73, pdf p. 24.

CIH oppose the Complaint on many grounds, including: [13]

- Lack of personal jurisdiction (general and specific) under Rule 12(b)(2);

- Lack of in rem jurisdiction under Rule 12(b)(2);

- The lawsuit "does not belong" in the United States (in essence, improper venue under Rule 12(b)(3));

- AJ Ruiz/Tinto did not comply with prior orders of this Court;

- Failure to state a claim under Rule 12(b)(6);

- A forum selection clause in the RTSA prevents U.S. adjudication;

- Comity;

- Res judicata;

- Abstention;

- Failure to join an indispensable party (the Bertins) under Rule 12(b)(7); and

- In pari delicto doctrine.

Although all defendants are not equally situated, they incorporated by reference their co-defendants' arguments.[14] Because a description of each argument would only repeat that which is already set forth in detail, the Court will refrain from offering a full synopsis. Instead, the Court notes that it has reviewed and digested

---

[13] In this Opinion, reference to "Rules" are to the Federal Rules of Civil Procedure. Bankruptcy Rules incorporate and make relevant many Rules, including Rule 12(b) and Rule 19. *See* FED. R. BANKR. P. 7012(b) (incorporating Federal Rule of Civil Procedure 12 in adversary proceedings) and FED. R. BANKR. P. 7019 (incorporating Federal Rule of Civil Procedure 19).

[14] BD Mot., ECF No. 196 at pdf p. 6 (preamble); JBS Mot., ECF No. 198 at pdf p. 1 (preamble). CIH also indicated that it supports arguments raised by the Brazilian Defendants and JBS.

the motions to dismiss, responses, replies, and supplements during its analysis. This table lists the key filings:

| Motion (ECF No.) | Movant | Short Name | Response (ECF No.) | Reply (ECF No.) |
|---|---|---|---|---|
| 196 | Brazilian Defendants | BD Motion | 201 | 203 |
| 198 | JBS | JBS Motion | 202 | 205 |
| 199 | CIH | CIH Motion | 200 | 207 |

In addition to those filings, the parties supplied the Court with an encyclopedia of reference documents. Those documents include affidavits, declarations, supplements, copies of Brazilian court decisions, objections, and sundry notices of filing. The Court's document review spanned at least hundreds (probably thousands) of pages.[15]

## ANALYSIS

This is not the first time that the Court has addressed issues of jurisdiction, comity, and venue in this adversary proceeding. At a hearing on September 13, 2024, the Court issued a lengthy oral ruling on three prior motions to dismiss, granting the motions with leave to amend.[16] At that time, the Court directed AJ Ruiz to ensure that the Complaint addressed the Court's jurisdictional concerns. The Complaint includes new explanatory allegations, as instructed, but still fails to link those allegations together in a cohesive way.

---

[15] The Court thanks the Brazilian Defendants for recognizing the importance of adherence to court-ordered page limitations and exercising restraint. ECF No. 212.

[16] Order Granting Conditional Mot. for Leave to File a Second Am. Compl., ECF No. 178.

To provide context for this Opinion, the Court will describe why jurisdictional challenges in chapter 15 require sophisticated analysis.

## I.    Rule 12(b)(1) Lack of Subject Matter Jurisdiction

Jurisdiction is a key point of dispute in this adversary proceeding. The Court has jurisdiction to issue this Opinion because AJ Ruiz filed the proceeding in its capacity as foreign representative of Tinto Holding Ltda. (Tinto) in chapter 15 bankruptcy case number 23-11719-MAM. Although the defendants contest jurisdiction, each has submitted to this Court's authority to hear and determine the issues raised in their motions to dismiss.[17]

To set the stage for the complex analysis that follows regarding personal jurisdiction, the Court will assume for now that subject matter jurisdiction exists. The reason for doing so is simple: it almost certainly exists because the Court has already granted recognition of the related chapter 15 bankruptcy case. *See generally Brit. Am. Ins. Co. Ltd. v. Fullerton (In re Brit. Am. Ins. Co. Ltd.)*, 488 B.R. 205, 224-26 (Bankr. S.D. Fla. 2013) (discussing interplay of Bankruptcy Code § 1521 and 28 U.S.C. § 1334). A longwinded discussion about subject matter jurisdiction is not helpful because existing case law shows that it is not truly in debate and other issues are a much closer call. *Id*. The Court will turn to personal jurisdiction, which is a difficult question.

---

[17] BD Mot., ECF No. 196; JBS Mot., ECF No. 198; CIH Mot., ECF No. 199.

II.    **Rule 12(b)(2) Lack of Personal Jurisdiction**

A.  General Principles

Bankruptcy courts address personal jurisdiction infrequently because it rarely arises as a point of dispute. Typically, a party submits to bankruptcy court jurisdiction by filing bankruptcy, asserting a monetary claim, litigating a bankruptcy-related legal issue, or waiving procedural challenges to jurisdiction. In most instances, the in rem jurisdiction of a bankruptcy court over a bankruptcy estate fills in any gaps. If a bankruptcy court has jurisdiction over an asset located within the territorial limits of the United States, then it usually also has personal jurisdiction to settle disputes involving that asset.

Enter chapter 15, which turns jurisdiction on its proverbial head. The distinctive nature of chapter 15 as a vehicle for comity and international cooperation pushes jurisdiction to points that would never arise in the "normal" bankruptcy context. It is precisely this type of scenario that plays out here.

Despite the broad potential reach of chapter 15, there are limits. Bankruptcy courts may refuse to "take an action governed by [chapter 15] if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. In the context of personal jurisdiction, that means that due process principles still apply.

Dismissal of an adversary proceeding for lack of personal jurisdiction falls under Rule 12(b)(2). A bankruptcy court's ability to exercise personal jurisdiction must comply with the requirements of traditional notions of fair play and substantial justice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477-78 (1985). The first step

10

in determining whether due process is satisfied at the motion to dismiss stage requires the Court to appreciate the difference between general and specific personal jurisdiction.

To establish general personal jurisdiction, a plaintiff must show that the defendant had "continuous and systematic" contacts with the forum that render the defendant essentially "at home" in the forum. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). If a plaintiff establishes a clear basis for general personal jurisdiction over a defendant, then a court may determine claims that could be completely unrelated to a defendant's contacts with the forum. *Diss v. Al Zawawi (In re Al Zawawi)*, 644 B.R. 907, 914 (Bankr. M.D. Fla. 2022).

Specific personal jurisdiction is narrower. To establish specific personal jurisdiction, a plaintiff must show that the controversy relates to or arises out of "purposeful contacts" with the United States. Those contacts must (1) be related to the cause of action; (2) involve some act by which the defendant purposefully availed himself of the privilege of doing business within the United States; and (3) be of such caliber that the defendant should reasonably anticipate being hauled[18] into court in the U.S. *In re Nexgenesis Holdings Ltda.*, 662 B.R. 406, 414 (Bankr. S.D. Fla. 2024).[19]

B. Tinto's Allegations

Tinto (acting through AJ Ruiz) limits most of its revised allegations to acts supporting specific personal jurisdiction, but a few seem intended to support general

---

[18] Older case law uses the term "haled" rather than "hauled". The meaning is essentially the same.

[19] The bankruptcy court in *In re Al Zawawi* described the test for specific jurisdiction within the Eleventh Circuit in a slightly different manner. 644 B.R. at 915.

personal jurisdiction because they have no direct link to the RTSA or any other aspect of this dispute. Tinto's allegations against the Brazilian Defendants, JBS, and CIH include:

- Ownership by Joesley and Wesley of a controlling interest of shares in Brazilian entities (JJMB and WWMB);

- Sporadic travel to and physical presence in the United States over the past fifteen years by Joesley and Wesley, including (without specificity) some business trips as directors and officers of JJMB and WWMB;[20]

- Joesley and Wesley serving as the "ultimate beneficial owners" of CIH;

- A plane registered to J&F landing in the United States multiple times in the past year (roughly nine years after the acts giving rise to the Complaint);

- J&F's purchase of a condominium in the United States (three years after execution of the RTSA);

- Wesley's ownership of a residence in Colorado;

- Joesley docking a yacht in the United States and making the yacht available for charter at the time of filing the Complaint (about ten years after execution of the RTSA);

- Wesley's ownership of a bank account in the United States;

---

[20] The Complaint further alleges that JJMB and WWMB direct the actions of J&F. All entities are Brazilian entities.

- Joesley and Wesley's ownership of business interests in U.S.-based entities (one to two years after execution of the RTSA and continuing for an indeterminate amount of time);

- J&F's entry of a guilty plea five years ago in an unrelated criminal action in the E.D.N.Y., with a statement of facts relevant to that proceeding that included connections between Joesley and Wesley, on the one hand, and the United States, on the other hand;

- Joesley's ownership of interests in a Delaware entity and a New York entity, each of which in turn has owned real estate in New York;

- Use of a United States bank (J.P. Morgan) to create CIH to hold benefits derived from the share-transfer agreements;

- The existence of affiliated subsidiary entities in the United States;

- JBS's receipt of revenue from business ventures within the United States;

- JBS's, Wesley's, and Joesley's ownership of interests in business entities in the United States;

- CIH's receipt of interests in Bertin FIP (a Brazilian non-party business entity) from initial iterations of the share-transfer agreements;

- Joesley borrowing money from a United States bank (J.P. Morgan) to purchase shares in JBS; and

- Joesley and Wesley holding management positions in unrelated business entities in the United States.

### C. Personal Jurisdiction Discussion

As soon becomes evident from reading the allegations, Tinto has taken a scattershot approach to personal jurisdiction. Throwing everything at the wall, Tinto recounted a long story of defendants' extended ties with the United States, a fair portion of which has nothing to do with the dispute at hand. The Court soon learned that analyzing personal jurisdiction for each defendant based on the Complaint is like playing a game of pick-up sticks. It is almost impossible to pull out the facts supporting one defendant's status without dislodging all the others.

Could the Court sort through the allegations and rule out a defendant without considering the ties between that defendant and all others? Perhaps, but the process invites supposition and error.

#### 1. CIH

Rather than circle endlessly through each of the allegations, and sorting them into buckets of applicability, the Court viewed the situation holistically. Tinto asserts that all defendants engaged in the same scheme to plunder its assets. CIH, a Delaware entity, is subject to personal jurisdiction within the United States. The Court can move on and look at the other defendants.

#### 2. All Other Defendants

Although the Court strongly doubts that personal jurisdiction exists as to all other defendants, it will bypass an extended analysis for the Brazilian Defendants and JBS because, in the end, other procedural bases decisively support dismissal. Instead, the Court supplies only a quick once-over of what it observed.

For the Brazilian Defendants and JBS, personal jurisdiction is probably not present. After an initial attempt and two revisions of its complaint, Tinto still has not explained key details, such as how ownership of a condominium in the United States relates to the alleged harm. To be fair, Tinto identifies allegations supporting general rather than specific jurisdiction for CIH and JBS.[21] But general jurisdiction over CIH, a Delaware LLC, has never been in dispute, and general jurisdiction over JBS, a Brazilian entity, is entirely uncertain.

Attempts to link revenue and ownership of business interests to JBS's jurisdictional status are unconvincing. The Complaint did distinguish between revenue derived through affiliates and subsidiaries versus direct revenue, as JBS pointed out. The Complaint also described employees without stating whether those persons were directly employed by JBS. The implication was that JBS directly employed many persons in the United States, but that allegation wasn't clearly set forth in plain language, and JBS provided ample data to contradict the implied assertion. A full trial on jurisdictional questions will waste judicial resources if other factors mandate dismissal, and they do. The Court will merely note that general personal jurisdiction as to JBS is unlikely and leave it at that for now.

For the Brazilian Defendants (J&F, JJMB, WWMB, Joesley, and Wesley), the Complaint does not expressly allege general personal jurisdiction. By default, it therefore alleges only specific personal jurisdiction, which requires a nexus between the complained-of acts and the United States.

---

[21] *See* Compl., ECF No. 190 at ¶¶ 22, 94, 105, 114, 121, 129, 139, 147.

From what the Court can discern, that nexus does not exist. There is no doubt that the Brazilian Defendants have had repeated and extended contact with the United States over the course of the past fifteen or so years. The problem is, the contacts must relate to the cause(s) of action, and it is not at all clear that they do.

Sporadic (or even continuous) travel to the United States is only relevant in this instance if the travel directly relates to the cause of action. That connection was inferred for Joesley and Wesley, but again was not stated with enough clarity to tie the threads together. (Remember, neither Joesley nor was Wesley alleged to be the direct 100% owner of CIH.)

Similar issues exist with allegations as to JJMB, WWMB, and J&F. J&F's status as a corporate criminal defendant is concerning, of course, but the Complaint did not link that status to the causes of action. JJMB and WWMB appear to be corporate vehicles used for many global ventures. There is no way for the Court to discern what level of connection to the United States pertains to the causes of action, rather than other, completely unrelated, business ventures.

The Court risks spinning its wheels hashing out all permutations of situations that might somehow connect the Brazilian Defendants and provide jurisdiction. That exercise serves no one (and could create bad precedent to boot) when other factors support dismissal.

The Court acknowledges that it has not directly answered the question of whether personal jurisdiction exists over the Brazilian Defendants and JBS. The closest the Court will state at this point is, it probably does not.

16

### III.    Rule 12(b)(3) Improper Venue

If the Court goes into extensive detail (as it did in the section immediately above) for each argument, reading this Opinion will become an exercise in patience. Intense scrutiny of venue is unnecessary because the procedural posture of this adversary proceeding undermines dismissal under Rule 12(b)(3).

The act of granting recognition under chapter 15 essentially guarantees venue is proper within a bankruptcy court somewhere in the United States. Strange as it may seem, a bankruptcy court's venue analysis for chapter 15 adversary proceedings is not complicated. If recognition is appropriate, then venue in a United States bankruptcy court is proper.[22] Note, however, that the issue of whether venue *ought* to exist in a specific district under traditional principles of fairness and convenience to the parties is a totally different question.

It has not escaped this Court's attention that the only asset tying this chapter 15 case and by extension, this adversary proceeding, to the Southern District of Florida is a modest retainer held by a local law firm.[23] That law firm may have

---

[22] 28 U.S.C. § 1509(b):

If the court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter—

    (1) the foreign representative has the capacity to sue and be sued in a court in the United States;

    (2) the foreign representative may apply directly to a court in the United States for appropriate relief in that court; and

    (3) a court in the United States shall grant comity or cooperation to the foreign representative.

[23] The Court is aware of the factual allegations in paragraph 22 of the Complaint, but finds them to be a strained and unconvincing basis upon which to rest venue.

17

expertise in an uncommon area of law, but the dearth of any solid ties between this district and the defendants or the underlying facts alleged in the Complaint is suspect. The lack of connection makes the choice of this venue seem as if it were designed purely for the convenience of the attorneys, rather than the parties. So, venue may be procedurally proper given the broad nature of chapter 15 jurisdiction, but it feels like a stretch.

## IV.    Rule 12(b)(6) Failure to State a Claim

Failure to state a claim is the perennial catchall provision for most dismissal arguments. Whenever there is a potential failure of proof or inability to meet a claim, litigants hasten to argue Rule 12(b)(6). In general, those arguments are ineffective because questions of fact require analysis of facts, and that process requires application of a summary judgment standard, not the dismissal standard (where allegations are accepted as true). *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (providing standard for motions to dismiss); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (same).

In the context of this adversary proceeding, fact-based issues go far beyond the norm because none of the claims originated under United States bankruptcy law. The Court can (and frequently does) analyze other areas of law, but chasing down nuances of Brazilian law—which form the bulk of Tinto's claims—again serves no immediate purpose. There are no federal claims at play and thus federal jurisdiction only exists by virtue of chapter 15 recognition. There is no true federal question and no ruling that this Court can offer that will shape substantive bankruptcy law. Under these

18

circumstances, opining about the limits of foreign claims under applicable law seems presumptuous. It isn't necessary in this instance, and the Court declines to issue what would amount to an advisory opinion on non-bankruptcy law.

The Court will assume without deciding that all claims are properly stated and contain valid recitations of the elements. Doing so enables the Court to turn to the more pressing issue, which is assessing the target of those claims. The absence of necessary parties impacted by the claims is not just an issue; in the context of this adversary proceeding, it is the most pressing issue.

## V.    Rule 12(b)(7) Failure to Join a Party Under Rule 19

Rule 12(b)(7) permits dismissal for failure to join a party under Rule 19.

Rule 19 is an infrequent flyer in the bankruptcy realm. It governs required joinder of parties and is most often invoked in the context of diversity jurisdiction, not adversary proceedings. But that does not mean that it does not apply.[24]

### A.  Legal Standard and History

Rule 19 provides:

(a) Persons Required to Be Joined if Feasible.
 (1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
  (A) in that person's absence, the court cannot accord complete relief among existing parties; or
  (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
   (i) as a practical matter impair or impede the person's ability to protect the interest; or

---

[24] Bankruptcy Rule 7019 incorporates Rule 19 with two exceptions that are not relevant to this Opinion's analysis.

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

(2) Joinder by Court Order. If a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.

(3) Venue. If a joined party objects to venue and the joinder would make venue improper, the court must dismiss that party.

(b) When Joinder Is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

(c) Pleading the Reasons for Nonjoinder. When asserting a claim for relief, a party must state:

(1) the name, if known, of any person who is required to be joined if feasible but is not joined; and

(2) the reasons for not joining that person.

(d) Exception for Class Actions. This rule is subject to Rule 23.

FED. R. CIV. P. 19.

Congress revamped Rule 19 in 1966, clarifying prior language that spawned years of conflicting decisions. *Schutten v. Shell Oil Co.*, 421 F.2d 869, 871-73 (5th Cir. 1970).[25] Subsection (a) of the revised rule describes people (and entities) whose presence promotes complete adjudication of issues in one proceeding. *Id*. at 873. If no

---

[25] Fifth Circuit Court of Appeals decisions before October 1, 1981 are binding precedent on this Court.

procedural or jurisdictional bars exist, Rule 19 requires joinder of these persons. *Id*. Subdivision (b) of Rule 19 acknowledges that joinder is sometimes procedurally impossible. For those situations, federal courts must examine four criteria to decide whether the case should proceed without that person (or entity). *Id*.

The division of potential litigants into those who must be there and those who should (but do not have to) be present invokes due process and basic fairness concerns. The origin of the rule predates the Federal Rules of Civil Procedure, which makes sense given that the concept of mandatory joinder has a rich history as an equitable tool.[26] *Elmendorf v. Taylor*, 23 U.S. 152, 166 (1825) ("Courts of equity require, that all the parties concerned in interest shall be brought before them, that the matter in controversy may be finally settled.") (commas in original); *Mallow v. Hinde*, 25 U.S. 193, 198 (1827) ("We do not put this case upon the ground of jurisdiction, but upon a much broader ground . . . no Court can adjudicate directly upon a person's right, without the party being either actually or constructively before the Court."); *Shields v. Barrow*, 58 U.S. 130, 141-42 (1854) (citing *Mallow* and *Elmendorf*); *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 122-23 (1968) (discussing evolution of Rule 19).

### 1.  Subsection (a): Required Parties

Over the years, confusing legal terminology developed that classified parties

---

[26] *See Federal Rules of Civil Procedure*, U.S. Cts., https://www.uscourts.gov/forms-rules/current-rules-practice-procedure/federal-rules-civil-procedure ("The rules were first adopted by order of the Supreme Court on December 20, 1937, transmitted to Congress on January 3, 1938, and effective September 16, 1938.").

into categories like "required", "necessary", or "indispensable". Although most case law applying earlier versions of Rule 19 is still good law, two of those terms are out of date. The current version of Rule 19 uses the term "required" in subsection (a) to describe potential parties who can participate in the case without destroying subject matter jurisdiction and whose presence promotes the full, final, and fair resolution of all issues.[27]

### 2. Subsection (b): Proceed or Dismiss

The test outlined in subsection (b) of Rule 19 is self-explanatory. In situations where joinder is not feasible, the Court takes a pragmatic approach to evaluating whether to dismiss. *Schutten*, 421 F.2d at 874 ("The watchwords of Rule 19 are 'pragmatism' and 'practicality.'"). In keeping with its equitable history, courts should not apply Rule 19(b)'s test mechanically, nor should they ignore substantive interests. *Id.* at 873. The "distilled essence" of the subsection (b) factors is an attempt to balance the rights of all parties concerned while maintaining public policy goals. *Id.*

### B. Application of Rule 19

Since the beginning of this adversary proceeding, the Court has had the same pesky questions: where are the members of the Bertin family who were alleged co-beneficiaries of the RTSA? Why are they not named in the Complaint when their interests are so visibly at stake? What about Bertin S.A., the entity that participated in the merger with JBS? How could the Court afford relief without impairing or

---

[27] The Court's paraphrasing is not exact, but it accurately captures the gist of subsection (a).

impeding all these potential parties' interests, or leaving them subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations?

The answer is simple: it cannot.

After many hours spent unpacking the allegations in the Complaint, the Court is convinced that some (unnamed) members of the Bertin family and Bertin S.A.[28] must be present for this litigation to proceed. They are, in the truest sense of the expression, required parties.

The Court strongly signaled its hesitation in moving forward absent the Bertins in its prior oral ruling and directed AJ Ruiz to include all required persons in the Complaint.[29] Tinto, through AJ Ruiz, elected not to heed the Court's admonition. Tinto also failed to comply with subsection (c) of Rule 19, which requires a party to state the name of any person who is required to be joined if feasible but is not joined and the reasons for not joining that person. Instead, Tinto doubled down on its stance that the Bertins are not necessary (or "indispensable") to this adversary proceeding.[30] The Court disagrees. Countless pages of the Complaint, responses, and other briefing repeatedly describe actions by or undertaken with the consent of the Bertins that advanced the alleged scheme to plunder Tinto's assets.

---

[28] For ease of reference, the Court collectively refers to the required persons and entity (or entities) as the "Bertins".

[29] Order Granting Conditional Mot. for Leave to File a Second Am. Compl., ECF No. 178.

[30] *E.g.,* Resp. to JBS Mot., ECF No. 202 at pdf p. 13.

Having determined that the Bertins are required parties, the Court must next evaluate whether the litigation may proceed without them. The conclusion reached by the Court is that it may not.

Any judgment rendered in the Bertins' absence would prejudice that person or entity. Because the allegations involve a complex scheme to "loot" Tinto, any factual findings by this Court about a collaborative scheme to (effectively) defraud Tinto would necessarily impact the Bertins. Protective provisions in the judgment, shaping the relief, or other remedial measures would not lessen or avoid that prejudice. Either the defendants collaborated with the Bertins to engage in a massive wrong, or they did not. There is no in-between assessment that could preserve the Bertins' interest whole without risking application of collateral estoppel in a later proceeding.

Any judgment this Court might render in the Bertins' absence would be inadequate. At best, the Court could perhaps determine that the defendants collaborated with other (unnamed) parties to harm Tinto through the RTSA, but that finding standing on its own does no good, nor does it achieve the relief Tinto seeks, which is unwinding the RTSA and redistributing shares of JBS. Setting aside the question of whether, in the first instance, the Court can equitably and effectively unwind a transaction that occurred many years ago in another country, under that country's law, and which is (by the applicable documents' own terms) governed by that country's law, it is inescapable that the Court is powerless to unwind an agreement originally orchestrated with the Bertins' consent without somehow impacting the Bertins' interests.

Tinto has another viable avenue for recovery. CIH has stated, without qualification, that it agrees to litigate in Brazil. To be even more plain, CIH—the only U.S. defendant—has openly waived all jurisdictional defenses against a proceeding in Brazil.[31] All other parties would be subject to service of process there. As CIH argued (and the Court agrees), dismissal will not prejudice a Brazilian plaintiff with the ability to sue Brazilian defendants under Brazilian law challenging Brazilian transactions and seeking to recover Brazilian stock. *In re Massa Falida do Banco Cruziero do Sul, S.A.*, 637 B.R. 675, 699 (Bankr. S.D. Fla. 2022).

Tinto may not want to pursue the claims alleged in this adversary proceeding—which again, assert no issues of U.S. federal law—in Brazil, but it may attempt to do so. Whether or not Tinto's requests for relief are time-barred under Brazilian law is not before this Court, nor should it be.[32] Chapter 15 exists to provide comity to foreign courts, not to offer a second bite at the apple if the first one should have happened somewhere else at an earlier date but did not.

And, to the extent that Tinto also asserts claims under New York law, a New York state court might be the best place for Tinto to pursue those claims, assuming Tinto can secure personal jurisdiction over the defendants in that jurisdiction and that the claims

---

[31] Reply, ECF No. 207 at pdf p. 4 ("Colorado has a foreign representative in Brazil, a tax identification number, an address, and reaffirms again (with binding effect) that it will not contest jurisdiction in Brazil.") (footnote omitted).

[32] Claims arising from a transaction that occurred at least fifteen years ago would probably be time-barred under the law of any jurisdiction. Fortunately, the Court need not evaluate timeliness given the presence of other determinative factors, but it would remain a concern even if personal jurisdiction exists (which it probably does not).

are not time-barred under New York law.[33] Just as chapter 15 does not exist to provide a back door into litigation in the United States instead of a foreign nation, it similarly does not function as an end run around personal jurisdiction and timeliness requirements.

## VI.    Other Considerations

### A.  Location of Assets

There are other compelling reasons for dismissal that do not fit neatly into the Rule 12(b) box. The most obvious is the location of the alleged assets. The focus of this adversary proceeding is the recapture of shares in a Brazilian entity. The Complaint failed to allege that the shares are physically located exclusively within the territorial jurisdiction of the United States.

If the shares are not presently tied to U.S. soil, what good does a U.S. judgment do? Why is a Brazilian court inadequately poised to determine entitlement to shares in a Brazilian entity? The Complaint fails to provide factual allegations that answer these questions. Although these omissions do not quite fall within the normal ambit of failure to state a claim, they perhaps could.

The legislative history to chapter 15 and its predecessor, Bankruptcy Code section 304 (repealed), shows that Congress adopted chapter 15 to promote comity

---

[33] *See, e.g., IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 272 (N.Y. 2009) (discussing potential statutes of limitation for breach of fiduciary duty claims under New York law); *Grice v. McMurdy*, 498 F. Supp. 3d 400, 413-414 (W.D.N.Y. 2020) (statute of limitations for unjust enrichment claims); *Homapour v. Harounian*, 182 A.D.3d 426, 426 (App. Div. 1st Dep't 2020) (statute of limitation for aiding and abetting claims).

26

between nations grappling with insolvency matters spanning the globe.[34] When an asset may only be captured by a judgment from a court with exclusive jurisdiction over the territory within which the asset is located, chapter 15 makes sense. When the asset is not exclusively located within that court's jurisdiction, the logic breaks down. Why choose that court, as opposed to the court with jurisdiction over the foreign main bankruptcy proceeding? Chapter 15 was not designed to give a United States bankruptcy court the ability to dictate the legal workings of another country, and this Court will not presume that it has the liberty to do so.

### B. Forum Selection Clause

The Court previously alluded to the existence of a forum selection clause in the RTSA. Because the law governing application of forum selection clauses is nuanced and other principles mandate dismissal, the Court has elected not to focus on that aspect of this dispute. That being said, the same principles of comity and respect for the judicial systems of other countries weigh in favor of respecting a clause that reserves adjudication to the nation where the agreement originated. The Court observes, without so formally deciding, that the existence of the forum selection clause supports determination of the claims alleged in the Complaint by a Brazilian court.

### C. General Principles of Fairness, Due Process, and Judicial Economy

When this Court balances its entire caseload, it must consider which matters

---

[34] See *Chapter 15 – Bankruptcy Basics*, U.S. Cts., https://www.uscourts.gov/court-programs/bankruptcy/bankruptcy-basics/chapter-15-bankruptcy-basics.

are most pressing and why. Is an individual debtor or their family likely to become homeless if the Court does not address their issues right away? Is a small business one short step away from going under? Are employees about to lose jobs, with the ripple effect that they too may become debtors? These issues are very real and central to the reason why this Court exists. This Court's jurisdiction is limited to bankruptcy-related issues for fundamental policy reasons.

Bankruptcy courts balance sophisticated cases alongside a daily flood of economic need. Interesting issues are not enough to command this Court's attention; the matter needs to be one that lands within the express jurisdictional limits set by the United States Constitution and Congress. This adversary proceeding is not one of those matters or more accurately stated, it should not be.

Chapter 15 is unique. It attempts to span divides between international legal systems and provide a platform for resolution of insolvency matters on a global scale. For the most part, it works very well. In certain instances, invocation of chapter 15 strains the limits of due process and fairness. This is one of those instances.

The Complaint sets forth allegations that have very little to do with the United States and nothing at all to do with assets located or persons domiciled within the territorial United States (other than CIH) or subject to U.S. bankruptcy law. Due process, equitable principles, personal jurisdictional limitations, and more mundane concerns like judicial economy all support dismissal.

CONCLUSION

The Court previously directed Tinto to amend the Complaint to present the

28

strongest possible allegations justifying jurisdiction over the defendants and claims asserted in the Complaint. Tinto's revised efforts have not yielded a viable justification for continuing this adversary proceeding in this Court. Further amendment of the Complaint would be futile given the continued absence of required parties.

For those reasons, the Court grants the BD Motion, the JBS Motion, and the CIH Motion, and dismisses this adversary proceeding with prejudice.[35]

### ###

<u>Copy to:</u>

Jessey J. Krehl, Esq.

*Attorney Krehl must serve this Opinion upon all interested parties and file a conforming certificate of service.*

---

[35] The Court makes no determination as to whether refiling may be appropriate in Brazil or in New York state court.